IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EMC CORPORATION, EMC INTERNATIONAL COMPANY, and EMC INFORMATION SYSTEMS INTERNATIONAL,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>PURE STORAGE, INC.,<br><br>　　　　　　　　Defendant. | Civil Action No. 13-1985-RGA |

MEMORANDUM ORDER

Presently before the Court are: (1) Defendant Pure Storage Inc.'s Motion in Limine #1 (D.I. 373-1); (2) the unresolved issue of Pure's Motion in Limine #2 (D.I. 374-1; *see* D.I. 389 at 2); (3) Pure's Motion in Limine #3 (D.I. 374-4); and (4) the Motion in Limine #3 of Plaintiffs EMC Corp., EMC International Co., and EMC Information Systems International (collectively, "EMC") (D.I. 373-1). For the reasons stated below, **IT IS HEREBY ORDERED THAT:**

1. Pure's Motion in Limine #1 is **DISMISSED IN PART, DENIED IN PART,** and **UNRESOLVED IN PART**. Pure's request to exclude evidence regarding whether Pure had a policy or practice concerning the review of EMC or third parties' patents is dismissed as moot due to EMC's agreement not to introduce such evidence. (*See* D.I. 373-4 at 3). The remaining issue is whether EMC may introduce evidence and argument concerning Pure's pre-suit knowledge of the asserted patents. Pure seeks to exclude such evidence and argument on the

1

ground that it is irrelevant or its probative value is substantially outweighed by the risks of unfair prejudice, confusion, and waste of time. (D.I. 373-3 at 4–5). EMC asserts that Pure's pre-suit knowledge of the asserted patents is relevant to the issues of induced infringement, secondary considerations of non-obviousness, and non-infringing alternatives. (D.I. 373-4 at 3–4). EMC maintains that the risk of unfair prejudice is minimal because the evidence it intends to present to establish that Pure had pre-suit knowledge of the patents will not lead the jury to consider the irrelevant and potentially unfairly prejudicial question of whether Pure had improper access to Data Domain's patented technology. (*See* D.I. 395 at 130–31).

Liability for induced infringement requires "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Here, EMC does not seek pre-suit damages for induced infringement, and Pure has stipulated that it had knowledge of the patents after the suit was filed. (D.I. 395 at 110–11, 114). Thus, evidence of Pure's pre-suit knowledge of the asserted patents is not probative of inducement in this case.

Pure's pre-suit knowledge of the asserted patents, as such, is also not probative of commercial success or industry praise of the patented invention. Of course, particular evidence may be probative of both secondary considerations of non-obviousness, including commercial success or praise, and Pure's pre-suit knowledge of the asserted patents.

An accused infringer's knowledge of the existence of asserted patents may be relevant to non-infringing alternatives. That an accused infringer knew that a particular course of action would constitute patent infringement and yet chose that course anyway could call into question its assertion that acceptable non-infringing alternatives were available. *See Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999) (noting that "the

2

infringer chose to produce the infringing, rather than noninfringing, product" in the context of assessing the availability of non-infringing alternatives). Knowledge that certain acts constitute patent infringement includes "knowledge of the existence of the patent that is infringed." *Global-Tech Appliances, Inc.*, 131 S. Ct. at 2068. Thus, evidence of Pure's pre-suit knowledge of the asserted patents may be relevant to whether acceptable non-infringing alternatives were available. It follows that EMC is not precluded, as a general matter, from eliciting testimony or presenting argument regarding whether Pure had any pre-suit knowledge of EMC's patents. Pure's requests to exclude particular deposition designations and documents are decided as discussed below. (*See* D.I. 382 at 2–3).

Pure's objections to the designations of deposition testimony by Mr. Colgrove (D.I. 373-3 at 67–68 (31:9–15, 32:3–6)), Mr. Kixmoeller (*id.* at 81 (100:3–10)), Mr. Vachharajani (*id.* at 90–91 (40:20–41:5)), and Mr. Wang (*id.* at 100–02 (38:5–39:3, 40:5–10)) are dismissed as moot as a result of EMC's agreement not to introduce evidence regarding whether Pure had a policy or practice concerning the review of EMC or third parties' patents.

The deposition designations of Mr. Slootman (*id.* at 58 (73:7–14)) and Mr. Kixmoeller (*id.* at 80–81 (99:23–100:2)) are relevant to non-infringing alternatives for the reasons discussed above. The testimony does not suggest that Pure had improper access to Data Domain's patents. The probative value of these deposition designations is therefore not substantially outweighed by the danger of unfair prejudice, confusion, or waste of time. *See* FED. R. EVID. 403. These portions of the deposition designations of Mr. Slootman and Mr. Kixmoeller are not excluded.[1]

---

[1] I have no idea why EMC would offer either piece of deposition testimony, since neither proves anything helpful to EMC.

Pure describes PTX349–351 (D.I. 373-4 at 58–123) as an "internal Pure email discussing the format of attached Data Domain product release notes." (D.I. 373-5 at 2 (emphasis omitted)). Based on the evidence presented, the email appears to have been sent in 2014, after this suit was filed. (*See* D.I. 373-4 at 58–83). To the extent PTX349–351 do not suggest that the Data Domain documents were in Pure's possession pre-suit, excluding them would go beyond the scope of Pure's motion to exclude evidence of Pure's pre-suit knowledge of the asserted patents. PTX349–351 are therefore not excluded.

PTX357–358 (*id.* at 125–337, 338–370), publicly available Data Domain documents that list Data Domain's patents by number, are not excluded because they are not necessarily irrelevant. Their relevance to Pure's pre-suit knowledge and, ultimately, the question of available non-infringing alternatives will depend on whether EMC can adduce a foundation as to the time at which Pure became aware of these documents, if ever. Because these documents were publicly available (*see* D.I. 373-4 at 5), they are not suggestive of improper access to Data Domain's technology by Pure. PTX357 and PTX358 are not excluded.

I decline to rule on the admissibility of PTX352–356, PTX359, and PTX360 at this time. The exhibits do not appear to be in the record and the descriptions provided on EMC's exhibit list are insufficient to provide a basis on which to meaningfully evaluate the probative value and potential prejudicial effects of these documents.

The identified deposition testimony of Mr. Dietzen (D.I. 373-3 at 30–31, 35–43 (113:9–114:12, 118:5–126:15)), Mr. Slootman (*id.* at 52–55, 56–57 (43:3–46:15, 71:15–72:23)), and Dr. Patterson (D.I. 373-5 at 9 (60:16–21)) does not relate to whether employees at Pure had knowledge of Data Domain's patents. Instead, this testimony appears to relate to the deponents' knowledge of and communications regarding deduplication at Data Domain. It is

4

not disputed, however, that Data Domain did not invent deduplication *per se*. The relevance of these deposition designations is therefore not apparent. EMC is requested to submit a letter explaining the relevance of these deposition designations no later than February 29, 2016. Pure should respond by submitting a letter no later than March 2, 2016.

For the reasons above, Pure's motion is denied to the extent that EMC is not precluded from eliciting testimony or presenting argument regarding whether Pure had any pre-suit knowledge of EMC's patents. The admissibility of the specific deposition designations and documents to which Pure objected is decided as discussed above. I appreciate Pure's concern that the jury not be led to consider whether Pure improperly accessed Data Domain's technology. I therefore encourage the parties to propose specific measures that may help to reduce the probability that the jury could make improper inferences on the basis of evidence presented regarding pre-suit knowledge.[2]

2. The unresolved part of Pure's Motion in Limine #2 is **GRANTED**. EMC is precluded from introducing evidence or argument concerning Data Domain's IPO valuation and the amount EMC paid to acquire Data Domain. EMC maintains that the IPO and acquisition values of Data Domain are relevant to commercial success and damages. (D.I. 374-2 at 4–5). "Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). Similarly, a patent owner's overall valuation is not a factor typically considered in calculating lost profits or reasonable royalty rates. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152,

---

[2] EMC is advised that any hint of argument about improper conduct in relation to Data Domain's technology would be grounds for a mistrial, with EMC to pay Pure's expenses for the first trial. *See Carrier Corp. v. Goodman Global, Inc.*, 2016 WL 698652, at *14 (D. Del. Feb. 22, 2016) (granting new trial).

1156 (6th Cir. 1978); *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1127–28 (S.D.N.Y. 1970). EMC argues that it can demonstrate a nexus between the IPO and acquisition values of Data Domain and the commercial success of the patented inventions by reference to news articles, Data Domain's stock symbol, and a sentence in Mr. Slootman's book about his time at Data Domain. (*See* D.I. 374-2 at 5 (citing D.I. 374-1 at 59, 63; D.I. 374-2 at 74); D.I. 395 at 146, 151–52). Although the evidence EMC cites suggests that Data Domain's deduplication technology was important to its business achievements, the evidence fails to connect Data Domain's overall valuation to the value of the features of its products that are protected by the asserted patents. The IPO and acquisition values of Data Domain therefore have little, if any, relevance to liability or damages issues in this case. Assuming EMC could present evidence establishing a nexus between the IPO and acquisition values of Data Domain and the patented inventions (*see* D.I. 395 at 151–52), I conclude that, even with a limiting instruction, the probative value of the dollar amounts of the Data Domain IPO and acquisition is substantially outweighed by the risk of unfair prejudice.

3. Pure's Motion in Limine #3 (D.I. 374-4 at 2) is **DISMISSED** as moot. The issues are resolved by agreement of the parties. (*Id.* at 56 n.1; D.I. 397).

4. Plaintiffs' Motion in Limine #3 (D.I. 373-1 at 2) is **GRANTED**. EMC seeks to prevent Pure from introducing evidence of or argument based on Pure's experts' testimony that embodiments in the asserted patents' specifications and commercial embodiments support their views about the plain and ordinary meaning of claim terms.[3] (*Id.* at 4–5). EMC argues that

---

[3] I do not understand there to be a dispute between the parties regarding whether Pure may present evidence and argument relating to EMC's commercial embodiments and embodiments in the specification for purposes other than to establish the plain and ordinary meaning of claim terms. (*See* D.I. 395 at 85; D.I. 399 at 1 n.1). Evidence of specification and commercial embodiments is not excluded for the other purposes Pure identifies in its proposed order. (*See* D.I. 400-1 at 2–3, ¶ 3).

6

permitting Pure's experts to rely on specification and commercial embodiments to support their testimony regarding the plain and ordinary meaning of claim terms will run afoul of the law in two ways. First, EMC argues that testimony regarding the plain and ordinary meaning supported by reference to specification and commercial embodiments constitutes impermissible claim construction. (*Id.* at 5 (citing *Cordis Corp. v. Bos. Scientific Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) ("[I]t is improper to argue claim construction to the jury . . . ."))). Second, EMC argues that unfair prejudice will result from expert testimony that specification and commercial embodiments bear on the plain and ordinary meaning of claim terms because it will suggest an improper literal infringement standard. (*Id.* at 4 (citing *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002) ("[I]nfringement is to be determined by comparing the asserted claim to the accused device, not by comparing the accused device to the figures of the asserted patent."); *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 772 (Fed. Cir. 1993) ("[I]nfringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment . . . .") (internal quotation marks omitted))). Pure does not dispute that an expert may not argue claim construction to a jury or that it may not establish non-infringement by comparing specification or commercial embodiments to the accused products. (*See* D.I. 400-1 at 2). Pure argues, however, that its experts are permitted to support their explanations of plain and ordinary meaning with evidence, including specification and commercial embodiments. (D.I. 400 at 1).

"At trial, parties may introduce evidence as to the plain and ordinary meaning of terms not construed by the Court to one skilled in the art, so long as the evidence does not amount to arguing claim construction to the jury." *MediaTek inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765, at *4 (N.D. Cal. Mar. 5, 2014) (alterations, emphasis, and internal quotation marks

7

omitted).[4] The question, then, is whether experts' testimony about the plain and ordinary meaning of claim terms supported by reference to specification and commercial embodiments would necessarily constitute impermissible claim construction or suggest an improper literal infringement standard. Testimony that embodiments in a patent specification support an expert's opinions regarding the plain and ordinary meaning of claim terms would amount to claim construction and suggest that literal infringement can be established by a comparison between accused products and specification embodiments.[5] *See id.* at *5 (excluding expert testimony as arguing claim construction to the jury where the expert "relie[d] heavily on the prosecution history, specifications, and even provisional applications to explain and expound upon a specific meaning and/or requirements of the terms identified"); *Catalina Lighting, Inc.*, 295 F.3d at 1286. Testimony that commercial embodiments support an expert's opinions regarding the plain and ordinary meaning of claim terms would suggest that literal infringement can be established by a comparison between accused products and commercial embodiments. *See Int'l Visual Corp.*, 991 F.2d at 772; *see also SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339 (Fed. Cir. 2005) (rejecting claim interpretation based on commercial embodiment). Suggesting, incorrectly, that literal infringement can be established by comparing accused products with specification or commercial embodiments would risk unfair prejudice that would substantially outweigh the probative value of testimony regarding the

---

[4] *MediaTek inc.* is the most thoughtful case I have seen dealing with this issue. It is a difficult issue because anything that could be presented to a jury to assist its understanding of the plain and ordinary meaning can also be (and often is) presented to the court at a claim construction hearing.

[5] An expert's testimony that a patent's prosecution history supports his or her understanding of the plain and ordinary meaning of a claim term would likewise amount to arguing claim construction to the jury. *See Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 660857, at *5 n.3 (N.D. Cal. Feb. 20, 2014) ("Although [the expert's] reliance on the prosecution history to confirm his plain and ordinary meaning opinion is appropriate, the Court will not allow him to testify about that prosecution history because it would confuse the jury and prejudice [the patent owner], and such evidence is not relevant to how a person of ordinary skill in the art reading the specification would understand that term.").

plain and ordinary meaning of claim terms bolstered by reference to specification and commercial embodiments.

Pure's experts are therefore precluded from testifying that specification and commercial embodiments support their views regarding the plain and ordinary meaning of claim terms.[6] Certainly, Pure is precluded from arguing a meaning to the jury through its expert that it already argued to the Court in the context of claim construction, as that truly would be "arguing claim construction to the jury." Although Pure's experts are precluded from testifying that specification and commercial embodiments support their views regarding the plain and ordinary meaning of claim terms, they are not precluded from making any reference whatsoever to patent specifications and commercial embodiments. Should Pure's experts refer to specification or commercial embodiments in the course of their testimony regarding the plain and ordinary meaning of claim terms, the determination whether the testimony amounts to claim construction will have to be made on an objection by objection basis in the context of the trial.

Whether an expert may testify that extrinsic evidence supports his or her testimony regarding the plain and ordinary meaning of claim terms is context dependent. *See MediaTek inc.*, 2014 WL 971765, at *5. Pure's experts are not *per se* prevented from testifying that their views regarding the plain and ordinary meaning of claim terms are supported by dictionary definitions, textbooks, product guides, prior art references, or the testimony of persons of skill in the art (including inventors of the asserted patents). Upon objection by EMC (or Pure) at the

---

[6] Of course, EMC's experts also cannot do what Pure's experts cannot do.

9

appropriate time, such testimony will be excluded if, in context, it amounts to claim construction or compares accused products to embodiments to establish non-infringement.[7]

Entered this 25 day of February, 2016.

Richard G. Andrews
United States District Judge

---

[7] As an example, an inventor's answer to the question "what do you understand 'x' to mean?" is not claim construction. An inventor's answer to the question "what did you mean when you referred to 'x' in the patent?" is claim construction.