IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EMC CORPORATION, EMC INTERNATIONAL COMPANY, and EMC INFORMATION SYSTEMS INTERNATIONAL, <br><br> Plaintiffs, <br><br> v. <br><br> PURE STORAGE, INC., <br><br> Defendant. | Civil Action No. 13-1985-RGA |

## MEMORANDUM OPINION

Jack B. Blumenfeld, Esq., Jeremy A. Tigan, Esq., Stephen J. Kraftschik, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Joshua A. Krevitt, Esq., Paul E. Torchia, Esq., GIBSON, DUNN & CRUTCHER LLP, New York, NY; Stuart M. Rosenberg, Esq., GIBSON, DUNN & CRUTCHER LLP, Palo Alto, CA; Chris R. Ottenweller, Esq., Matthew H. Poppe, Esq., Jesse Y. Cheng, Esq., ORRICK, HERRINGTON & SUTCLIFFE LLP, Menlo Park, CA; Alyssa M. Caridis, ORRICK, HERRINGTON & SUTCLIFFE LLP, Los Angeles, CA; T. Vann Pearce, Jr., Esq., ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C.; Paul T. Dacier, Esq., Krishnendu Gupta, Esq., William R. Clark, Esq., Thomas A. Brown, Esq., EMC CORPORATION, Hopkinton, MA, attorneys for Plaintiffs.

John W. Shaw, Esq., David M. Fry, Esq., SHAW KELLER LLP, Wilmington, DE; Robert A. Van Nest, Esq., Matthew Werdegar, Esq., R. Adam Lauridsen, Esq., Corey Johanningmeier, Esq., David Rizk, Esq., KEKER & VAN NEST LLP, San Francisco, CA; Joseph FitzGerald, Esq., PURE STORAGE, INC. Mountain View, CA, attorneys for Defendant.

February ___, 2016

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court is Defendant Pure Storage, Inc.'s challenge to Plaintiff EMC

Corporation's standing to assert U.S. Patent Nos. 7,373,464 and 7,434,015 ("the deduplication

patents"). (D.I. 372 at 9; D.I. 372-1 at 49–55).  The matter has been fully briefed.  (D.I. 390,

403, 410). The parties agree that the record before the Court contains everything necessary to

decide the standing issue without a hearing. (D.I. 390 at 18; D.I. 403 at 15 n.6). For the reasons

stated below, the Court holds that EMC Corporation has standing to sue for infringement of the

deduplication patents.

## I. BACKGROUND

Deduplication reduces the demand for storage space in a data storage system by ensuring

that only a single copy of unique data is stored. (D.I. 215 at 10).  The deduplication patents,

which disclose systems and methods for providing efficient data storage using deduplication

techniques, were issued to co-inventors Benjamin Zhu, Kai Li, and Hugo Patterson. ('464

patent, (57), (75), 1:19–21; '015 patent, (57), (76), 1:18–20).  The co-inventors assigned the

deduplication patents to Data Domain, Inc. (D.I. 391-1 at 2, 4).

In 2009, EMC Corporation acquired Data Domain. (D.I. 391-1 at 6). Shortly thereafter,

EMC Corporation entered a series of agreements with its affiliates to reorganize its operating

structure. (*See* D.I. 391-2 at 34–55). An Agreement and Plan of Reorganization (the

"Reorganization Agreement") governed the reorganization. (*Id.*).  One aspect of the

reorganization involved transferring ownership of Data Domain's assets to EMC Corporation.

(*See id.* at 53–54).  The transfer of Data Domain's assets to EMC Corporation proceeded in

several steps. First, Data Domain, Inc. was converted to Data Domain LLC. (D.I. 391-1 at 10–

11). Second, Data Domain LLC assigned "all right, title and interest" in its intellectual property,

2

including the deduplication patents, to Data Domain Holding, Inc. ("New Data Domain"). (*Id.* at

17). Third, New Data Domain entered a License and Assignment Agreement ("EIC License

Agreement") with EMC International Company ("EIC"). (*Id.* at 22–34). Fourth, EIC granted an

exclusive sublicense to EMC Information Systems International ("EISI"). (*Id.* at 36–43; D.I.

391-2 at 1–4). Fifth, New Data Domain transferred "all right, title and interest" in its intellectual

property to EMC Corporation. (D.I. 391-2 at 6–8). Additionally, EMC Corporation became an

authorized reseller of Data Domain products. (*Id.* at 10–20).

## II. LEGAL STANDARD

Standing to sue is a threshold requirement in every federal case. *Warth v. Seldin*, 422

U.S. 490, 498 (1975). Whether a plaintiff has standing to sue is a matter of law to be determined

by the court. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 873

(Fed. Cir. 1991). "Because the court (and not a jury) decides standing, the district court must

decide issues of fact necessary to make the standing determination." *Crayton v. Concord EFS,

Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 747 (9th Cir. 2012). "The party bringing the

action bears the burden of establishing that it has standing." *Sicom Sys., Ltd. v. Agilent Techs.,

Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).

A "patentee" has standing to bring a civil action for patent infringement. 35 U.S.C.

§ 281. The "patentee" is the owner of the patent, either by issuance or assignment. 35 U.S.C.

§ 100(d). An assignment by the patent title holder thus gives the assignee standing to bring an

infringement action in his or her own name. *Vaupel Textilmaschinen KG v. Meccanica Euro

Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991); *see also Waterman v. Mackenzie*, 138 U.S. 252,

255 (1891). A patent owner's transfer of "all substantial rights" in the asserted patents to an

exclusive licensee "is tantamount to an assignment of those patents to the exclusive licensee,

3

conferring standing to sue solely on the licensee" and divesting the patent owner of any right to sue. *Alfred E. Mann Found. for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1358–59 (Fed. Cir. 2010). Where an exclusive license agreement transfers less than "all substantial rights" in the patents, "either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation." *Id.* at 1360.

"It is well settled that whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Vaupel Textilmaschinen KG*, 944 F.2d at 875 (alteration and internal quotation marks omitted). Thus, to determine whether an exclusive license agreement transfers "all substantial rights" in the patents to the licensee, the court "must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001). Courts consider whether the licensor granted various rights to the exclusive licensee to determine whether the license rendered the exclusive licensee the owner of the patent. *Alfred E. Mann Found.*, 604 F.3d at 1360–61 (*e.g.*, "the exclusive right to make, use, and sell products or services under the patent, . . . the licensee's right to sublicense, . . . the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent"). Often, "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor, is the most important consideration." *Id.* at 1361. That the licensor retained the right to sue accused infringers often

4

precludes a finding that all substantial rights were transferred to the licensee, unless that right is illusory. *Id.* A "licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers." *Id.*

Courts interpret assignment and license agreements that are relevant to the standing inquiry according to state law. *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008). Here, the relevant agreements are governed by Massachusetts law. (*See* D.I. 390 at 7; D.I. 403 at 8; *see, e.g.*, D.I. 391-1 at 30; D.I. 391-2 at 7, 46). Under Massachusetts law, an unambiguous contract is interpreted as a matter of law, without resort to extrinsic evidence. *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d 283, 289 (Mass. 1991). "In considering whether a contract is ambiguous, we read the agreement in a reasonable and practical way, consistent with its language, background, and purpose." *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 134 (1st Cir. 2012) (internal quotation marks omitted) (applying Mass. law). "[I]nstruments deriving from a given transaction shall be read together." *Id.* at 135 (internal quotation marks omitted). Ambiguity exists if the contract "is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *S. Union Co. v. Dep't of Pub. Utilities*, 941 N.E.2d 633, 640 (Mass. 2011) (internal quotation marks omitted). Courts may consider extrinsic evidence to resolve the ambiguity where "the bare language suggests one outcome but does not rule out the other." *Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc.*, 233 F.3d 1, 3 (1st Cir. 2000) (applying Mass. law).

## III. ANALYSIS

Pure argues that EMC Corporation possesses insufficient rights to the deduplication patents to have standing to sue for infringement. (D.I. 403 at 7). Plaintiffs maintain that EMC Corporation has standing because the assignment and licensing history of the deduplication

5

patents demonstrates that EMC Corporation obtained, and has since held, title to the

deduplication patents; the right to sue and control litigation for infringement of the deduplication

patents; the right to make, use, or sell products practicing the deduplication patents, other than

Data Domain products; and the right to license the deduplication patents except in connection

with Data Domain's business. (D.I. 390 at 10). Pure argues that EISI obtained and currently

possesses sufficient rights to the deduplication patents to render EISI, not EMC Corporation, the

patents' owner. (D.I. 403 at 7).

The most significant consideration in deciding the standing inquiry is the nature and

scope of the parties' rights to bring suit for infringement. *Alfred E. Mann Found.*, 604 F.3d at

1361. The relevant provisions of the EIC License Agreement between New Data Domain and

EIC state:

5.1    EIC hereby requests New Data Domain and New Data Domain hereby agrees
to control and direct the conduct of any actions necessary to prevent or
terminate any infringement or misappropriation of the New Data Domain
Intellectual Property and/or New Developments or any other action as is
necessary to protect the New Data Domain Intellectual Property and/or New
Developments, including the institution of legal proceedings. EIC shall co-
operate with New Data Domain and shall bear any and all expenses incurred
in connection with such actions. New Data Domain shall pay to EIC any
amounts recovered in respect of any such action. EIC acknowledges that the
prior written consent of EIC is not required to take any actions pursuant to this
Section 5.1. New Data Domain shall, upon receipt of written request from
EIC, advise EIC of any actions taken pursuant to this Section 5.1.

5.2    If New Data Domain fails to take timely action in connection with any actions
contemplated by Section 5.1, upon receipt of written request from EIC for EIC
to take over the conduct and control of such actions, New Data Domain may
consent thereto, such consent not to be unreasonably withheld. New Data
Domain agrees to co-operate with, and provide reasonable assistance to, EIC
in connection with any such actions. EIC shall bear any and all expenses
incurred in connection with such actions.

(D.I. 391-1 at 27–28). New Data Domain then assigned to EMC Corporation "all right, title and

interest in, to and under" New Data Domain's patents, "including, without limitation, all rights,

claims and privileges pertaining [thereto], including, without limitation, . . . the right to sue and recover damages for past, present, and future infringement." (D.I. 391-2 at 6).

Plaintiffs argue that EMC Corporation obtained the primary right to sue and control litigation for infringement of the deduplication patents. (D.I. 390 at 13). Plaintiffs' interpretation of the agreements pertaining to the right to sue is as follows: In the EIC License Agreement, New Data Domain granted a limited exclusive license to EIC but expressly retained the primary right to sue and control litigation for infringement. (*Id.* at 8–9; *see* D.I. 391-1 at 27–28). New Data Domain subsequently assigned its retained right to sue for infringement and control infringement litigation to EMC Corporation. (D.I. 390 at 10). Thus, EMC Corporation obtained the primary right to sue for infringement of the deduplication patents and to control infringement litigation. (*Id.*).

Pure argues that EMC Corporation did not obtain the right to sue for infringement of the deduplication patents and control infringement litigation. (D.I. 403 at 20). Pure's interpretation of the agreements pertaining to the right to sue is as follows: In the EIC License Agreement, interpreted in light of the Reorganization Agreement, New Data Domain granted an exclusive license to EIC of "all substantial rights" in New Data Domain's intellectual property, including the right to sue. (*Id.* at 15, 20). In addition to and consistent with conveying all of its substantial rights in the deduplication patents to EIC, New Data Domain also agreed in the EIC License Agreement to "control and direct" infringement litigation on behalf of EIC. (*Id.* at 20–22). EIC thus delegated authority to sue to New Data Domain; New Data Domain did not retain or obtain the primary right to sue for infringement. (*Id.* at 20). As a result, EMC Corporation did not obtain the primary right to sue for infringement upon New Data Domain's assignment of its intellectual property to EMC Corporation. A delegation of authority to control and direct

7

litigation is insufficient to confer standing on the receiving party. (*Id.* (citing *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1192 (Fed. Cir. 2007))).

Pure argues in the alternative that, to the extent the EIC License Agreement does not license to EIC all substantial rights to the deduplication patents, it is inconsistent with the Reorganization Agreement's statement that "[a]t the Closing, [New Data Domain] licenses all substantial rights to its owned IP . . . to [EIC] in exchange for cash, as described in Article IV." (*Id.* at 14; D.I. 391-2 at 54). Pure maintains that the inconsistency renders the agreement ambiguous and that, as a result, the agreement should be interpreted in light of extrinsic evidence. (D.I. 403 at 14–15). Pure contends that extrinsic evidence supports its interpretation of the agreements and demonstrates that EMC Corporation does not possess all substantial rights to the deduplication patents. (*Id.* at 15).

The Reorganization Agreement and the EIC License Agreement should be read together. *See Lass*, 695 F.3d at 135; (D.I. 391-1 at 22–34 (not including an integration clause); D.I. 391-2 at 47 ("This [Reorganization] Agreement . . . and agreements that may be executed in furtherance of the transactions contemplated by this Agreement constitute the entire agreement . . . among the Parties with respect to the subject matter of this Agreement.")). Read together, the Reorganization Agreement and the EIC License Agreement are consistent with each other. To establish that the agreements are ambiguous, Pure cites a passage in Exhibit B to the Reorganization Agreement that states that that New Data Domain "licenses all substantial rights" to its intellectual property to EIC "as described in Article IV." (D.I. 403 at 13; D.I. 391-2 at 54). Article IV of the Reorganization Agreement describes the license to be granted to EIC as limited to the Data Domain Business as it had previously been conducted, using language nearly identical to that used in the EIC License Agreement. (D.I. 391-2 at 35, 42; *see* D.I. 391-1 at 26).

8

Although Exhibit B to the Reorganization Agreement states that New Data Domain "licenses all substantial rights" to its intellectual property to EIC, the precise grant and right-to-sue provisions in the EIC License Agreement control. *See Astra USA, Inc. v. Bildman*, 914 N.E.2d 36, 55 (Mass. 2009) ("[It is] a cardinal principle of contract interpretation [that] a more specific contract provision controls a more general provision on the same issue."). This conclusion is further supported by the fact that the Reorganization Agreement describes Exhibit B as "generally" setting forth the reorganization of Data Domain and certain subsidiary entities of Data Domain. (D.I. 391-2 at 35). Because the relevant language of the agreements is not ambiguous, the Court must interpret them as a matter of law without resort to extrinsic evidence. *See Mass. Mun. Wholesale Elec. Co.*, 577 N.E.2d at 289.

New Data Domain retained the primary right to sue for infringement in the EIC License Agreement and subsequently assigned that right to EMC Corporation. The EIC License Agreement established that New Data Domain retained the primary right to "control and direct the conduct of any actions necessary to prevent or terminate any infringement . . . , including the institution of legal proceedings." (D.I. 391-1 at 27–28). EIC was granted a secondary right to initiate infringement "[i]f New Data Domain fails to take timely action." (*Id.* at 28). EIC's right to institute and control infringement litigation is restricted because EIC must submit a written request to take over the conduct and control of infringement litigation and New Data Domain "may consent thereto, such consent not to be unreasonably withheld." (*Id.*). New Data Domain later assigned its retained primary right to sue to EMC Corporation. (D.I. 391-2 at 6–8).

Pure argues that New Data Domain did not retain the primary right to sue and control litigation because the relevant license term provides only that "EIC hereby requests New Data Domain and New Data Domain hereby agrees to control and direct [infringement litigation]."

9

(D.I. 391-1 at 27; D.I. 403 at 20). Pure argues that, rather than transferring its right to sue back to New Data Domain, EIC merely delegated its authority to sue. (D.I. 403 at 20). Delegating authority to sue is insufficient to confer standing on a licensee. *See Propat Int'l Corp.*, 473 F.3d at 1192; *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000). That New Data Domain could enforce its intellectual property rights without consulting EIC undermines Pure's argument that the EIC License Agreement established a principal/agent relationship between New Data Domain and EIC. (*See* D.I. 391-1 at 28). Additionally, New Data Domain and EIC explicitly agreed that the EIC License Agreement "does not create a principal or agent . . . relationship." (*Id.* at 30). New Data Domain's power to sue pursuant to the EIC License Agreement was therefore a right belonging to New Data Domain and was not mere authority to sue on behalf of EIC.

EMC Corporation's primary right to sue for infringement is not illusory. A party's right to sue for infringement is complete if it includes the "right to indulge infringements." *See AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009); *E8 Pharm. LLC v. Affymetrix, Inc.*, 680 F. Supp. 2d 292, 298 (D. Mass. 2010), *aff'd*, 538 Fed. App'x 902 (Fed. Cir. 2013). Thus, a party's right to sue is illusory if another party possesses an unfettered right to settle litigation instituted by the first by "granting royalty-free sublicenses to the accused infringers." *Alfred E. Mann Found.*, 604 F.3d at 1361; *see Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000). Here, EMC Corporation has the right to indulge infringement of the deduplication patents. EMC Corporation need not consult EIC prior to bringing suit for infringement of the deduplication patents and, indeed, need not even notify EIC unless EIC requests notification in writing. (D.I. 391-1 at 27–28). EIC "shall co-operate" with EMC Corporation in infringement actions EMC Corporation institutes. (*Id.* at 28). EIC impinges on

EMC Corporation's primary right to sue only to the extent that EIC may "request" to take over infringement actions if EMC Corporation fails to take action. (*Id.*). EMC Corporation "may consent" to EIC's taking over an infringement action, "such consent not to be unreasonably withheld." (*Id.*). Although EIC has the right to grant sublicenses, its sublicensing power extends only to uses in connection with the operation of New Data Domain business as it existed on December 31, 2009. (*Id.* at 24, 26). EMC Corporation's non-illusory right to institute and control infringement litigation is the most important consideration in support of its standing to sue for infringement of the deduplication patents.

EMC Corporation possesses other rights in the deduplication patents that support its standing. Possession of a right to make and use products embodying the inventions claimed in patents supports a licensor's claim that it retained all substantial rights. *See Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995). That a license agreement restrains or controls the licensee's sublicensing power also supports the licensor's claim that it retained all substantial rights. *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1342 (Fed. Cir. 2011). Although New Data Domain granted to EIC the exclusive (even as to New Data Domain) right to make, use, or sell products protected by the deduplication patents in connection with the Data Domain business, New Data Domain retained the right to otherwise make, use, or sell products protected by the deduplication patents. (*See* D.I. 391-1 at 26). EMC Corporation obtained that right pursuant to the assignment by New Data Domain. (*See* D.I. 391-2 at 6–8). Additionally, the exclusive license to EIC (subsequently sublicensed to EISI) is limited to use in connection with the "New Data Domain Business." (D.I. 391-1 at 26). New Data Domain, on the other hand, implicitly retained the right to license the deduplication patents outside the Data Domain business (*id.*) and ultimately assigned that right to EMC Corporation (D.I. 391-2 at 6–8).

11

These additional rights further support that EMC Corporation has standing to assert infringement of the deduplication patents.

Pure argues that EMC Corporation does not possess the right to make, use, or sell products practicing the deduplication patents or to license the deduplication patents aside from the New Data Domain Business. (D.I. 403 at 16). Pure contends that the phrase "in connection with the New Data Domain Business" was not intended to create a limited field of use. (*Id.*). First, Pure argues that a limited field of use is inconsistent with other statements in the relevant agreements, including: (1) the statements in Exhibit B to the Reorganization Agreement that New Data Domain "licenses all substantial rights" to its intellectual property to EIC and "distributes . . . legal title" to EMC Corporation" (D.I. 391-2 at 54; D.I. 403 at 16–17); (2) the recital in the EIC License Agreement stating that "New Data Domain desires to grant and EIC desires to receive exclusive licenses under all the New Data Domain Intellectual Property" (D.I. 391-1 at 24; D.I. 403 at 18); and (3) the assignment by EIC to New Data Domain of "all improvements to and derivative works of the New Data Domain Intellectual Property," not limited to improvements within the scope of the New Data Domain Business (D.I. 391-1 at 29). As discussed above, the Exhibit B and recital statements are not inconsistent with a limited field of use explicitly set forth in the specific grant. *See supra* pp. 8–9 (citing *Astra USA, Inc.*, 914 N.E.2d at 55). The assignment by EIC to New Data Domain of improvements to and derivative works of all New Data Domain Intellectual Property is consistent with New Data Domain's more limited grant to EIC of a license to use New Data Domain Intellectual Property only in connection with the New Data Domain Business.

Second, Pure argues that "[i]f the rights [New Data Domain] licensed to EIC were only for a limited field, there should be . . . evidence that EMC Corp. was granted rights to a

reciprocally limited field of use." (D.I. 403 at 17 n.9). The absence of a document acknowledging that New Data Domain retained and that, later, EMC Corporation obtained, rights to make, use, or sell products practicing the deduplication patents and to license the deduplication patents does not suggest that the rights do not exist. It goes without saying that a right possessed and not transferred to another is retained. Thus, EMC Corporation possesses the rights to make, use, or sell products practicing the deduplication patents and to license the deduplication patents outside the scope of the New Data Domain Business. These additional rights further support that EMC Corporation has standing to assert infringement of the deduplication patents.

## IV.  CONCLUSION

For the reasons discussed above, EMC Corporation possesses a non-illusory right to institute and control infringement litigation with respect to the deduplication patents. (*See* D.I. 391-1 at 27). EMC Corporation also possesses the right to make, use, or sell products practicing the deduplication patents, other than Data Domain products, and the right to license the deduplication patents except in connection with the Data Domain business. EMC Corporation's rights with respect to the deduplication patents are sufficient to demonstrate that EISI did not obtain all substantial rights to the deduplication patents. EMC Corporation therefore has standing to sue for infringement of the deduplication patents.