```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE


EMC CORPORATION,              )
EMC INTERNATIONAL COMPANY,    )
And EMC INFORMATION SYSTEMS   )
INTERNATIONAL,                ) Trial Volume 2
                              )
         Plaintiffs,          )
                              ) C.A. No.
v.                            ) 13-1985-RGA
                              )
Pure STORAGE, INC.,           )
                              )
         Defendant.           )



                  Tuesday, March 8, 2016
                  9:00 a.m.
                  Courtroom 6A


                  844 King Street
                  Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge



APPEARANCES:


         MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
         BY:  JACK B. BLUMENFELD, ESQ.

              -and-

         GIBSON, DUNN & CRUTCHER, LLP
         BY:  JOSH A. KREVITT, ESQ.
         BY:  PAUL E. TORCHIA, ESQ.
         BY: STUART M. ROSENBERG, ESQ.
         BY:  KATHERINE DOMINGUEZ, ESQ.

              -and-
```

```
APPEARANCES (Cont'd):


          ORRICK, HERRINGTON & SUTCLIFFE, LLP
          BY:  MATTHEW A. POPPE, ESQ.

                    Counsel for the Plaintiffs




          SHAW KELLER, LLP
          BY:  JOHN W. SHAW, ESQ.
          BY:  DAVID M. FRY, ESQ.

                    -and-

          KEKER & VAN NEST, LLP
          BY:  ROBERT A. VAN NEST, ESQ.
          BY:  MATTHEW WERDEGAR, ESQ.
          BY:  CORY JOHANNINGMEIER, ESQ.
          BY:  R. ADAM LAURIDSEN, ESQ.
          BY:  DAVID W. RIZK, ESQ.

                    Counsel for the Defendants
```

```
 1                    THE COURT:  Good morning,
 2    everyone.  Please be seated.  So how is
 3    everybody?
 4                    MR. VAN NEST:  Fine, Your Honor.
 5    Thank you.
 6                    THE COURT:  Do you have anything
 7    for me?
 8                    MR. VAN NEST:  We do.  Good
 9    morning.
10                    THE COURT:  Good morning.
11                    MR. VAN NEST:  I think one of the
12    witnesses this morning will be Professor Li.
13                    THE COURT:  Professor who?
14                    MR. VAN NEST:  Li.  He's the
15    inventor of the '464.  And he was, as you
16    recall, well, disclosed late.  You offered some
17    curative discovery and we've taken that.  I
18    think they expect to call him on a number of
19    subjects related to commercial success of Data
20    Domain.  And while I don't object to him talking
21    about his invention and whatever invention story
22    he has, for a number of reasons it would be
23    improper to allow him to do that now.  Number
24    one, he was never disclosed to somebody on
```

351

```
 1      commercial success and the first time that
 2      anything came out of his mouth on it was during
 3      the curative phase, which we were given to cure
 4      the fact that he hadn't been disclosed earlier
 5      and they hadn't ever talked about an earlier
 6      invention date.  Number two, with obviousness
 7      out, I question any testimony really about the
 8      commercial success of Data Domain.  They are not
 9      seeking damages based on any Data Domain
10      products.  Data Domain is not in the same market
11      with Pure or XtremeIO.  Data Domain never made a
12      Flash product.  They are not even in the primary
13      storage market.
14                So for a number of reasons,
15      leading off really with discovery, I think that
16      shouldn't be allowed.  I believe the most
17      offensive part of it will be testimony from him
18      about revenues from Data Domain's products.
19      They have product revenues, obviously.  Again,
20      those products don't compete with either
21      XtremeIO or Pure.  They are large numbers.
22      They'd be prejudicial, and again, the relevance
23      of that, if there is any, is minimal.  And it
24      wasn't disclosed until very late in the game.
```

```
 1    He was not a Rule 26 disclosure on commercial

 2    success and he didn't -- he wasn't proffered

 3    during discovery on that.  We didn't take any

 4    discovery.

 5              During the curative phase, it's

 6    true, when we were done asking about conception,

 7    they lobbed in some redirect for the very first

 8    time without having given us any notice ahead of

 9    time and that's why I know this is coming or may

10    be and I don't think it's proper.

11              THE COURT:  All right.

12              MR. KREVITT:  Your Honor, very

13    briefly, we can address the relevance of the

14    commercial success of Data Domain if you'd like,

15    but there's a much shorter answer to this.

16              THE COURT:  Okay.

17              MR. KREVITT:  Pure Storage filed a

18    motion in limine on Doctor Kai Li.  The motion

19    in limine was directed specifically to

20    commercial success.  Doctor Kai Li should not be

21    permitted to testify with respect to commercial

22    success.  That was a motion in limine submitted

23    to this court.  We had argument on that.  Part

24    of that motion in limine that Pure Storage filed
```

1    was that EMC should not be able to call Frank

2    Slootman.

3              The parties went away after Your

4    Honor reserved ruling on some of the motions in

5    limine.  We had extensive, more than you might

6    imagine, negotiations on these topics, multiple

7    drafts going back and forth and the resolution

8    was this and memorialized and submitted to Your

9    Honor in a writing, in exchange for withdrawing

10   our request to call Frank Slootman, so we

11   forewent any --

12             THE COURT:  I remember seeing a

13   letter.  I don't remember exactly what it said.

14   Do you have a copy of it?

15             MR. KREVITT:  We are putting our

16   hands on it now.  I didn't -- I didn't

17   anticipate this issue being raised this morning,

18   I apologize.

19             THE COURT:  No need to apologize.

20             MR. KREVITT:  I can represent to

21   Your Honor, not in hoc verba, but having

22   participated in the discussions, the deal was we

23   were going to withdraw Frank Slootman so we were

24   telling Your Honor rule in their favor on the

1       Frank Slootman motion in limine effectively.

2       And in exchange, explicitly in exchange, Pure

3       Storage withdrew all objections to EMC calling

4       Doctor Kai Li, including with respect to

5       commercial success.

6                   THE COURT:  Okay.  So Mr. Van

7       Nest, you recall this letter?

8                   MR. VAN NEST:  I've been reminded

9       of it.  But there's two things that are not

10      correct.  One is that's before we removed any

11      obviousness case on the deduplication.  Right?

12      In other words, at that time, we still

13      maintained an obviousness case and commercial

14      success is relevant to that.  We've withdrawn

15      that as to the deduplication patents.

16                  THE COURT:  Okay.  So that's

17      really -- that's a different argument than

18      saying, you know, it's a discovery violation.

19      That's saying it's not relevant.

20                  MR. VAN NEST:  That's right.  I

21      said this morning that without obviousness, it's

22      not -- but the other point is, I don't believe

23      we withdraw all our objections.  I think the

24      objection we may have withdrawn as to late

355

```
1    discovery.  If that's true, of course, that's my
2    fault for raising it.  But I do think that we
3    reserved other objections to relevance and the
4    like.  And right now --
5              THE COURT:  I would imagine you
6    did -- that relevance wasn't decided by the
7    letter.
8              MR. VAN NEST:  Sure.
9              THE COURT:  But since you let off
10   with is a discovery violation, sounding to me
11   like that's actually been resolved.
12             MR. VAN NEST:  It may have been.
13   But look where we are in the trial now.  We
14   don't have an obviousness case.  It's clear that
15   Data Domain is not even in the market.
16             THE COURT:  All right.  So let me
17   go back.  Mr. Krevitt was promising a short
18   solution and he did cut off your first leg.  How
19   about the second leg?
20             MR. KREVITT:  It was the only leg
21   raised with us, so I now have another leg to
22   deal with.  The short answer to that is there is
23   no dispute in this case that the Data Domain
24   product embodies the patents in suit, two of the
```

356

```
 1    patents in suit, the deduplication patents, the

 2    '015 and '464.  That's where we start.  We're

 3    talking about relevance.  There's no dispute

 4    about that.  The success of the product that

 5    incorporated the technology is explicitly and

 6    highly relevant to damages, including lost

 7    profits and reasonable royalty.  In fact --

 8                 THE COURT:  So the product -- so

 9    first off when you talk about the success of the

10    Data Domain, what you're actually talking about

11    is revenues for something that Data Domain sold;

12    right?

13                 MR. KREVITT:  Yes, Your Honor.

14    Revenues attributable to products embodying the

15    patented invention.

16                 THE COURT:  And right.  So I just

17    want to make sure because, you know, we're

18    talking kind of general terms, Data Domain

19    success, what we're really talking about is

20    numbers relating to some product or product that

21    Data Domain sold; right?

22                 MR. KREVITT:  Your Honor has it

23    exactly right.  In fact, it's an important

24    distinction because you may recall my colleague,
```

357

1      Mr. Torchia, tried to convince the Court that we

2      should be able to put in the --

3                    THE COURT:  Right.

4                    MR. KREVITT:  And this was

5      precisely the distinction that the Court drew

6      which was that's to attenuated to talk about a

7      big price, this is revenues directly

8      attributable to the product.

9                    THE COURT:  This may not be --

10     what is the name of the product that Data Domain

11     sold?

12                   MR. KREVITT:  I think it was

13     called Data Domain.

14                   MR. TORCHIA:  I believe it's

15     called Data Domain Deduplication DDR.

16                   MR. KREVITT:  Data Domain

17     Deduplication.

18                   THE COURT:  And this was sold over

19     what time period?

20                   MR. TORCHIA:  So Your Honor, this

21     was sold from 2003 all the way up past the

22     acquisition, and still on the market and Dr. Li

23     has personal knowledge of the revenues of the

24     patented product.

```
 1                    THE COURT:  So you say,

 2    Mr. Krevitt, that it is undisputed that the body

 3    of the patent or two of the patents, is that, in

 4    fact, correct, Mr. Van Nest?

 5                    MR. VAN NEST:  Excuse me, Your

 6    Honor, I was looking at the letter.

 7                    THE COURT:  Okay.  Mr. Krevitt

 8    says that the sales of these Data Domain

 9    products embodied the patent.

10                    MR. VAN NEST:  There is no opinion

11    in the case to that fact.  Mr. Jestice, their

12    expert, does not go through a technical analysis

13    of any kind to tie the products to the patents

14    and that's the thing we have been saying, there

15    is no nexus to these patents.

16                    THE COURT:  Right.  And by nexus,

17    you just mean does it practice the patent?

18                    MR. VAN NEST:  There is no opinion

19    from any technical expert or witness in the

20    case, Jestice didn't --

21                    THE COURT:  I got your point

22    there.

23                    Mr. Torchia.

24                    MR. TORCHIA:  Mr. Rosenberg is
```

```
 1        about to show you that there is such an opinion.

 2                    MR. KREVITT:  There is an opinion,

 3        Your Honor.  Dr. Li, Mr. Rosenberg will come,

 4        Dr. Li is sitting in the room.

 5                    THE COURT:  Over there?

 6                    MR. KREVITT:  Over there.

 7                    THE COURT:  You pointed to

 8        Mr. Shaw.

 9                    MR. KREVITT:  And in a half hour

10        is going to testify that it embodies and for

11        purposes of relevance, to understand relevance,

12        we should assume that the product embodies the

13        patents.  We're happy to show you that there is

14        evidence of that.

15                    THE COURT:  I would like to see

16        that evidence because apparently you have it

17        easily at hand.

18                    MR. KREVITT:  Yes, and we also --

19                    MR. TORCHIA:  We're about to put

20        it up on the screen.

21                    THE COURT:  Okay.

22                    MR. VAN NEST:  Again, as Your

23        Honor knows, Dr. Li was certainly never

24        disclosed as an expert on this topic and never
```

```
1    presented during discovery on it.  The first

2    time we talked to him was after summary judgment

3    when they threw him in on conception, so if

4    there is an opinion, it's news to me and it's

5    very late.

6              MR. KREVITT:  Your Honor, Dr. Li

7    was identified in Pure Storage's initial

8    disclosures.  They could have deposed him at any

9    time and chose not to.

10             MR. TORCHIA:  This is --

11             THE COURT:  So that looks like

12   page 127 of somebody's expert report.

13             MR. KREVITT:  This is our expert,

14   Your Honor.

15             THE COURT:  The name of your

16   expert?

17             MR. KREVITT:  Ian Jestice.

18             THE COURT:  So, I mean, without

19   knowing, recalling exactly -- so five of those

20   six claims, and some number of the '464 patent

21   claims.

22             MR. KREVITT:  Yes, Your Honor.

23             THE COURT:  Okay.

24             MR. KREVITT:  If you go further,
```

```
1    claim 32.
2              THE COURT:  What do you have to
3    say about that, Mr. Van Nest?
4              MR. VAN NEST:  May I have a
5    moment, Your Honor?
6              He has an opinion in his report,
7    Your Honor.  It's not much.  He doesn't cite the
8    source code or do any analysis, he cites
9    testimony, but he has an opinion.
10             THE COURT:  So he has an opinion.
11   I think from what I'm gathering, though, Mr. Van
12   Nest, you were just looking at the letter, that
13   you know, the objections about we didn't know
14   about this or that, that seems to have been lost
15   in this letter, so it's really a question of
16   whether it's relevant or not.
17             And I guess the success of,
18   commercial success of the product that embodied
19   the patents is something that is listed in the
20   Georgia-Pacific factors as a consideration, so
21   unless I hear something else, I'm going to let
22   him do it.
23             MR. KREVITT:  As well as for lost
24   profits.
```

```
 1                    MR. VAN NEST:  I don't know why

 2        there should be any discussion of the numbers

 3        themselves, Your Honor, apart from the fact that

 4        the product was successful.  Particularly given

 5        the state of the record now, where obviousness

 6        is out, and it may be a minor Georgia-Pacific

 7        factor, but you know, their expert doesn't rely

 8        on the numbers.  Their expert in the expert

 9        report doesn't say I'm relying on, he's got a

10        sentence on commercial success that doesn't go

11        into any detail at all.

12                    THE COURT:  What does the sentence

13        say?

14                    MR. VAN NEST:  He says I

15        understand that the products have been

16        commercially successful.

17                    THE COURT:  I think they can put

18        in some evidence to support that opinion.

19                    MR. KREVITT:  Thank you, Your

20        Honor.

21                    MR. VAN NEST:  Very well, Your

22        Honor.

23                    THE COURT:  All right.  Is there

24        anything else?
```

363

```
 1              MR. VAN NEST:  I'm not aware of
 2      anything else, Your Honor.
 3              THE COURT:  Mr. Krevitt, do you
 4      have anything else?
 5              MR. KREVITT:  Not at the moment,
 6      Your Honor.  Mr. Torchia said something to me.
 7              THE COURT:  Do you want to speak
 8      to him for a second?
 9              MR. KREVITT:  I don't think I need
10      to raise it right now, Your Honor.
11              THE COURT:  All right.  And so
12      just I'll leave in a minute so you can do your
13      last second things, but the order of battle this
14      morning, Mr. Krevitt, is what?
15              MR. KREVITT:  Yes, Your Honor.  So
16      Mr. Cobb, our witness from yesterday is still on
17      cross-examination.  We understand there is
18      another fifteen or twenty minutes, or maybe that
19      grew overnight.
20              THE COURT:  Or maybe it shrunk.
21              MR. KREVITT:  Hopefully it shrunk.
22      And then there may be some redirect, I don't
23      anticipate that will be very long.
24              THE COURT:  This is too much
```

364

```
 1        detail.  Who is coming after Cobb?

 2                    MR. KREVITT:  Got it.  Dr. Li.

 3                    THE COURT:  Now, you expect the

 4        direct of him to be in the ballpark of?

 5                    MR. KREVITT:  Forty minutes.

 6                    THE COURT:  And so probably we'll

 7        have some other witness before lunch.  Do you

 8        expect to do depositions or what?

 9                    MR. KREVITT:  I don't think so,

10        Your Honor.  I think what we would do right then

11        is get started with Mr. Jestice, our technical

12        expert on the dedup patents.

13                    THE COURT:  If we do that, that

14        will certainly take us to lunch.

15                    MR. KREVITT:  Yes.

16                    THE COURT:  Okay.  I'll be back

17        in.

18                    MR. KREVITT:  Your Honor, there is

19        one issue that I'm sorry, I should have told you

20        before you stood up that the parties are still

21        conferring about, so we're happy to continue to

22        confer, I just don't want too much time to go by

23        without raising it with the Court.  But if you

24        prefer us to see if we can work it out.
```

```
 1              It deals with an issue from our
 2     perspective, an issue that was raised in Mr. Van
 3     Nest's opening statement that opened the door to
 4     revisiting some rulings that Your Honor made
 5     earlier.
 6              THE COURT:  Well, as you may have
 7     noticed, I was listening to your opening
 8     statements.  So I didn't hear anything, but I
 9     wasn't listening to it with the same attention
10     to detail that I'm sure you were.  If you want
11     to give me a suggestion as to what it is, I'm
12     happy -- I don't want to resolve it now, I think
13     you should talk to each other, but it will help
14     me to think about it.
15              MR. KREVITT:  I'm happy to do
16     that, Your Honor.  I didn't want too much time
17     to past, but at the same time we are candidly
18     speaking about it.
19              As Your Honor may recall, another
20     motion in liminae was Pure Storage had moved to
21     prevent EMC from introducing evidence about Pure
22     Storage's IPO, how much money it has, it's
23     financial condition, it's got a lot of money.
24     And Your Honor --
```

```
 1              THE COURT:  What did he say that
 2    opened this up?
 3              MR. KREVITT:  And what we said at
 4    the time when we opposed that was that we had
 5    concerns that Pure Storage was going to portray
 6    itself as the little guy in the marketplace.  In
 7    fact, we specifically said David and Goliath.
 8              THE COURT:  I think you said that
 9    in your opening.
10              MR. KREVITT:  No, I don't think
11    so, Your Honor.  I don't believe so, if I did, I
12    certainly didn't mean to.  And Mr. Van Nest said
13    exactly the issue, exactly the issue that we
14    were concerned about, Your Honor, portrayed and
15    using the words, we, Pure Storage, are the
16    little guy in the market.  We believe it's
17    relevant to a whole host of issues.  As I say,
18    we're talking about ways to handle it, either
19    with stipulations or otherwise.
20              THE COURT:  He'll let you all
21    continue to talk about that.  I do appreciate
22    you bringing it up, because -- I do appreciate
23    you bringing it up.  We'll be in recess for a
24    few more minutes.
```

367

```
 1                    (A brief recess was taken.)

 2                    THE COURT:  All right.  We're

 3       going to get the jury.  Mr. Cobb, you can come

 4       forward and take the witness seat if you hurry

 5       up.

 6                    THE WITNESS:  Thank you, Your

 7       Honor.

 8                    THE COURT:  Good morning, members

 9       of the jury.  Everyone, you may be seated.

10       Members of the jury, thank you all for being

11       here on time and we're on time too, so Mr.

12       Werdegar, you may continue your

13       cross-examination.

14                    MR. WERDEGAR:  Thank you, Your

15       Honor.

16      BY MR. WERDERGAR:

17                    Q.  And good morning, Mr. Cobb.

18       Welcome back.

19                    A.  Good morning.  Thank you.

20                    Q.  You testified yesterday that EMC

21       introduced a version of its VMAX product with

22       some Flash and some hard disks back in 2008,

23       right?

24                    A.  Yes, a hybrid array.
```

368

```
 1              Q.   The hybrid array, right.  Now that
 2       hybrid array that EMC began offering in 2008 did
 3       not have deduplication, right?
 4              A.   That's correct.
 5              Q.   Okay.  And EMC did not add
 6       deduplication to its VMAX product after it
 7       acquired Data Domain, did it?
 8              A.   That's correct.
 9              Q.   Okay.  And did EMC last month
10       introduced a new All-Flash version of its VMAX
11       product, right?
12              A.   Yes, sir, we did.
13              Q.   Okay.  And that new All-Flash
14       version of VMAX does not have data
15       deduplication, right?
16              A.   No, it does not.
17              Q.   Okay.  Now, Mr. Cobb, you're
18       familiar with the term use case in the storage
19       context, aren't you?
20              A.   Yes.  It's used in several
21       different ways, but I'm generally familiar with
22       it.
23              Q.   And one way it's used is to
24       describe how a customer will be using the
```

```
1        storage product, correct?

2               A.   That's correct.

3               Q.   So they might have a data base use

4        case, for example, in connection with a data

5        base application; is that right?

6               A.   Yes, that's correct.

7               Q.   And it's correct, is it not, that

8        there are uses for a storage product for which

9        data deduplication provides little or no

10       benefit, correct?

11              A.   Yes, some use cases have more

12       duplicate data than other use cases do.

13              Q.   And some use cases are essentially

14       not deduplicable; is that correct?

15              A.   Correct.  The benefits of

16       deduplication for that would be marginal.

17              Q.   Okay.  For example, for many data

18       base use cases, there is little or no space

19       saving benefit from deduplication, correct?

20              A.   When compared to the other use

21       cases, data bases tend to deduplicate less.

22              Q.   And so for those use cases, you

23       need other data reduction technologies to save

24       space, right, if you want to do data reduction?
```

 1                    A.   That's correct.

 2                    Q.   So, for example, with data base

 3      use cases, compression is the primary data

 4      reduction technology for those use cases,

 5      correct?

 6                    A.   Compression is one of the

 7      technologies for that use case.  It's not the

 8      only.

 9                    Q.   Okay.  But compression is

10      certainly one that has a big benefit for data

11      base use cases, correct?

12                    A.   Compression often has a 2 to 1

13      benefit.

14                    Q.   Okay.  And for the first full year

15      after it was generally released in 2013,

16      XtremeIO did not have a compression data

17      reduction feature, correct?

18                    A.   That's correct.

19                    Q.   Okay.  And as we discussed

20      yesterday, Mr. Cobb, EMC bought XtremeIO in May

21      of 2012, right?

22                    A.   Yes.

23                    Q.   Yeah.  And you testified yesterday

24      that EMC was working with XtremeIO from about

1    2008 onwards; is that right?

2         A.  Yes, that's right.

3         Q.  Okay.  And XtremeIO did not

4    generally release its product for sale until

5    November of 2013, right?

6         A.  Yes, that's correct.

7         Q.  Okay.  So despite all the

8    assistance that EMC provided XtremeIO that you

9    described yesterday, it still took five years

10   for XtremeIO to generally release a product,

11   right?

12        A.  Yes, that sounds about right.

13        Q.  And after EMC acquired Xtreme IO

14   in 2012, the delay in getting XtremeIO generally

15   released caused senior executives within EMC to

16   be concerned that XtremeIO was late to market,

17   correct?

18        A.  Yes, there was concern that the

19   All-FlashArray market was developing more

20   quickly than we expected.

21        Q.  Would you turn to Exhibit 810 in

22   the binder of exhibits before you?

23        A.  All set.

24        Q.  Okay.  And is this an e-mail that

```
1          you received from Zahid Hussein on May 30, 2013?

2                 A.   Yes, it is.

3                 MR. WERDEGAR:   Okay.  I would like

4          to offer Exhibit 810 into evidence.

5                 MS. DOMINGUEZ:   No objection.

6                 THE COURT:   Thank you.  Admitted

7          without objection.

8     BY MR. WERDERGAR:

9                 Q.   And Mr. Hussein, at the time that

10         he sent this e-mail out, was the head -- Mr.

11         Hussein, at the time he sent this e-mail out,

12         was the head of the Flash Products Group within

13         EMC, correct?

14                A.   That's correct.

15                Q.   And one of Mr. Hussein's

16         responsibilities was XtremeIO, correct?

17                A.   Yes, that's right.

18                Q.   Okay.  Now, Mr. Hussein is

19         forwarding to you and some others at EMC an

20         e-mail from Josh Goldstein, correct?

21                A.   Yes.

22                Q.   Okay.  And if we look at Mr.

23         Goldstein's original e-mail that he sent on May

24         29, 2013, Mr. Goldstein wrote in his original
```

373

1       message, Pure Storage announced version 3.0 of

2       the Purity operating system today, along with

3       updated hardware.  Do you see that?

4               A.   Yes, I do.

5               Q.   Okay.  And at the time Mr.

6       Goldstein sent his e-mail, XtremeIO did not yet

7       have a product generally available, right?

8               A.   That's correct.  This was in May.

9               Q.   Okay.  And he writes in his

10      e-mail, the changes of note are detailed below

11      and we'll send a competitive bulletin to the

12      field.  However, amongst of the leadership team,

13      I want to make sure to send a clear message that

14      we are now 14 months behind Pure on features and

15      while I believe our performance advantage still

16      exists, its being progressively marginalized.

17      Do you see that?

18              A.   Yes, I do.

19              Q.   And you understood at the time

20      that this was coming from the head of marketing

21      and product management for XtremeIO, right?

22              A.   Yes, that was Josh's role.

23              Q.   Yeah, those were the concerns he

24      was expressing, correct?

```
 1              A.   Yes, he was representing product

 2      marketing concerns.

 3              Q.   Okay.  And then he writes in his

 4      e-mail still, I know we are heads down for GA,

 5      and that's general availability, right?

 6              A.   Correct.

 7              Q.   And I know we are heads down for

 8      GA, but we have to begin a catch up and overtake

 9      plan.  Our advantages won't matter to most

10      accounts when we have a 14 plus month feature

11      deficit and as Pure gains more market

12      credibility and wins more accounts.  Do you see

13      that?

14              A.   Yes, I do.

15              Q.   And you understood that Mr.

16      Goldstein, the head of product management and

17      marketing for XtremeIO was proposing that EMC

18      needed to begin a catch up and overtake plan to

19      catch up with Pure, right?

20              A.   Yes, that was his opinion.

21              Q.   And it was his opinion as the head

22      of marketing at product management for XtremeIO,

23      right?

24              A.   Yes, it was.
```

375

```
 1              Q.   Okay.  Now -- oh, actually, let's

 2      just back up, because there's one more question

 3      there.  Mr. Hussein, who is the head of the

 4      Flash Products Group, then writes back the next

 5      day, actually forwards Mr. Goldstein's message

 6      the next day to you and other executives at EMC,

 7      right?

 8              A.   That's correct, sir.

 9              Q.   Okay.  And at that time Mr.

10      Hussein wrote to you, like Josh, I'm

11      increasingly concerned about how late XtremeIO

12      is to market.  So you understood when you

13      received this, did you not, that Mr. Hussein,

14      who is in charge of XtremeIO, was increasingly

15      concerned about how late it was to market,

16      right?

17              A.   Yes, Mr. Hussein was

18      understandably concerned.

19              Q.   Mr. Cobb, EMC has a group within

20      the company that prepares various forms of

21      information concerning EMC's competitors in the

22      marketplace; is that right?

23              A.   Yes, sir, that function is

24      performed in several areas.
```

```
 1                    Q.   Okay.  And one area is called the
 2          Competitive Intelligence Group, right?
 3                    A.   That's correct.
 4                    Q.   Okay.  Could you turn to Exhibit
 5          807 in your cross-examination binder, please?
 6                    A.   Okay.
 7                    Q.   Okay.  And Exhibit 807 is a
 8          document entitled All-FlashArray competition,
 9          correct?
10                    A.   That's correct.
11                    Q.   And it's dated October 29, 2013?
12                    A.   Yes, sir.
13                    Q.   Okay.  And this is the type of
14          report that you normally would have received in
15          your role at EMC, right?
16                    A.   Yes, it is.
17                    Q.   Okay.  And you know the authors of
18          this document Andy Watson and Brian Durick,
19          right?
20                    A.   Yes, I do.  I work with them
21          often.
22                    Q.   And they're both contributors to
23          EMC Competitive Intelligence Group; right?
24                    A.   Correct.
```

1              MR. WERDEGAR:  I would like to

2      offer Exhibit 807 into evidence.

3              MS. DOMINGUEZ:  No objection.

4              THE COURT:  Admitted without

5      objection.

6      BY MR. WERDEGAR:

7              Q.  Here is a the document and if we

8      could go to page nine of this document.  And

9      this is a page entitled irresistible lure of VDI

10     for AFA.  And Mr. Cobb, VDI is a virtual desktop

11     infrastructure?

12             A.  That's correct.

13             Q.  And that's one of the big use

14     cases for all-Flash storage?

15             A.  That was one of the initial

16     targets for all storage was deduplication.

17             Q.  And AFA stands for all-Flash

18     array; is that right?

19             A.  That's correct.

20             Q.  And the Competitive Intelligence

21     Group at EMC as of October 29, 2013 is stating

22     that VDI is an insanely crowded Flash storage

23     market.  Do you see that?

24             A.  Yes, I do.

378

```
 1                Q.   And then below that there is
 2     subbullet point the second one, the Competitive
 3     Intelligence Group reports all dedupe
 4     implementations have an obvious huge impact,
 5     therefore, relatively easy to go to market.  Do
 6     you see that?
 7                A.   Yes.
 8                Q.   And, in fact, as of the date of
 9     this document, October of 2013, there existed in
10     the storage market a number of different
11     deduplication implementations; correct?
12                A.   Yes, sir, that's correct.
13                Q.   Now, if we could turn to page 32.
14     And this is a portion of the report that's
15     labeled key takeaways.  Are you there yet,
16     Mr. Cobb?
17                A.   I'm just getting there.
18                Q.   It's also on the screen in front
19     of you.  It's easier.
20                A.   My eyesight, the printed page is
21     much better.  Thank you.
22                Q.   Are you there now?
23                A.   Yes, I am.
24                Q.   And this is a page labeled key
```

```
 1     takeaways?

 2               A.   Yes.

 3               Q.   And in the upper right-hand corner

 4     of this page is a label, insanely crowded

 5     market, competition will be fierce(r), and there

 6     is a little R in parentheses; right?

 7               A.   Correct.

 8               Q.   So did you understand -- strike

 9     that.

10               Was the conclusion that was being

11     presented in this document by EMC's competitive

12     intelligence team as of October 2013 that the

13     market for VDI, one of the initial use cases was

14     an insanely crowded market and competition would

15     be fierce(r)?

16               A.   Yes, everyone in the market aimed

17     for VDI as their initial use case.

18               Q.   Could we turn to page seven of the

19     document.

20               And is this page, Mr. Cobb, a

21     graphic prepared by EMC depicting that insanely

22     crowded market as being described in the report?

23               A.   Yes, it is.

24               MR. WERDEGAR:  I have no further
```

```
 1         questions.  Thank you.
 2                    THE WITNESS:  You're welcome.
 3                    THE COURT:  Any redirect?
 4                      REDIRECT EXAMINATION
 5    BY MS. DOMINGUEZ:
 6              Q.  Good morning, Mr. Cobb.
 7              A.  Good morning.
 8              Q.  Just now Mr. Werdegar asked you a
 9    series of questions about some concerns about
10    the timing of XtremIO's launch.  Do you recall
11    that?
12              A.  Yes, I do.
13              Q.  And he showed you an email from
14    some marketing folks talking about those
15    concerns; right?
16              A.  Right.
17              Q.  As best you understand, does any
18    of that have anything to do with whether Pure
19    Storage uses EMC's patented technology?
20                    MR. WERDEGAR:  Objection.
21    Leading, 701.
22                    THE COURT:  Overruled.
23              A.  Sorry, could you restate the
24    question?
```

1        Q.   As best you understand, does any

2   of what Mr. Werdegar asked you about have

3   anything to do with whether Pure Storage uses

4   EMC's patented technology?

5        A.   No, it does not.

6        Q.   Now, by the way, while some folks

7   were obviously pushing as we saw to get XtremIO

8   out into the market as son as possible.  I want

9   to understand what happened after it launched.

10  Could you briefly explain?

11       A.   We launched the product in mid

12  November of 2013.  We had a very good quarter,

13  in just six weeks of selling, we progressed into

14  2014 and by the middle of 2014 we had gone from

15  entering the market to being number one in the

16  market.

17       Q.   What is XtremIO's position in the

18  market today?

19       A.   Today it is still number one.

20       Q.   Just so I understand, how long did

21  it take for XtremIO to get to that position?

22       A.   About three quarters.

23            MS. DOMINGUEZ:  Thank you.  I have

24  nothing further.

```
 1                    THE COURT:  All right.  Thank you,
 2       Mr. Cobb.  You may step down.
 3                    THE WITNESS:  Thank you, Your
 4       Honor.
 5                    THE COURT:  Mr. Krevitt.
 6                    MR. KREVITT:  Yes, Your Honor.
 7       Our next witness is Dr. Kai Li, one of the
 8       inventors of the dedupe patent.  If I can just
 9       step outside.
10                    THE COURT:  Okay.
11
12                         KAI LI,
13              the deponent herein, having first
14              been duly sworn on oath, was
15              examined and testified as follows:
16                    MR. KREVITT:  We have some
17       binders, Your Honor.  May I approach?
18                    THE COURT:  Yes.
19                    MR. KREVITT:  May I proceed?
20                    THE COURT:  Yes.
21                    DIRECT EXAMINATION
22       BY MR. KREVITT:
23              Q.   Good morning, Dr. Li?
24              A.   Good morning.
```

```
 1              Q.   Would you state your full name for
 2       the record and introduce yourself to the jury?
 3              A.   My name is Kai Li.  I'm professor
 4       at Princeton University.
 5              Q.   How long have you been a professor
 6       at Princeton University?
 7              A.   I joined the faculty in 1986.
 8       Since then I have been faculty member.
 9              Q.   For the last thirty years?
10              A.   Yes.
11              Q.   And at some points along the way,
12       did you take any breaks from teaching at
13       Princeton University?
14              A.   Yes.  At the university, typically
15       we are allowed to have sabbatical every six
16       years.  So I took a several sabbatical during
17       this period of time.
18              Q.   And we'll talk about one in a
19       little bit.  If I can ask you to turn to in the
20       binder that I have provided, Dr. Li, to what's
21       marked PTX-1.
22              MR. KREVITT:  And Your Honor, if
23       we could introduce this into evidence, it's the
24       patent.
```

```
 1                  THE COURT:  Right.  Admitted

 2      without objection.

 3   BY MR. KREVITT:

 4             Q.   Do you recognize what's been

 5      marked as -- if we could go to the next page.

 6      Maybe highlight that part.

 7                  Do you recognize this document?

 8             A.   Yes.

 9             Q.   What is it?

10             A.   That's a patent we awarded when I

11      was working at a startup called Data Domain.

12             Q.   And it says Kai Li there.  Is that

13      you?

14             A.   Yes, that's me.

15             Q.   And this is the '464 patent?

16             A.   Okay.

17             Q.   And you understand that the '464

18      patent is one of the patents that's at issue in

19      this case?

20             A.   Yes, I understand.

21             Q.   And if you would flip to PTX 3,

22      it's the '015 patent?

23                  MR. KREVITT:  Your Honor, if we

24      could have that introduced into evidence.
```

385

```
 1                    THE COURT:  Admitted without
 2       objection.
 3                    MR. KREVITT:  Thank you, Your
 4       Honor.
 5     BY MR. KREVITT:
 6            Q.   If you could just make sure,
 7       Dr. Li, that you recognize this document as the
 8       '015 patent, the second patent at issue in this
 9       case?
10            A.   Yes.
11            Q.   And it says Kai Li, that's you?
12            A.   Yes.
13            Q.   As one of the inventors.
14                 Now, I think you touched on this a
15       moment ago, but the patent, if you go down a
16       little bit says that Data Domain is the
17       assignee?
18            A.   Yes.
19            Q.   And you had mentioned earlier that
20       you were working at Data Domain when you took a
21       sabbatical.  When was that?
22            A.   That was in 2001, when I was on
23       sabbatical at Stanford University, and then I
24       team up with two cofounders to start this
```

```
 1    company.
 2              Q.   And let's just break that down for
 3    smaller pieces if we can.  So the year was 2001,
 4    I think you mentioned Stanford, I hadn't heard
 5    anything about Stanford yet.  Can you explain to
 6    the jury what you were doing at Stanford?
 7              A.   Initially I was on sabbatical at
 8    Stanford University.  And during sabbatical
 9    typically we're supposed to take some time off,
10    perhaps learn something new so we can return
11    back to the university to start a new research
12    program.
13                   During that period of time, I was
14    -- I met some friends who were interested in
15    doing, asking me to help them with their
16    startups, then I thought if I have time to do
17    that, perhaps I should think about doing a
18    startup myself, that's when I team up with the
19    two other cofounders to start Data Domain.
20                   So we start the company October
21    12th, 2001, which is one month after September
22    11th.
23              Q.   And we'll talk more about Data
24    Domain, but just briefly, sir, did Data Domain
```

387

```
1     make products?
2           A.   Yes, Data Domain make what we
3     currently call deduplication storage system
4     products to protect data.  Especially with
5     focusing on backup data.
6           Q.   And just to be clear, you said
7     what we currently called, did the Data Domain
8     product have a different name earlier when you
9     had launched it?
10          A.   Yes.  I think the first product we
11    call it is a, I think we changed a thousand
12    times, we called restorer, meaning that you can
13    restore data very quickly.  We also called that,
14    I think internally we called -- today we call
15    deduplication, but back then we called global
16    compression.  I think a few years later market
17    research firms start talking about this new
18    market segment.  They coined the name
19    deduplication, then Data Domain follow that
20    term.  We thought it was a good terminology.
21          Q.   And did all of Data Domain's
22    products use deduplication?
23          A.   Yes.  The entire product line use
24    deduplication.
```

388

```
 1              Q.   And how important was
 2    deduplication to Data Domain and its products?
 3              A.   That's the key technology for Data
 4    Domain product.
 5              Q.   Now, I probably should have asked
 6    this earlier, but just for the jury's benefit,
 7    can you give your, at a high level, your
 8    understanding of what deduplication is?  When
 9    you talk about deduplication, what do you mean?
10              A.   Right.  Deduplication is a method
11    to identify duplicate data segments and then in
12    order to store unique segments, such that you
13    can reduce the footprint of the storage
14    dramatically.  In the past if you're using
15    typical compression tools on your laptop or
16    desktop computer, they also identified duplicate
17    data, except in a very small window, such as a
18    hundred kilobytes or so.  Back then when we call
19    global compression or today we call
20    deduplication is to make that window very large
21    that in the entire storage system or the network
22    of storage systems, you can find duplicate data,
23    so you can avoid storing them, now you can find
24    a lot more duplicate data.  I think that's what
```

```
 1        we refer to as deduplication today.
 2                Q.   How does deduplication relate to
 3        the patents that are at issue in the case, the
 4        patents that you just looked at?
 5                A.   I think to build a deduplication
 6        storage system, there are many challenges.  So
 7        to solve this problem, to be able to build a
 8        commercial product that works well, you have to
 9        have innovations.  I think those innovations
10        represents some parts of the deduplication
11        technology.
12                Q.   You mean the innovations?
13                A.   The innovation.
14                Q.   That you developed at Data Domain?
15                A.   Yes.
16                Q.   And do all of the products that
17        Data Domain sell incorporate the technology in
18        the patents that we're talking about?
19                A.   Yes.
20                Q.   Let's take a step back.  We jumped
21        into deduplication quicker than I anticipated
22        and just get a sense of who you are.  Where did
23        you grow up?
24                A.   I was born and grew up in China.
```

390

```
 1              Q.   Where in China?

 2              A.   In the city called Chongqing, we

 3     call Manchuria in the US.  It was the capitol of

 4     the country during World War II.

 5              Q.   And you went to college in China?

 6              A.   Yes, I went to university called

 7     Jiaotong University in the same province where I

 8     grew up.  That university is a public school,

 9     large public school, sort of similar, if I used

10     the analogy, it would be similar to University

11     of Illinois, University of Wisconsin.

12              Q.   And after your time in college,

13     did you have further studies in China?

14              A.   Yes.  I went to Chinese Academy of

15     Science for my master degree during which time I

16     applied to the PhD programs in the US, then in

17     1981 I went to Yale University for my PhD study.

18              Q.   After your studies in China you

19     went to Yale for your PhD studies, is that what

20     you said?

21              A.   Yes.

22              Q.   And that was in, I'm sorry, which

23     year?

24              A.   That's 1981.
```

```
 1                    Q.   And was that your first time in
 2        the United States?
 3                    A.   Yes, that was the first time to
 4        the United States, also the first time I got out
 5        of China.
 6                    Q.   First time leaving China?
 7                    A.   Yes.
 8                    Q.   What led you to leave China at
 9        that time?
10                    A.   Well, for the better opportunity
11        to study, for better education.
12                    Q.   And was that common for people in
13        China to come and study in the United States at
14        that time?
15                    A.   No.  That wasn't common.  I think
16        this is after the so called revolution, that was
17        the first time the government allows students to
18        get out of China to study.
19                    Q.   So you go to Yale.  It's your
20        first time in the United States.  What did you
21        do -- you got a doctorate from Yale?
22                    A.   Yes.
23                    Q.   And then what happens after you
24        graduated with your doctorate, what do you do?
```

1          A.   I received my PhD degree in 1986

2     and then I joined Princeton University as a

3     faculty member.

4          Q.   And that's in sort of full circle

5     that you've been there ever since?

6          A.   Yes.

7          Q.   And did you consider going back to

8     China after you got your doctorate at Yale?

9          A.   No.  I think like many first

10    immigrants, after receiving education in the US,

11    you know, I felt I loved this country.  This

12    country gave the best opportunity for my career,

13    also the best environment to create a family, so

14    I stayed.

15         Q.   So turning back to the patents,

16    other than the two patents that we've talked

17    about so far, the '015 and the '464 patents that

18    are at issue in this case, are you an inventor

19    on any other patents?

20         A.   Yes, I have received numerous

21    patents.

22         Q.   Ballpark sense of them?

23         A.   More than 20.

24         Q.   And other than the patents that

```
 1      you received, have you received other awards in

 2      your industry or other honors?

 3              A.   Yeah.  Yes, numerous awards.

 4              Q.   You're going to be modest with me.

 5      Can you give the jury an example or two of the

 6      honors and awards that you've received in your

 7      career?

 8              A.   Yeah, probably the most

 9      prestigious one I was elected to National

10      Academy of Engineering in 2012.  And before that

11      I was elected to IEEE and IEEE fellow and after

12      that I was elected to be ACM fellow.  Those are

13      recognitions for the work I've done in the past.

14              Q.   Okay.  So let's take a step back

15      now to the founding of Data Domain.  I think you

16      said that was in October of 2001?

17              A.   Yes.

18              Q.   Okay.  So let's go back to that

19      time.  And you said that you had some

20      co-founders?

21              A.   Yes.

22              Q.   Can you explain briefly who your

23      co-founders were and how quickly you came

24      together and formed Data Domain?
```

1          A.   Yes.  One of the co-founders, Ben

2     Zhu, who I met several years before 2001,

3     because he was a graduate student at Standford

4     University and his advisor, Pat Hyrahan was a

5     friend of mine.  And we -- it happened also he

6     was a roommate of Larry Page, who is now the --

7     who is one of the founders of Google.  So in

8     2001, I first met him through the potential

9     investor of one of the venture capitol first.

10    And once we met we recognized we had already met

11    before, so he wanted to work with me to start a

12    new company.  Another person is Brian Biles.  He

13    has expertise in product management.  And he

14    was -- his company was just fired so he was

15    looking for an opportunity with other people to

16    start up a company.

17          So the three of us, once we met,

18    we sort of really enjoyed being together, and we

19    spend more time every day.  Eventually we

20    decided to start a company.

21          Q.   And during all of this time you

22    remain a professor at Princeton?

23          A.   That was during my is sabbatical.

24    During sabbatical the university actually pay

```
 1      your salary because for you to learn something

 2      new.  But when I knew I was about -- was

 3      thinking about doing a start up, I actually

 4      informed the university stop paying my salary,

 5      so -- to avoid potential conflict of interest

 6      and I would -- so I was on no pay leave from the

 7      university.

 8              Q.   So explain for the jury when you

 9      and your founders come together what the mission

10      of Data Domain was.  What was the purpose you

11      all set out to pursue?

12              A.   Our mission was to replace tape

13      library data centers.  The reason we were

14      thinking about doing that, because at the time

15      as many of you probably remember, the music

16      cassette tapes were replaced by MP3 players and

17      ipods.  And VHS videotapes were being replaced

18      by DVR and TiVo's at the time.  So tapes were

19      very difficult to use and people at the data

20      center had the similar problem, but no one was

21      able to build a product to replace them, so we

22      thought that would be a good opportunity for us

23      to build some product to replace tape library in

24      data centers.
```

1          Q.   If tape library weren't great, you

2     wanted to replace them, why were they so widely

3     used?

4          A.   Well, tape media, as many of you

5     know, are inexpensive comparing with magnetic

6     disk drives, so people, they produce a lot of

7     backup data, because typical data center you do

8     a back up every day, the incremental back up,

9     back up all the files have been changed, but on

10    a weekly basis typically you do a full back up,

11    back up the whole data, all the data you have in

12    the server, and so that consume a lot of media,

13    and tapes are inexpensive, therefore data

14    centers would prefer using tapes.  Another

15    reason is to move tape to the this side for

16    disaster recovery like earthquake or something

17    like September 11 so you can get your data back

18    and they have been using this for this way for

19    decades, so -- but you have problem, many

20    problems, for example, you want to find the

21    data, you have to find the tape first, and you

22    also need to rewind the tape to find where the

23    data is.

24               Tape media are also not so

```
 1      reliable.  Sometimes when we write data into it,

 2      by the time you read the data, you may not be

 3      able to read it back reliably.

 4              So we have Data Domain recruit

 5      some people from Erta Mountain, that's the

 6      largest company for remote data transfer, and

 7      they told us that often they cannot find

 8      customers' tape because the tape placement are

 9      based on bar code and human produce errors.

10      Their statistics is that about ten percent of

11      the time they couldn't find the tapes.  So there

12      is a lot of issues with tape.

13              Q.  Just so I understand, and the jury

14      understands that you described some quality

15      issues with tape, but at the end, you said that

16      it also gets lost.  And you say that a company

17      that stores that told you that ten percent of

18      the time, tape just can't be found?

19              A.  Yes.  Also, I think in early 2000,

20      California passed a law saying that any -- if

21      you are a company and if you lose data of

22      California residents, you have to provide that

23      information to the public domain, disclose that

24      information.  So, therefore, since year -- since
```

1    that time, we saw a lot of article about, Bank

2    of America lost 600,000 customer information

3    during the backup data transfer.

4              When they transfer tape, sometimes

5    they just lost, they couldn't find, and that

6    information would be exposed, it's compromised.

7         Q.   So with the significant problems

8    associated with tape that you explained to the

9    jury and disks existed, why in the backup

10   storage that you were focused on didn't everyone

11   just use disks?

12        A.   Right.  First of all, disks,

13   magnetic disk drives always cost a lot more than

14   tape by several factor, like around factor of

15   five at the time.  So you would have to make

16   that decision, if you just used the

17   straightforward way to store data on disks, it

18   would cost data center, an increase of the cost

19   dramatically.

20             In order to compete, similar to

21   iPod or DVR players, you would have to have

22   special compression to shrink the footprint such

23   that using disk space as storage would be

24   competitive in price, but better in many other

1    -- you have other good, so that's the challenge.

2    You have to be able the create a new kind of a

3    compression that can dramatically shrink the

4    data footprint in order to have disk replace

5    tape, that's what we set out to do as a startup

6    company.

7            Q.   That's what Data Domain set out to

8    do to replace tape with disks?

9            A.   Right.

10           Q.   And what were those -- you start

11   in October of 2001, what were those first months

12   like if you could explain to the jury, what was

13   that like being in that startup for you?

14           A.   Well, I think life in startup,

15   it's always exciting, but very time consuming.

16   We were just very busy working.  And typically

17   we worked fourteen hours a day and the weekends.

18   And we worked in that way for a long time.

19           Q.   And did Data Domain, did you and

20   your colleagues find a solution to the problem

21   to be able to move from tape to disk?

22           A.   Yes.  I think a few months after

23   we start a company, we came up with the idea, I

24   think today people called it deduplication

```
 1        storage technology, and based on that we start

 2        building our product line.

 3                Q.   And did Data Domain succeed in

 4        developing the deduplication technology, the new

 5        deduplication technology to be able to move from

 6        tape to disk?

 7                A.   Yes.  We were able to do that.

 8        And I think in 2006, Data Domain product line

 9        revenue exceeded the tape revenue, that means we

10        won the war on replacing tape.

11                Q.   Let's just follow-up on that.

12        When did the first Data Domain product launch?

13                A.   It was in 2004.

14                Q.   2004.  And within a year or say,

15        what market share did Data Domain have?

16                A.   Well, initially I think people

17        were not -- there was no deduplication storage

18        product segment.  Data Domain was the company

19        that introduced the deduplication storage

20        product into the marketplace.

21                     I think the first year we had a

22        revenue of 8 million, and then quickly increased

23        to 40 million, then over a hundred million, then

24        200 and 500, and then over a billion in revenue.
```

```
 1            Q.   So for us, we don't get to a
 2      billion so quickly, so if we could slow that
 3      down.  So you said you were at 8 million?
 4            A.   Right.
 5            Q.   Was that the first year after
 6      launch?
 7            A.   Right.
 8            Q.   You can explain it, but maybe if
 9      you slow it down and just give the jury a sense
10      of the timing of how you got to, I think you
11      said 40 million or whatever the right numbers
12      are, if we could explain to the jury what the
13      trajectory is to get to that revenue for the
14      Data Domain products?
15            A.   I'm not sure what you meant.
16            Q.   I'm not either.
17                 So I just want -- you gave several
18      numbers, and so that just so the record is
19      clear, the first year of Data Domain revenue was
20      about $8 million?
21            A.   Yes.
22            Q.   And the second year of revenue?
23            A.   It was -- the second after that I
24      think was over 20 million, if my memory is
```

```
 1    correct, it was around 27 million.  And then it
 2    went to 46 million.
 3              Q.   The next year?
 4              A.   Yeah.  And then to 127 million.
 5    Then to I believe after that was the year -- so
 6    that was at 250 million, and then 570.
 7              Q.   Do you remember what year was 250
 8    million?
 9              A.   That was 2006.
10              Q.   So just a couple of years after
11    launching the product?
12              A.   Yeah.  Uh-huh.
13              Q.   And then it doubled to 500
14    million?
15              A.   No, I'm sorry.  I need to get
16    back, take it back.  I think the year of 2007
17    was 127, that was the year we went public.  The
18    year after that is 250.  Then in 2009 was 570,
19    that was the year EMC acquired Data Domain.
20              Q.   And then when did it go to a
21    billion dollars in revenue?
22              A.   The year after that acquisition,
23    2010 it went to 1.1 billion.
24              Q.   Do you know how the revenue of the
```

```
 1        Data Domain product has continued since then?
 2               A.   Yes.  The year after that, it was
 3        one point -- over 1.5 billion, then 1.8 billion,
 4        then over two billion for the rest of the years.
 5        So in total Data Domain product line has
 6        generated over ten billion revenue.  And the
 7        gross margin is around over 75 percent.  I think
 8        the last two years was over 80 percent.  I think
 9        EMC is charging too much money, but --
10               Q.   Objection.
11               A.   I wish it was a little lower.
12               Q.   And just for the benefit of
13        everybody here, what do you mean when you say
14        gross margins in that context?
15               A.   Gross margin is the -- let's say
16        you have a hundred dollars of revenue, then the
17        cost of making the product is 25 percent.  Then
18        the cost is $25.  And the 75 -- in this case,
19        gross margin is 75 percent.
20               Q.   And just following this through,
21        do you have a sense of what Data Domain's market
22        share was in those years?
23               A.   I think since the market research
24        community defined the segment of deduplication
```

1    storage, Data Domain product line, has always

2    had more than 60 percent of the market share.

3         Q.   60 percent?

4         A.   60 percent, yeah.

5         Q.   And those revenues are all

6    attributable to the Data Domain deduplication

7    products?

8         A.   Yes.

9         Q.   And all of those products

10   incorporate the '015 and '464 patents we have

11   been talking about?

12        A.   Yes.

13        Q.   So let's get back to deduplication

14   and you're working fourteen hour days on the

15   startup in the early months, and how quickly did

16   you and your founders, your colleagues develop

17   the idea to use deduplication?

18        A.   I think -- the complete set of

19   ideas or the technology, or invention, whatever

20   you call it, that we had altogether was in

21   February 2002.

22        Q.   So from October to February,

23   October 0 one to February 2002?

24        A.   Yes.

1          Q.   Let me ask you a question if we

2     step back.  Did you, Dr. Li, invent

3     deduplication, the concept of deduplication?

4          A.   Well, I would say no, because

5     deduplication, the concept, has been around

6     since we start doing compression, back in the

7     '70s.  Because if you run those compression

8     tools, they're trying to identify and duplicate

9     data, so you call that deduplication, then that

10    concept has been around for a long time.

11              I think what we have is how to

12    build deduplication storage system, that was

13    new, that was new at the time.

14         Q.   And is that what you invented and

15    put in your patents?

16         A.   Yes.  I think the aspect -- yeah,

17    in this patent, in the two patents, I think what

18    we have is how to build a disk storage system

19    that can run fast and that can achieve low cost,

20    and that's how we can use the product to replace

21    tape backup.

22         Q.   And you developed new and specific

23    techniques to use deduplication in order to

24    accomplish that move from tape to disk?

```
 1              A.   I wouldn't say use, I would say we

 2       invent new ways to implement or to make

 3       deduplication storage part.

 4              Q.   Can you just at a very high level

 5       describe what those -- what you understood to be

 6       your new techniques and new inventions?  If I

 7       may, I know the patent sets out your invention,

 8       I'm not asking you to read your patent, but for

 9       the jury, at the highest level, what you

10       understood you had come up with?

11              A.   Yes.  So the challenge of building

12       deduplication storage system to replace tape is

13       that I think I'm trying to simplify the

14       description.

15              So one thing you have to

16       accomplish is that to reduce the cost, as I

17       mentioned before, disk, magnetic disk media

18       typically cost several times more expensive than

19       tapes.  So we have to shrink data footprint, we

20       have to have a compression ratio much higher

21       than the cost factor.

22              Let's say it cost more than a

23       factor, cost more than factor of five comparing

24       with tape library, and the compression ratio has
```

1      to be greater than five in order to break even.

2      So we want to achieve very high compression

3      ratio.

4                  The other thing is there is also

5      another cost in it which is you need to have a

6      server inside a storage box in order to perform

7      the compression, so that cost has to be reduced,

8      too, in the same formula.  I think the most

9      technical challenge is the speed of moving data.

10     The reason is that every day when we back up

11     data, data center only has a few hours, for

12     example from midnight to four o'clock in the

13     morning, four hours, and this is a time you

14     don't have users.

15                 But the data growth rate is very

16     high.  The data keeps growing.  Actually the

17     data growth rate, we call it the Moore Curve,

18     Gordon Moore, Intel founder, predicted that the

19     network transistors on various chips would

20     double every eighteen months or so, so then in

21     the industry, we called that Moore Law.  We

22     applied Moore Law to data growth rate to CPU

23     performance to many, many things.

24                 So that basically means that the

```
 1        data grows by a factor of ten every five years.

 2                    So that means that you know, if we

 3        only have four hours to move data to back up

 4        devices, our through put has to increase by a

 5        factor of ten every five years.  So that's one

 6        of the challenges.

 7                    But meanwhile you want to reduce

 8        costs, therefore you can't use expensive storage

 9        to test whether which data is redundant, so you

10        have to use very little other resources, such as

11        DRAM to hold information in order to test.

12        Without looking at data restored in data media

13        to decide which piece of data you already have

14        or currently you have the same data, so you can

15        identify which data is redundant.

16                    So this, I think this one of the

17        patents, probably the '015 Patent talk about how

18        to use a data structure, very compact structure

19        and how to, describe the algorithm, how to use

20        that method to decide which data is duplicate

21        and which one is not duplicate, then we can

22        achieve the compression.  So in the end, I think

23        we typically can get compression ratio by a

24        factor of 20 to 30, because in back up in the
```

```
1      entire storage there's a lot of redundant data

2      we can find.  That is -- that's how we can build

3      product, so this process is difficult because of

4      what I described.

5              Q.   The inventions that you and your

6      colleagues came up with and put in the '015 and

7      '464 Patent solve those issues?

8              A.   Yes, we proved that we solve the

9      issues by shipping those products and customers,

10     users have seen what the products can do.

11             Q.   You're referring to the revenue,

12     the fact that there were so many sales of the

13     products?

14             A.   Not only the revenue, but also we

15     have the auto support data coming back from the

16     customer showing us what compression ratio they

17     achieve.

18             Q.   And you use the term compression

19     numerous times.  I believe in this context

20     you're using compression to mean deduplication;

21     is that right?

22             A.   Well, deduplication -- the

23     definition of deduplication is a little vague,

24     because in our product in addition to
```

 1    identifying which data segments are redundant,

 2    we also apply the so-called local compression on

 3    the unique segments before we store it to the

 4    data.  So it's a combined approach and when we

 5    say compression ratio, total compression ratio,

 6    we mean the compound of the compression of

 7    deduplication and local compression together.

 8            Q.   And when you said you achieved 20

 9    to 30 X?

10            A.   Yes.

11            Q.   What do you mean by that?

12            A.   That means that if I have 20

13    megabytes of data, then I only need to consume 1

14    megabytes of storage.

15            Q.   You reduced the data by that much?

16            A.   By that factor, yeah.

17            Q.   So let me ask you a few questions

18    about when you came up with the ideas that you

19    and your colleagues put in the patents, in the

20    '015 and the '464 patents.  Do you remember with

21    precision a date by which you had conceived of,

22    thought of the ideas that you put in your

23    patents?

24            A.   Yeah.  With my co-founder Ben Zhu,

```
 1          we had a lot of discussions.  This is before,
 2          before we start recruiting other people.  I
 3          think -- on the day we put all the ideas
 4          together that we understood how to make such
 5          product was in February.  The reason we remember
 6          it was in February, was that we -- I wrote a lot
 7          of discussions on a white board and we had a
 8          tradition of taking white board, using digital
 9          camera to take white board shots as a record of
10          our discussion.  I had a digital camera at the
11          time that -- you know, cell phones didn't have
12          cameras at the time, so when I was told that
13          there was a patent litigation going on I
14          immediately, you know, remembered I had those
15          white board shots, so I found those.  Those were
16          taken in February.  In fact, these screen -- the
17          first screenshot at the time I named the file
18          February 13, 2002.  We also remember -- I
19          remember that Hugo Patterson, who was the
20          co-inventor of the patent, he joined Data Domain
21          within a week after he received his offer
22          letter.  I found his offer letter dated February
23          25 the of 2002.  Then another person --
24                    MR. VAN NEST:  Objection, Your
```

412

```
 1        Honor.  Move to strike.
 2                     THE COURT:  All right.  The last
 3        sentence, Mr. Krevitt, you agree, right?
 4                     MR. KREVITT:  I don't -- I don't
 5        necessarily.
 6                     THE COURT:  All right.  Come over
 7        to side bar.
 8                     (Side bar discussion.)
 9                     THE COURT:  So he referred to
10        finding the offer letter, which I think is one
11        of the documents that I struck, right?
12                     MR. KREVITT:  I confess I don't
13        know -- I didn't think it was, but it may well
14        have been.  I would need to find out.
15                     MR. VAN NEST:  It is.
16                     MR. KREVITT:  Or I can take his
17        representation.
18                     MR. VAN NEST:  It's stricken.
19                     MR. KREVITT:  You struck the
20        document, but if he has an independent
21        recollection of it --
22                     THE COURT:  How could he possibly?
23                     MR. KREVITT:  I think he
24        absolutely does.
```

```
 1                THE COURT: He just said I found
 2     the letter or saw the letter.
 3                MR. KREVITT:  Can I ask that
 4     question, aside from the letter -- in other
 5     words --
 6                THE COURT:  It's actually just not
 7     plausible that he remembers the date of a letter
 8     when we know he saw the letter.
 9                MR. KREVITT:  I don't mean that.
10     I mean by when Mr. Patterson joined the company.
11                THE COURT:  You can ask him that,
12     you've said that all along.
13                MR. KREVITT:  Okay.
14                MR. VAN NEST:  We're going to
15     instruct the jury that this reference to the
16     offer letter and the date will be stricken?
17                THE COURT:  Right.
18                MR. VAN NEST:  Yeah, okay.
19                THE COURT:  Okay.
20                MR. VAN NEST:  He can talk about
21     if he remembers when Patterson joined as long as
22     it's separate from the offer letter.
23                MR. KREVITT:  I don't know that it
24     instruction is necessary, Your Honor, at this
```

414

```
 1      time.
 2                   THE COURT:  Well, I mean, he's
 3      referred to something I struck, so I'm going to
 4      give -- tell them, actually, I think -- you
 5      know.
 6                   MR. KREVITT:  I actually didn't
 7      expect the witness to refer to the offer letter,
 8      that's why I didn't look back to -- just one
 9      thing.  I just wouldn't -- so he volunteered it,
10      and I am concerned that there is going to be an
11      instruction that makes it seem like we did
12      something that we shouldn't be doing, when --
13                   THE COURT:  You know, I'm not
14      concerned with why they think it was struck.
15      I'm concerned what kind of follow up question
16      you think you can ask that won't --
17                   MR. VAN NEST:  Evoke this.
18                   THE COURT:  Yeah, something like
19      that.
20                   MR. KREVITT:  Why can't I ask
21      explicitly, independent of any letter,
22      correspondence, just from your own memory and
23      recollection?
24                   MR. VAN NEST:  Your Honor, if you
```

1    struck the question and answer, which I think

2    you're intending to do --

3              THE COURT:  The problem is the

4    answer was sort of narrow which he was doing a

5    bunch of things.  The question was fine.  I

6    think.

7              MR. KREVITT:  I did not refer to a

8    letter, I can assure you of that.

9              MR. VAN NEST:  So, I'm concerned

10   that just about any question about when Mr.

11   Patterson started, given that he's now reviewed

12   the letter and now reread it, to give him the

13   date is going to be tainted by that.  So I'm not

14   sure what question he could ask that would be

15   appropriate.

16             THE COURT:  And that's kind of my

17   concern is you can't actually -- I mean, if you

18   ask him do you remember when Mr. Patterson

19   started, he'd probably say, yeah, it was about a

20   week after February 23rd or whatever date of

21   that letter he just said.  So in terms of

22   verifying or corroborating go his testimony, I

23   don't know how him saying well, Mr. Patterson

24   started when, actually he's going to do that

416

1    anyhow.  So why don't we just skip that?

2              MR. KREVITT:  I can tell you if

3    you're interested.

4              THE COURT:  Okay.  Tell me.

5              MR. KREVITT:  This is what he's

6    told us.  We ask him how do you know that you

7    came up with your ideas by a certain date?  One

8    of the things he said from the start, I

9    understand he found documents later, was that he

10   had done these white board drawings before Mr.

11   Patterson started.  That's how I can situate

12   them in time.

13             THE COURT:  But when you're asking

14   the white board date, I thought the white board

15   drawings had some kind of date that was

16   associated with them.

17             MR. VAN NEST:  One does.

18             MR. KREVITT:  They all do.

19             THE COURT:  So that saying I

20   know -- so the point is when trying to get some

21   kind of corroboration of what he's saying --

22             MR. KREVITT:  We'll move on.  I'll

23   move on.

24             THE COURT:  Okay.

```
 1                    THE COURT:  All right.  Members of
 2        the jury, Dr. Li, actually I'm just going to
 3        strike his entire answer to the last question,
 4        so I'm going to ask you to disregard it.  I
 5        would ask Mr. Krevitt to try to ask another
 6        question.  All right.
 7   BY MR. KREVITT:
 8             Q.   So I want to go back to how you
 9        know that you conceived of your inventions in
10        the February time frame, and you were talking
11        about your whiteboard photos.
12             A.   Yes.
13             Q.   I want to ask you some follow-up
14        questions about that.  And I'm not interested in
15        how they may have related to other people
16        joining the company, I just want to understand
17        your understanding of the whiteboard photos and
18        why they're relevant to you in terms of when you
19        conceived of all the ideas that are in your
20        patent.  So let's -- why don't we start there.
21                  You were talking about these
22        whiteboard photos that you prepared.  How did
23        those whiteboard photos, drawings, confirm for
24        you that you had conceived of your inventions in
```

418

```
 1          that time period?
 2                    A.   Well, the whiteboard photos is
 3          important because that white board discussion --
 4          we actually left the whiteboard writing for
 5          quite a while because that captured the key
 6          inventions that eventually went into the patent.
 7                    Q.   Why don't we look at, start
 8          looking at the whiteboard photographs.  And why
 9          don't we pull up -- I think you had said that
10          one file name was mid-February; is that right?
11                    A.   Yeah.
12                    Q.   Let's pull up PTX 9.  And can you
13          tell the jury, it's obviously hard for us all to
14          read, but can you tell the jury what we're
15          looking at?
16                    A.   Right.  So I think this is in the
17          upper left corner it talks about the cache
18          container of a table which described cache table
19          size and also what are the procedures needed to
20          access this data structure.
21                         Then following that is a map
22          showing how to identify using a summary data
23          structure to identify which -- what data is new,
24          what data segments are duplicates.
```

```
 1              Then there is a big table, that's
 2      the entire table that has all the information
 3      that's in the middle called global hash table.
 4      This described the data structure as well as how
 5      to access them, as well as how to even make an
 6      update, how to achieve high performance.
 7              You can see there is also some
 8      parameters, and also on the right-hand side
 9      there is some configuration how to build, what
10      parameters we are thinking about using, what we
11      estimated how the performance of such a data
12      structure.
13              So many of the data structure,
14      even the parameters are still used in the
15      current product line.
16           Q.   Does this whiteboard photograph
17      confirm that at the time that you prepared the
18      actual drawings, you had conceived of all the
19      inventions that are in the claims that we're
20      talking about in the '015 and the '464 patent?
21              MR. VAN NEST:  Objection, Your
22      Honor.  Leading.
23              THE COURT:  I would ask that you
24      rephrase the question, Mr. Krevitt.
```

```
 1    BY MR. KREVITT:

 2              Q.   What does this photograph tell you

 3    about the relationship of when you prepared this

 4    whiteboard drawing to when you had conceived of

 5    all the ideas in the claims of the '015 and '464

 6    patent?

 7              A.   The invention that happened is

 8    essentially from this drawing.

 9              Q.   Does that mean that you had

10    conceived of the ideas at the time this was

11    prepared?

12              A.   Yes.

13              Q.   And you said that you took

14    photographs of the whiteboard; is that right?

15              A.   Yes.

16              Q.   And are you familiar with the

17    concept of metadata?

18              A.   Yes.  Those are the description of

19    about when, how, and information about the

20    photos created by the camera.

21              Q.   Created by the?

22              A.   By the camera.

23              Q.   The photograph that was taken of

24    this whiteboard, who took it?
```

421

```
 1              A.   I took it.
 2              Q.   If we could pull up the metadata.
 3    Is this the metadata that you referred to that
 4    describes when the photograph was taken and how?
 5              A.   Yes.
 6              Q.   And what is the date that is
 7    identified as the date that the photograph of
 8    the whiteboard that has your invention was
 9    taken?
10              A.   Well, the date here is February
11    27th, 2002.  The name of the file, I gave was
12    February 3th, 2002.  I think I named the file
13    because that was the date of the writing on the
14    board.  I believe that February 27 was the day I
15    took the photo.
16              Q.   So just make -- you named the file
17    that you put the photograph in February 13?
18              A.   Yeah.  This particular file, I
19    named February 13.
20              Q.   And you think that's because
21    that's the date you actually did the drawings?
22              A.   Yes.
23              Q.   But this date, February 27th,
24    that's the date that you then take the
```

422

```
 1        photograph of the drawings?

 2               A.   Yes.

 3               Q.   If we turn to PTX 10.  I'm not

 4        going to ask you to describe everything on the

 5        whiteboard, Dr. Li.  But is this another --

 6        maybe if you could just tell the jury what this

 7        is?

 8               A.   Yes.  This is a, part of the

 9        architecture design to implement the invention

10        into a product.  This is a COS, means compress

11        object store.

12               Q.   And so does this also confirm that

13        you had conceived of your inventions by the time

14        you did this drawing?

15               A.   Yes.

16               Q.   And why don't we look at the

17        metadata for this photograph, again, which is

18        the date the picture was taken.  Can you tell us

19        what the date of the picture?

20               A.   That's March 20th, 2002.

21               Q.   March 20, 2002.

22                    That means that the photograph was

23        taken on that date?

24               A.   Right.
```

423

1          Q.   Does that mean that you did the

2     drawings on that date?

3          A.   No.   That means that the drawing

4     has to be done before the photo was taken.

5          Q.   So no later than that date, maybe

6     earlier?

7          A.   No later than that date.

8          Q.   And if we flip to just one more,

9     PTX 11, and again, not asking you to go through

10    in detail, but does this whiteboard like the

11    others relate to the deduplication inventions in

12    your patent, your patents, excuse me?

13         A.   Yes.   This one is to describe the

14    function of, particularly the future and also

15    the analysis of how many bits you need per

16    entry, so we did some contemplation on the

17    whiteboard.   This is my handwriting.

18         Q.   Are all the white boards your

19    handwriting?

20         A.   Yes.

21         Q.   Let's just look at the metadata

22    for completeness on this one.   What is the date

23    of this one?

24         A.   This is also March 20, 2002.

424

```
 1            Q.   Do you remember taking the
 2     photographs?
 3            A.   Yes, it was my digital camera.  I
 4     don't have it in the office, but once in a while
 5     I bring the camera in, I would take photos as a
 6     record.
 7            Q.   And why did you take the photos?
 8            A.   Well, it's a more efficient way to
 9     archive the discussions.  And also later we
10     could use to remind ourselves what we had
11     discussed before.
12               MR. KREVITT:  Your Honor, we move
13     PTX 9, 10 and 11 into evidence.
14               MR. VAN NEST:  No objection, Your
15     Honor.
16               THE COURT:  All right.  Admitted
17     without objection.
18     BY MR. KREVITT:
19            Q.   Let me show you another document,
20     Dr. Li, or ask you to flip to in your binder.
21     It's PTX 8.  So it comes right before the
22     whiteboard photos we were just looking at.
23            A.   Yes.
24            Q.   Do you recognize this document?
```

425

1           A.   Yes, I do.   I wrote this document.

2           Q.   And what is an architectural

3    specification?

4           A.   Architectural specification is the

5    document describing the product architecture,

6    and also document the technology used in the

7    product.

8           Q.   And was the architectural

9    specification we're looking at here, does that

10   reflect your inventions and indicate that you

11   had conceived of your inventions by the time you

12   wrote the architectural specification?

13          A.   Yes.   The standard practice we

14   develop a technology and we want to use the

15   technology in the product, we will write a

16   specification.   In fact, we'll write two

17   specifications, one is the architectural

18   specification, the other is a functional

19   specification, based on both of the engineers

20   would be able to implement that particular

21   design.

22               But in this case, this is a global

23   design, the top design.   Then the product will

24   be divided into modules, then for each module,

```
 1      we'll have to write an architectural

 2      specification and the functional specification

 3      so you know what to implement, how to implement

 4      and also what to test later, that way you put

 5      everything together and it will work.

 6                  This one is essentially follow the

 7      whiteboard discussion document, what ideas would

 8      go into -- based on your discussion would go

 9      into the product.

10                  Q.   Were those the same ideas that you

11      conceived that went into the patents?

12                  A.   Right.  Yes.

13                  Q.   And would you sit down to write an

14      architectural specification before you had

15      conceived of your inventions that you put in

16      your patents?

17                  A.   No.  You can't write a

18      specification without the invention.  You have

19      to have the invention in place before you write

20      a specification.  In fact, in many cases, this

21      is not just Data Domain, but standard practice

22      in most of the companies.  You need to validate

23      your ideas by either using mathematics or by

24      implementing prototype and work with running
```

427

```
 1    with workload before you start writing

 2    specification, otherwise it will be a waste of

 3    time.

 4            Q.   There are two dates on this

 5    architectural specification, March 16, 2002 and

 6    April 3, 2002?

 7            A.   Right.

 8            Q.   Can you explain what those dates

 9    mean?

10            A.   Well, in this case, March 16, 2002

11    was the first draft.  Then that was named the

12    version 0.1.  0.1 one is this particular

13    version, that's the vision, and released in

14    April, on April 3rd, 2002.

15            Q.   And did you look for the March 16

16    document?

17            A.   I couldn't find that document.  I

18    did look.

19            Q.   And are you able to say how

20    significant or what the nature of any changes

21    may have been between the March 16 document and

22    the April 3rd document?

23            A.   Well, based on the -- our

24    convention, versioning convention, the change is
```

428

1       minor.  The reason is that typically before the

2       dot, that mark the main version, but in this

3       case we're using zero as the first draft.  In

4       some cases, I think -- in some companies

5       typically you use 1 as the first draft.  In this

6       case that's the main version, then the digit

7       after the dot is the -- are the changes since

8       the first version.  Then the second digit after

9       that is a minor change.  That's our convention.

10      I'm pretty sure it's minor changes since then.

11      Also -- what described in this document are what

12      I described in the white board -- the screen

13      shots.

14             Q.   In the white board photographs?

15             A.   Yes.  So I'm certain that the

16      version March 16 document, the idea is white

17      boards too.

18             Q.   So just to be clear, what you're

19      saying, are you absolutely certain based on the

20      white board photos and this document and just

21      your own recollection that by March 16 you had

22      conceived of all the inventions in the claims in

23      the patent in this case?

24             A.   Yes.

429

```
 1          Q.   Now, after you conceived of the
 2     inventions and you created the March 16
 3     architectural specification, what did the
 4     company focus on next?
 5          A.   The company, we -- on several
 6     things in parallel.  One is to immediately build
 7     a prototype, based on the invention and we
 8     convinced three data centers to run -- their
 9     work load.  Actually we deployed the prototype
10     into three data centers.  Then meanwhile we're
11     designing the rest of the pieces, right, then
12     build a purer version 1 of the product.  So we
13     were very busy working on those.
14          Q.   What was that time like for you in
15     those months after you conceived of the
16     invention or were working hard?
17          A.   Yeah, just extremely busy.  I
18     think -- I think after that, after working very
19     hard to build the product line and developing
20     the market and so on and so forth, looking back
21     was very interesting, but at the time it was
22     very difficult for most people, just because
23     we -- we worked very hard.  As I mentioned
24     before, we typically worked 14 hours a day.
```

```
 1              Q.   And was that for months on end?

 2              A.   No.  No.  For the first two or

 3     three years, I think we were working like that.

 4              Q.   And if I can ask you --

 5              MR. KREVITT:  First, Your Honor,

 6     if I can move into evidence PTX-8, the

 7     architectural specification.

 8              MR. VAN NEST:  No objection, Your

 9     Honor.

10              THE COURT:  Admitted without

11     objection.

12     BY MR. KREVITT:

13              Q.   And if you could look, Doctor Li,

14     and I'm going to speed it along, if you could

15     look through, I'm going to give you some

16     numbers, 49 and 50.

17              A.   Where are you looking at?

18              Q.   They should be in your binder.

19              A.   49.  Oh, in the back.

20              Q.   I'm sorry, yes.

21              A.   Okay.  Yes.

22              Q.   I'm not going to ask you specific

23     questions about these documents, but I do want

24     to make sure -- I just want to ask you what they
```

431

 1     are, so 49, 50, 51, 55, 57.

 2              A.   Right.

 3              Q.   59 and 62.

 4              A.   Yes.

 5              Q.   63 and 65.  And then 66, 67 and

 6     68.  And if you could just tell me if you

 7     recognize these documents?

 8              A.   Yes, I recognize them.

 9              Q.   And what are they, just again?

10              A.   These are the architectural and

11     the functional specification I mentioned before

12     for each main module in the product.

13              Q.   And those documents that have

14     dates ranging from May of 2002 to December of

15     2002, does that refresh your recollection as to

16     the time frame within which you were working

17     that hard to build your product?

18              A.   Yes.

19              MR. KREVITT:  Your Honor, I would

20     move to have those, all of those documents

21     admitted into evidence, please.

22              MR. VAN NEST:  No objection, Your

23     Honor.

24              THE COURT:  All right.  All

1    admitted without objection.

2  BY MR. KREVITT:

3              Q.   Now, finally at some point earlier

4    you said that Data Domain went public?

5              A.   Yes.

6              Q.   Do you remember the year?

7              A.   It's 2007.

8              Q.   And when Data Domain went public,

9    what was its stock ticker symbol?  What was the

10   symbol that goes across to the ticker?

11             A.   It was DDUP for dedupe.

12             Q.   For deduplication?

13             A.   Yeah.

14             MR. KREVITT:  Thank you very much,

15   Doctor Li.  I have no further questions, Your

16   Honor.

17             THE WITNESS:  Thank you.

18             THE COURT:  All right.  Why don't

19   we take our morning break right now for 15

20   minutes.  Can we take the jury out please.

21             MR. KREVITT:  Do you want Doctor

22   Li to stay there?

23             THE COURT:  Doctor Li, you can

24   step down and take a break.  Is there anything

```
 1        you want to discuss?

 2                    MR. KREVITT:  No, sir.

 3                    MR. VAN NEST:  I don't think so,

 4        Your Honor.

 5                    THE COURT:  All right.  We'll be

 6        back in 15 minutes.

 7                    THE COURT:  All right.  Are we

 8        ready to resume?  Dr. Li.

 9                    MR. KREVITT:  We're missing

10        Dr. Li.

11                    MR. VAN NEST:  Would you like a

12        witness binder now, Your Honor?

13                    THE COURT:  Sure.

14                    All right.  Let's get the jury in.

15                    MR. KREVITT:  Your Honor, I am

16        very sorry, I just flipped open the witness

17        binder, and I know we're going to have a very

18        serious objection to the very first exhibit.  We

19        can do that if Mr. Van Nest gets to it or we can

20        do it now.  It may just make sense to do it.

21                    In the witness binder flipping to

22        it has the very first exhibit is prior art.  I

23        don't want to do it in front of the jury.

24                    THE COURT:  All right.  Hold them
```

434

1    up.

2                     MR. KREVITT:  I'm sorry.  The very

3    first -- I have only flipped to the first, I

4    don't know if any other prior art is in here,

5    but the very first exhibit is one of Pure

6    Storage's anticipation references, the Venti

7    reference, which presumably they're going to try

8    to question Dr. Li on, which is -- there is lots

9    of case law on this, it's highly improper.  He's

10   not an expert.

11                    THE COURT:  Of course the problem

12   is I don't really know what questions they're

13   going to ask.  What are you going to ask,

14   Mr. Van Nest?

15                    MR. VAN NEST:  It's going to be

16   very brief and it goes to this whole idea of

17   conception.  All I want to establish is that

18   Dr. Li attended the conference in January where

19   this paper was presented.  He saw the

20   presentation, he read the paper.  And just very

21   briefly outline not in any detail, but the

22   subject was a paper on deduplication storage.

23   He's mentioned it --

24                    THE COURT:  What is the point of

```
 1      this?
 2                   MR. VAN NEST:  The point of this
 3      is that this paper was well-known and this
 4      presentation was well-known and it was out there
 5      and even the inventor saw it a month before he
 6      said he conceived his invention.  It is one of
 7      our prior art references.  I'm not going to go
 8      into the details, but I want to establish that
 9      it was well-known and out there.
10                   MR. KREVITT:  Your Honor we
11      stipulated to its authenticity and its
12      availability.
13                   THE COURT:  Well, Mr. Van Nest --
14                   MR. VAN NEST:  There is no
15      question that it's authentic, but I think that
16      it's significant that one of the inventors was
17      present when it was presented and read it, saw
18      it --
19                   THE COURT:  So I guess what I'm
20      wondering, it's not going to be challenged on
21      authenticity, I'm sort of okay with asking just
22      as a matter of fact whether he was at this
23      convention, you know, was familiar with the
24      paper.  But I'm not really sure why -- what else
```

1        --

2                    MR. VAN NEST:  I just want to

3        establish through him just by looking at the

4        title in the abstract that it's about a data

5        storage system, and deduplication in that

6        system.  That's basically it.

7                    MR. KREVITT:  Your Honor, that's

8        exactly what he shouldn't be doing with this

9        witness.  This is a Pure anticipation case now.

10       The only thing that's relevant is what is in the

11       four corners of the document.  The fact that

12       Mr. Li may have been there and heard is highly

13       irrelevant and prejudicial.

14                   THE COURT:  Well, I mean, I guess

15       that's what I'm concerned about, because it

16       sounds like you're trying to plant the seed that

17       he copied this.

18                   MR. VAN NEST:  No.

19                   MR. KREVITT:  There is no

20       inequitable conduct in this case.

21                   MR. VAN NEST:  I'm not intending

22       to suggest or plant it, I'm intending to suggest

23       that at the time that he came up with his

24       invention, others were working on the same

```
 1    problem, at or around the same time, and that
 2    one of those others was the Venti system that
 3    was discussed in a big group of professionals in
 4    late January.  That's all.
 5              THE COURT:  All right.  Well, I'm
 6    going to -- I think there is some relevance to
 7    what Mr. Van Nest says, so I'm going to allow
 8    him to do it.  But there shouldn't be any
 9    technical questions.  Basically he should
10    identify the article and let your experts talk
11    to the technical stuff.
12              MR. VAN NEST:  I will.  I'll
13    identify, I would like to display it so we can
14    confirm what it is.
15              THE COURT:  I have no problem with
16    showing the cover page.
17              MR. KREVITT:  Your Honor, our
18    concern here is knowledge is not an element of
19    anticipation.  And none of this was disclosed in
20    an invalidity contention.  And it is designed
21    obviously, there is no other reason given that
22    we have stipulated to its availability and
23    authenticity to create in the jury's mind that
24    Dr. Li was aware of certain prior art and
```

```
 1      Mr. Van Nest said in opening statement, none of
 2      the prior art was disclosed to the patent
 3      office.  We are creating subtext of inequitable
 4      conduct claim which is entirely irrelevant.  It
 5      has zero relevance to anticipation.
 6                  THE COURT:  I don't think I'll
 7      hear that.  If I here hear that, I'll be very
 8      upset.  So I'm going to let him do it.
 9                  MR. VAN NEST:  Thank you, Your
10      Honor.
11                  THE COURT:  All right.  Let's get
12      the jury in.
13                  (Jury entering the courtroom at
14      11:14 a.m.)
15                  THE COURT:  All right.  Members of
16      the jury, welcome back.  Everyone, you may be
17      seated.
18                  Mr. Van Nest, you may proceed.
19      Dr. Li, you may be seated.
20                  MR. VAN NEST:  Thank you, Your
21      Honor.  May I approach Dr. Li with a witness
22      binder?
23                  THE COURT:  Yes.
24                  MR. VAN NEST:  Thank you.
```

439

```
 1                    CROSS-EXAMINATION

 2    BY MR. VAN NEST:

 3              Q.   Good morning, Dr. Li.

 4              A.   Good morning.

 5              Q.   Dr. Li, you were one of the

 6    cofounders of Data Domain; correct?

 7              A.   Yes.

 8              Q.   And I believe you said you briefly

 9    served as the CEO of the company for a couple of

10    months?

11              A.   About two months.

12              Q.   And after that, you became the

13    chief technical officer?

14              A.   Yes.

15              Q.   And you served in that position

16    all the way up until the time that EMC acquired

17    the company?

18              A.   No.  When I -- in 2004 I returned

19    back to university teaching and doing research,

20    and also around 2006, I was sick, so I took some

21    medical leave.  Doctor contribute that to too

22    much work during the startup days.

23              Q.   Fair enough.  In any event, as a

24    founder, you own stock in Data Domain?
```

440

```
 1                    A.   Yes.

 2                    Q.   And that stock went public at some

 3       point?

 4                    A.   Yes.

 5                    Q.   And then EMC acquired the stock

 6       when it bought Data Domain?

 7                    A.   Yes.

 8                    Q.   And at that point, you made a

 9       great deal of money in connection with that

10       acquisition; correct?

11                    A.   Yes.

12                    Q.   And then after Data Domain was

13       acquired, you served on the technical board of

14       EMC?

15                    A.   Yes.

16                    Q.   The technical board meets a few

17       times a year to discuss technology?

18                    A.   Yes.

19                    Q.   And for that you were also paid at

20       the rate of about $15,000 a year?

21                    A.   Yes.  In my contract expired April

22       2015.

23                    Q.   So you served in that position

24       from 2009 to 2015, and were paid that salary
```

```
 1        each year; correct?

 2                  A.   Yes.

 3                  Q.   And then in addition, as a member

 4        of the technical advisory board, you also got

 5        stock in EMC; right?

 6                  A.   Very few, but some.

 7                  Q.   But you got shares?

 8                  A.   Yes.

 9                  Q.   And they have gone up in value

10        over time?

11                  A.   Yes.

12                  Q.   As a matter of fact, you are being

13        paid as a consultant in this litigation as well;

14        right?

15                  A.   I was paid to look for materials,

16        not for deposition or as a witness.

17                  Q.   You were paid at the rate of $475

18        an hour to search for documents?

19                  A.   Right.

20                  Q.   And also to work with the lawyers?

21                  A.   Yes.  But my rate, that's very

22        low, much lower than my typical rate for

23        consulting.

24                  Q.   But again, that rate was paid in
```

442

```
 1      the course of your work in this case, working

 2      with the lawyers for EMC, searching for

 3      documents, and that sort of thing; correct?

 4              A.   Right.   Looking for documents,

 5      yes.

 6              Q.   Now, when you started Data Domain,

 7      you were trying to replace tape system with disk

 8      drive; correct?

 9              A.   Right.

10              Q.   And I think you said the focus of

11      Data Domain was on the backup market?

12              A.   Yes.   That was the focus.

13              Q.   Backup storage as opposed to the

14      primary market, is that what you meant?

15              A.   Well, actually viewed several

16      kinds of products in the product line, backup

17      was just one of them.   We also had product for

18      storing archival data, we called archiver.   And

19      also we were sell the line and internally we

20      also have a project Flash memory product using

21      deduplication storage even though that was never

22      shipped.

23              Q.   Let's unpack that.   I take it the

24      primary market, the market in which Data Domain
```

443

```
 1        has had success is the backup market?

 2                   A.   That's the primary market, yes.

 3                   Q.   And you understand -- well, strike

 4        that.

 5                        And the Data Domain products that

 6        have had the success, they all use mechanical

 7        spinning disks; right?

 8                   A.   Mechanical, magnetic disk drives

 9        are the primary media, but we have other storage

10        components in the system.

11                   Q.   But you understand this case is

12        about the transition from disk to Flash; right?

13                   A.   What do you mean?

14                   Q.   This lawsuit is about the

15        transition from disk drive to Flash technology,

16        you understand that, Dr. Li; right?

17                   A.   I'm not sure what you talking

18        about.  I thought this lawsuit was a transition

19        of the product.

20                   Q.   Now, I take it Data Domain never

21        was able to commercialize a Flash product,

22        right?

23                   A.   Did not commercialize the Flash

24        product.
```

444

```
 1              Q.   Right.  You had a project to try

 2      to build Flash, but eventually you killed that

 3      project, correct?

 4              A.   I don't know what happened,

 5      because I was no longer with Data Domain.

 6              Q.   But in any event you're aware that

 7      Data Domain never was able to commercialize a

 8      product in the All-Flash market, right?

 9              A.   I'm not aware.

10              Q.   Okay.  Now, and there's no mention

11      at all of Flash in either of the '464 or the

12      '015 patents, right?

13              A.   Yes, not mentioned.

14              Q.   Those patents were developed in

15      the days when mechanical disk was the primary

16      storage means, correct?

17              A.   I'm not sure what you mean.  There

18      are many forms of media.

19              Q.   Let me move on, Doctor Li.

20              A.   Yeah.

21              Q.   Now, you continued serving on the

22      technical advisory board at EMC right up until

23      April of last year, correct?

24              A.   Right.
```

1           Q.   And after 2009, EMC had acquired

2      all of your patents and all of the Data Domain

3      technology, correct?

4           A.   Yes.

5           Q.   Now, did you become aware through

6      your position on the technical advisory board

7      that EMC went out and bought another company,

8      namely XtremeIO to get into the Flash market?

9                MR. KREVITT:  Objection, Your

10     Honor.  Foundation and outside the scope of my

11     direct examination.  Obviously I didn't touch on

12     any of those.

13               MR. VAN NEST:  I asked him whether

14     he knew it, Your Honor.  I'm trying to find out.

15               THE COURT:  Well, I'm going to

16     overrule the objection.  Go ahead.

17     BY MR. VAN NEST:

18          Q.   I'll ask it again, Doctor Li.

19          A.   Okay.

20          Q.   And that is did you become aware?

21          A.   Yes, I'm aware.

22          Q.   Okay.  So even though EMC had

23     possession of all of the Data Domain technology,

24     they went out and bought a different company

446

```
1    with different technology to enter the Flash
2    market, correct?
3              A.   I don't know how EMC works in
4    terms of acquiring company.  I can't --
5              Q.   Well, you're certainly aware that
6    in order to enter the Flash market one of the
7    things EMC did was purchase XtremeIO and
8    eventually commercialize their product?
9              A.   EMC also bought SSD company, also.
10             Q.   So they maybe acquired yet another
11   company.  What company is that called, DSSD?
12             A.   SSD, that's a Flash memory storage
13   company.
14             Q.   All right.  So but my point is
15   after they owned all of your technology, they
16   went out and bought other companies to get into
17   Flash, right?
18             A.   Yes.
19             Q.   Now, did you become aware, as a
20   member of the technical advisory board, that EMC
21   Ventures had approached Pure Storage to discuss
22   its technology?
23             A.   I don't -- I don't know about
24   that.
```

447

```
 1                  Q.   Now, you yourself indirectly were
 2        an investor in Pure Storage, right?
 3                  A.   Yes.  I'm a small limited partner
 4        of Greylock, which invested in Pure Storage.
 5                  Q.   So Greylock, that's one of
 6        these --
 7                  A.   I'm formal acting CEO and Aneel
 8        Bhusri is on the board of Pure Storage.
 9                  Q.   And you are a partner in a venture
10        capitol firm called Greylock; is that right?
11                  A.   Yes.
12                  Q.   And Greylock looks at startups for
13        investment?
14                  A.   Right.
15                  Q.   And they are trying to pick the
16        best startups and the best investments they can?
17                  A.   Right.
18                  Q.   And that's why you've invested in
19        Greylock, right?
20                  A.   Well, that's not -- I don't make
21        decision for Greylock who to invest.  I was only
22        investing Greylock because they asked me to.
23                  Q.   Okay.  But you know that one of
24        the investments Greylock made was in Pure
```

```
 1    Storage, right?

 2            A.   Yes.

 3            Q.   And you've been following and

 4    aware of Pure Storage since it was started back

 5    in '09 as well?

 6            A.   I don't know the details about

 7    Pure Storage.  I know the existence of Pure

 8    Storage.

 9            Q.   Okay.  Now, I think you testified

10    on direct that you and your colleagues at Data

11    Domain, you didn't invent the idea of

12    deduplication, that was pretty old?

13            A.   Well, what I said was the cause of

14    finding duplicate data start back in the '70's,

15    when we're building compression software.  That

16    has been around for decades.

17            Q.   And actually in your patent, in

18    the '464 Patent, you mention that there are

19    other forms of deduplication technology that

20    have been attempted, right?

21            A.   Right, but they didn't solve the

22    challenging problems.  And that's what the

23    invention is about.

24            Q.   You mentioned a number of
```

```
 1        different technologies in the '464 patent that

 2        were performing deduplication and indicated

 3        yours was better, right?

 4               A.   It's not only better.  I think the

 5        previous -- the previous approaches wouldn't be

 6        able to build a commercial product.  I think

 7        that our technique is the one that enabled us to

 8        build a commercial product.

 9               Q.   One of the papers that was out

10        there before your invention was the Venti paper,

11        correct?

12               A.   Yes.

13               Q.   Now, the Venti paper, let's back

14        up a minute.  Do you attend a conference each

15        year called the FAST conference, F-A-S-T?

16               A.   Not every year, but I went there

17        several times.

18               Q.   Okay.  And FAST stands for file

19        and storage technologies, correct?

20               A.   Yes.

21               Q.   That's an annual conference of

22        file and storage people?  You have to give me a

23        verbal answer, Doctor Li.

24               A.   Yes.
```

1          Q.   Okay.  And you've attended it a

2      number of times in the past?

3          A.   Yes.

4          Q.   Now, could you open your binder

5      there to DTX-560, please?

6          A.   Okay.

7          Q.   And can you tell us what you see

8      there?  Is that the Venti system paper?

9          A.   Yes.

10         Q.   Okay.  You're familiar with that?

11         A.   Yes, we also disclosed this for

12     our patent filing.

13         Q.   Okay.

14              MR. VAN NEST:  I'd like to move

15     DTX-560 in evidence, Your Honor.

16              MR. KREVITT:  No objection, Your

17     Honor.

18              THE COURT:  All right.  Admitted

19     without objection.

20     BY MR. VAN NEST:

21         Q.   Now, Doctor Li, the Venti paper

22     was actually presented at the FAST storage

23     conference inspect late January of 2002,

24     correct?

451

```
 1                    A.   Yes.

 2                    Q.   As we have on the screen, this is

 3        the title of the -- not the paper, but the

 4        proceedings, correct?

 5                    A.   Yes.

 6                    Q.   And you remember that they

 7        occurred in late January of 2002?

 8                    A.   Yes.

 9                    Q.   You attended the conference?

10                    A.   Yes, I did.

11                    Q.   And you remember attending the

12        presentation of the Venti paper, right?

13                    A.   Yes.  That's why we learned they

14        could not -- their paper is the techniques that

15        couldn't build a commercial product.

16                    Q.   Doctor Li --

17                    MR. KREVITT:  Your Honor, if the

18        witness can be allowed to finish his answer,

19        please.

20                    THE COURT:  I'm going to let him

21        finish his answer.  I think he has actually.

22                    THE WITNESS:  I was about to

23        elaborate a little further, but --

24                    THE COURT:  Well, so we'll save
```

452

1          the elaboration.  Go ahead, Mr. Van Nest.

2                     MR. VAN NEST:  Thank you.

3     BY MR. VAN NEST:

4                Q.   My point was you actually attended

5          the presentation in January where this paper was

6          presented?

7                A.   Yes, I said I did.

8                Q.   Right.  And then you actually read

9          the paper?

10               A.   Yes, we read the paper to identify

11         the problems that we had not been able to give a

12         product.

13               Q.   Can I have the next page and the

14         title of the paper?  The paper concerns data

15         storage techniques, correct, the title is a new

16         approach to archival storage, right?

17               A.   Right.

18               Q.   And that's the problem that you

19         and your inventors were working on at that time?

20               A.   Yes.

21               Q.   Okay.  And the very first sentence

22         indicates --

23                     THE COURT:  All right.  So he's

24         familiar with the paper.  That's what you're

453

```
 1          going to do with him.  Is there some other

 2          question you have?

 3                       MR. VAN NEST:  The only question I

 4          had beyond that, Your Honor, was that the paper

 5          in the abstract discusses that it's using

 6          deduplication in a data storage system.

 7                       MR. KREVITT:  Your Honor --

 8                       THE COURT:  Is that what the paper

 9          is about?

10                       THE WITNESS:  Well, there was no

11          word called deduplication in this abstract.

12    BY MR. VAN NEST:

13               Q.   But, in fact, there is a

14          discussion of a technique for performing

15          deduplication, right, Doctor Li?

16               A.   I would say this is a research

17          project at Bell Labs at the time we were using,

18          attempt to view such a system, but they

19          couldn't -- this paper described why it wouldn't

20          work, therefore, we identified all the problems,

21          we learned from this paper that what problems to

22          work on.

23               Q.   My question was a little

24          different.  Could we highlight that third
```

454

```
 1       sentence in addition, duplicate copies of a

 2       block can be coalesced reducing the consumption

 3       of storage and simplifying the implementation,

 4       that means deduplication to professionals like

 5       yourself, Dr. Li, does it not?

 6                    MR. KREVITT:  Your Honor,

 7       objection.  It's exactly what we discussed.

 8                    THE COURT:  All right.  I'm going

 9       to sustain the objection.

10                    Move on, Mr. Van Nest.

11                    MR. VAN NEST:  I will do so, Your

12       Honor.

13    BY MR. VAN NEST:

14              Q.  Now, Dr. Li, you filed for what

15       became the '015 patent in the patent office on

16       December 20th of 2002; correct?  If you want to

17       look --

18              A.  Maybe.

19              Q.   It's DTX 797.  And this is also

20       PTX 3, Your Honor, it's already in evidence.

21       I'll put on the screen the cover and let's

22       highlight the December 20 date.  So that's the

23       record date in the patent office at which time

24       the patent was filed; right?
```

```
 1              A.   Yes.

 2              Q.   There are some other dates after

 3      that, but that's the official patent office date

 4      for the filing of the '015 patent; correct?

 5              A.   Yes.

 6              Q.   And you're not exactly sure what

 7      specific date you and your fellow inventors

 8      actually came up with all the ideas in the '015;

 9      correct?

10              A.   That's not true.  I just testified

11      before about the dates.

12              Q.   Is there a specific date that you

13      believe is the date at which --

14              A.   February 13, 2002.

15              Q.   And that's based on the

16      photographs; correct?

17              A.   Based on the name of the file of

18      the photograph.

19              Q.   Now, you testified about an

20      architectural specification; correct?  Could I

21      have PTX 8, please.  And I just want to get

22      clear on this.  This architectural specification

23      itself, this document is dated April 3rd, 2002;

24      correct?
```

```
 1              A.   Yes.

 2              Q.   And so the information in this

 3    specification is as of April 3rd of '02; right?

 4              A.   Yes.

 5              Q.   And you mentioned a version 0.1

 6    that's shown on the face there as having an

 7    earlier date; correct?

 8              A.   Yes.

 9              Q.   Just to confirm, you were unable

10    to locate that document?

11              A.   I could not find that document.

12    It's been so many years ago.

13              Q.   You looked in your files, you

14    couldn't find it?

15              A.   I looked in my files.

16              Q.   You looked in your office, you

17    couldn't find it; right?

18              A.   Which office?

19              Q.   Well, did you look in an office?

20    Was there more than one location that you

21    searched?

22              A.   Well, my office at Princeton

23    doesn't have information of the company.  I

24    don't have access to the office.
```

```
 1              Q.  The information for the company,

 2    that went to EMC when they bought Data Domain;

 3    right?

 4              A.  That's correct.

 5              Q.  And as far as you know, EMC hasn't

 6    been able to find this March 16 document,

 7    either; right?

 8              A.  I don't know.  They didn't tell me

 9    whether.

10              Q.  But they have all the company

11    records and they got them back in '09 when you

12    sold the company; correct?

13              A.  I assume so.

14              Q.  Now, you gave a deposition about a

15    month ago?

16              A.  Right.

17              Q.  Dr. Li, correct, you were under

18    oath for the deposition?

19              A.  Yes.

20              Q.  And you told us that you weren't

21    exactly sure what was in the earlier version of

22    the April 3rd document; correct?

23              MR. KREVITT:  Your Honor,

24    objection.  That's not impeachment, quoting a
```

458

```
 1        deposition to the witness.

 2                   THE COURT:  Overruled.

 3   BY MR. VAN NEST:

 4             Q.   Dr. Li --

 5             A.   I don't think I said exactly what

 6        you said.

 7             Q.   Would you open --

 8                   THE COURT:  Wait, Mr. Van Nest.

 9        He was speaking.

10                   MR. VAN NEST:  I'm sorry.  Go

11        ahead, Dr. Li.

12                   THE WITNESS:  I don't think -- I

13        don't remember exactly what I said.  That was a

14        seven-hour deposition.  I'm not sure what your

15        question was.

16             Q.   Well, Dr. Li, you're not exactly

17        sure what was in the earlier version even now

18        because we don't have it; right?

19             A.   Right.  We don't have the current

20        version.  I think what I said was that based on

21        the content of the screen shots, based on our

22        version, I think the version of 0.11 has a minor

23        revision from version 0.1, that's what I said.

24             Q.   But you also said you weren't
```

459

```
 1      exactly sure what was in the earlier version
 2      because you hadn't seen it; right?
 3              A.   Well, I wrote all version because
 4      at that time I was the only person who write
 5      specification.  I think it would be natural for
 6      me to document what we had discussed before,
 7      even in version 0.1, that's why I'm assuming the
 8      difference is not -- is minor.
 9              Q.   But you're making that assumption,
10      again, you don't know for sure; right?
11              A.   Well, I have the screen shots to
12      remind me of what's in -- what I would write in
13      0.1 version.
14              Q.   Could you open your deposition
15      there, Dr. Li, to page 193 at lines 7 through
16      14.  Start at line 7, did you give this answer
17      to our question:
18              "Question:  But just to be clear
19      for the record, you don't know for certain
20      looking at this document what the differences
21      are in this document with respect to version
22      point one; right?
23              "Answer:  I can not tell exactly
24      what was in 0.1.  All I can tell, my guess is
```

```
 1        not a big difference between the two."

 2                      Did you give that answer?

 3                      A.   Probably.  I didn't read this, the

 4        record, but probably.  That's what I just said a

 5        few minutes ago.

 6                      Q.   Now, you never -- as of a month

 7        ago, you had not done any element-by-element

 8        comparison of this architectural specification

 9        with your patents; correct?

10                      A.   With what?

11                      Q.   With your patents, with the claims

12        of your patents.

13                      A.   No.

14                      Q.   And so --

15                      A.   I'm aware --

16                      MR. KREVITT:  The witness --

17                      THE COURT:  Well, he hadn't done

18        it as of a month ago.  Okay.  Mr. Van Nest,

19        question.

20        BY MR. VAN NEST:

21                      Q.   Now, as of then, you hadn't even

22        read the dependent claims in your patent;

23        correct?

24                      A.   Well, I think our tradition is
```

```
1       that when we file a patent, we have a discussion

2       with the patent lawyers.  Then we'll come up

3       with a claims before we sign our name as

4       inventor, we need to read all the claims.

5       That's our standard practice.

6               Q.   My question was a little

7       different.  As of a month ago, you hadn't even

8       read the dependent claims in the '015 patent;

9       right?

10              A.   This is what I was trying to

11      answer your question, I'm saying I read that

12      before, before I put my name as a coinventor.

13              Q.   But as of a month ago, you hadn't

14      reread the dependent claims --

15              A.   No, the dependent claims I read

16      before that.

17              THE COURT:  Dr. Li, let him finish

18      the question.

19              Q.   You hadn't read the dependent

20      claims; right?

21              A.   Do you mean before a month ago or

22      after a month ago?

23              Q.   Before a month ago.

24              A.   Before the month ago, I'm sure I
```

```
 1      read it because I would not have signed my name
 2      without reading the claims.
 3                  Q.  But you had not read it in years
 4      when you gave your testimony a month ago;
 5      correct?
 6                  A.  I haven't read -- I haven't read
 7      them for a long time.  I don't remember how many
 8      years.  This was filed a long time ago.
 9                  Q.  All right.  And obviously you
10      haven't made any comparison of those claims to
11      the very first version of the architectural spec
12      because it doesn't exist; right?
13                  A.  Can you rephrase your question
14      again?  I'm sorry.
15                  Q.  Yes.  You haven't done any
16      comparison between the dependent claims in the
17      '015 patent and the architectural spec, the
18      first version of it, because you can't find the
19      first version; right?
20                  A.  You are right, I cannot find the
21      first version.
22                  Q.  Now, let's turn to the three
23      whiteboard photos.  You said it was your
24      handwriting on all three of the boards?
```

```
 1                    A.   Yes.

 2                    Q.   So you wrote that yourself?

 3                    A.   Yes.

 4                    Q.   And I think you said they were

 5      taken with an old camera?

 6                    A.   Yes.  With an old camera.

 7                    Q.   You don't have the camera anymore?

 8                    A.   I still have the camera.

 9                    Q.   You still have the camera?

10                    A.   I still have the camera.

11                    Q.   Did you testify just a month ago

12      that you didn't have it?

13                    A.   No, I have the camera.  I think

14      the question probably was about whether I have

15      the storage in the camera, the Flash memory of

16      the camera.

17                    Q.   Open up your deposition, please,

18      Dr. Li, to page 119, lines 17 to 24?

19                    A.   119?

20                    Q.   Yes.  Lines 17 to 24.

21                    A.   Okay.

22                    Q.   Were you asked this question and

23      did you give this answer:

24                         "Question:  Now, do you still have
```

464

```
 1        the camera that you used to take these photos?
 2                  "Answer:  No, I don't have it.
 3        This is a really old camera."
 4                  Did you give that answer?
 5             A.   Maybe.
 6             Q.   Do you have the camera now or not?
 7             A.   I think I have the camera.  It's
 8        probably in one of the boxes I haven't opened.
 9        But I think I may have the camera.
10             Q.   Why did you last see it?
11             A.   Several years ago, just very old
12        camera.
13             Q.   But a month ago when we asked you
14        that question under oath, you said I don't have
15        it; right?
16             A.   Yeah, I couldn't find it at the
17        time.  But later I think I seen the camera in
18        the box.  I haven't opened -- I just moved to a
19        new house, was doing unpacking.
20             Q.   Well, you knew that the issue of
21        when these photos was taken was important,
22        Dr. Li; right?
23             A.   Yes, I do.
24             Q.   And it's important because the
```

1    date is very close to the date of one of the

2    other pieces of prior art in this case; right,

3    you know that, too?

4              A.   Well, I think to some degree it's

5    not as important because what -- the early

6    employees all remember very well, when Hugo

7    Patterson came to Data Domain --

8              MR. VAN NEST:  Your Honor, this is

9    not responsive to my question.

10             THE COURT:  All right.  Dr. Li, I

11   think you have gone beyond what the question is

12   right now.  So I'm going to ask you to stop and

13   Mr. Van Nest ask another question.

14             THE WITNESS:  Okay.

15   BY MR. VAN NEST:

16             Q.   Now, you don't know whether the

17   date setting in that old camera was correct or

18   not when you took the photos; right?

19             A.   I never really checked whether --

20   I believe the dates on the camera were correct,

21   but I don't -- I haven't -- even today if you

22   check, you would not be able to tell whether so

23   many years ago the dates were correct.  You

24   can't say anything a hundred percent correct for

```
 1        any computer devices.

 2                Q.   You told us a month ago that you

 3        didn't know whether the date setting on this old

 4        camera was right or not?

 5                A.   I could not say a hundred percent

 6        say back in 2002 the dates were correct.

 7                Q.   All right.  Now, let's put up

 8        PTX-9.  That's the first one.  This first photo,

 9        Doctor Li, I think we established has a title

10        file date of February 13th, but the metadata

11        shows that it's later, right?

12                A.   Right.

13                Q.   The metadata shows February 27th

14        and the title of the file says February 13th,

15        right?

16                A.   Right.

17                Q.   Now, you're the one that created

18        the title on that file, right?

19                A.   That's correct.

20                Q.   And the title on a file, like any

21        other file, can be changed any time, right?

22                A.   It depends on your file system.

23                Q.   Your file system would allow you

24        to change that file date any time?
```

467

1           A.   No.  For certain file systems, if

2      you change the name of the file, the date would

3      be changed of the metadata too.

4           Q.   Now, I think you testified earlier

5      that you weren't sure exactly when these photos

6      were taken, right?

7           A.   I was just trying to refer to you

8      I knew it was in February.  I gave you evidence

9      you did not want to take.

10          Q.   My question was a little

11     different.  Even a month ago you weren't sure

12     exactly when the photos were taken, right?

13          A.   I said -- I think I said I was

14     sure it was in February.  And I was going to use

15     evidence to show, but you're not allowed me to

16     use that evidence.

17          Q.   Well, let me ask you this.  Didn't

18     you testify just a month ago, with respect to

19     the meeting where the notes were taken that you

20     don't remember exactly?

21          A.   I think I said it was in February.

22          Q.   Well, please turn to your

23     deposition again, Doctor Li, at page 271.

24          A.   271.

468

```
 1            Q.   Yep.   Lines 10 through 16.   And
 2    were you asked this question and did you give
 3    this answer?  All right.   Now, when in your
 4    recollection did the meeting occur where the
 5    notes were recorded on the white board that we
 6    see represented in Exhibit C?  Answer, I don't
 7    remember exactly.   Did you give that answer?
 8            A.   Yes.   When I say not exactly, I
 9    don't know exactly when was taken in my memory,
10    but I have out of evidence to show it was taken
11    in February, that looks like the Court wouldn't
12    allow me to use that evidence; is that correct?
13            Q.   Excuse me, Doctor Li.  Haven't you
14    also testified that you thought that the photos
15    were all taken at or about the same time within
16    a day or two of each other?
17            A.   I didn't say one or two days.  I
18    think we always taken after, but before we need
19    to erase the board.   Also when I bring the
20    camera in.
21            Q.   My question was, didn't you
22    previously testify that you thought, you guessed
23    that the three photos were taken within a day or
24    two of each other?
```

```
 1              A.   I can't remember things like that

 2      so many years ago.

 3              Q.   But at least as of a month ago you

 4      thought, you guessed the photos were taken

 5      within a day or two of each other, all three of

 6      them?

 7              A.   I can't remember whether a day or

 8      two.  But even I said so in the deposition, I

 9      could be wrong, because any human memory

10      deteriorates over time.  I can't remember 2002

11      exactly what happened.

12              Q.   Okay.

13              A.   But I have evidence to show it was

14      taken in February sometime.

15              Q.   Now, as a matter of fact, the

16      metadata on two of the three photos show they

17      were taken later in March, right?

18              A.   Yes.

19              Q.   So if it's true that the photos

20      were taken within a day or two of each other,

21      it's possible, isn't it, Doctor Li, that they

22      were all taken in March?

23              A.   Well, I don't remember whether how

24      many days were on the board before we took the
```

470

```
1    photo.  That's just so many years ago.  I can't
2    make such assumption.
3              Q.  But it's clear that as to two of
4    the photos, the metadata has a date later in
5    March, right?
6              A.  Yes, March 20th.
7              Q.  Now, you also, as of a month ago,
8    had not compared the claims of the '015 Patent
9    with anything on the white board, right?
10             A.  As I said before, when we file
11   patents, we always review all the claims.
12             Q.  Excuse me, Doctor Li, that's not
13   an answer to my question.  My question was, as
14   of a month ago when we talked to you under oath,
15   you had not compared any claim of the '015
16   Patent with the elements displayed on the white
17   board, right?
18             A.  No, I have not.
19             Q.  All right.  And that's true for
20   all three of the photos, correct?
21             A.  Well, I think how do I describe
22   this?  When we file a patent, we --
23             Q.  Again, doctor, excuse me.  I'm
24   asking you whether the statement you just made
```

471

```
 1        is true for all three photos.

 2                    A.   I was just trying to answer how we

 3        review -- we review claims when we file for a

 4        patent.

 5                    Q.   You'll get a chance to do that

 6        with your lawyer.  Don't worry, you'll get a

 7        chance to do that.  My question is simply, as of

 8        a month ago you hadn't analyzed whether all of

 9        the elements of your claims appeared on the

10        white board, right?

11                    A.   I did not compare, take out the

12        white boards and compare it with the claims if

13        that's what you meant.

14                    Q.   That's what I meant.  And I think

15        you testified that even with respect to the

16        white boards, you hadn't even read the dependent

17        claims to see what element they had, right?

18                    A.   As I said before, we always read

19        the claims before we put our name as a

20        co-inventor.

21                    Q.   Well, what you told us a month

22        ago, Doctor Li, was that with respect to

23        dependent claim 7 of the '015, you hadn't done a

24        comparison to determine whether that was
```

472

```
 1     conceived before March 16th, right?
 2             A.  Well, I did not do a comparison
 3     between the claims and the specification, if
 4     that's what you meant.
 5             Q.  And with respect to the dependent
 6     claims, you hadn't even read those, right?
 7             A.  When -- what time frame do you --
 8             Q.  Prior to your deposition a month
 9     ago.
10             A.  Well, as I said, we always read
11     the claims before we sign our name.  And that's
12     what I did, but close to the deposition, I did
13     not read before I went to the deposition.
14     Again.  I did not read again.
15             Q.  You told us that Data Domain was a
16     successful company, Doctor Li.  I'm switching
17     topics.
18             A.  I think -- I would think it's
19     successful, yes.
20             Q.  And you're very proud of the work
21     you did there.  I take it at Data Domain, you
22     obtained many patents, multiple patents for your
23     work?
24             A.  Yes.
```

473

```
 1              Q.   And all those patents were
 2     important in contributing to the success of the
 3     products?
 4              A.   Yes.
 5              Q.   Okay.  And you mentioned
 6     compression, that's one of the other
 7     technologies that you used at Data Domain?
 8              A.   Yes.
 9              Q.   That was important too?
10              A.   Yeah.  I think in the company we
11     also -- we today call it deduplication.  We
12     called it global compression, so compression is
13     meaning both local and --
14              Q.   But there were a whole series of
15     technologies that were important to the success
16     of Data Domain, right?
17              A.   There are many technologies, yes,
18     but Data Domain is all about building
19     deduplication storage system.
20              Q.   But there are many technologies
21     that go into the Data Domain products; right?
22              A.   But they are the key technology,
23     the key technology --
24              Q.   There are many others that do --
```

```
 1                   MR. KREVITT:  Your Honor.

 2                   THE COURT:  Dr. Li, can you maybe

 3      say a little louder, finish answering the

 4      question that you were just answering.

 5                   THE WITNESS:  Yes.  What I was

 6      saying is the key technology of Data Domain is

 7      deduplication storage system.  Technology is the

 8      deduplication storage system.

 9   BY MR. VAN NEST:

10           Q.   There were many other technologies

11      that contributed to the success of your

12      products; right?

13           A.   Yes, there are many technologies.

14           Q.   And there are many other factors

15      that make success happen, too, like the people?

16           A.   Yes, because people invent

17      technologies.

18           Q.   And people sell products, too;

19      right?

20           A.   People sell the products.

21           Q.   People market the products?

22           A.   Yes.

23           Q.   And the deduplication name I think

24      you mentioned came from a marketing slogan that
```

```
 1       someone else had come up with; right?
 2              A.   For market research firm.
 3              Q.   A market research firm told you
 4       that would be good to use and you used it, and
 5       that was part of the success, too; right?
 6              A.   I don't think so.  I think the
 7       market research firm actually didn't tell us,
 8       they don't -- because Data Domain didn't have
 9       much money, they didn't really work with
10       research firms.
11              Q.   My point was simply that marketing
12       and sales, they're also important to the
13       success; right?
14              A.   I'm sure you need many factors to
15       success.
16                   MR. VAN NEST:  Thank you, Dr. Li.
17                   THE COURT:  All right.  Redirect.
18                   MR. KREVITT:  Very quickly.
19                      REDIRECT EXAMINATION
20       BY MR. KREVITT:
21              Q.   Real quick, Dr. Li.  Mr. Van Nest
22       asked you questions about whiteboard photos and
23       changing time stamps on cameras.  Just to be
24       clear, did anything Mr. Van Nest asked you, have
```

1   you seen anything that changes or in any way

2   makes you question the testimony that you gave

3   earlier that you are actually certain that by

4   March 16, 2002 you had conceived of all the

5   ideas in the '015 and '464 patents?

6          A.   Yes, in February, yes.

7          Q.   You had conceived of them in

8   February?

9          A.   Yes.

10          Q.   And you're absolutely certain of

11   that?

12          A.   Yes.

13          Q.   And I know we covered your

14   background, you have been a professor at

15   Princeton for thirty years.  Is honesty and

16   integrity important to you, sir?

17          A.   Yes.  As a human being, as a

18   researcher in academics, we have to have

19   integrity.

20          Q.   And before today, in your

21   thirty-year career as an acclaimed scientist and

22   professor at Princeton University, has anyone

23   ever challenged your integrity or your honesty?

24          A.   Not really.  I think -- but I have

477

```
 1    examples to show that I will maintain my

 2    integrity independent of financial gains.

 3             Q.   You have examples of your

 4    integrity, not that anyone has ever challenged

 5    you?

 6             A.   That's right.

 7             Q.   I just want to be clear.  Is there

 8    any one you want to share with us, Dr. Li?

 9             A.   Well, early days at Data Domain,

10    we were looking for someone to join the funding

11    team who has a CEO track record, and one person

12    introduced by the venture capital firm, and this

13    person actually came up with the name Data

14    Domain.  And we were experimentally working

15    together for two weeks.

16                  And during that time, towards the

17    end, this person came to me, said Kai, you know

18    in this company right now, the most important

19    people are you and me.  So this person was

20    trying to discuss with me about how to

21    reposition the founder shares, reducing the

22    founder shares for my two other cofounders and

23    increase mine and obviously this person would

24    get more.  And then already agreed with my
```

```
 1        cofounders not to continue, and we didn't

 2        hesitate a second, I disengaged with this

 3        person.

 4                   This person asked me, "Did you

 5        fire me?"  I said "Yes."

 6                   I think that I would rather

 7        maintain my integrity given in the case I may

 8        have financial gain.

 9             Q.   Thank you, sir.  I appreciate your

10        time.

11                   MR. KREVITT:  No further

12        questions, Your Honor.

13                   THE COURT:  All right.  Dr. Li,

14        you may step down.

15                   THE WITNESS:  Thank you.

16                   MR. KREVITT:  Would you like us to

17        call our next witness, Your Honor?

18                   THE COURT:  I would.

19                   MR. KREVITT:  Your Honor, EMC at

20        this time has the pleasure of calling Mr. Ian

21        Jestice, a technical expert for the

22        deduplication patents.  My colleague, Stuart

23        Rosenberg will be speaking with Mr. Jestice.

24                   THE CLERK:  Please state and spell
```

```
 1        your full name for the record.

 2                     THE WITNESS:  My name is Ian

 3        Jestice.  I-A-N, J-E-S-T-I-C-E.

 4

 5                     IAN JESTICE,

 6            the deponent herein, having first

 7            been duly sworn on oath, was

 8            examined and testified as follows:

 9                     MR. ROSENBERG:  Your Honor, may I

10        approach the witness with a witness binder?

11                     THE COURT:  Yes, you may.

12                     MR. ROSENBERG:  May I approach the

13        Court with copies?

14                     THE COURT:  Yes.

15                     DIRECT EXAMINATION.

16    BY MR. ROSENBERG:

17            Q.   Good morning, Mr. Jestice.

18            A.   Good morning.

19            Q.   Can you please explain to the jury

20        very briefly why you're here today?

21            A.   Yes.  I am Ian Jestice and I have

22        been asked to come here today to talk about two

23        patents, and whether or not Pure Storage

24        infringes those patents.
```

1          Q.   And so let's get something clear

2     right off the bat.  There are two deduplication

3     patents at issue in this case; right?

4          A.   That's correct.

5          Q.   The '015 patent and the '464

6     patent?

7          A.   Yes, that's correct.

8          Q.   And on one of those two patents,

9     you understand that the parties already agree

10    that Pure Storage infringes the patent?

11         A.   Yes, I understand that.

12         Q.   Which patent is that?

13         A.   That's the '015.

14         Q.   So you are not going to in light

15    of that agreement go through infringement of

16    that patent today; is that right?

17         A.   That's correct.

18         Q.   And then the other patent is the

19    '464 patent?

20         A.   Yes.

21         Q.   And you are going to express an

22    opinion today about infringement of the '464

23    patent; right?

24         A.   Yes, that's one I'm going to talk

1    about today.

2            Q.   Is there a dispute about

3    infringement of the '464 patent?

4            A.   There is a dispute about one

5    element or one claim on the '464 patent.

6            Q.   Do you have an opinion about

7    whether the asserted claim of the '464 patent

8    including that one element is, in fact,

9    infringed by Pure Storage?

10           A.   Yes.  It's my opinion that that --

11   all of the elements of the claim 32 are

12   infringed by the Pure Storage products.

13           Q.   So let's back up a little bit.  On

14   the slide here we have just a list of topics I'm

15   hoping to cover with you today.  Will you tell

16   us a little bit today about what deduplication

17   technology is?

18           A.   Yes.  Deduplication technology as

19   you already heard several times is to do with

20   identifying data in a computer system that is

21   going to be stored and to remove duplicates to

22   save space.

23           Q.   And just to review the remaining

24   topics, are you going to tell us a little bit

```
 1        about patents at issue, your opinion about
 2        infringement of the '464 patent and then some
 3        technical issues that relate to damages in the
 4        case?
 5               A.   That's correct.
 6               Q.   So Mr. Jestice, I'd like to ask
 7        you about your background.  Can you tell me a
 8        little bit about your educational background?
 9               A.   Yes, I'm -- if you haven't
10        recognized my accent, I'm from the United
11        Kingdom and I attended the City and Guilds
12        Institute of London in 1968 to 1971.
13               Q.   What did you study there?
14               A.   I studied computer science and
15        telecommunication.
16               Q.   And did you get some kind of
17        certification from the City and Guilds
18        Institute?
19               A.   Yes, I got a core technological
20        certificate from the City and Guilds Institute.
21               Q.   Do you have an understanding of
22        how that compares to a Bachelor of Science
23        degree in the United States?
24               A.   When I moved to the United States,
```

```
 1    almost 40 years ago, the Department of

 2    Immigration and the Department of Labor looked

 3    at my qualifications and concluded it was

 4    approximately the same as a bachelors degree.

 5           Q.   And while you were in school in

 6    London, did you also have any work experience?

 7           A.   Yes, I was employed by the British

 8    government.  They owned the telephone company,

 9    the Post Office, and I worked for them while I

10    was studying.

11           Q.   Did you receive any kind of

12    recognition or reward for your work for the

13    British government while you were there?

14           A.   Yes.  The Post Office had an idea

15    recognition plan.  I developed a system for

16    recognizing the failure of multiple voice and

17    data circuits when they failed digitally.

18           Q.   Mr. Jestice, what did you do for a

19    living after you worked for British government?

20           A.   I joined IBM.

21           Q.   And how long were you at IBM?

22           A.   I was at IBM a total of 10 years

23    in England, Canada and the United States.

24           Q.   What kind of work did you do at
```

1      IBM?

2             A.   I did many things and I did -- I

3      was a system engineer supporting customers and I

4      was a storage specialist.

5             Q.   Did you work on any storage

6      systems as a storage specialist at IBM?

7             A.   Yes, I worked on many generations

8      of storage systems that IBM was selling at that

9      time.

10            Q.   And I believe we have an example

11     of one of them up on the screen.  Can you tell

12     us what this is?

13            A.   This is one of my favorite

14     systems.  This is the 3340 Winchester disk

15     drive.

16            Q.   What is the 3340 Winchester disk

17     drive?

18            A.   You can't see the size of this,

19     but it stood approximately up to half way

20     through my chest.  It was a big, physically big

21     device.  And it held 30 megabytes and 60

22     megabytes in two 30-megabyte drives.

23            Q.   How does that relate to the name

24     Winchester?

485

```
 1              A.   Winchester, it got the name of

 2     Winchester because this affectionately was known

 3     as the 30/30.  It held 30 megabytes and 30

 4     megabytes.  And I believe there's a Winchester

 5     rifle that's called the 30/30..

 6              Q.   And how does this disk drive

 7     relate to the disk drives that we've seen

 8     earlier in the case and passed around to the

 9     jury that you might find in a modern day

10     computer?

11              A.   Well, the Winchester disk drive

12     was the first disk drive that incorporated all

13     the mechanical and all the electronics in one

14     package and the rotating drives that the Pure

15     Storage is passing now is a Winchester disc

16     drive.  And this it's grandfather or great

17     grandfather.

18              Q.   So apart from your work on

19     particular storage systems at IBM, did you do

20     anything else?

21              A.   My job supporting customers in the

22     field, so I would support the software,

23     hardware.  I did capacity planning for large

24     enterprise customers.
```

486

1              Q.   What do you mean by capacity

2       planning?

3              A.   So the systems I supported were

4       multimillion dollar systems and part of my job

5       at the customer was to help them look at their

6       future needs to predict how much, in this case

7       storage they would need.

8              Q.   And apart from your work at IBM,

9       do you have any other work experience that

10      relates to storage systems?

11             A.   Yes, after I left IBM, I went to a

12      company all Amdel, company that's now called

13      Fujitsu, partially owned by Fujitsu and as part

14      of my time there, I worked in the storage

15      product department developing storage systems.

16             Q.   And do storage systems that you

17      worked on at Amdel include any of the kinds of

18      storage systems the jury is going to hear about

19      and has heard about already in this case?

20             A.   Yes, these are large storage

21      systems for event price customers.

22             Q.   Did you do any teaching while you

23      were employed at Amdel?

24             A.   Yes.  Amdel had a very active

1    college recruiting program.  That meant that we

2    as engineers, managers, would go out to

3    university, hiring engineers to help us with

4    product development.  And the engineers that

5    arrived obviously didn't know Amdel technology

6    and didn't know the actual hands on experience,

7    developing stuff for customers.  And so I took

8    classes on our computer architecture error

9    recording and error reporting.

10         Q.   Mr. Jestice, in addition to the

11   experience you had working directly on storage

12   systems and teaching relating to storage

13   systems, have you ever founded a company?

14         A.   Yes.  I founded a company called

15   Zadian Technologies.

16         Q.   How do you spell that?

17         A.   Z-A-D-I-A-N.  And the I-A-N is

18   Ian.  That's how we got the name.

19         Q.   And what kind of work did you do

20   when you founded Zadian?

21         A.   The company we founded produced

22   test equipment for storage systems.  And I was

23   the director of design assurance and part of

24   that job was to make certain that the product we

```
 1   were developing was the one that obviously we

 2   could sell.  We wanted to sell the system.  And

 3   secondary job I did there was as the IT manager.

 4   I managed the IT, all the computers for the

 5   corporation.

 6           Q.   How long did you work at Zadian?

 7           A.   I worked there until we sold the

 8   company to a company called Xyratex.

 9           Q.   What is Xyratex?

10           A.   Xyratex is a contract manufacturer

11   that makes computer systems, storage systems for

12   other companies.

13           Q.   Mr. Jestice, how many years of

14   experience in total do you have working on

15   technologies that relate to storage systems?

16           A.   I've been working on storage

17   systems since I worked for the Post Office,

18   almost 40 years.

19                MR. ROSENBERG:  So Your Honor,

20   we'd ask the Court to accept Mr. Jestice as an

21   expert in the field of storage systems.

22                MR. VAN NEST:  No objection, Your

23   Honor.

24                THE COURT: All right.  You may
```

489

```
 1        proceed.
 2   BY MR. ROSENBERG:
 3             Q.   Mr. Jestice, now that we've talked
 4        about your background, I'm hoping you can help
 5        gives us some background on the technology at
 6        issue in this case.  What is the technology that
 7        you're here to talk about that's at issue in
 8        this case?
 9             A.   The technology is about storage
10        systems, large enterprise storage systems.  And
11        in particular one called deduplication.
12             Q.   What is a storage system?
13             A.   Companies that want to store --
14        okay.  A storage system stores computer data.
15        And this storage system that we're talking
16        about, this arena is to do with very large
17        amounts of data stored by large companies.
18             Q.   And I have a slide here.  Can I
19        ask you to explain, starting with what's at left
20        side.  I think it's a little cut off on the
21        screen there with the word hosts, what's going
22        on in this illustration of data storage
23        technology?
24             A.   Yes, in the left side are the host
```

490

```
 1        computers which would typically be workstation

 2        is or PC's and then between them is a data

 3        stream and the data stream goes over on

 4        interface which could be fiber optic, it could

 5        be copper on the storage system itself.  And on

 6        the right side is a storage system consisting of

 7        a controller and some storage element.

 8                Q.  So let's just take those one at a

 9        time.  The host are things like people

10        individual computers; is that right?

11                A.  These are people looking at their

12        email, writing email, looking at databases, just

13        the sort of things that computers are so much

14        involved with in our society today.

15                Q.  And the data stream is the data

16        that's moving from the host into a storage

17        system?

18                A.  Yeah.  This is data typically

19        split up into blocks or segments.

20                Q.  And how much data are we talking

21        about streaming or flowing into a storage

22        system?

23                A.  It depends on that interphase, but

24        it's huge amounts of data.  We're talking about
```

```
 1        sending a movie in a second or less over these

 2        streams.

 3                Q.   And then inside the data storage

 4        system on the right side of the graphic here,

 5        there are two parts, the controller and the

 6        storage elements.  What is a controller in a

 7        data storage system?

 8                A.   The controller in many systems

 9        certainly today is a little computer itself,

10        running software.  And it is like a librarian in

11        a book library.  When it receives the streams of

12        data, it decides what to do with it, where to

13        put it and how to handle it.

14                Q.   What are the storage elements

15        inside a data storage system?

16                A.   Storage are the devices that

17        actually store the data.

18                Q.   What are those storage elements

19        made up of, what's the media in there?

20                A.   Historically they have been --

21        they could have been tape drives, rotating disk

22        drives that you have seen or the solid state

23        Flash memories.

24                Q.   So we have shown some examples of
```

1    each of those three here.  If a company is

2    making a storage system, how do they choose

3    which one of these three to use as the storage

4    elements?

5            A.   Well, like most things in

6    computers there is a trade off between the price

7    and the performance.  So the tape drives are

8    typically very cheap and relatively slow.  The

9    hard disk drive is much faster but much more

10   expensive than tape.  And then the Flash drive

11   is even faster, but it's more expensive than

12   hard disk drives.

13           Q.   Is there technology that can make

14   the more expensive kinds of media, the hard disk

15   drives or the Flash memory, more affordable for

16   use as a storage element in a storage system?

17           A.   One way is to actually save less

18   data.

19           Q.   And is deduplication a way to do

20   that?

21           A.   Deduplication is one of those

22   technologies.

23           Q.   Tell us briefly what is

24   deduplication?

1          A.   Deduplication is identifying

2     duplicate data and removing, just keeping a

3     single copy.

4          Q.   Can you give us an example of that

5     in the real world?

6          A.   So if you were working at a

7     company that let's say a thousand people and the

8     president sent out a thousand emails, the same

9     thousand emails to every employee, without

10    deduplication, every one of those employees

11    would save a copy of their emails.  So with

12    deduplication the system would identify those

13    and only save one copy of the email, saving a

14    significant amount of space on the storage

15    systems.

16         Q.   Mr. Jestice, does all

17    deduplication work in the same way?

18         A.   No.  There is two kinds that I am

19    going to talk about today, background

20    deduplication and inline deduplication.

21         Q.   Turning the first one you

22    mentioned which is background deduplication, can

23    you explain to us how background deduplication

24    works?

494

```
 1              A.   Yes, I can.  So I have a --
 2        something to show how this works.  On the
 3        left-hand side is the hosts as I described
 4        before and there is a data stream coming across
 5        the interphase to the storage system itself.  In
 6        background deduplication, a segment will come
 7        into the storage controller, we have the
 8        animation.
 9              Q.   Which segment in particular are we
10        highlighting here?
11              A.   The first segment which is marked
12        P2, P2 is a representation of the data.
13              Q.   Some of the segments have already
14        been stored; right?
15              A.   Some of the segments will already
16        be stored.
17              Q.   For example, maybe A9?
18              A.   Yes.
19              Q.   And how does background
20        deduplication work on segments that have already
21        been stored?
22              A.   So in background deduplication,
23        there is a processor running in the storage
24        controller that is going around looking for
```

1    duplicate sectors.  So as A9 in this case was

2    stored in two different places, I would say

3    erroneously, but as part of background

4    deduplication it would pick up that duplication

5    and delete one of the copies.

6          Q.   And there is animation of deleting

7    the copy there.  What does the word background

8    have to do with this?

9          A.   Background typically describes a

10   process in a computer that's running in its

11   spare time, if you like, it's when the computer

12   is not handling its major task, so this would

13   just use up resources going around trying to

14   find these duplicates.

15         Q.   And so this is a process operating

16   on data that's already been stored in a storage

17   system?

18         A.   Yes.  In this case, both copies of

19   the data were stored in the storage system

20   first.

21         Q.   You mentioned a different kind of

22   deduplication, I believe you called it inline

23   deduplication.  Can you explain how that works

24   and how it's different from background

```
 1   deduplication?
 2           A.   Yes.  Inline deduplication looks
 3   for the data before it's stored and, therefore,
 4   saving the extra store.
 5           Q.   So what happens, for example, if
 6   data comes in that has not yet been stored?
 7           A.   So data comes into the storage
 8   controller, in this case we have a block that's
 9   got C4, and the storage controller looks to see
10   if there is a duplicate already.  And in this
11   example there wasn't.  So it stores C4 the first
12   time.
13           Q.   So in inline deduplication, you're
14   looking for a duplicate of a segment that you
15   have not yet stored; is that correct?
16           A.   That's correct.
17           Q.   And if you don't find a duplicate,
18   then you'll store the segment?
19           A.   Then you store the segment.
20           Q.   And in this example we showed the
21   data inside that segment, the C4?
22           A.   Yes.
23           Q.   And what happens if a data segment
24   comes in that is a duplicate?
```

```
 1              A.   If there is a duplicate, in this

 2       case we're using P2 as an example, the storage

 3       controller during the storage process finds P2

 4       and, therefore, doesn't need to write it a

 5       second time.

 6              Q.   And so what happens to the copy of

 7       P2 that's just arrived but hasn't yet been

 8       stored?

 9              A.   That is just discarded.

10              Q.   Mr. Jestice, as between the two

11       kinds of deduplication you just showed us,

12       background, operating on data that's already

13       been stored, and inline where you're operating

14       on data you haven't yet stored, does inline

15       deduplication have any advantages over

16       background deduplication?

17              A.   In this technology, it has.  We're

18       talking about Flash memories, solid state

19       memory, it has two distinct advantages.

20              Q.   What are they?

21              A.   The first is you don't have to

22       write the data twice, so that saves you having

23       to buy extra storage to hold that data until the

24       background process came in and cleared it out.
```

1    So that's one significant advantage.

2              The other advantage is the Flash

3    technology itself is not like rotating disks and

4    magnetic disks, it wears out, and it's a bit

5    like a paperclip.  If you take a paperclip and

6    bend it twenty times or so, it will snap.  Flash

7    storage fails after a number of writes.  So if

8    we don't write the data, then we don't wear out

9    the drives so quickly, which saves money again.

10             Q.   And Mr. Jestice, are there any

11   difficulties associated with performing inline

12   deduplication as opposed to background became?

13             A.   Yes, there is a problem called

14   latency or delay.  That background, that inline

15   deduplication takes a finite amount of time.

16   And so we have to be able to handle that fast

17   enough to not delay the saving of data from the

18   other users or even the user that's trying to

19   save the data.

20             Q.   And am I correct just to summarize

21   that then inline deduplication has advantages

22   over background deduplication with respect to

23   how much memory you have to have and whether you

24   wear it out, but there are difficulties in

```
 1      implementing inline deduplication?
 2           A.   Yes.   There have been difficulties
 3      trying to reduce that latency.
 4           Q.   And Mr. Jestice, how does the
 5      technology that you just described relate to the
 6      patents that are at issue in this case?
 7           A.   Well, the patents that are at
 8      issue in this case, in this case, are describing
 9      a better way, a more efficient way to do inline
10      deduplication.
11           Q.   Mr. Jestice, is this one of the
12      two patents you reviewed in this case?
13           A.   Yes, this is the '015 patent.
14           Q.   What's the title of this patent?
15           A.   Efficient data storage system.
16           Q.   Is this the other patent you
17      reviewed in the case?
18           A.   Yes, this is the '464 patent.
19           Q.   And what's the title of this
20      patent?
21           A.   It's the same title, it's
22      efficient data storage system.
23           Q.   Were you here earlier today when
24      Kai Li testified about his work at Data Domain?
```

500

1            A.   Yes, I was.

2            Q.   Do you see Data Domain listed on

3    the patent?

4            A.   Yes, Data Domain is listed on the

5    lower left-hand corner as the assignee.

6            Q.   And do you understand how Data

7    Domain relates to the parties in this case?

8            A.   My understanding is that Data

9    Domain was taken into the EMC fold.

10           Q.   And is a part of EMC?

11           A.   It is part of EMC now, yes.

12           Q.   Mr. Jestice, had you heard of Data

13   Domain before you got involved in this patent

14   case?

15           A.   Yes, I had.  Anyone that was

16   working in that enterprise storage business

17   would have heard of Data Domain.

18           Q.   Turning back to the patents, can

19   you tell us very briefly at a high level, what

20   is the invention in the deduplication patents?

21           A.   Well, it says it in the title,

22   it's an efficient data storage system.  It is

23   deduplication and in particular this is inline

24   deduplication.

501

```
1              Q.   Mr. Jestice, is there a part of
2         the specification in the patent that discusses
3         the problems associated with duplicate data?
4              A.   Yes.  The specification or
5         description of a patent, they describe what the
6         problems were.  For example, several copies of
7         the same data, we have highlighted here.
8              Q.   And before Dr. Li and his
9         colleagues tried to solve this problem, had
10        anyone else tried to solve the problem of
11        duplicate data in the storage system?
12             A.   Yes, there were other people
13        working on the problem.
14             Q.   Does the specification acknowledge
15        that?
16             A.   The specification talks about the
17        problems that were.
18             Q.   What does the specification say
19        very briefly?
20             A.   It says there have been many
21        attempts to prevent redundant coping of data.
22             Q.   What does the specification say
23        about whether those attempts from been
24        successful?
```

502

```
 1              A.   It says these approaches incur
 2      significantly latency.  It would have been
 3      desirable to reduce the latency, so it's
 4      addressing the problem of latency, the time it
 5      takes to write the data.
 6              Q.   Can you explain one more time what
 7      is latency, and maybe give us an example of how
 8      that would affect somebody in the real world?
 9              A.   It's the delay writing data.  If
10      you were working in an organization with such a
11      system and you were saving a document, saving an
12      email, if there was significant latency, you
13      would see a little clock going around and around
14      and around while you were waiting.  This idea
15      reduces that latency, which means you would get
16      a faster turnaround when you save data.
17              Q.   Mr. Jestice, how did Dr. Li and
18      his colleagues solve that problem in the
19      deduplication patents?
20              A.   They came up with an idea for
21      doing preliminary checks that efficiently would
22      determine whether the data had been deduplicated
23      already.
24              Q.   What do you mean by preliminary
```

```
 1     checks, why preliminary?

 2          A.   A preliminary check is done early,

 3     it's done inline, and it's not a hundred percent

 4     certain whether it is a duplicate or not, but it

 5     can be done quickly.

 6          Q.   And why would a preliminary check

 7     be better than just doing a certain check

 8     against all of the data you already have stored?

 9          A.   A preliminary check can be done

10     very quickly and the full check takes a lot

11     longer.

12          Q.   Mr. Jestice, now that we have

13     looked at the specification in the patents, I

14     would like to turn to the '464 patent claim

15     that's at issue in this case.  Is it your

16     understanding that there is a dispute about

17     whether Pure Storage infringes this claim?

18          A.   The dispute is only about the last

19     elements of this claim.

20          Q.   And is it your understanding that

21     the parties agree that the Pure Storage products

22     meet the earlier elements of the claim?

23          A.   Yes.  My understanding is the

24     parties agree that Pure Storage infringes the
```

```
 1        first two elements of this claim.
 2               Q.   Okay.  I would like to get to the
 3        disputed element in a minute, but just start
 4        with a little bit of background about what this
 5        claim says.  It starts with the language, a
 6        computer program product for storing the data
 7        embodied in a computer readable medium and
 8        comprising computer instructions.  Can you
 9        explain what that means in plainer English?
10               A.   This means a computer program,
11        software that's designed for very specific
12        purpose, storing data.  The computer program is
13        on a -- some device that's readable by a
14        computer such as a disk, CD, Flash drive.  And
15        it consist of instructions, computer
16        instruction, software.
17               Q.   And do the Pure Storage products
18        that are accused of infringement in this case
19        include a computer program product that includes
20        instructions for the steps listed here?
21               A.   Yes, they do.  They call it Purity
22        software.
23               Q.   What is Purity software?
24               A.   It is the software that's a bit
```

1     like the Windows software, for example, if

2     you're running on a PC, except this software is

3     designed for a storage system.

4              Q.   So it's the operating system for

5     the Pure Storage products?

6              A.   Yes, it is.

7              Q.   And how do you know that the Pure

8     Storage products have this Purity software on it

9     that performs these steps?

10             A.   I have looked at the software, the

11    source code of the software.

12             Q.   What is source code?

13             A.   Source code of the instructions

14    that an engineer would write to create the

15    software.

16             Q.   And apart from the source code,

17    did you look at any other materials that

18    informed you about what the Purity software on

19    Pure Storage products is and how it works?

20             A.   Yes, I have listened to

21    depositions.  I have looked at manuals --

22    depositions of Pure Storage employees.  I have

23    looked at manuals produced by Pure Storage.

24             Q.   And Mr. Jestice, can I ask you to

506

```
1       turn in your binder to Exhibit 12, which is the
2       FlashArray users guide.  And my question for
3       you, is that one of the documents you reviewed
4       in reaching your opinions about infringement?
5                 A.   This is one of the user guides,
6       yes, it is.
7                 MR. ROSENBERG:  Your Honor, we
8       move Exhibit 12 into evidence.
9                 MR. VAN NEST:  No objection, Your
10      Honor.
11                THE COURT:  Admitted without
12      objection.
13      BY MR. ROSENBERG:
14                Q.   And Mr. Jestice, does the
15      FlashArray users guide discuss the Purity
16      software that you were referring to earlier?
17                A.   Yes, it does.  It tells the
18      customer how to use the whole system including
19      the Purity software.
20                Q.   I would like to turn back to the
21      patent claim language and ask you about the
22      steps that the software must perform according
23      to this claim.  We're going to put a checkmark
24      next to the beginning there to indicate that the
```

507

1      Pure Storage include this computer program

2      product.  So I would like to start here.  Can

3      you read for us what that claim language is?

4              A.   This says receiving a data stream

5      comprising a plurality of data segments wherein

6      each data segment is associated with an

7      identifier.

8              Q.   In your understanding, has the

9      Court provided a definition or a claim

10     construction for any of the language in this

11     part of the patent claim?

12             A.   Yes, the Court has.

13             Q.   Let's take a look.

14             THE COURT:  Before we do that,

15     Mr. Rosenberg, so members of the jury, one of

16     the responsibilities I have as a judge is

17     sometimes in a patent claim I have to give

18     what's called a construction to a term that

19     appears in it.  And I do that before we have the

20     trial and then what happens is that construction

21     that I give it is what the parties have to use

22     as the meaning of that term.

23             So when I construed a term, it's a

24     legal analysis, that's the reason why the judge

```
 1      does it rather than the jury.  But then you have

 2      to take when you're evaluating infringement or

 3      invalidity down the road, you have to accept the

 4      construction that I have given.  And I believe

 5      that the constructions are -- they're written

 6      down in an order, but the Purity does not have

 7      that; right?

 8                  MR. KREVITT:  I believe they

 9      certainly will.  I'm not certain it was included

10      in the materials yet, Your Honor.

11                  THE COURT:  In any event, there

12      will be -- before the case is over there will be

13      at least an order of about three pages that you

14      will have that has exactly every construction

15      that I have given in this case.  There is maybe

16      about I would say ten terms or so that I have

17      construed.  And when the lawyers say -- I'm not

18      going to say this every time when this comes up.

19      When the lawyers say there is a construction

20      that the Court has given, that's what they're

21      talking about.

22                  Go ahead, Mr. Rosenberg.

23                  MR. ROSENBERG:  Thank you, Your

24      Honor.
```

509

```
1     BY MR. ROSENBERG:
2             Q.   Mr. Jestice, has the Court
3     provided a construction or a meaning for any of
4     the language here in this sentence?
5             A.   Yes, it has.
6             Q.   Can we take a look and can you
7     tell me what that is?
8             A.   The Court has defined identifier
9     meaning information that identifies a data
10    segment.
11            Q.   Did you apply this construction in
12    reaching your opinion about whether the Purity
13    software in Pure Storage's products meets this
14    limitation of the patent claim?
15            A.   Yes, I did.
16            Q.   And in general, so I don't want to
17    ask this every time, did you apply the Court's
18    constructions of the language in the claim when
19    reaching your opinion about infringement?
20            A.   All the way through, yes.
21            Q.   Mr. Jestice, is it your opinion
22    that Pure Storage's products and the software on
23    them meet this limitation of claim 32 of the
24    '464 patent?
```

510

1          A.   Yes, it is.

2          Q.   Do you understand Pure Storage to

3    disagree with you about that?

4          A.   Pure Storage agrees with me on

5    that.

6          Q.   I think we'll put a checkmark

7    there to indicate that that's agreed.  And we'll

8    move on to the determining step.  Can you read

9    this claim step for the jury?

10         A.   It's determining using a subset of

11   identifiers that are stored in low latency

12   memory when a data segments has been previously

13   stored.

14         Q.   Has the Court provided a

15   construction for any of the language in this

16   term?

17         A.   Yes, they have.

18         Q.   Okay.  So I'd ask you to explain

19   what those are?

20         A.   So, first defining, the Court has

21   defined -- determining.  The Court has defined

22   that to mean deciding either conclusively or

23   inconclusively.

24         Q.   And is there any other language in

511

```
 1        the claim that's been construed?

 2                  A.    Yes, there is.

 3                  Q.    Can you explain?

 4                  A.    Low latency memory has been

 5        described as a memory or cache that can

 6        generally be read more quickly or has better

 7        throughput than the large memory that stores the

 8        entire segment data base.

 9                  Q.    And so we see that word latency

10        again.  Can you remind us what latency is and

11        how it would relate to memory?

12                  A.    This is the delay, the time it

13        takes to do something.

14                  Q.    And so the Court has explained

15        that the low latency memory is memory that can

16        be read more quickly than other memory; is that

17        right?

18                  A.    That's what they define it as,

19        yes.

20                  Q.    And I believe there's one more

21        correction here by the Court to this claim; is

22        that right?

23                  A.    Yes, the claim says data segments

24        and the court has corrected that to data
```

512

1    segment.

2            Q.   Mr. Jestice, is it your opinion

3    that Storage's products and specifically the

4    software on those products meets this limitation

5    of Claim 32?

6            A.   Yes, it does.

7            Q.   And does Pure Storage disagree

8    with you about that?

9            A.   Pure Storage agrees with me on

10   this.

11           Q.   So I'm adding a check mark there

12   to indicate that.  And now we've come to the

13   last limitation of Claim 32.  Can you read for

14   the jury what this limitation is?

15           A.   Yes, this is returning the

16   identifier for the data segment in the event

17   that the data segment is determined to have been

18   stored previously.

19           Q.   And has the Court provided a

20   construction for language in this limitation?

21           A.   Yes, they have.

22           Q.   Can you explain?

23           A.   They have defined returning to

24   mean delivering back.

513

```
 1              Q.   And Mr. Jestice, is this the

 2    element of the claim where Pure Storage

 3    disagrees with you about whether there's

 4    infringement?

 5              A.   Yes, it is.

 6              Q.   Okay.  In your opinion, does the

 7    Purity software on every one of the FlashArray

 8    products that Pure Storage sells meet this

 9    limitation of Claim 32?

10              A.   Yes, it's my opinion that Pure

11    Storage products do infringe this element of the

12    Claim 32.

13              Q.   And how many ways does Pure

14    Storage perform this element?

15              A.   They actually perform it two ways.

16              Q.   And so I'd like to ask you to

17    explain your opinion about that and we have an

18    animation to help, so we're going to turn to

19    that.  Backing up, can we talk a little bit

20    about how Pure Storage's deduplication process

21    works?  Do you understand whether Pure Storage

22    uses a form of inline deduplication?

23              A.   Yes, they do.

24              Q.   Okay.  And what happens in Pure
```

514

```
 1        Storage's inline deduplication process?
 2             A.   So this is a very similar diagram
 3        to the one I used before and there's an data
 4        stream coming in from the left and the storage
 5        element on the right and the storage control in
 6        the center.
 7             Q.   Okay.  And what is P2 in this
 8        diagram?
 9             A.   P2 is a segment that came in, a
10        block of data, and just for this discussion
11        we're saying it contains the data P2.
12             Q.   So P2 would be the actual
13        information in the incoming data?
14             A.   Yes, it would be.
15             Q.   Like the content of part of a
16        document?
17             A.   Yes, it would be.
18             Q.   And what is the next thing that
19        happens in Pure Storage's inline deduplication
20        process?
21             A.   The next that happens is the
22        storage controller assigns an identifier.  I'm
23        using this rotating cog to show that this is a
24        software program that's running.
```

1          Q.   So is this the Purity software

2     that's being represented by the rotating gear?

3          A.   This is the Purity software that's

4     assigned that identifier and it, just for, as an

5     example, it's like a name tag that you'd stick

6     on.

7          Q.   Okay, so the content of the data

8     that we're talking about here is P2?

9          A.   Yes, the content is P2 and the

10    identifier is the name tag Ed.

11         Q.   And why does the software assign

12    an identifier to the incoming data segment?

13         A.   So it can go do a preliminary

14    check to see whether there's a duplicate.

15         Q.   And is there any disagreement, to

16    your understanding, between the parties about

17    whether the Purity software assigns this

18    identifier to an incoming data segment?

19         A.   No, I believe that Pure Storage

20    agrees with that it assigns an identifier.

21    There's no disagreement on that.

22         Q.   So after the Purity software has

23    assigned an identifier to than incoming data

24    segment, here P2, what's the next that happens

```
 1      in Pure Storage's inline deduplication process?

 2              A.   The Purity software goes to a

 3      structure called the SD table.

 4              Q.   What is the SD table?

 5              A.   It's the successfully deduplicated

 6      table.  It's a list of segments that were

 7      previously deduplicated.

 8              Q.   And does the SD table contain the

 9      identifiers or in this case mention the nametags

10      of segments that have already been determined to

11      be duplicates?

12              A.   Yes, the identifiers, the name

13      tags are what's in the SD table and some way of

14      joining it up with the data, but yes, it

15      contains the identifiers.

16              Q.   And what is the usefulness of a

17      table that contains information about segments

18      you've already determined to be duplicates if

19      what you're trying to do now is determine that

20      an incoming segment is or isn't a duplicate?

21              A.   Well, if you think back to those a

22      thousand e-mails I was talking about, if you

23      receive -- if the storage system receives one

24      duplicate, it's likely there will be more, so if
```

517

```
1        you keep track of the recently successfully

2        deduplicated ones, you may save some time.

3                Q.   So how does the Purity software

4        use this SD table in the inline deduplication

5        process?

6                A.   The Purity software takes the

7        identifier and compares it with the contents of

8        the SD table.

9                Q.   And what happens if the Purity

10       software determines that there is no match in

11       the SD table for the identifier of the incoming

12       data segment?

13               A.   Yeah, so the animation showed the

14       Purity software searching in the SD table, not

15       finding it, and then it will make a decision to

16       go to another table, called the recent table.

17               Q.   What is the recent table?

18               A.   The recent table is another list

19       of segment identifiers that the Purity software

20       has seen before.

21               Q.   And how does the Purity software

22       use the recent table?

23               A.   The Purity software searches

24       through the recent table looking to see if there
```

518

```
 1        was a match of the identifier.
 2              Q.   And what happens if the Purity
 3        software, after comparing the indentifier in the
 4        incoming segment to the identifiers in the
 5        recent table finds a match, what happens if the
 6        identifier of the incoming segment is matched to
 7        an identifier in the recent table?
 8              A.   So the Purity software now goes
 9        and checks that the incoming segment data
10        matches the saved data to be absolutely certain
11        it's the same.
12              Q.   So on the left-hand side of the
13        screen you were comparing the name tags and now
14        over here on the right-hand side we're comparing
15        the actual data?
16              A.   Yes.
17              Q.   And have you reviewed the source
18        code that Pure Storage uses to perform this
19        comparison to determine whether an incoming
20        segment is potentially a duplicate of an already
21        stored segment?
22              A.   Yes, I have.  The software is long
23        and complex, but typically software designers
24        split the logic of the programming into little
```

```
 1        pieces, functions or subroutines and there's a

 2        subroutine called compare dup which is software

 3        that actually compares data.

 4               Q.   That's the software that would

 5        perform the comparison in the top right?

 6               A.   Correct.

 7               Q.   Okay.  Is there also software that

 8        performs the lookups that takes the identifier

 9        of the incoming segment to the SD table and the

10        recent table and performs those lookups?

11               A.   Yes, that's another function

12        called hash lookup.

13               Q.   You said hash lookup?

14               A.   Correct.

15               Q.   What does the name hash have to do

16        with anything here?

17               A.   The hash in computer science terms

18        is an identifier that can be created in many

19        different ways, but it's generally called a

20        hash.

21               Q.   And so here the name hash refers

22        to the identifier or the name tag in our

23        example?

24               A.   Yes.
```

```
 1              Q.   And the name of the function is

 2      hash lookup?

 3              A.   Correct.

 4              Q.   Okay.  And what happens -- let me

 5      back up and first ask this.  Is there any

 6      dispute as far as you understand between

 7      yourself and Pure Storage and Pure Storage's

 8      expert about whether the software is performing

 9      these lookups in the order that you have

10      described here?

11              A.   No.  I think both experts agree

12      this is actually how it works.

13              Q.   Okay.  What happens next in the

14      Pure Storage inline deduplication process if the

15      software determines that the incoming data

16      segment is a duplicate of a segment that's

17      already been stored, if P2 matches P2?

18              A.   Then the Purity software takes the

19      identifier and stores it in the SD table,

20      successfully deduplicated table, because the

21      Purity software has just decided that it -- it

22      has successfully deduplicated this segment.

23              Q.   And is there a disagreement

24      between yourself and Pure Storage's expert
```

```
 1        witness about whether the Pure Storage software

 2        is putting the identifier in the SD table at

 3        this point in the process?

 4                A.   My understanding is that he

 5        agrees.

 6                Q.   Now, I'd like to turn back, if I

 7        can, to the claim language here.  I'm sorry,

 8        there's one more step, isn't there?  Can you

 9        explain what that was?

10                A.   Yes, once we've decided it's

11        duplicate, we can discard the P2 that came in

12        from the data stream.

13                Q.   Okay.  And now I'd like to turn

14        back to the claim language that's at issue here.

15        Which part of what you just showed us in the

16        inline deduplication process in Pure Storage's

17        products is the part that you think is

18        delivering back the identifier for the data

19        segment in the event that the data segment is

20        determined to have been stored previously?

21                A.   This is when the Purity software

22        delivers the identifier back into the SD table.

23                Q.   So that's step three in the little

24        yellow arrows there?
```

522

```
 1              A.   Step three, it's going back to the
 2     SD table to put the identifier in.
 3              Q.   And do you understand whether Pure
 4     Storage's expert agrees with you that this step
 5     meets this limitation of the claim?
 6              A.   No, he disagrees with me.
 7              Q.   And why do you think he disagrees
 8     with you?
 9              A.   He says that in order for it to
10     deliver back, then the identifier has to have
11     been there before.
12              Q.   The identifier has to have been
13     stored in the SD table in Pure Storage's
14     expert's view?
15              A.   In his view, yes, it has to have
16     been stored in the SD table before it can be
17     returned back there.
18              Q.   And do you think he's right about
19     that?
20              A.   Well, it doesn't make any sense.
21     And so no, I don't think it needed to be stored
22     there before.
23              Q.   And so turning back to the claim
24     language for a moment, can you explain one more
```

523

```
 1       time how you think this claim language

 2       delivering back the identifier in the event that

 3       the segment's determined to have been stored

 4       previously is met by Pure Storage's system?

 5               A.  Well, this is just one of the ways

 6       that that claim element is met, but it is in the

 7       storing -- it's in the storing of the identifier

 8       in the SD table by the Purity software that's

 9       already been to the SD table.

10               Q.  Okay.  And you mentioned this is

11       one of the ways.  I'd like to ask you in a

12       couple minutes about the other ways.  But first,

13       were you here for Pure Storage's opening

14       presentation?

15               A.  Yes, I was.

16               Q.  And did you see Pure Storage's

17       counsel present an animation of the process of

18       checking the SD table and the recent table?

19               A.  Yes, I did.

20               Q.  Okay.  And is this the animation

21       that you saw presented?

22               A.  Yes.

23               Q.  Mr. Jestice, do you think that

24       this animation accurately characterizes what is
```

```
 1    happening in the Purity software that's at issue

 2    in this case?

 3              A.  I don't think it accurately

 4    describes it.  And it's also only one of the

 5    ways that the software infringes.

 6              Q.  And so did you have an opportunity

 7    after viewing this yesterday to direct the

 8    preparation of a demonstrative with edits to

 9    this one to show how you think the software

10    really works?

11              A.  Yes, I did.

12              Q.  Okay.  And is this the

13    demonstrative you directed the preparation of?

14              A.  Yes.

15              Q.  And what's going on here?

16              A.  So the data is coming into the

17    controller, the identifier is first being

18    checked against the contents of the SD table,

19    then it's being checked against the contents of

20    the recent table.  And in the event it wasn't

21    found in the SD table the first time, in the

22    event it was found in the recent table, it is

23    delivered back to the SD table.

24              Q.  And can you remind us what that
```

525

```
 1        spinning gear was in the animation?

 2             A.   This is the Purity software.

 3             Q.   So the Purity software is taking

 4        the identifier to compare it against the SD

 5        table and then compare it against the recent

 6        table and if the segment is determined to be a

 7        duplicate, it is in your view delivering it back

 8        to the SD table?

 9             MR. VAN NEST:  Objection.

10        Leading, Your Honor.

11             THE COURT:  All right.  I'll

12        sustain it.

13   BY MR. ROSENBERG:

14             Q.   Mr. Jestice, in which point in

15        your diagram do you view constitutes delivering

16        back to the SD table?

17             A.   It's exactly the same as in my

18        diagram, the modified Pure Storage diagram, in

19        step three when we take the identifier and put

20        it back in the SD table, deliver it back to the

21        SD table is the step.

22             Q.   Okay.  Mr. Jestice, a few minutes

23        ago you mentioned you think there's another way

24        that the Purity software meets this claim
```

```
 1        element of delivering back the identifier; is

 2        that right?

 3               A.   Yes, that's correct.

 4               Q.   And what is that other way?

 5               A.   So the Pure Storage expert says

 6        that the, there's a requirement to have a return

 7        statement, which is a very specific computer

 8        instruction.

 9               Q.   What is a return statement?

10               A.   It's an instruction.  I talked a

11        little bit about the subroutines, where you try

12        to split your program up into distinct parts.

13        At the end of one of these subroutines or

14        functions, there's frequently a return

15        statement, which is the exit from that function.

16               Q.   And with reference to what's on

17        the screen, is this what a return statement

18        might look like?

19               A.   It may.  A return statement can

20        return nothing or it could return some value.

21               Q.   Is there a return statement in the

22        Purity software that you've looked at in

23        connection with this delivering back or

24        returning the identifiers?
```

527

```
1                 A.   Yes, there is.
2                 Q.   And in your opinion, does that
3       return statement meet this claim step of
4       returning the identifier?
5                 A.   Yes, that also meets this claim
6       step.
7                 Q.   How does it do that?
8                 A.   Because the claim requires
9       delivering back the identifier and that the
10      return statement returns the identifier back in
11      the form of an index.
12                Q.   What is an index?
13                A.   An index is an address within an
14      array.  It's sort of like a pointer to the
15      actual data.
16                Q.   And how does returning the index
17      in your view meet the step of returning the
18      identifier?
19                A.   Well, in computer science terms or
20      in computer programming terms, if you return the
21      index, you have the identifier.
22                Q.   So does this return statement in
23      Pure Storage's source code that returns the
24      index to the identifier literally in your view
```

```
1    meet the claim language returning the

2    identifier?

3            A.   Yes, it does.  It returns the

4    identifier.

5            Q.   Does Pure Storage agree with you

6    about whether returning the index literally

7    meets this claim step?

8            A.   No, Pure Storage disagrees with

9    me.

10           Q.   Have you heard of something called

11   the doctrine of equivalents?

12           A.   Yes, I have.

13           Q.   Is it your understanding that

14   under the doctrine of equivalents, an accused

15   product can meet a claim limitation even if it

16   doesn't meet it literally, as long as it

17   performs substantially the same function in

18   substantially the same way to achieve

19   substantially the same result?

20           A.   Yes, that's my understanding.

21           Q.   And do you have an opinion as --

22   about whether the return statement in Pure

23   Storage's source code that returns an index to

24   the identifier infringes this claim step under
```

1      the doctrine of equivalents?

2              A.   Yes, I believe it does.  Because

3      it does, performing substantially the same

4      function, it returns an index and it does do it

5      substantially the same way in that it returns

6      the index in the event that there's a match.

7      And the result is that you have an identifier

8      that you can use for other things, so

9      substantially the same result.

10             Q.   And so if we now turn back to the

11     claims, can we summarize, do you have, in your

12     opinion, two reasons why you believe that the

13     returning the identifier step of Claim 32 is met

14     by Pure Storage's software in its FlashArray

15     products?

16             A.   Yes, my opinion is it's infringed

17     in both ways that I stated, which is returning

18     the identifier, delivering back the identifier

19     to the SD table and in the return statement.

20             Q.   So we'll put a checkmark up there.

21     And to summarize, is your opinion that Pure

22     Storage products infringe this claim?

23             A.   Yes, my opinion is that Pure

24     Storage products infringe all of the elements of

```
 1      claim 32 of the '464 patent.

 2              Q.   Mr. Jestice, do you have an

 3      understanding that there are different acts that

 4      can infringe a patent claim?

 5              A.   Yes, I do.

 6              Q.   Do you have an opinion about

 7      whether Pure Storage infringes this claim by

 8      making all of the accused FlashArray products in

 9      the United States?

10              A.   Yes, they do.  They infringe by

11      making the products in the United States.

12              Q.   And is it also possible to

13      infringe a patent claim by using or selling or

14      offering to sell the patented product in the

15      United States?

16              A.   Yes.  My opinion is that they

17      infringe the patent by making, selling and

18      offering to sell the products in the United

19      States.

20              Q.   Okay.  Mr. Jestice, now that we

21      have talked about infringement, I would like to

22      turn to the issue of noninfringing alternatives?

23              THE COURT:  Mr. Rosenberg, I'm

24      thinking maybe this is a good time for lunch.
```

531

```
 1        Is it?

 2                    MR. ROSENBERG:  Absolutely.

 3                    THE COURT:  Members of the jury,

 4        we are going to take a one-hour lunch break now,

 5        and then we'll resume at 12 minutes of 2:00.

 6        All right.  Let's take the jury out.

 7                        (Jury leaving the courtroom at

 8        12:48 p.m.)

 9                    THE COURT:  All right.

10        Mr. Jestice, you can step down.

11                    Everyone be seated.  Is there

12        anything that anybody wants to talk about?

13                    MR. VAN NEST:  No.

14                    MR. KREVITT:  None for the

15        plaintiff at this time, Your Honor.

16                    MR. VAN NEST:  We're okay, Your

17        Honor.

18                    THE COURT:  All right.  Just in

19        terms of actually finishing Mr. Jestice, which I

20        assume will happen sometime this afternoon,

21        what's next?

22                    MR. KREVITT:  Mr. Birmingham, who

23        was the inventor on the '556 patent.

24                    THE COURT:  Okay.  And do you
```

```
 1    think that's going to take us through the rest

 2    of the day?

 3                 MR. KREVITT:  I'm not sure.  Then

 4    what we were thinking if not is that we would

 5    move to Mark Jones, our expert on the '556

 6    patent.  Almost certainly that would take us to

 7    the end of the day.

 8                 THE COURT:  I think that's a

 9    reasonable bet.  All right.  I'll see you all

10    again in a little less than an hour.

11                 (A luncheon recess was taken.)

12                 THE COURT:  All right.  Please be

13    seated.  Are we ready to bring the jury in.

14                 MR. VAN NEST:  Your Honor, it's

15    awfully warm in here, I'm reflecting that for

16    everybody.

17                 THE COURT:  I noticed it when I

18    walked in and I have asked the deputy, courtroom

19    deputy to contact building management, offer

20    them more money and see if we can't lower the

21    heat.

22                 MR. VAN NEST:  Thank you.

23                 (Jury entering the courtroom at

24    1:53 p.m)
```

533

```
 1                    THE COURT:  Members of the jury,
 2       welcome back.  Everyone you may be seated.  I'm
 3       not sure if they turned the heat on while we
 4       were out to lunch, but we are going to try to
 5       get it lowered, but that takes a little bit of
 6       time.
 7                    Go ahead, Mr. Rosenberg.
 8                    MR. ROSENBERG:  Thank you, Your
 9       Honor.
10       BY MR. ROSENBERG:
11                    Q.  Welcome back, Mr. Jestice.  Before
12       lunch we were talking about infringement of the
13       '464 patent and your opinion that the Purity
14       software meets every step or element of claim 32
15       of the '464 patent.
16                    I would like to turn now to a
17       separate issue called noninfringing
18       alternatives.  Do you have an understanding of
19       what noninfringing alternatives are in a patent
20       case?
21                    A.  Yes.  My understanding is that
22       they are suggestions in this case put forward by
23       Pure Storage of ways they could change their
24       products so they would not infringe the patents.
```

1          Q.   These are not questions about

2     whether the actual designs of the products

3     infringe, but rather whether alternative designs

4     would have infringed; right?

5          A.   That's correct.

6          Q.   Have you considered whether Pure

7     Storage had available to it acceptable

8     noninfringing alternatives to the asserted

9     claims of the '015 and '464 patents?

10         A.   Yes, I have.

11         Q.   And what have concluded?

12         A.   I concluded that they would still

13     infringe the patents of the '464 and the '015.

14         Q.   And in order to help you explain

15     that, I know we have talked about the '464 and

16     your opinion on infringement.  We have not

17     talked about the claims of the '015 patent.  I

18     understand you're not here to offer an opinion

19     about infringement of that patent.

20              Is it your understanding that the

21     parties agree that there are claims of the '015

22     patent that are infringed?

23         A.   Yes.

24         Q.   To help explain your opinions

535

1    about whether the alternatives proposed by Pure

2    Storage would still infringe, I would like to

3    have you explain to the jury what the patent

4    claim of the '015 patent here says.  Can you

5    tell us what the first part of claim 1 of the

6    '015 patent up there on the screen says and what

7    it means?

8              A.   Yes.  This is a method for storing

9    data comprising, receiving a data stream

10   comprising a plurality of data segments.

11             Q.   Can you show us how that relates

12   to a data storage system, for example, the

13   illustration we have been using?

14             A.   This is the same diagram I used

15   before with hosts on the left generating data,

16   an interface between them that transmits a data

17   stream which is a plurality of data segments and

18   then there is a controller and storage segments

19   that manage and store the data.

20             Q.   And then moving back over to the

21   claim, after the data stream has been received,

22   what's the next step recited in claim 1 of the

23   '015 patent?

24             A.   Assigning an identifier to one of

536

```
 1      a plurality of data segments.

 2              Q.   How does that relate to the claim,

 3      or I'm sorry, the illustration we see here?

 4              A.   This is exactly the same as

 5      before, a segment comes into the storage

 6      controller and an identifier, in this case it's

 7      like a name tag, Ed we have associated with that

 8      segment that contains the data, P2 for this

 9      illustration.

10              Q.   And the name tag, the identifier

11      here is Ed?

12              A.   Ed, yes.

13              Q.   And then the last step of claim 1

14      of the '015 patent is determining whether one of

15      the plurality of data segments has been stored

16      previously using a summary, wherein the summary

17      is a space efficient probabilistic summary of

18      segment information.  Do you have an

19      understanding of how that step relates to the

20      concept of preliminary checks?

21              A.   This is the preliminary check.

22              Q.   When would that happen in an

23      example of a storage system?

24              A.   Right here.  It would take, it
```

```
 1        would take the identifier and then use that as a

 2        preliminary check to see if it's been stored

 3        before.

 4                Q.   And Mr. Jestice, the Court has

 5        provided constructions for some of the language

 6        in the claim we just looked at; is that right?

 7                A.   Yes, they have.

 8                Q.   And we haven't looked at those

 9        because of course you haven't offered and you

10        are not here to put in an opinion about whether

11        the products infringe, but I want to go back to

12        the word identifier here.  Do you recall the

13        Court having construed the identifier to mean

14        information that identifies?

15                A.   Yes, I do.

16                Q.   And now moving forward to the

17        alternatives that Pure Storage has proposed, do

18        you understand this list to reflect alternatives

19        that Pure Storage, and specifically its expert,

20        Dr. Zadok, have proposed for ways in which Pure

21        Storage supposedly could have redesigned its

22        inline deduplication process to avoid infringing

23        the patents?

24                A.   Yes.  There is actually two sets
```

538

```
 1    because they have offered two solutions, one for

 2    the '015, one for the '464, so they're arranged

 3    in two columns here.

 4         Q.   On the side on the left there

 5    where it says the '015, these are things that

 6    Pure Storage's experts says Pure Storage could

 7    have done to change or redesign their inline

 8    deduplication process to avoid the claim we just

 9    looked at in the '015 patent; right?

10         A.   That's correct.

11         Q.   Are these changes things that Pure

12    Storage has actually done, has Pure Storage

13    actually made these two changes to its inline

14    deduplication products as far as you know?

15         A.   As far as I know, they haven't

16    made these changes.

17         Q.   In your opinion, if Pure Storage

18    had made either of those two changes to its

19    inline deduplication products, would that have

20    resulted in a noninfringing product with respect

21    to the '015 patent?

22         A.   In respect to the '015 patent, no,

23    it still would have infringed.

24         Q.   Why not?
```

539

1                A.   Well, the first noninfringing

2       suggestion was assign hash values to multiple

3       sector blocks of data, there is nothing in the

4       patent that says that the sets have to be a

5       certain size, they can be 512 bites or any size.

6       They can also be variable.  There is also no --

7       there is no reason that that has to be hash

8       values, why it would not work if hash values

9       were associated with multiple sectors.

10               Q.   What about the second alternative

11      listed on the left side of the screen?

12               A.   Again, in the patent it talks

13      about variable length sectors, and sliding

14      windows of data.

15               Q.   And Mr. Jestice, has the fact that

16      Pure Storage has not actually changed its inline

17      deduplication process in either of those two

18      ways informed your opinion about whether they

19      would have been acceptable solutions?

20               A.   I have some questions whether it

21      would work, but no, it hasn't changed my

22      opinion.

23               Q.   So if you'll allow me, I'll put

24      strike marks through those to indicate your

540

```
1      opinion that those are not noninfringing
2      alternatives.
3                  If we turn to the '464 patent, on
4      the right side here, is it your understanding
5      that these are ways in which Pure Storage's
6      expert says Pure Storage could have changed its
7      inline deduplication process to avoid infringing
8      the claim of the '464 patent we looked at
9      earlier, claim 32?
10          A.   Yes, that's their suggestions were
11     changing the code so they would not infringe the
12     '464.
13          Q.   Have you seen any indication that
14     Pure Storage has actually made any of these four
15     changes to its inline deduplication process?
16          A.   No, I have not.
17          Q.   So these are things Pure Storage
18     says it could have done, but Pure Storage did
19     not actually do?
20          A.   Correct.
21          Q.   In your opinion, if Pure Storage
22     had made these changes, any one of these changes
23     to its inline deduplication process, would that
24     have made the inline deduplication process an
```

541

```
1        acceptable alternative to the '464 patent?

2                 A.   No, it would not.

3                 Q.   Why not?

4                 A.   Well, the first choice, the

5        reverse order in which they are performed still

6        has the return statement.  The modifying code to

7        eliminate recent stable and just rely the SD

8        table also still has the return statement.

9                      The perform deduplication against

10       a single table stored in relatively high latency

11       memory, I believe would still require a hash

12       filter that would also be a subset of the

13       identifiers in the latency memory, so I think

14       that would infringe and still be a return

15       statement.

16                      The suggestions for removing or

17       changing the code for return statement, I don't

18       believe actually does remove the return

19       statement.  And you -- and the final suggestion,

20       because there is actually two suggestions in

21       there, would be a violation of coding standards.

22                 Q.   Mr. Jestice, if Pure Storage had

23       made the changes on the right side of the screen

24       there, has Pure Storage's expert expressed a
```

542

```
 1    view that making those changes would do anything

 2    to avoid infringing the '015 patent on the left?

 3              A.   No, the ones on the right have

 4    been suggested for only the '464 patent.

 5              Q.   And it's your opinion that those

 6    changes would not result in acceptable

 7    noninfringing alternatives for the '464?

 8              A.   That's correct.

 9              Q.   I'll put a line through those to

10    illustrate that.

11              Other than what's listed on the

12    screen here, has Pure Storage's expert,

13    Dr. Zadok, proposed any other changes Pure

14    Storage could have made to its products to avoid

15    infringement?

16              A.   Yes, he's proposed removing inline

17    deduplication completely.

18              Q.   So not changing inline

19    deduplication in the ways described here, but

20    simply removing inline deduplication as a

21    feature?

22              A.   Yes.  He has discussed disabling

23    it, but ultimately he would remove all the code

24    from the Purity software.
```

1          Q.   And do you think that taking out

2    or disabling or removing the inline

3    deduplication feature from the Pure Storage

4    products would have been an acceptable

5    alternative to using inline deduplication under

6    the claims?

7          A.   I don't believe it would be

8    acceptable.

9          Q.   And earlier you had discussed some

10   advantages that inline deduplication has over

11   background deduplication.  Do those advantages

12   relate to your opinion about whether taking

13   inline deduplication out would have been an

14   acceptable alternative?

15         A.   Yes.  The end result of taking

16   inline deduplication out would be that the data

17   would initially be written to the storage

18   element and that causes using more storage and

19   secondly it would wear the storage out faster,

20   so neither of -- both of those things would

21   increase the price of the product.

22         Q.   And so taking inline deduplication

23   out and relying only on background deduplication

24   in your view wouldn't have been an acceptable

```
 1    way to make a product; is that right?

 2              A.   That's correct.

 3              Q.   Okay.  You understand that Pure

 4    Storage's expert witness, Doctor Zadok,

 5    disagrees with you about that?

 6              A.   Yes, he does.

 7              Q.   Okay.  Have you seen any

 8    information from Pure Storage outside the

 9    courtroom that reinforces your view that taking

10    inline deduplication out of the products would

11    not have been acceptable?

12              A.   Yes, I have.

13              Q.   Okay.  Do these statements relate

14    to your views on that?

15              A.   Yes.  This is.

16              MR. VAN NEST:  Objection.  Your

17    Honor, 702.  This is not expert testimony.

18              MR. ROSENBERG:  It is, in fact,

19    Your Honor.  Relates to the question of whether

20    this technology is essential, mandatory, key,

21    such that removing it would not result in an

22    acceptable product.

23              THE COURT:  I'm going to overrule

24    the objection.
```

545

```
1    BY MR. ROSENBERG:
2              Q.   So Mr. Jestice, can you remind us
3    who is Scott Dietzen.
4              A.   He is the CEO of Pure Storage.
5              Q.   What has he said in these blog
6    posts that you find relevant to your opinion
7    about whether taking inline deduplication out of
8    Pure Storage's products would have been an
9    acceptable alternative?
10             A.   He says deduplication is key.
11   Inline deduplication is essential and inline,
12   submillisecond deduplication is mandatory.
13             Q.   And what does this indicate to you
14   about whether Pure Storage's view about whether
15   taking inline deduplication out of the product
16   would have been an acceptable alternative?
17             A.   They don't think it would have
18   been acceptable.
19             Q.   In addition to these blog posts --
20   let me stop and have you look at Exhibit 31.
21             A.   PTX-31?
22             Q.   31.
23             A.   Yes, I have it.
24             Q.   And is this the blog post shown on
```

```
 1        the left side of the slide?

 2                  A.   Yes, it is.

 3                  Q.   Okay.

 4                  MR. ROSENBERG:  Your Honor, we'd

 5        move PTX-31 into evidence.

 6                  MR. VAN NEST:  I have no

 7        objection, Your Honor, to the admission of the

 8        exhibit, but I do object to using an expert to

 9        perform this task, 702.

10                  THE COURT:  So the exhibits are

11        admitted without objection and the rest, any

12        objection is overruled.

13                  MR. ROSENBERG:  And Your Honor,

14        likewise, maybe to speed this along, we move

15        into evidence the other two blog posts listed

16        here, Exhibits 33 and 38.

17                  MR. VAN NEST:  No objection, Your

18        Honor.

19                  THE COURT:  All right.  Admitted

20        without objection.

21        BY MR. ROSENBERG:

22                  Q.   Mr. Jestice, in addition to the

23        information Mr. Dietzen wrote on the Pure

24        Storage blog, did you also review Mr. Dietzen's
```

547

```
1       deposition in this case?

2               A.   Yes, I did.

3               Q.   And did he say anything in his

4       deposition that you believe supports your view

5       that removing inline deduplication from Pure

6       Storage's products would not have been

7       acceptable?

8               A.   Yes, I did.

9               Q.   And is this one of the statements

10      he made in his deposition that you believe is

11      consistent with your opinion?

12              A.   Yes, he says deduplication is one

13      of the essential techniques.

14              Q.   Mr. Jestice, here Mr. Dietzen is

15      only using the word deduplication, he doesn't

16      say inline deduplication, right?

17              A.   That's correct.

18              Q.   And there are two different kinds

19      of deduplication, inline and background, right?

20              A.   Yes, there is.

21              Q.   And the one we're talking about

22      potentially removing here and whether that would

23      be acceptable was inline deduplication, right?

24              A.   That's correct.
```

548

1          Q.   And so how do you know that this
2     statement by Mr. -- I'm sorry, Doctor Dietzen is
3     consistent with your view that Pure Storage
4     views inline deduplication as an essential
5     technique?  Is there any information in Pure
6     Storage's documents that supports your
7     understanding?
8          A.   Yes, there is.
9          Q.   And is this one of the documents
10    you reviewed that you believe supports your
11    understanding of that statement?
12         A.   Yes, it is.
13         Q.   Can you explain how this document
14    supports your understanding of doctor Dietzen's
15    testimony?
16         A.   Yes, this is a Pure Storage
17    document and it says content deduplication with
18    512 byte geometry is roughly 95 percent.
19         Q.   Is roughly 95 percent inline?
20         A.   Inline and the remainder is done
21    post-process, which is background.
22         Q.   Okay.  And so is it your
23    understanding that Pure Storage is saying here
24    that of the data that is deduplicated by the

```
 1        deduplication features in the FlashArray, 95

 2        percent of that data deduplication happens

 3        through the inline feature and not the

 4        background feature?

 5                     MR. VAN NEST:  Objection.

 6        Document speaks for itself.  Calling for

 7        speculation.

 8                     THE COURT:  All right.  Overruled.

 9                     THE WITNESS:  When I read that

10        document, that's what it says.  It's 95 percent

11        inline.

12    BY MR. ROSENBERG:

13                 Q.   And Mr. Jestice, did you also

14        review testimony by a Pure Storage executive

15        name Matt Kixmoeller?

16                 A.   Yes, I did.

17                 Q.   And did any of his testimony

18        support your opinion?

19                 A.   Yes, it did.

20                 Q.   Can you please move the slide

21        forward?  And is this testimony given by Mr.

22        Kixmoeller that you believe supports your

23        opinion?

24                 A.   Yes, he said inline deduplication
```

550

```
 1      is one of the mandatory features.

 2             Q.   And so this is Pure Storage

 3      talking about it's own products, correct?

 4             A.   Correct.

 5             Q.   And did you review any Pure

 6      Storage documentation as opposed to the

 7      testimony or the public facing blog posts, any

 8      Pure Storage presentations that support your

 9      view about removing inline deduplication?

10             A.   Yes, I did.

11             Q.   And is this one of the

12      presentations you reviewed?

13             A.   Yes, it is.

14             Q.   Can you explain how this supports

15      your view that removing inline deduplication

16      would make the Pure products unacceptable?

17             A.    This presentation is saying what's

18      the secret sauce.  And it's global inline

19      deduplication.

20             Q.   Mr. Jestice, were you in the

21      courtroom earlier today when Doctor Li talked

22      about the commercial success that Data Domain

23      had?

24             A.   Yes, I was.
```

551

```
 1              Q.   And do you understand that the
 2     patents, the deduplication patents, the '015 and
 3     the '464 Patents came out of the work that
 4     Doctor Li and his colleagues did at Data Domain?
 5              A.   Yes, that's my understanding.
 6              Q.   Okay.  Do you have an opinion
 7     about whether Data Domain's own products, the
 8     deduplication products sold by Data Domain
 9     practice the '015 and '464 patents?
10              A.   Yes.  I've looked at the
11     documentation and my opinion is is that the --
12     these main products do implement the '015 and
13     '464 Patents.
14              Q.   Did you look at products dating
15     back to -- let me scratch that.  When you were
16     here earlier and heard Doctor Li testify, did
17     you hear him testify about the first products
18     Data Domain released in 2003 or 2004?
19              A.   Yes.
20              Q.   And is your opinion that the Data
21     Domain products practice the '015 and '464
22     Patent, does that encompass the Data Domain
23     products that were sold starting in 2003 and
24     2004?
```

552

```
 1              A.  Yes, it does.
 2              Q.  And does that extend to Data
 3    Domain products that were sold up until and
 4    through when EMC purchased Data Domain?
 5              A.  Yes, it does.
 6              Q.  Okay.  And does it include Data
 7    Domain's products up until the present day?
 8              A.  Yes, it does.
 9              Q.  And is it your opinion that the
10    Data Domain products practice the claims of the
11    '015 Patent that are at issue in this lawsuit,
12    specifically claims 1, 2, 7, 15, and 16 of the
13    '015 patent?
14              A.  Yes, that's my opinion.
15              Q.  And is it also your opinion that
16    the Data Domain products practice Claim 32 of
17    the '464 Patent, the patent you showed us
18    earlier how Pure Storage infringes?
19              A.  Yes, that's my opinion.
20              Q.  And in reaching your opinion that
21    Data Domain's products practice these patents,
22    did you consider any documentation about the
23    Data Domain products?
24              A.  Yes, I did.
```

```
 1              Q.   Did you consider a Data Domain

 2     technology and architecture overview?

 3              A.   Yes, I did.

 4              Q.   Can you turn to Exhibit 47 in your

 5     book?

 6              A.   Okay.

 7              Q.   47.  Is this the Data Domain

 8     technology and architecture overview that you

 9     reviewed when reaching your opinion that Data

10     Domain's products practice patents?

11              A.   Yes, it is.

12              MR. ROSENBERG:  And Your Honor,

13     we'd move Exhibit 47 into evidence.

14              MR. VAN NEST:  No objection, Your

15     Honor.

16              THE COURT:  Admitted without

17     objection.

18     BY MR. ROSENBERG:

19              Q.   And did you also consider in

20     forming this opinion a Data Domain document

21     entitled compressed object store architectural

22     specification?

23              A.   Yes, I did.

24              Q.   Can you turn to Exhibit 65 in your
```

1    binder, I think it's the next one.  And is this

2    the architectural specification you reviewed?

3              A.  Yes, it is.

4              MR. ROSENBERG:  Your Honor, we'd

5    move Exhibit 65 into evidence.

6              MR. VAN NEST:  No objection, Your

7    Honor.

8              THE COURT:  Admitted without

9    objection.

10   BY MR. ROSENBERG:

11             Q.  And in addition to this

12   documentation about Data Domain's products, did

13   you also consider testimony by the chief

14   architect at Data Domain, Mahesh Kamat, about

15   how the Data Domain products have worked?

16             A.  Yes, I did.

17             Q.  And do you believe his testimony

18   supports your opinion that the Data Domain's

19   products practice the asserted claims?

20             A.  Yes, I do.

21             Q.  And you mentioned you were here

22   for Doctor Li's testimony about the commercial

23   success of Data Domain.  In your opinion, was

24   the deduplication technology embodied in the

555

```
 1        asserted claims of these patents and practiced

 2        by the Data Domain products the cause of the

 3        commercial success of Data Domain's products?

 4                A.   That's my opinion, yes.

 5                Q.   Mr. Jestice, have you seen

 6        statements by anyone in the storage industry

 7        that you believe support your view that the

 8        inline deduplication technology invented at Data

 9        Domain is an important technology in this

10        industry?

11                A.   Yes, I have.

12                Q.   Have you seen statements by Frank

13        Slootman?

14                A.   Yes, I have.

15                Q.   Who is Frank Slootman?

16                A.   He was CEO of Data Domain, and I

17        believe he's now on the board of directors of

18        Pure Storage.  And he wrote a book called Tape

19        Sucks.

20                Q.   And did you read that book?

21                A.   Yes, I did.

22                Q.   And is there anything written by

23        Mr. Slootman in that book that you found useful

24        in reaching your opinion that the inline
```

1    deduplication technology that you've testified

2    was embodied in Data Domain's products is

3    important technology in this industry?

4            A.  Yes, I do.

5            Q.  And is this one of those

6    statements?

7            A.  Yes.  Frank Slootman says that

8    Data Domain's landmark invention -- this was

9    Data Domain's landmark invention.

10           Q.  And you believe that's consistent

11   with your view that the deduplication technology

12   claimed in the '015 and '464 Patents drove the

13   commercial success of Data Domain's products?

14           A.  Yes, I believe Data Domain

15   implemented all of the patents and their

16   products' success was based on those patents.

17           Q.  Mr. Jestice, has Pure Storage's

18   expert, Doctor Zadok, said that it would be

19   acceptable for Pure Storage to take inline

20   deduplication out of its products and not do

21   anything to substitute for its absence?

22           A.  Yes, he has.

23           Q.  Let me rephrase it.  Is there

24   anything Dr. Zadok has said Pure Storage would

```
1    do, would want to do, would have to do to

2    substitute for the absent of inline

3    deduplication if they took it out?

4         A.   Dr. Zadok said that you need to

5    increase the amount of storage to compensate for

6    the lack of inline deduplication.

7         Q.   And did Dr. Zadok also take a look

8    at how frequently inline deduplication is

9    currently used in Pure Storage's FlashArray

10   products?

11        A.   Yes.  Pure Storage's FlashArray

12   products communicate back to Pure Storage with

13   statistics and information about their devices,

14   and Dr. Zadok put together some information

15   about which of the products ran inline

16   deduplication and which did not.

17        Q.   And did he observe a certain

18   number of FlashArray products that he said were

19   not using the inline deduplication feature?

20        A.    Initially he said there was six

21   that he had found on a particular day that did

22   not use the inline deduplication feature.

23        Q.   And is it true that those six

24   FlashArrays never used inline deduplication?
```

558

```
 1              A.   No, that's not actually true.

 2              Q.   How many of them did use inline

 3      deduplication?

 4              A.   Well, there is some information

 5      provided that said that three of those at a

 6      later date were actually running inline

 7      deduplication.

 8              Q.   So of the six FlashArray devices

 9      that Dr. Zadok looked at, three of them in fact

10      did use inline deduplication at some point?

11              A.   At some point in time, yes.

12              Q.   Were these the only six

13      FlashArrays that Dr. Zadok had access to

14      information about?

15              A.   No, Dr. Zadok and the Pure Storage

16      has 1,600 FlashArrays.

17              Q.   And of those 1,600 FlashArrays,

18      how many of them used inline deduplication?

19              A.   All of them except for the three.

20              Q.   So is that about 99 percent?

21              A.   Yeah.

22              Q.   Mr. Jestice, did these statistics

23      about how many FlashArrays use inline

24      deduplication and how many don't inform your
```

1    opinion about whether removing inline

2    deduplication would be acceptable?

3            A.   Yes.  If only three out of the

4    1,600 arrays had it disabled, and I don't know

5    why they were disabled and have not provided,

6    been given any information as to why they were

7    disabled, that indicates to me that the

8    customers think that inline deduplication is

9    really important.

10           Q.   Mr. Jestice, has Dr. Zadok

11   estimated the amount of extra storage that Pure

12   Storage would need to add to its products in

13   order to make up for the lack of inline

14   deduplication if they took it out in his view?

15           A.   Yes, he has.

16           Q.   What has he said about that?

17           A.   6.58 percent.

18           Q.   So his view is that if Pure

19   Storage took inline deduplication out of the

20   FlashArray products, Pure Storage could make up

21   for that by adding about six-and-a-half percent

22   additional storage capacity to its products?

23           A.   That's what he says.

24           Q.   Do you agree with that opinion?

```
 1              A.   No, I don't.

 2              Q.   Why not?

 3              A.   The data that we have been

 4    provided with that's coming back from the

 5    customers of these products is very limited.

 6    And Dr. Zadok has taken and analyzed that data

 7    and is considering an average usage through the

 8    systems he's looked at.

 9                   And this comes back to a task

10    called capacity planning which is what I did at

11    IBM and what I did at my startup company.  You

12    need to look at the peaks to find out the

13    maximum usage, and then add some percentage to

14    that.  So his analysis was flawed because it --

15    when you considered the averages of some of the

16    products he looked at.

17              Q.   Mr. Jestice, you said you need to

18    look at the peaks.  Can you explain a little bit

19    more about what you meant by that?

20              A.   Yes, there is two aspects when

21    you're trying to decide how much computer

22    storage you'll need.  One is benchmarking, which

23    is how fast this system goes and how much it can

24    handle.  The second is how much storage are you
```

561

```
 1      going to need?  How much data are you going to
 2      need?  And you generally project forward for
 3      this.
 4                  So what you need to do is look at
 5      the maximum amount of data you're expecting to
 6      see and you can do that based on the maximum
 7      amount of data that you have already received
 8      and then project out future needs, but you got
 9      to start looking at those peaks.
10                  For example, if you were looking
11      to heat your house, you would look at the
12      coldest season of the year to find out how much
13      heating you need because it doesn't do any good
14      saying on average it's going to be 30 degrees
15      around here if you got some days that's going to
16      be zero.  You need to be able to bring the
17      temperature up to a reasonable amount.  The same
18      with capacity planning, you need to be able to
19      identify those cold days in order to provide
20      enough capacity to not stop the operations of
21      the computer.
22           Q.   Mr. Jestice, did you make any
23      effort to account for the peaks and follow
24      Dr. Zadok's calculations, but consider the peaks
```

```
1    that you believe he left out?
2         A.  Yes.  I actually asked for some
3    more data to try and identify that peak time and
4    I was provided with some limited amount of data
5    and then considering that not all those
6    customers are going to hit peaks because it's
7    going to be a unique calculation for each
8    customer, I averaged out the peaks and came up
9    with a different peak.
10        Q.  Did you come up with a figure
11   that's larger than six-and-a-half percent?
12        A.  Yes, I did.
13        Q.  Can you tell us what you came up?
14        A.  In my estimation based on the
15   limited data we have is 25.1 percent.
16        Q.  What are these percentages?  Are
17   you saying that every FlashArray out there would
18   have to have 25 percent more storage than the
19   top of the line system or something else?
20        A.  Each customer is going to be
21   unique based on their workload.  I'm saying on
22   average customers are going to need 25.1 percent
23   more.
24        Q.  In order to accommodate peak
```

```
 1    demands on those customers?

 2              A.   As currently seen based on today's

 3    data.  You also got to factor in what their

 4    future needs are, but based on today's data,

 5    that's what they would need.

 6              Q.   Mr. Jestice, if Pure Storage had

 7    to actually buy 25 percent more storage capacity

 8    for each of its products, would Pure Storage be

 9    able to sell an acceptable product for would its

10    customers be able to afford it?

11              A.   Neither Dr. Zadok or Pure Storage

12    believe that to be true and I also don't believe

13    that to be true.

14              Q.   Just to sum up your opinion here

15    on noninfringing alternatives, Pure Storage and

16    Dr. Zadok proposed some changes that Dr. Zadok

17    believes Pure Storage could have made to keep

18    inline deduplication, but do it differently; is

19    that correct?

20              A.   That's correct.

21              Q.   And it's your opinion that if Pure

22    Storage had made those changes, that would not

23    have resulted in an acceptable noninfringing

24    alternative; is that correct?
```

```
 1              A.   That's correct.

 2              Q.   And Dr. Zadok also suggested that

 3     Pure Storage could have removed inline

 4     deduplication completely to the FlashArray; is

 5     that correct?

 6              A.   That's correct.

 7              Q.   Is it your opinion that that would

 8     have resulted in an unacceptable alternative?

 9              A.   That's correct.

10              MR. ROSENBERG:  Thank you very

11     much, Mr. Jestice.

12              THE COURT:  Cross-examination.

13              MR. VAN NEST:  May I have just a

14     moment, Your Honor?

15              THE COURT:  Yes.

16              MR. VAN NEST:  Your Honor, I have

17     some binders for Mr. Jestice.  May I pass them

18     out?

19              THE COURT:  Sure.

20              MR. VAN NEST:  May I proceed, Your

21     Honor?

22              THE COURT:  Yes

23                  CROSS-EXAMINATION

24     BY MR. VAN NEST:
```

```
 1              Q.   Good afternoon, Mr. Jestice.

 2              A.   Good afternoon.

 3              Q.   You frequently serve as an expert

 4     witness in cases like this; correct?

 5              A.   I don't know about frequently.  I

 6     do.

 7              Q.   You do.  The resume you provided

 8     shows about forty different expert assignments

 9     over the past several years?

10              A.   Over the last fifteen years, yes.

11              Q.   And, in fact, you do it enough

12     that you have an agency that represents you as

13     an expert; correct?

14              A.   Actually I think like most experts

15     I have several agencies that represent me.

16              Q.   And those agencies help you find

17     and then manage expert assignments; right?

18              A.   Yes.

19              Q.   And they get a cut of whatever

20     you're paid by EMC for that service?

21              A.   Yes, they do.

22              Q.   And you're represented by an

23     agency in connection with this case as well?

24              A.   Yes, I am.
```

```
1              Q.   And over the course of your expert

2     work through agencies and otherwise, you have

3     actually testified about many different types of

4     products, fields and technologies; correct?

5              A.   I have testified about software 99

6     percent of the time.

7              Q.   You have testified about home

8     appliances?

9              A.   Can you tell me which case?

10             Q.   It was spin dryers?

11             A.   That was software.

12             Q.   Softwares that run home

13    appliances?

14             A.   That's correct.

15             Q.   And the game programing?

16             A.   Software that runs a game program,

17    yes.

18             Q.   LED monitors?

19             A.   Which case was that?

20             Q.   I believe it's listed on your

21    resume, LED monitors was Faulk versus TPV.

22             A.   For that case I wrote software to

23    measure the latency of an LED, yes.

24             Q.   In any event, you testified about
```

567

```
1    a wide range of products over the course of your
2    career; correct?
3              A.   I testified on software for a wide
4    range of products, that's correct.
5              Q.   And this is not the first time
6    that you have served as an expert for EMC, is
7    it?
8              A.   No, it's not.
9              Q.   You have testified in four
10   different cases just for EMC alone; right?
11             A.   That's correct.
12             Q.   And over the course of those
13   cases, all of them, you have earned several
14   hundred thousand dollars as an expert witness;
15   correct?
16             A.   That's correct.
17             Q.   So they have become a good repeat
18   customer for you?
19             A.   EMC doesn't generally pick me, I'm
20   picked from the agency.
21             Q.   But the agency has picked you for
22   four separate EMC cases; correct?
23             A.   Different agencies pick me for
24   different cases.
```

1          Q.   Now, you have never actually

2     published a paper on storage or storage systems

3     in any sort of peer reviewed journal, have you?

4          A.   No, I haven't.

5          Q.   You have never taught a course at

6     college or university about storage?

7          A.   Not a college or university, no.

8          Q.   And you have never attended the

9     FAST conference that we heard Dr. Li testify

10     about this morning; right?

11          A.   No, I have not.

12          Q.   And as a matter of fact, that's

13     the conference that storage technologists and

14     executives attend each year?

15          A.   I don't know anything about that

16     conference other than what I have read.

17          Q.   That's something you're not even

18     familiar with; correct?

19          A.   Correct.

20          Q.   Now, let's get right to your

21     infringement opinions, Dr. Jestice.  Obviously

22     in order to establish infringement, you need to

23     show that all of the elements of the claim are

24     present; right?

1          A.   That's correct.

2          Q.   And EMC as the plaintiff has

3    burden of proof in doing that?

4          A.   Yes, they do.

5          Q.   So if even one element is missing,

6    there is no infringement; correct?

7          A.   That's correct.

8          Q.   And you've given opinions here

9    today about claim 32 of the '464?

10         A.   Yes, I have.

11         Q.   And you have given an opinion that

12   the Pure Storage products literally infringe

13   that claim; right?

14         A.   Yes, I have.

15         Q.   And to establish literal

16   infringement means that the limitation is met if

17   it exist in the product just in the way it

18   appears in the claim; right?

19         A.   Yes, that's correct.

20         Q.   So it can't be close, it's got to

21   be just the way described in the claim itself

22   for literal infringement; right?

23         A.   Yes.

24         Q.   Now, as we discussed, could I have

```
 1    claim 32 up from DTX 18, please.  You were here
 2    when I gave my opening statement; right?
 3              A.   Yes, I was.
 4              Q.   And you heard me say this was the
 5    significant element of this claim?
 6              A.   Yes.
 7              Q.   And this is the one that's in
 8    dispute?
 9              A.   Yes, it is.
10              Q.   And by the way, this element is
11    not in the other patent that you and
12    Mr. Rosenberg talked about, the '015 patent does
13    not have this element; right?
14              A.   That's correct.
15              Q.   This is unique to the '464?
16              A.   Between the two, yes.
17              Q.   And so again, if FlashArray does
18    not meet this limitation, there is no
19    infringement of claim 32 of the '464; right?
20              A.   Yes, I agree.
21              Q.   And the only claim that you're
22    asserting from this patent is this claim 32?
23              A.   Yes, it is.
24              Q.   So this is the only real issue on
```

571

```
1       infringement that our jurors have to resolve in

2       connection with at least the '464 patent; right?

3               A.   That's correct.

4               Q.   Now, the Court has defined for us

5       what returning the identifier means; right?

6               A.   That's correct.

7               Q.   And you have taken that definition

8       into account in performing your evaluation;

9       right?

10              A.   Yes, I have.

11              Q.   The term return or returning as

12      used in the patent means deliver back, or

13      delivering back; right?

14              A.   That's correct.

15              Q.   Let's go back to the claim,

16      please.  That requires that the identifier

17      that's been assigned to the data segment be

18      returned and delivered back; right?

19              A.   It says delivering back the

20      identifier, by the Court's claim construction.

21              Q.   And you have pointed to a

22      multistep process in Pure's device that you say

23      satisfies this claim limitation; right?

24              A.   That's correct.
```

572

```
 1                 Q.   And that process involves checking

 2       and then updating the SD table, right?

 3                 A.   It involves checking the SD table,

 4       checking the recent table and then updating the

 5       SD table.

 6                 Q.   All right.  Can we pull up Mr.

 7       Jestice's slide from this morning's

 8       presentation?  I want to get one of your

 9       graphics up, Mr. Jestice, so we know.  This is

10       what you presented, part of what you presented

11       to our jurors this morning, right?

12                 A.   Yes, that's correct.

13                 Q.   And what you show is in this

14       example the identifier is the name tag, hello

15       Ed, right?

16                 A.   Yes.

17                 Q.   And this is sort of, I don't want

18       to demean it, but sort of a cartoon to show

19       what's happening in the Pure Storage device?

20                 A.   Yes, it is.

21                 Q.   You didn't actually show us any

22       source code in connection with your testimony?

23                 A.   No.

24                 Q.   Right.  But in order to understand
```

```
1      how the device works, you'd have to look at

2      source code ultimately, right?

3              A.   Yes.

4              Q.   And the source code is what the

5      engineers use to write the programs that operate

6      the system, right?

7              A.   That's correct.

8              Q.   And that's one of the things you

9      looked at in forming your opinions?

10             A.   That's correct.

11             Q.   Now, it's true, isn't it, that at

12     the start of this process the identifier is not

13     actually in the SD table, correct?

14             A.   It's not stored in the SD table,

15     that's correct.

16             Q.   May I have the laser pointer,

17     please.  So here's the SD table and here's the

18     recent table.  At the start of this process that

19     you have described as constituting the

20     infringement, the identifier is not stored in

21     the SD table, correct?

22             A.   That's correct.

23             Q.   And you're showing an arrow from

24     the SD table to the recent table.  That's arrow
```

574

```
1     two.  Do you see that?
2               A.   Yes, it is.
3               Q.   Actually the SD table can't send
4     anything anywhere, it's just a memory, right?
5               A.   I didn't say that it was sending
6     anything anywhere.
7               Q.   Okay.  So you didn't mean to imply
8     by this arrow labeled two, that this identifier
9     was actually moving from this table to this,
10    right?
11              A.   The Purity software is moving its
12    focus from the SD table to the recent table.
13              Q.   But the SD table itself isn't
14    sending anything anywhere, right?
15              A.   The SD table is a table, it's not
16    capable of sending anything anyway.
17              Q.   Right.  And the recent table, it's
18    a table too, it's not capable of sending
19    anything anywhere either?
20              A.   I didn't say it was.
21              Q.   Right.  So this arrow you're
22    showing as running from the recent table back to
23    the SD table, it's not actually sent there by
24    the recent table because the recent table can't
```

1    send anything anywhere, right?

2            A.   It's the Purity software that is

3    going from the SD table to the recent table and

4    then back to the SD table.

5            Q.   But these arrows aren't intended

6    to reflect movement between these tables, right?

7            A.   Yes, they are.

8            Q.   Well, let me back up a minute.

9    They are not intended to reflect that the SD

10   table sends anything anywhere, right?

11           A.    They are intending to reflect that

12   the Pure Storage software, the Purity software

13   is moving and checking first in the SD table,

14   then the recent table and then the SD table.

15           Q.   Okay.  So let's get this clear for

16   our jurors.  The Purity software is operated by

17   the controller in the Purity device, right?

18           A.   Yes, it is.

19           Q.   That's what performs all these

20   functions, the controller?

21           A.   Yes, it is.

22           Q.   These tables can't do any

23   comparing of anything because they are just

24   tables, right?

```
 1                    A.   That's true.

 2                    Q.   And they can't send anything

 3       anywhere because they are just tables, right?

 4                    A.   That's true.

 5                    Q.   It's the Purity controller that's

 6       doing the work?

 7                    A.   The Purity software is doing the

 8       work.

 9                    Q.   Okay.  As executed through the

10       controller?

11                    A.   And it's being executed through

12       the controller, yes.

13                    Q.   Now, I think you told us that at

14       the start of this process that you say

15       infringes, the identifier is not stored in the

16       SD table, correct?

17                    A.   That's correct.

18                    Q.   So that means when the update

19       happens, the identifier is being placed into the

20       SD table for the first time?

21                    A.   It is being -- well, yes, it's

22       being stored in the SD table for the first time.

23                    Q.   And it's being placed there by the

24       operation of the controller on the software,
```

1    correct?

2            A.   By the Purity software it's being

3    placed there, yes.

4            Q.   Right.  But it's being placed

5    there for the first time?

6            A.   As far as we know, yes.

7            Q.   And you call that delivering back,

8    right?  That's your opinion?

9            A.   That's my opinion.

10           Q.   Okay.  But you concede, one, it

11   was not in the SD table to begin with, correct?

12           A.   I agree, yes.

13           Q.   And two, when it is updated there,

14   that's the first time it's being returned

15   anywhere?

16           A.   That's what I said, yeah, that's

17   my opinion.

18           Q.   Now, actually there isn't much

19   dispute between you and Doctor Zadok about how

20   the system works, correct?

21           A.   If there is it's very small.

22           Q.   All right.  As a matter of fact,

23   there isn't really a technical dispute between

24   the two of you about how the software in the

```
 1    system works, right?
 2              A.   There's a dispute about the
 3    return.
 4              Q.   Indeed.  Of course.  Let me
 5    rephrase it.  In terms of how the software
 6    operates in the device, you and Doctor Zadok
 7    agree?
 8              A.   Yes.
 9              Q.   Okay.  It's the interpretation of
10    that where the disagreement comes in, right?
11              A.   Yes, it is.
12              Q.   Now, and you prepared an opening
13    report in connection with your work on this
14    case, correct?
15              A.   Yes, I did.
16              Q.   And you understood the rules
17    required you to put your opinions out in
18    writing?
19              A.   Yes.
20              Q.   And to support them with whatever
21    information you needed?
22              A.   Yes, I did.
23              Q.   And to explain the bases for your
24    opinions, correct?
```

```
 1              A.   Yes.

 2              Q.   And in discussing this element of

 3    infringement, you listed one line of code,

 4    right?

 5              A.   Yes.

 6              Q.   Could we have paragraph 181 from

 7    Doctor Jestice's opening report, paragraph 181.

 8    I think it's the next paragraph.  It's 180.  I'm

 9    sorry.  My fault.  This is the paragraph from

10    your opening report in which you discuss this

11    process, correct?

12              A.   I was just going to check.

13              Q.   I handed you your report.  That's

14    your opening report.  It should be in there at

15    paragraph 180.

16              A.   Okay.  I'm there.

17              Q.   Okay.  And very last -- can you

18    identify the very last sentence?

19              A.   Yes.

20              Q.   That's the one line of code and

21    the only line of code that you cited in

22    connection with this element of your analysis in

23    your opening report, correct?

24              A.   In my opening report, that's
```

580

```
1      correct.
2              Q.   And then Doctor Zadok got a chance
3      to do a report, correct?
4              A.   Yes.
5              Q.   And he wrote several paragraphs
6      describing how the source code operates the
7      deduplication function in Pure's software,
8      right?
9              A.   Yes, he did.
10             Q.   And he cited many of the modules
11     that are used to operate deduplication, right?
12             A.   Yes.
13             Q.   He cited the code?
14             A.   I would have to go back and look
15     at his report, but most likely, yes.
16             Q.   We can look at it, if you want.
17     Do you remember that he cited quite a bit of the
18     code from deduplication?
19             A.   Yes, I do.
20             Q.   Paragraph after paragraph of it,
21     right?  Correct?
22             A.   That's correct.
23             Q.   Okay.  And you didn't have any
24     disagreement with what he set forth as to how
```

1    the source code for deduplication works in Pure

2    Storage's device, right?

3            A.   That's correct.

4            Q.   You were in agreement when you

5    looked at all the source code that he laid out,

6    your conclusion was he's right, that's how it

7    works, correct?

8            A.   Well, I was looking at the source

9    code in total, and yes, I agree.

10           Q.   Okay.  And one of the things that

11   you agree with in Doctor Zadok's report is that

12   none of the deduplication source code routines

13   that he identified directly return the actual

14   identifier value to their calling routine,

15   right?

16           A.   I have to go back and look at the

17   references.

18           Q.   Well, didn't you testify in your

19   deposition that after looking at all of Doctor

20   Zadok's analysis you agreed with his conclusion

21   that none of the source code in the

22   deduplication modules directly returns an actual

23   identifier to its calling routine?

24           A.   So you're talking about a return

582

```
 1    statement?

 2              Q.   That's right, I am.

 3              A.   Yeah, I agree.

 4              Q.   And you agree with that?

 5              A.   With the computer return

 6    statement, yes.

 7              Q.   Okay.  And you actually testified

 8    that none of the duplication source code

 9    routines identified by Doctor Zadok directly

10    return the identifier to its calling routine in

11    terms of a return statement, right?

12              A.   That's correct.

13              Q.   Now, you didn't actually show us

14    any source code this morning, right, during your

15    testimony?

16              A.   That's correct.

17              Q.   You showed us a graphic that said

18    return P, right?

19              A.   It wasn't a piece of source code.

20              Q.   Okay.  Can we put up the graphic

21    that we saw this morning.  Return (p).  Now

22    that's not actually evidence; right?

23              MR. ROSENBERG:  Objection, Your

24    Honor.  Objection to that as argumentative.
```

```
 1                    THE COURT:  I'm going to overrule
 2      the objection.
 3                    THE WITNESS:  It's just an example
 4      of the return code, any return code.
 5   BY MR. VAN NEST:
 6           Q.   But you actually identify in your
 7      report some specific source code that you said
 8      performed a return; right?
 9           A.   Yes.
10           Q.   And that's the one line of code we
11      looked at this morning, or we looked at just a
12      moment ago?
13           A.   That's correct.
14           Q.   You didn't even show that to the
15      jury; right?
16           A.   That's correct.
17           Q.   And one reason for that is that
18      that code doesn't actually return the identifier
19      anywhere, it returns an index?
20           A.   It returns an index as an
21      identifier.
22           Q.   But it doesn't return an
23      identifier itself; right?
24           A.   Yes, it does.
```

584

```
 1                 Q.   Let's actually put up the source
 2      code, I think it's in 905, DTX 905.  Can we blow
 3      that up a little bit.
 4                      So this is the source code, this
 5      is the only line of code that you identified
 6      anywhere in your various reports that you say
 7      performs a return in connection with this claim;
 8      right?
 9                 A.   That's correct.
10                 Q.   And first off, in your report, you
11      didn't even explain what this return does, did
12      you?
13                 A.   That's correct.
14                 Q.   And you didn't even bother to tell
15      our jurors this morning what it does, either;
16      right?
17                 A.   That's correct.
18                 Q.   One thing we know for sure is that
19      this is not the code that updates the SD table;
20      right?
21                 A.   The code I was looking for was a
22      return of the identifier.
23                 Q.   My question was, Mr. Jestice, this
24      code is not involved in the update of the SD
```

```
 1        table that you told us was the infringing

 2        function; right?

 3                  A.   It's completely separate.

 4                  Q.   It's completely separate.  So just

 5        so there is no confusion, this code is not

 6        involved in updating the SD table in Pure's

 7        products; right?

 8                  A.   That's correct.

 9                  Q.   That means with respect to your

10        opinion about infringement, with respect to

11        updating the SD table, you haven't provided us

12        with any source code; right?

13                  A.   They're completely separate.

14                  Q.   But you haven't provided us with

15        any source code explaining how the SD table

16        update occurs?

17                  A.   That's correct.

18                  Q.   What you have shown us was the

19        cartoon that we saw on the screen a little bit

20        earlier?

21                  A.   That's correct.

22                  Q.   Now, obviously -- strike that.

23                       You have also expressed an opinion

24        that this line -- let's put the line of code
```

```
 1        back up because -- excuse me, we'll stay on it.

 2                     You've expressed an opinion that

 3        this line of code constitutes infringement under

 4        the doctrine of equivalents; right?

 5             A.   Yes, it does.

 6             Q.   Now, the doctrine of equivalents

 7        is something that you can fall back on if there

 8        is no literal infringement; right?

 9             A.   That's true.

10             Q.   So normally if an expert believes

11        that it's certain that his opinion establishes

12        literal infringement, there is no need to resort

13        this to; right?

14             A.   Dr. Zadok disagrees with me on my

15        interpretation.

16             Q.   He disagrees with you on

17        everything; right?

18             A.   He disagrees with me on return

19        statement.

20             Q.   He disagrees with you on deliver

21        back; right?

22             A.   That's the return.

23             Q.   Well, I think we have established

24        this line of code doesn't update the SD table?
```

```
 1              A.   That's correct.

 2              Q.   Now, you understand that to

 3    establish equivalents, you must show that the

 4    accused feature is performing the same function

 5    in the same way to get the same result; right?

 6              A.   Substantially the same function.

 7              Q.   Fair enough.  Substantially the

 8    same function, substantially the same way,

 9    substantially the same result?

10              A.   That's correct.

11              Q.   So the requirement of the claim is

12    that you deliver back the identifier if a match

13    is found?

14              A.   Correct.

15              Q.   And the functionality that you

16    have identified in Pure Storage that you say

17    performs that is updating the SD table?

18              A.   That's one way it infringes.

19              Q.   Your opinion is this is a totally

20    separate different way that it infringes; right?

21              A.   That's correct.

22              Q.   Even though you haven't told us

23    what it does; right?

24              A.   I have identified as the line of
```

588

```
1       code that returns the identifier.
2                Q.   But again, all this code returns
3       is an index?
4                A.   It returns the identifier as an
5       index.
6                Q.   Now, at the time you formed your
7       opinion, did you even know what this line of
8       code served as in the deduplication process at
9       Pure?
10               A.   Did I understand where it fits
11      into the system?
12               Q.   Yes.
13               A.   I could tell you, yes.
14               Q.   But you certainly didn't describe
15      in your report what function it performed;
16      right?
17               A.   I didn't need to describe in my
18      report, I'm identifying the code that does the
19      return.
20               Q.   And, therefore, you didn't?
21               A.   Correct.
22               Q.   Now, apart from this line of code
23      and your opinion that updating the SD file
24      infringes, that's the limit of your reasons for
```

```
 1          finding infringement of claim 32; right?
 2                    A.   It's the last element of the
 3          claim, the one that's in dispute.
 4                    Q.   But we have covered the scope of
 5          what you say constitutes that infringement, it's
 6          this one line of code and the SD table update;
 7          right?
 8                    A.   That's correct.
 9                    Q.   Nothing else; right?
10                    A.   Yes, I said that was correct.
11                    Q.   Now, you testified, Mr. Jestice,
12          that Data Domain products practice the '464 and
13          '015 patents; is that correct?
14                    A.   That's correct.
15                    Q.   Did you actually look at scores
16          code for the Data Domain products?
17                    A.   No, I did not.  It wasn't
18          available to me.
19                    Q.   It wasn't available?
20                    A.   It was not made available to me.
21                    Q.   But the owners of that code are
22          EMC; right?
23                    A.   That's correct.
24                    Q.   That's who you're working for?
```

590

```
 1              A.   That's correct.
 2              Q.   Did you ask anybody to let you see
 3      the source code from the Data Domain products?
 4              A.   The architectural specification in
 5      this case were good enough.
 6              Q.   So you didn't need to look at the
 7      source code?
 8              A.   Not for those products.
 9              Q.   And therefore, you didn't?
10              A.   That's correct.
11              Q.   And you didn't even ask?
12              A.   That's correct.
13              Q.   So it's not that they weren't made
14      available as you just told me, it's that you
15      didn't ask for them; right?
16              A.   That's correct.
17              Q.   Now, you understand that Data
18      Domain doesn't manufacture any storage device
19      today that's all Flash; right?
20              A.   That's my understanding.
21              Q.   They manufacture the older
22      variety, magnetic spinning disks.  Different
23      variety?
24              A.   Different.
```

591

```
 1                    Q.   They're not in the all-Flash
 2       market?
 3                    A.   They're not.
 4                    Q.   And as a matter of fact, their
 5       primary market is backup rather than primary
 6       storage which is what Pure and XtremIO do?
 7                    A.   Correct.
 8                    Q.   Not only are they using a
 9       different product, but they're in a different
10       market, too?
11                    A.   I'm not an expert in that field,
12       but I would agree with you.
13                    Q.   You're not an expert in marketing?
14                    A.   Correct.
15                    Q.   Now, have you ever analyzed
16       whether EMC's Flash product, XtremIO, practices
17       the patents?
18                    A.   No, I have not.
19                    Q.   So you don't have any opinion on
20       that?
21                    A.   No, I don't.
22                    Q.   And you weren't even asked by
23       anyone at EMC to analyze that; right?
24                    A.   That's correct.
```

1                    Q.   So based on all the work you have

2        done, no one at EMC has ever suggested to you

3        that their all-Flash product uses the '015 or

4        the '464 patent; correct?

5                    A.   That's correct.

6                    Q.   And the Data Domain patents that

7        you analyzed, the '015, the '464, they make no

8        mention of Flash at all; right?

9                    A.   Not specifically, no.

10                   Q.   Not even a general mention of

11       Flash?

12                   A.   Flash is a storage device.

13                   Q.   Now, I want to explore the last

14       opinion you expressed about capacity.  You did a

15       capacity analysis; correct?

16                   A.   Well, yes.

17                   Q.   Now, capacity is ultimately a

18       question for customers; right?

19                   A.    Well, the customers know what data

20       they are creating, but they would work in

21       conjunction with a vendor to decide how much

22       storage they need.

23                   Q.   You mentioned that there is inline

24       deduplication and background deduplication in

1    Pure's devices?

2              A.   Yes, there is.

3              Q.   And if you turn the inline off,

4    the background processing will still run?

5              A.   That's my understanding.

6              Q.   And you're not accusing the

7    background process of infringement; right?

8              A.   No.

9              Q.   So background processing is a

10   non-infringing alternative, even in your view?

11             A.   If you remove the inline dedupe

12   code, yes.

13             Q.   Okay.  So it constitutes a

14   non-infringing alternative that Pure could

15   elect, if it chose to do that and you would

16   agree that's non-infringing?

17             A.   It's not an acceptable

18   non-infringing use.

19             Q.   Fair enough, but it is a

20   non-infringing alternative, according to you,

21   based on the technical analysis you've done?

22             A.   Yes, if you actually pull the

23   inline code, then it would not infringe.

24             Q.   And that can be done, correct?

1          A.   I don't know how to answer that.

2     Anything is possible.

3          Q.   Well, customers and Pure can turn

4     inline off?  In other words, as a technical

5     matter, it's not a hard technical challenge to

6     turn the inline deduplication off?

7          A.   What you said was not correct.

8          Q.   Well, let me put it this way.  You

9     looked at some systems where the inline had been

10    turned off, right?

11         A.   The inline can only be turned off

12    by Pure Storage.

13         Q.   Right, but it's not difficult for

14    Pure Storage to turn it off?

15         A.   No, that's true, but it's a

16    different scenario if you're actually going to

17    pull the code.

18         Q.   In other words, it could be turned

19    off instead of pulled and Pure Storage has the

20    ability to do that?

21         A.   But if it was turned off, it would

22    still infringe.

23         Q.   Okay.  So in your view, you have

24    to pull the inline code out?

595

```
 1              A.   Correct.

 2              Q.   Okay.  But if you did that, it

 3    would be non-infringing?

 4              A.   It would be non-infringing, but

 5    not acceptable.

 6              Q.   Okay.  And that's because you

 7    believe that if the inline were out, the

 8    customer would need 25 percent more capacity in

 9    order to have an acceptable performing device,

10    right?

11              A.   Based on the data that I've seen,

12    limited data, that would be the average need.

13              Q.   And I want to analyze how you got

14    to that, because the comparable number that

15    Doctor Zadok came up with was about 6 percent,

16    right 6 and a half, 7, I think, right?

17              A.   Yes, 6.57, I think.

18              Q.   And you wanted to challenge, so

19    you asked Pure Storage to provide data from its

20    customers, right?

21              A.   Yes.

22              Q.   And what you asked for wasn't

23    average data, you asked for data for the 10

24    worst days in the year?
```

596

```
 1              A.    That's correct.

 2              Q.    Okay.  So what you said was for 23

 3      of these FlashArray devices, give me the very

 4      worst day of the year from a standpoint of lots

 5      of volume being processed, correct?

 6              A.    Actually I asked for a lot more

 7      data.

 8              Q.    Okay.

 9              A.    But that's what we were given.

10              Q.    But what you wanted was the worst

11      day, the highest day, because you're looking for

12      the peak?

13              A.    That's what capacity planning is

14      about.

15              Q.    So you got the 10 days?

16              A.    We got a 10 days.

17              Q.    And that was from 23 different

18      devices, right?

19              A.    I don't remember the exact

20      details.  We can go and check my report.

21              Q.    We're going to go and do that in

22      just a minute.  We'll do that.  But you took

23      those 10 days, and you didn't average the 10,

24      you made a selection from within the 10 of 1 --
```

```
 1        let me withdraw that.  Let's go to paragraph 32
 2        of Doctor Jestice's supplemental report.  So
 3        it's your supplemental report, Mr. Jestice.  And
 4        is there a chart?  It might be in paragraph --
 5        there it is.  So I have up on the screen the
 6        chart that I want to discuss with you, Mr.
 7        Jestice.
 8                   A.   I see it.
 9                   Q.   From your report?  That's from
10        your supplemental report?
11                   A.   I'm not at the supplemental
12        report.
13                   Q.   Okay.  I'll represent to you that
14        that's in, I believe paragraph 34?
15                   A.   Oh, I see, okay, yes.
16                   Q.   Okay.  So we put this together.
17        This is actually one chart that appears in your
18        report, correct?
19                   A.   Yes.
20                   Q.   And there are 23 entries on it,
21        because there were 23 separate arrays that you
22        got data for?
23                   A.   That's all we got, yes.
24                   Q.   Right.  And the data that you got
```

598

```
 1    was for a full day in each case?
 2                A.   Only one day, yes.
 3                Q.   And you got -- but you got -- you
 4    got 10 days?
 5                A.   Yes.
 6                Q.   From each of the arrays?
 7                A.   Yes, out of the 8.
 8                Q.   So you didn't average those 10
 9    days, right?
10                A.   Absolutely not.
11                Q.   And you didn't find the mean or
12    the middle of the 10 days, right?
13                A.   Absolutely not.
14                Q.   You took the absolute worst day
15    from the 10 worst days of the year?
16                A.   Of course I did.
17                Q.   Okay.  And that's what's displayed
18    here.  This is -- these represent the very worst
19    day out of the very worst 10 days of the data
20    you got?
21                A.   That's how you do capacity
22    planning.
23                Q.   And then you didn't even average
24    those or take the mean of those, right?
```

599

```
 1              A.   That's correct.

 2              Q.   You picked the highest five of the

 3    23?

 4              A.   That's correct.

 5              Q.   Right.  So rather than take the

 6    1.6 percent or the 1.4 percent, the highlighted

 7    ones are the ones you picked?

 8              A.   I'd have to go back and look why I

 9    dropped the others, but yes, that's what I did.

10              Q.   Okay.  So you essentially took the

11    worst day of the worst 10 days and from that you

12    chose the worst five days out of all these

13    thousands of hours of information that you had,

14    right?

15              A.   I don't know if it's thousands of

16    hours.  From the limited information I had, I

17    picked the worst ones, because that's what

18    capacity planning is about.

19              Q.   You started with the worst days

20    and you picked the worst one, and then you

21    picked the worst five out of those?

22              A.   Yes, of course you do.

23              Q.   Okay.  And then you said well,

24    that's what I think everybody should buy,
```

```
 1        something for the worst of the worst of the

 2        worst, right?

 3                A.   No.

 4                Q.   You said that's the capacity you

 5        need to meet, the peak?

 6                A.   That's the average capacity that I

 7        estimated to meet the peak.

 8                Q.   And it's certainly not your --

 9        you're not a marketing expert, right?

10                A.   No, I'm not.

11                Q.   You haven't talked to any Pure

12        customers?

13                A.   No, I haven't.

14                Q.   You don't know how Pure designs

15        their products?

16                A.   No, I haven't.

17                Q.   No.  But does your opinion assume

18        that they'll build 25 more capacity for every

19        single one of the 1,600 customers regardless of

20        whether they need it or not?

21                A.   They would analyze each customer,

22        which is what you would do as a capacity

23        planner, which is what I did, and I would make

24        recommendations to the customers for their
```

601

```
 1    specific needs based on their work load and
 2    projected work load, so the only information I
 3    have is to average the very small amount of data
 4    that Pure Storage would give me.
 5              Q.  But it's not your opinion that the
 6    only way to make this noninfringing alternative
 7    work is to sell every customer 25 percent more
 8    storage; right?
 9              A.  No.  I'm saying on average your
10    storage will have to sell 25 more storage for
11    their customers.  Some will require more.
12              Q.  And that average you got was
13    picking the ten worst days and selecting the
14    worst one of those and then the worst five of
15    those to get your number?
16              A.  Absolutely.  That's my job?
17              MR. VAN NEST:  I have nothing
18    else, Your Honor.
19              THE COURT:  Any redirect,
20    Mr. Rosenberg?
21              MR. ROSENBERG:  Yes, Your Honor.
22                  REDIRECT EXAMINATION
23    BY MR. ROSENBERG:
24              Q.  Mr. Jestice, you see the 44
```

```
 1      percent number at the top right-hand number of

 2      the slide?

 3                A.   Yes, I do.

 4                Q.   So in the data provided by Pure

 5      Storage, did you see instances in which it would

 6      have taken more, in fact, more than twice what

 7      you came up with in terms of extra capacity to

 8      meet peak demand?

 9                A.   For that particular storage array

10      would have needed 44 percent.

11                Q.   And what would happen to a

12      FlashArray customer if the FlashArray

13      experienced the peak demand that they didn't

14      have the capacity for?

15                A.   They would get a message saying

16      I'm out of space.

17                Q.   Would that be in your view

18      acceptable to the Pure Storage customer trying

19      to use that FlashArray?

20                A.   If you were a large enterprise

21      customer that ran out of space, I think you

22      would have a serious conversation with your

23      capacity planner.

24                Q.   Why in your opinion would Pure
```

```
1     Storage have needed to provide 21 percent more
2     storage on average for its customers if it had
3     taken inline deduplication out?
4              A.   Because if you take the limited
5     data we had, I average out the worst case
6     because that's what you do in capacity planning.
7              Q.   Mr. Jestice, I would like to turn
8     back to the questions Mr. Van Nest asked you
9     about the opinions you have about infringement.
10    Earlier today you told us about the two
11    different ways in which you believe the Purity
12    software performs the returning identifier step,
13    do you remember that?
14             A.   Yes, I do.
15             Q.   Is source code related to both of
16    those?
17             A.   Source code is related to the
18    actual flow of data back into the SD table.
19    It's only important as far as Dr. Zadok saying I
20    need a return statement, which I found.
21             Q.   Did you examine the Pure Storage
22    source code before you reached your opinions
23    about both of the kinds of infringement you
24    believe are occurring?
```

1          A.   Yes, I spent multiple days looking

2     at source code.

3          Q.   In fact, during your direct

4     examination today, didn't you identify for us

5     the name of the source code function that is

6     involved in what you consider to be delivering

7     the identifier back to the SD table?

8               MR. VAN NEST:   Objection.

9     Leading, Your Honor.

10              THE COURT:   Why don't you just

11    change the question to what is the --

12    BY MR. ROSENBERG:

13         Q.   Mr. Jestice, did you identify for

14    the jury earlier today the source code function

15    or method that Pure Storage uses to deliver back

16    the identifier to the SD table?

17              MR. VAN NEST:   Same objection,

18    Your Honor.

19              THE COURT:   Ask him what it is and

20    you'll know whether he did it before.

21         Q.   What is the name of the source

22    code function or method that in your view

23    returns the identifier to the SD table?

24         A.   I identified two functions, one of

```
 1        this is the hash tag look up, which is the
 2        function that looks up the identifier tables and
 3        compared dedupe which is the comparison of the
 4        data that's been stored against the data that's
 5        been received.
 6              Q.   And Mr. Van Nest asked you some
 7        questions about your second theory or the second
 8        way in which you expressed an opinion that Pure
 9        Storage product meets the returning step.  In
10        your opinion does the return statement that you
11        identified need to be related to the SD table in
12        order for Pure Storage software to meet the
13        returning step under that theory?
14              A.   No, it does not.
15              Q.   And in addition to that, do you
16        have a view about whether the asserted claim
17        here, in particular the returning the identifier
18        step, requires a return statement at all?
19              A.   It does not.
20              Q.   Mr. Jestice, Mr. Van Nest asked
21        you some questions about whether the table,
22        specifically the SD table and the reset table
23        send things.  Do you recall that.
24              A.   Yes, I recall that.
```

606

1          Q.   Can we put up a slide with claim

2     32 of the patent.  So if we actually look at the

3     returning the identifier step, what is it that

4     claim 32 requires to perform the step of

5     returning the identifier?

6          A.   Can you rephrase?

7          Q.   So actually I would like to look

8     if I can at the whole claim.  At the very start

9     of the claim you see the language a computer

10    program product?

11         A.   Yes.

12         Q.   So did you explain to us earlier

13    what in laymen's terms the product that is

14    claimed by claim 32 is?

15         A.   Yes.

16         Q.   What is it?

17         A.   This is the Purity software.

18         Q.   So what in this claim has to

19    perform the step of returning the identifier?

20         A.   The Purity software.

21         Q.   Does the SD table have to perform

22    the step itself returning the identifier?

23         A.   No, it does not.

24         Q.   Does the resent table have to

```
 1      perform the step returning the identifier?

 2              A.   No, it does not.

 3              Q.   Did you identify the code that you

 4      believe is involved in the look ups and

 5      returning the identifier?

 6              A.   Yes, I did.

 7              Q.   And Mr. Van Nest asked you also if

 8      you had identified only one line of code in a

 9      particular part of your report.  Did you

10      consider only one line of code in Pure Storage's

11      source code before reaching your opinions about

12      infringement?

13              A.   No, I spent multiple days looking

14      at source code in the process of reaching my

15      opinions.

16              MR. ROSENBERG:  I have no further

17      questions.  Thank you.

18              THE COURT:  All right.

19      Mr. Jestice, you may step down.

20              MR. KREVITT:  Ready for us to

21      proceed, Your Honor?

22              THE COURT:  Yes.

23              MR. KREVITT:  Your Honor, at this

24      time, EMC would call its next witness,
```

```
 1        Mr. Michael Bermingham.  He's coming.  And

 2        Mr. Poppe, my colleague, is going to be handling

 3        this witness.

 4                    THE COURT:  Sorry.  Can you say

 5        your name.  I don't think the jury knows you.

 6                    MR. POPPE:  Good afternoon.  My

 7        name is Matthew Poppe.

 8                    THE CLERK:  Please state and spell

 9        your full name for the record.

10                    THE WITNESS:  Michael Bermingham.

11        M-I-C-H-A-E-L, B-E-R-M-I-N-G-H-A-M.

12

13                        MICHAEL BERMINGHAM,

14              the deponent herein, having first

15              been duly sworn on oath, was

16              examined and testified as follows:

17                    MR. POPPE:  Your Honor, may I

18        approach?

19                    THE COURT:  Yes, Mr. Poppe.

20                    DIRECT EXAMINATION.

21        BY MR. POPPE:

22                    Q.  Good afternoon, Mr. Bermingham.

23                    A.  Good afternoon.

24                    Q.  Would you please state your name
```

```
 1          and introduce yourself to the jury?

 2                   A.   My name is Michael Bermingham.

 3                   Q.   And you are an EMC employee; is

 4          that correct?

 5                   A.   That's correct.

 6                   Q.   Why are you here to testify today?

 7                   A.   I'm one of the inventors of the

 8          '556 patent.  And I'm here today to talk about

 9          my invention.

10                   Q.   You have been handed a white

11          binder.  If you could open that up and take a

12          look at Exhibit PTX 0005.

13                   A.   Okay.

14                   Q.   Is this a patent of which you are

15          an inventor?

16                   A.   Yes, it is.

17                   Q.   And that's the '556 patent?

18                   A.   Correct.

19                   MR. POPPE:  Your Honor, I would

20          like to offer Exhibit PTX 0005 into evidence.

21                   THE COURT:  All right.  Admitted

22          without objection.

23          BY MR. POPPE:

24                   Q.   And in the upper left corner of
```

```
1       the cover page of the patent, do you see a

2       section called inventors?

3               A.   Yes, I do.

4               Q.   And is that your name listed as

5       the second inventor?

6               A.   Yes.

7               Q.   Who were the other two listed

8       inventors?

9               A.   They're John Walton and Chris

10      MacLellan.  We worked together.

11              Q.   How long did you work together?

12              A.   In general or on this patent?

13              Q.   In general.

14              A.   Probably over the course of five,

15      six years.

16              Q.   What field of technology does the

17      '556 patent related to?

18              A.   It relates to data storage

19      products.

20              Q.   Is there a particular issue

21      associated with data storage products that the

22      patented invention addresses?

23              A.   It deals with basically protecting

24      data, keeping it reliable and making sure it's
```

```
1    successful.

2              Q.   Do you have any other patents?

3              A.   Yes, I have nine other patents

4    with EMC.

5              Q.   So we'll come back to the subject

6    of your '556 patent in a moment.  First I'd like

7    to ask you a little bit about your personal

8    background.  Where are you from originally?

9              A.   Originally I'm from Ireland.

10             Q.   And where do you live today?

11             A.   I live in California.  I've lived

12   in the US for several decades now.  I lived in

13   Massachusetts in the east coast for a while, but

14   I'm currently in California.

15             Q.   Did you go to college?

16             A.   Yes.

17             Q.   And where was that?

18             A.   University of Limerick in Ireland.

19             Q.   What did you study at that time?

20             A.   I studied electronic engineering.

21             Q.   Did you obtain any other degrees

22   after college?

23             A.   Yes, I have a masters degree in

24   electrical engineering from Northeastern
```

```
 1      University in Boston and I have an MBA from

 2      Babson College in Wesley, Massachusetts

 3              Q.   That's a masters of business?

 4              A.   Correct, yes.

 5              Q.   Moving forward a few years from

 6      your graduate degree, when did you first join

 7      EMC?

 8              A.   I joined in 1993.

 9              Q.   That was so about 22 years ago?

10              A.   Yeah, pretty much.  I remember,

11      because my son was born the same year, '93, so

12      he's 22.

13              Q.   What was your position at EMC when

14      you were hired?

15              A.   Excuse me.  I was hired as a

16      hardware design engineer focusing on ASIC and

17      memory design.

18              Q.   What is an ASIC?

19              A.   It's an acronym for -- means

20      applications specific integrated circuit.

21      Basically it's a computer chip.

22              Q.   And when you refer to memory, is

23      that another kind of computer chip?

24              A.   Yes.
```

613

1          Q.   During your time at EMC in the

2     1990's and early 2000's, was there a particular

3     EMC product that you were working on?

4          A.   Yes, I worked mainly on the

5     Symmetrix product.  And that was basically it

6     was EMC's flagship storage product.  We sold to

7     large customers, institution type customer like

8     financial institutions, banks and so forth as

9     their kind of primary massive data storage

10    system.

11         Q.   And does EMC still sell the

12    Symmetrix products?

13         A.   They do.  It's currently branded

14    as VMAX.

15         Q.   Your work on the invention of the

16    '556 patent was a few years after you joined

17    EMC; is that correct?

18         A.   Correct.

19         Q.   And what was your position in the

20    company at that time?

21         A.   I have been promoted several

22    times.  I was senior hardware engineer and team

23    lead for, responsible for memory subsystem

24    design for Symmetrix products.

1          Q.   And when you say responsible for

2     design, can you say a little bit more about what

3     that meant at that time for you?

4          A.   Yeah.  I mean, our main focus

5     really was around how do we kind of improve, you

6     know, expand, enhance the Symmetrix products.

7     So our main focus was on next generation

8     architectures, so, you know, I think our key

9     responsibilities, our areas of focus were

10    reliability, performance and cost of the system.

11         Q.   You said reliability, performance

12    and cost; is that right?

13         A.   Correct.

14         Q.   And when you say reliability, what

15    does that mean in this context?

16         A.   Well, in the context of data

17    storage, what it really means is keeping

18    customers' data safe, making sure it doesn't get

19    lost or corrupted, making sure it's always

20    available to the customer in a timely manner.

21         Q.   And what does performance mean in

22    this context when you used it to describe the

23    work you were doing?

24         A.   Essentially speed, how quickly you

```
1        can store or retrieve data.

2              Q.   And how do the issues of

3        reliability, performance and cost work together?

4              A.   Well, essentially there, you know,

5        reliability and performance both cost cost.

6        They incur cost, right?  So there's a balance.

7        You can develop the most, you know, very high

8        performing system, an extremely reliable system,

9        but in general adding reliability for data

10       storage means adding additional components,

11       adding redundancy, so all of that costs, so

12       there's a trade off there.

13             Q.   All right.  So we're talking about

14       your general position and responsibilities in

15       the early 2000's.  Was that also around the time

16       that you ended up going to business school?

17             A.   Correct, yes.

18             Q.   And how did that come about?

19             A.   Well, with my, you know, increased

20       responsibility, I became closer to, you know,

21       the business aspects of, you know, of the

22       technology and, you know, how it related to real

23       customer needs, so that was -- became a big

24       interest area for me.  And you know, I'm always
```

616

```
1     interested in learning more, so it was a good

2     opportunity.  EMC paid for my business school,

3     so, you know, I went -- I continued working at

4     EMC, I went to school at night and weekend.

5              Q.   Was there a point in time in the

6     2000's when you left EMC?

7              A.   Yes, I left in 2005.  I had an

8     opportunity to go to a small company in

9     California doing something completely different,

10    so I took it up.

11             Q.   And you eventually rejoined the

12    company, EMC?

13             A.   Yeah, I rejoined in 2011, a

14    different department, different group, different

15    product, basically.  You know, I was recruited

16    to come back to a company in Irvine, California,

17    that EMC had acquired several years earlier, so

18    it was a great opportunity and I was glad to

19    come back.

20             Q.   So taking the two periods of your

21    employment together, you've been at the company

22    about 16 years, right?

23             A.   12, yeah, 16, 17 almost years,

24    yeah.
```

617

```
 1              Q.   And why have you stayed with the

 2    company so far?

 3              A.   Well, they've been a good company

 4    to work for.  You know, I've done pretty well

 5    there.  It's a great kind of atmosphere, very

 6    innovative, lots of innovative people.  It's got

 7    a great work/life balance.  It's been named one

 8    of the best companies to work in the US several

 9    times, so it's -- it's been good for me and my

10    family.

11              Q.   Let's turn now back to the '556

12    Patent and you mentioned that this patent

13    relates to protecting data; is that right?

14              A.   That's right.

15              Q.   During the period that you and

16    your co-inventors were working on the invention,

17    what technology was in use at that time in the

18    Symmetrix product to protect data in the part of

19    the product that you were responsible for?

20              A.   Okay.  So in the part or subsystem

21    of our product we used a technology called

22    mirroring.

23              Q.   How did mirroring work to protect

24    data?  And maybe we can pull up a slide of that.
```

```
1              A.   Sure.  Yeah.  So in concept it's
2     pretty simple.  So at this -- what this depicts
3     is a small example of data and in mirroring
4     essentially we make a second copy of it, so any
5     time we want to write into a storage system we
6     do write into a separate location or a separate
7     storage area, that way if anything happens to
8     either of the copies of the data, you know,
9     we're protected because we have a second copy we
10    can use.
11             Q.   Does mirroring have any
12    disadvantages?
13             A.   Yes.  The primary disadvantage is
14    cost and space, so as you can see here, again,
15    we have three, you know, digits of bits of data
16    in this small example, so we have to double the
17    amount of storage we need, you know, with
18    mirroring.  So here it looks kind of trivial, if
19    you can imagine a very large system with
20    billions of these bits, it adds up, so it can
21    cost in dollar costs of the memory devices and
22    also in just space of kind of keeping of this.
23             Q.   Did this issue have any relation
24    to the work that you were doing in the tasks
```

619

1    that were assigned to you in the early 2000's

2    period at EMC?

3                A.   Yes.  So as I had mentioned, you

4    know, one of our prime responsibilities as a

5    team was developing, you know, the next

6    generation product and proving, you know, its

7    performance and reliability and trying to

8    achieve better cost.  So in the case of the

9    memory system, you know, it was pretty costly.

10   We had very large, I mean physically, if you can

11   imagine, these systems are kind of refrigerator

12   sized and you have customers' data center is

13   potentially hundreds of these boxes.  And the

14   memory system itself in, you know, one --

15   there's different versions of course, but in the

16   kind of central box it could consume somewhere

17   in some cases a quarter of the space, so what we

18   were looking at in the next generation was, you

19   know, a couple of things, how could we reduce

20   the cost of this memory.  And the semiconductor

21   memory that we used had great benefits for

22   features and performance, but as I said, it did

23   cost.  Also we were kind of up against it in

24   terms of we would love to have more memory or at

620

```
 1    least more usable memory, but we really didn't
 2    have any additional space in which to put it, so
 3    that kind of brought us along the path of
 4    exploring ways to get more efficient uses out of
 5    the memory that we did have.
 6              Q.   And what idea along those lines
 7    did you and your co-inventors have?
 8              A.   The basic idea was to use RAID
 9    which is a, you know, an existing technology for
10    hard drives, use it for semiconductor memory.
11              Q.   And let's bring up the next slide
12    if we could.
13              So the jury has heard a little bit
14    about RAID so far, but could you tell them using
15    the slide how RAID works?
16              A.   Sure.  So the idea is that we do a
17    mathematical operation called an exclusive R or
18    XR as it's abbreviated to generate an additional
19    bit.  In this case we have the data world it's 1
20    0 0, and parity calculation essentially is it
21    wants to have an even number of ones in the
22    field.  So in this example, we have 1 0 0, so
23    there is one 1, it's an odd number of ones so
24    the parity becomes one so that the overall
```

1    number of ones in this picture is even.

2                So for example, if the data had

3    two ones, if it was a 1 1 0, then the parity

4    would be zero, again to preserve the even number

5    of ones.  That's the basic principle of parity.

6                Q.   Let's go to the next slide and

7    maybe you can explain why all that math matters

8    and is useful?

9                A.   So what that means is right, how

10   do we use that to protect our recover data.  So

11   this example what we're showing the missing bit

12   here, we have lost or we corrupted a data, we

13   don't know what it is, it could be a one or a

14   zero.  If you apply that parity operation or

15   that XR operation, it wants to have an even

16   number of ones.  There is already an even number

17   of ones here, so therefore the missing has to be

18   a zero.

19                So it's kind of a trick if you

20   will, but it essentially, you know, protects,

21   you can recover the lost data from the parity

22   information.

23                Q.   Do you have to start with three

24   pieces of data as in your example for this to

1    work?

2           A.   No.  No, this is -- typically you

3    would never use three, but typically these are

4    much larger data words verified over chunks of

5    data versus a single piece of data.

6           Q.   Let's go to the next slide, if you

7    can explain why parity is better than mirroring?

8           A.   So this is a summary of the two

9    pictures that we talked about.  So on the left

10   is the mirroring picture and again we duplicated

11   the data, we have a data and we have a copy so

12   in this case it's six bits total.  In the RAID

13   with parity case, we have only added an

14   additional one bit, so we need less storage for

15   the same type of protection.

16          Q.   Is this basic RAID process

17   something that you and your co-inventors

18   invented?

19          A.   No, RAID has been around for a

20   long time, applied to disk systems.

21          Q.   What was it that you were trying

22   to do that you believed was new?

23          A.   So what we invented was a means of

24   taking this approach and applying it to

623

```
 1    semiconductor memories.  Now, it's not as easy,
 2    it wasn't a trivial problem, not as easy as
 3    saying let's take RAID and put it in memories.
 4    There are some pretty tough performance problems
 5    you have to deal with in applying these RAID
 6    type calculations and this parity calculation to
 7    memory, so that's really what was novel about
 8    what we did.
 9          Q.   So at some point in time, you and
10    your co-inventors had the idea of trying to use
11    RAID in semiconductor memory; is that right?
12          A.   Yes.
13          Q.   And what happened next to try to
14    figure out how to do that?
15          A.   In terms of the process or how --
16          Q.   Well, first maybe you can say how
17    long a process was that to figure out the
18    problem?
19          A.   Sure.  The way it kind of went,
20    you know, as we're trying to look at better or
21    more efficient use of the memory for the
22    semiconductor memory system, you know, we had
23    this idea of using RAID.  So the next step was
24    kind of to say okay, would that really be
```

624

1    feasible with semiconductor memories and kind of

2    go through basically a whiteboarding session to

3    look at how this worked, what the kind of got

4    you maybe, you know, where there might be

5    performance issues or problems we might have to

6    work through.

7              So in total it probably took is

8    about a year to probably refine it to a point

9    where it really was workable.  We weren't

10   working on it exclusively for a year, we had a

11   lot of other responsibilities and things to do,

12   but in the timeline was about a year to get it

13   done.

14             Q.   And I apologize, it may be just

15   me, but can you pull your microphone a little

16   closer.  I'm having trouble hearing.

17             A.   Sure.  Thanks.  Better?

18             Q.   That's better.  Thanks.

19             A.   Obviously I'm shorter than the

20   last person.

21             Q.   And why was it a difficult problem

22   to solve how to do this in semiconductor memory,

23   why wasn't it whatever had been done before with

24   disks and using the same thing?

```
 1              A.   Yeah, that's a good question.  I
 2     think the problem really comes down to -- okay,
 3     with RAID applied to disk systems, hard disks
 4     which is where RAID is commonly used, it does
 5     have an overhead.  So to calculate the parity
 6     information here requires, it's more -- it takes
 7     more time than the mirroring.  If you look at
 8     the mirroring what you're doing, you're doing
 9     two rights in parallel.  In computing terms
10     that's a relatively easy operation.
11              For calculating parity in RAID,
12     you have to do multiple reads and writes and to
13     do the exclusive R operation, so it consumes,
14     it's got overhead.
15              Now in a disk system, that's not
16     as problematic because disks are inherently much
17     slower in semiconductor memory.  As a matter of
18     fact, the reason why you would use, you know,
19     expensive semiconductor memory in a system like
20     this is to kind of overcome the performance
21     problems or limitations of drives.
22              The tough thing about it is now
23     you're dealing with memory that has, you know,
24     if you kind of mess with its performance
```

626

1    characteristics, right, by introducing overhead

2    and so forth, you can lose the benefits of

3    having the memory in the first place, so there

4    is a bit of a balance there.

5                    And keep in mind the system, these

6    are pretty simple diagram of the concept, but

7    these systems were very large systems that had a

8    lot of parallel activity going on.

9                    So to make sure you didn't kind of

10   block any accesses to the memories, there was

11   quite a bit of kind of analysis required and

12   kind of what we came up with really is the

13   solution was really to in how the memory itself

14   was organized and how to control structures

15   utilize the memory organization to kind of do

16   the RAID operations in parallel.  So we kind of

17   hid some of the overhead so that it worked for

18   memory subsystem.

19                    Q.   And so in the end, you were able

20   to achieve the reliability of RAID without

21   hurting the performance; is that right?

22                    A.   Correct.

23                    Q.   Let's look at page 15 of Exhibit

24   5, PTX 5.  And if you could expand claim 6 in

```
 1    column 15 including the line numbers on the

 2    right.  Can you see that okay, Mr. Bermingham?

 3              A.   So part six here.

 4              Q.   If it's easier to use the document

 5    in front of you, whatever works for you.

 6              A.   Sure.

 7              Q.   So if I can direct your attention

 8    to lines 25 through 28.  And first of all, you

 9    understand claim 6 is one of the claims that EMC

10    is asserting against Pure Storage in this case?

11              A.   Yes, I do.

12              Q.   And just generally the portion of

13    the claim related to -- in lines 25 to 28 where

14    it talks about a parity segment and a logical

15    exclusive-or, is this relating to the RAID that

16    you discussed earlier?

17              A.   Yes, exactly, that's the RAID

18    calculation that I mentioned.

19              Q.   And then the application of RAID

20    to a semiconductor memory, if you look up at

21    line 17, and is there a reference to that

22    concept in line 17 where it says plurality of

23    semiconductor memory segments?

24              A.   Yes.
```

628

```
 1              Q.   And then finally, can you direct

 2    the jury to the portion of the claim that

 3    relates to achieving the performance that you

 4    talked about while at the same time implementing

 5    RAID in a semiconductor memory?

 6              A.   So it's essentially the last

 7    paragraph here showing each of the segments

 8    included in a respective memory region may be

 9    assigned a respective base memory different from

10    the other segments, that's kind of a key piece.

11              Q.   And what was it about having

12    memory boards with respective memory regions and

13    memory segments and the other elements of this

14    last paragraph including the base memory address

15    that related to this goal of achieving

16    performance while implementing RAID in

17    semiconductor memory?

18              A.   Right.  So there was essentially a

19    system comprised of various memory boards which

20    were physically, you know, separate pieces of

21    hardware, and each board there were regions and

22    within each region there were segments.  One of

23    the key pieces of the meaning of the base memory

24    address is used to essentially control the
```

629

```
 1    mapping or the accesses across these different

 2    areas.  So we could facilitate the parallel

 3    accesses.  That's one piece of it.

 4              The second major piece is in

 5    dealing with when there is a failure situation

 6    where you have to actually rebuild, kind of the

 7    second example I had given where you got to do

 8    the computation to figure out the missing data.

 9    Once you do that, you want to take that rebuild

10    data and store it somewhere else so the next

11    time you need it, you don't have to suffer the

12    same performance penalty.  So that's, you know,

13    essentially got to do with our using, you know,

14    the concept of memory segments and base

15    addresses.

16         Q.   Just taking a base memory address

17    independently by itself, was that something that

18    you invented?

19         A.   No.

20         Q.   It was the combination that was

21    your invention?

22         A.   Yeah.  It was using that in the

23    context of this kind of distributed memory

24    system, and you know, parallel control access
```

630

1      that would allow us to do it.

2              Q.   And in the experience that you had

3      encountering base memory addresses before this

4      invention, can you just describe that experience

5      and what, you know, what a base memory address

6      is in that context of your prior experience?

7              A.   Essentially it refers to a kind of

8      an access method where you can, you know,

9      specify where a chunk of memory can be found and

10     located.

11             Q.   And why is that useful?

12             A.   It allows, among other things,

13     kind of virtual memory systems or physical to

14     logical translation.  So what I am by that is

15     kind of maybe like in a computer system the

16     processing element is dealing with its own set

17     of addresses, so it wants memory, it has a

18     means, it kind of knows where memory is, but in

19     the physical system when things start going

20     wrong, you can kind of remap that without having

21     to burden the process or to know where things

22     are.

23             Q.   And at the time that you and your

24     co-inventors developed the invention, what did

1    you believe the implications of the invention

2    were?

3              A.   Well, we thought it had pretty

4    wide implications and we were trying to solve a

5    particular problem for a product at the time,

6    but it was clear to us that it was -- it had

7    pretty wide implications that this could

8    essentially be applied to any similar

9    semiconductor memory system that was looking

10   for, you know, more efficient reliability.

11             MR. POPPE:  Thank you very much.

12             THE COURT:  All right.  Members of

13   the jury, despite the heat, you all seem to

14   still be alert, but let's not push it.  So let's

15   take a break for 15 minutes and then we'll come

16   back and wrap up for the day.  Take the jury,

17   out please.

18             All right.  You can all be seated.

19   Is there anything you need to discuss?

20             MR. KREVITT:  Not from us, Your

21   Honor.

22             MR. VAN NEST:  I'm not sure if

23   we're going to get to Doctor Jones or not today.

24             THE COURT:  I would think we'd get

```
 1        started with him.
 2                    MR. VAN NEST:  If we are, Mr.
 3        Johanningmeier has some comments about slides
 4        that we were shown.
 5                    MR. JOHANNINGMEIER:  Your Honor,
 6        we received some demonstratives last night that
 7        they intend to use and they have some testimony
 8        pulled from some witnesses who haven't been here
 9        and who aren't designated.  Now we understand
10        that experts can rely on hearsay, but we are
11        objecting to the fact that they are going to be
12        displaying testimony on the screen that comes
13        from -- and these aren't 30(b)(6)'s, these are
14        witnesses who just simply aren't here, so they
15        are -- they are using their expert to bring in
16        testimony and so we're objecting to that as
17        improper.
18                    In addition there's one of the
19        slides where they've cut it down and excluded
20        the question and put it in ellipses and all
21        that.  We have an objection to that.  It's just
22        improper use of the expert to get testimony into
23        the record.
24                    MR. POPPE:  Your Honor, all of the
```

```
 1        witnesses in question are Pure Storage engineers

 2        who developed functionality and Doctor Jones is

 3        simply going to be explaining how he, in support

 4        of his opinions, he relied on meaningful

 5        information about how these products work.  He's

 6        certainly not going to read the full extent of

 7        what these Pure Storage engineers testified, but

 8        it's reasonable for him to show the basis of his

 9        opinions.  And in the one case where there are

10        ellipses, it's simply because the engineer in

11        question, English was his second language,

12        understandably he had some stuttering and

13        repeating of words and we simply cleaned it up.

14        There's been no indication to us in the amount

15        of time that this has been raised that there's

16        anything misleading resulting from those

17        ellipses and it wouldn't be helpful for the jury

18        to see a bunch of uhs and stuttering.

19                   THE COURT:  Do I take it, Mr.

20        Johanningmeier, that your objection is not so

21        much that he relies on these statements to

22        support his opinions so much, but that he --

23        that they want to put the statements up on the

24        screen?
```

```
 1              MR. JOHANNINGMEIER:  That's

 2     exactly it.  It's the manner of presentation.

 3     Basically we had a process for designating depos

 4     and encountering and figuring out a way to get

 5     the system and deal with objections and this is

 6     sort of circumventing that and putting snippets

 7     on the screen.  The cut down one isn't just to

 8     deal with English problems.  He's taken a

 9     question off the slide.

10              THE COURT:  So pretty hard for me

11     to deal with that in the abstract.

12              MR. JOHANNINGMEIER:  I understand.

13     I could hand it up if you'd like.

14              THE COURT:  Well, I think -- how

15     many slides are we talking about, Mr.

16     Johanningmeier?

17              MR. JOHANNINGMEIER:  I think it's

18     five or six.  I mean, we told them we didn't

19     object to the people who were 30(b)(6)'s, but

20     the other ones, it's six slides.  Some of these

21     witnesses will be here to testify later in the

22     case as well.

23              MR. POPPE:  But he needs to

24     explain the basis for his opinion now.
```

635

```
 1                   THE COURT:  All right.  Well, he
 2       can explain the basis without necessarily having
 3       deposition excerpts up on the slides, right?
 4       That's what we seem to be all agreeing.
 5                   MR. POPPE:  He can and he
 6       certainly will, but I think it's reasonable for
 7       him to.
 8                   THE COURT:  Well, let me just
 9       think about that.  I'll come back in a few
10       minutes, but I'm kind of inclined to think that,
11       for basically hearsay that I have a certain
12       amount of discretion as to what to do with it.
13       And having random statements from what I take to
14       be engineers being deposed in their personal
15       capacity, you know, seems to me to unnecessarily
16       call that out.  Let me think about that for a
17       minute and I'll be back in a few minutes.
18                   MR. JOHANNINGMEIER:  Thank you,
19       Your Honor.
20                   THE COURT:  All right.  Just
21       before we bring the jury in, Mr. Johanningmeier,
22       you have these six slides or whatever that you
23       object to?
24                   MR. JOHANNINGMEIER:  Yeah.  Yes,
```

```
 1        Your Honor, I do.  May I approach.

 2                    THE COURT:  Yes, please.  Are they

 3        the ones?

 4                    MR. JOHANNINGMEIER:  I'll tell you

 5        what numbers they are.  It's numbers 16, 32, 20,

 6        31, 33 and 34.

 7                    THE COURT:  All right.  I will

 8        look at them as we head in -- as we proceed.

 9                    MR. POPPE:  And I'll be sure not

10        to pull up a slide until you've approved it.

11                    THE COURT:  Thank you, Mr. Poppe.

12        All right.  Let's get the jury.

13                    All right.  Thank you, jury.

14        Welcome back.  Everyone may be seated.  Mr.

15        Johanningmeier.

16                    MR. JOHANNINGMEIER:  I have a

17        binder to pass up to the witness.  And Your

18        Honor, may I approach?

19                    THE COURT:  Sure.  Yeah.

20   BY MR. JOHANNINGMEIER:

21              Q.    Okay.  Good afternoon, Mr.

22        Bermingham.

23              A.    Good afternoon.

24              Q.    Now, in your examination earlier
```

```
 1      you mentioned you know an EMC employee named Mr.

 2      Christopher McClellan, right?

 3              A.   I do know Chris, yes.

 4              Q.   And he's one of your co-inventors

 5      on the '556 Patent, right?

 6              A.   Correct.

 7              Q.   And you know he was deposed in

 8      this litigation concerning the '556 Patent,

 9      right?

10              A.   Yes.

11              Q.   In fact, you met him shortly

12      before he was deposed, right?

13              A.   I was on a conference call with

14      him.

15              Q.   Now, have you reviewed his

16      deposition testimony since then?

17              A.   No.

18              Q.   Okay.  Now, when you met with

19      Mr. -- when you had your call with Mr.

20      McClellan, you understood that he had been

21      picked by EMC to be the company's spokesperson

22      about the '556 Patent, right?

23              A.   When I last met with him, I

24      believe that was prior to his being deposed.
```

638

```
 1                    Q.   But you knew that he was going to
 2      be deposed, right?
 3                    A.   At that time I did not.
 4                    Q.   Okay.  And you haven't been
 5      deposed in this case before, right?
 6                    A.   Correct.
 7                    Q.   Now, I think you said this already
 8      but I want to talk about it a little bit because
 9      you put up some slides about RAID and talked
10      about some of the advantages of RAID.  You did
11      not invent RAID; correct?
12                    A.   Correct.
13                    Q.   RAID was invented by computer
14      scientists at Berkley in the '80s; right?
15                    A.   I believe that's correct.
16                    Q.   When did you first learn about
17      RAID technology?
18                    A.   Probably in the '80s I learned
19      about it.
20                    Q.   And have you ever looked at
21      scholarly papers about RAID?
22                    A.   I have read some articles and so
23      forth, yes.
24                    Q.   Could I show the witness DTX 528.
```

639

```
 1            This is an image here, a picture of a patent.

 2       Have you ever seen this particular article

 3       before?

 4                 A.   Not that I recall.

 5                 Q.   So you wouldn't -- so we can take

 6       that down.

 7                      Now, let's look at your patent

 8       which is the '556 patent, DTX 5.  And I want to

 9       call up on the screen the background of the

10       invention and that's at column one and lines 24

11       to 29.

12                      So now you see this paragraph

13       that's been highlighted here.  The section of

14       the background of the patent talks about the

15       things that came before the invention; right?

16                 A.   Yes.

17                 Q.   So this patent says here that

18       EMC's own Symmetrix products applied RAID before

19       you filed for the '556 patent; right, it talks

20       about it in the background of the patent?

21                 A.   Yes.  For the disks, correct.

22                 Q.   So Symmetrix had RAID technology

23       on the disk before the '556 patent that was

24       filed on August 9th of 2001; right?
```

640

```
 1              A.   Correct.

 2              Q.   And so, in fact, you didn't invent

 3    the RAID with parity that was used on the disk

 4    that you talked about in your exam; correct?

 5              A.   Yes.

 6              Q.   You didn't invent mirroring?

 7              A.   Correct.

 8              Q.   Have you heard mirroring referred

 9    to as RAID 1, RAID Level 1?

10              A.   Yes.

11              Q.   And RAID with parity that you were

12    talking about, would you call that RAID Level 4

13    or 5, have you heard that before?

14              A.   Yes, generally it's RAID 5.

15              Q.   Let's go back to the cover of the

16    patent.  Now this section of the patent I want

17    to call out under other publications, this is

18    the section of the patent that talks about prior

19    art publications; right?

20              A.   Yes.

21              Q.   So these are documents that came

22    before the patent; right?

23              A.   Yes.  Sorry.  Correct.

24              Q.   So there is one listed here from
```

641

```
 1        author Holland and it's called Fast On-Line

 2        Failure Recovery in Redundant Disk Arrays and it

 3        was presented at the Fault-Tolerant Computing

 4        Conference in 1993.  Do you see that?

 5               A.   I do.

 6               Q.   Can we call up DTX 523 for the

 7        witness.  Now, does this appear to be a copy of

 8        the Holland paper, the Fast on-Line Failure

 9        Recovery in Redundant Disk Arrays from 1993?

10               A.   Yes.

11               MR. JOHANNINGMEIER:  I would ask

12        to move this into evidence.

13               MR. POPPE:  Relevance, Your Honor.

14               THE COURT:  Why are you moving

15        that.

16               MR. JOHANNINGMEIER:  It's the

17        prior art of the patent.  Maybe I could ask a

18        couple of questions to make that clear.

19               THE COURT:  I'm just wondering

20        what's the disputed point that you're addressing

21        here?

22               MR. JOHANNINGMEIER:  Your Honor,

23        the witness displayed some stuff about mirroring

24        and about parity on the board and so I wanted to
```

```
 1        just clarify the things that are in the prior

 2        art are not things that he invented.

 3                    THE COURT:  He said that a number

 4        of times already.

 5   BY MR. JOHANNINGMEIER:

 6             Q.   I'll just ask you.  The stuff you

 7        put up about mirroring and about parity and the

 8        benefits of one versus the other, this was all

 9        stuff that was well-known in the prior art;

10        right?

11             A.   That's correct.

12             Q.   Now, you mentioned that you came

13        back into the EMC fold when your company was

14        acquired.  What company were you working for at

15        the time?

16             A.   No, I came back into EMC to join

17        the different division that had been acquired.

18        It was a company that was acquired by EMC, so I

19        was working for Western Digital prior to

20        rejoining EMC.

21             Q.   What was that company that had

22        been acquired?

23             A.   Called Avamar.

24             Q.   Now, Avamar had made some
```

643

```
 1    deduplication products in the past; correct?
 2              A.   Correct.
 3                   MR. POPPE:  Objection.  Beyond the
 4    scope, Your Honor.
 5                   THE COURT:  I'm going to overrule.
 6    Wait.  We're not talking about deduplication
 7    here.  So I'll sustain it.
 8                   MR. JOHANNINGMEIER:  I'm sorry,
 9    Your Honor, I'll move on.
10    BY MR. JOHANNINGMEIER:
11              Q.   In your examination, you mentioned
12    the subsystem of the product that you had been
13    working on, I think you called it a memory
14    system, you said it was in the central box; is
15    that right?
16              A.   Yes.
17              Q.   And you mentioned system
18    semiconductor memory that was used there?
19              A.   Correct.
20              Q.   So that was SD ram or D ram memory
21    that you were talking about that was used in
22    that subsystem; right?
23              A.   That was what we used, yes.
24              Q.   It was not Flash?
```

```
 1              A.   Correct.

 2              Q.   And just to be clear, Flash is not

 3      mentioned at all in the '556 patent; right?

 4              A.   I don't believe so.

 5              Q.   And there is nothing about the

 6      patent that was directed to particularly for

 7      Flash memory as opposed to some other kind of

 8      memory; right?

 9              A.   No, it was semiconductor memory,

10      which is Flash is a type of semiconductor memory

11      as is D ram.

12              Q.   There was no optimization, just

13      Flash, because Flash wasn't even mentioned;

14      right?

15              A.   Right.

16              Q.   Now, you talked a little bit about

17      base memory addresses.  And, of course, you

18      didn't invent that concept; right?

19              A.   Correct.

20              Q.   And those are commonly used in

21      computer systems and they have been for a very

22      long time; right?

23              A.   Yes.

24              Q.   You said that one of the things
```

```
 1          that they are used for is to control mapping to
 2          facilitate parallel accesses; right?
 3                   A.   Right.
 4                   Q.   That wasn't just in your system
 5          that they used for that, that's in lots of
 6          systems of base memory addresses are used for
 7          that; right?
 8                   A.   Possibly.
 9                   Q.   I think you mentioned that base
10          memory addresses are used in virtual memory
11          systems; is that right?
12                   A.   Yes.
13                   Q.   Do you know of any other
14          applications for base memory addresses?
15                   A.   I mean, I'm familiar with some
16          that I have dealt with which essentially is
17          remapping of memory between different physical
18          locations in general.
19                   Q.   So it's a very broad concept;
20          right?  Is that fair?
21                   MR. POPPE:  Objection.  Vague.
22                   THE COURT:  I'm going to overrule
23          it.  Can you rephrase the question?
24                   Q.   I said base memory address is a
```

```
 1      concept that has very broad applicability;
 2      right?
 3              A.   Sorry, yes.
 4              Q.   So it could be applied to lots of
 5      different things; right?
 6              A.   It depends again on the context of
 7      the application.
 8              Q.   And it had been applied to lots of
 9      different things in the prior art in the past
10      before your patent; right?
11              MR. POPPE:  Objection, Your Honor.
12      The witness is not testifying as an expert and
13      questioning about prior art is irrelevant.
14              THE COURT:  I'm going to sustain
15      the objection.
16  BY MR. JOHANNINGMEIER:
17              Q.   Now, did you do any searching for
18      prior art before you applied for the '556
19      patent?
20              A.   Yeah, we did some searching.
21              Q.   Where did you look?
22              A.   There were some online sources so
23      essentially it was an online search.
24              Q.   Did you disclose all of the art
```

647

```
 1      you found to the PTO?

 2              A.  Yes.  Well, we disclosed it to our

 3      attorneys.

 4              Q.  Now, in that search you were

 5      looking for art that was applying RAID to solid

 6      state memory, right?

 7              MR. POPPE:  Objection, Your Honor

 8      402.

 9              THE COURT:  I'm sorry, louder.

10              MR. POPPE:  402.  Sorry, Your

11      Honor.  No issue in the case.

12              MR. JOHANNINGMEIER:  He testified

13      that that invention was applying RAID to solid

14      state memory.

15              THE COURT:  But you're asking

16      something different here so I'm going to sustian

17      the objection.

18              MR. JOHANNINGMEIER:  Thank you,

19      Your Honor.

20      BY MR. JOHANNINGMEIER:

21              Q.  Now, in your direct examination

22      you put up some slides showing the XOR

23      calculations, right, simple XOR parody

24      calculation?
```

648

```
 1                    A.   Yes.

 2                    Q.   Of course you did not invent that,

 3       right?

 4                    A.   That's correct.

 5                    Q.   That was well known?

 6                    A.   Yes.

 7                    Q.   Before you came up with patent?

 8                    A.   Yes.

 9                    Q.   Base memory addresses were well

10       known before you came up with the patent, right?

11                    A.   Yes, in certain applications.

12                    Q.   And of course we know RAID was

13       well known in general?

14                    A.   Correct.

15                    Q.   Now, dividing up memory into

16       regions and segments, that was well known in the

17       art, right?

18                    A.   Not so sure about that.  I hadn't

19       come across too many.  I'm sure there was.  I

20       mean any large memory system to some extent you

21       have to subdivide it, so --

22                    MR. JOHANNINGMEIER:  I don't have

23       any further questions.  Thank you.

24                    THE COURT: All right.  Thank you,
```

649

```
 1      Mr. Johanningmeier.  Any redirect?

 2                  MR. POPPE:  Just one question,

 3      Your Honor.

 4   BY MR. POPPE:

 5                  Q.  Mr. Bermingham, the Symmetix

 6      systems that counsel drew your attention to in

 7      the patent that pre-existed your invention and

 8      use RAID, that use of RAID was in the disks not

 9      in semiconductor memory; is that correct?

10                  A.  Yes, that's correct.

11                  MR. JOHANNINGMEIER:  Your Honor,

12      may I clarify one thing?

13                  THE COURT:  I'm going to give you

14      a chance, but it better be good.

15   BY MR. JOHANNINGMEIER:

16                  Q.  When you mentioned the Symmetrix

17      system had used RAID in the central memory

18      system, right, it used RAID 1 mirroring?

19                  A.  We used RAID 1 also known as

20      mirroring, correct.

21                  MR. JOHANNINGMEIER:  Thank you.

22                  THE COURT:  All right.  Mr.

23      Bermingham, thank you very much.  You may step

24      down.
```

```
 1              THE WITNESS:  Thank you.

 2              MR. POPPE:  Your Honor, our next

 3    witness is Doctor Mark Jones.

 4              THE COURT:  All right.  Can I see

 5    you and whose ever from somebody from the other

 6    side over at side bar for just a minute?

 7              (Side bar discussion.)

 8              THE COURT:  All right.  So what I

 9    take it is your dealing with those quotes from

10    these depositions here are things that would

11    otherwise be inadmissible but they are going to

12    be admitted or they are going to be referred to

13    by the expert because it's under Rule 703

14    because it's going to help the jury evaluate,

15    the probative value is to help the jury evaluate

16    the opinions substantially outweighs any

17    prejudicial effect, but I do think putting them

18    up on the slide elevates them to a more -- you

19    know, you get more from the testimony having

20    them not appear than if they would appear.  And

21    that doesn't -- and that seems to me to be

22    unnecessary.  So what I'd like for you is to

23    remove, not use those slide, but you can still

24    ask them, you know, what it is people said that
```

```
 1    supports his opinion, all right?
 2                    MR. JOHANNINGMEIER:  Just to be
 3    clear, the witness reading the testimony
 4    verbatim into the record would have the same
 5    effect, but it would have the witness
 6    credibility to it.
 7                    THE COURT:  He's either going to
 8    be summarizing it -- some of that is pretty
 9    bulky stuff.  I don't know whether it's going to
10    be subject to summary or not, but I think he
11    could probably, I'm sure he's a smart guy, he
12    could probably summarize it, but if he needs to
13    read it, he can read it.  But that's not the
14    preferable way to do it.  Better to synthesize
15    it.
16                    MR. POPPE:  Okay.  Thank you, Your
17    Honor.
18                    MR. POPPE:  Your Honor, may I move
19    the easel?
20                    THE COURT:  Sure.
21                        MARK THOMAS JONES,
22              the deponent herein, having first
23              been duly sworn on oath, was
24              examined and testified as
```

```
 1    follows:
 2                    THE COURT:  So, Mr. Poppe, so I
 3    have just minor point.  Neither the witness nor
 4    I can see the easel.
 5                    MR. POPPE:  That's a fair point,
 6    Your Honor.  If I move it back into the corner
 7    facing out, is that acceptable?
 8                    THE COURT:  I'm not going to give
 9    you technological instructions here, but you
10    know, the jury needs to be able to see it and
11    us.
12                    MR. POPPE:  Understood.
13    BY MR. POPPE:
14            Q.   Good afternoon, Doctor Jones,
15    would you please state your name and introduce
16    yourself to the jury?
17            A.   Yes.  My name is Mark Jones and
18    I'm a professor of electrical and computer
19    engineering at Virginia Tech.
20            Q.   Yeah, and if you could just make
21    sure your microphone is in a good spot so
22    everyone can hear.  Thank you.  What is your
23    occupation?
24            A.   I'm a professor in computer
```

```
 1      engineering.

 2                Q.   And where are you professor?

 3                A.   At Virginia tech.  That's in

 4      Blacksburg, Virginia.

 5                Q.   Please tell the jury why you're

 6      here today?

 7                A.   I'm here to explain my analysis

 8      and conclusions as they relate to infringement

 9      of the '556 patent that we've been hearing

10      about.

11                Q.   Are you being paid for your work?

12                A.   Yes, I'm being paid at $450 an

13      hour.

14                Q.   Does your compensation depend in

15      any way on the testimony that you give or the

16      outcome of the case?

17                A.   No, it does not.

18                Q.   Please tell the jury about your

19      educational background?

20                A.   I received my Bachelor of Science

21      in computer science and minor in computer

22      engineering in 1986 from Clemson University and

23      then I went on to get a PhD from Duke University

24      in computer science in 1990.
```

```
 1              Q.   What did you do after getting your
 2    degree?
 3              A.   I joined the mathematics and
 4    computer science division at Argon National
 5    Laboratory which is part of the Department of
 6    Energy and I was there for three years.
 7              Q.   What did you do after that?
 8              A.   I joined the computer science
 9    faculty at the University of Tennessee at
10    Knoxville and then in 1997 I got a chance to go
11    back home to Blacksburg and I joined the faculty
12    at Virginia Tech where I've been ever since.
13              Q.   During your work as a university
14    professor, what experience have you had with the
15    data storage technologies?
16              A.   I've been obviously we've covered
17    that when I was an undergraduate and graduate
18    student.  I've also taught it in multiple
19    classes to undergraduates and graduates,
20    graduate students.  I've also been involved in
21    research that uses data storage including new
22    architectures, computer architectures that make
23    use of things like Flash memory as an integral
24    part of the architecture.
```

```
 1              Q.   And during your work as a
 2      university professor, what experience have you
 3      had with RAID technologies?
 4              A.   I've experienced both teaching
 5      RAID to students and using it in our laboratory.
 6              MR. POPPE:  Your Honor, at this
 7      time I would proffer Doctor Jones as an expert
 8      in the fields of data storage and RAID.
 9              MR. JOHANNINGMEIER:  No objection.
10              THE COURT:  All right.  You may
11      proceed.
12      BY MR. POPPE:
13              Q.   And Doctor Jones, can you give us
14      an outline of the testimony that you're prepared
15      to give today?
16              A.   I've had some slides prepared that
17      summarize the testimony or at least the points
18      I'm going to hit and we'll be referring to this
19      throughout and we'll just take these one at a
20      time as they come up.  The first one is just
21      briefly give you an overview of RAID technology.
22              Q.   And you were in the courtroom
23      during the testimony of Mr. Bermingham; is that
24      right?
```

1          A.   Yes, I was.

2          Q.   And so I don't want you to bore

3     the jury with things that they've already heard.

4     So I'm going to skip ahead through a bit of

5     this, but can you just illustrate for the jury a

6     bit about what the name RAID actually means?

7          A.   Well, it stands for as you see

8     here redundant array of independent or

9     inexpensive disks.  The word array refers to the

10    fact that there are multiple disks across, they

11    are kind of arrayed together, so it's a

12    collection of disks.  The word redundant refers

13    to the ability to -- having at least one extra

14    disk that will have enough information to

15    recover data, as Mr. Birmingham explained.

16         Q.   And so if we go to the next slide,

17    can you explain how this illustrates the issue

18    of redundancy?

19         A.   Yes, this is -- represents the

20    parody information in this case stored on a

21    single disk and this is the type of parody

22    information that Mr. Bermingham was explaining

23    in his slides.

24         Q.   And you'll recall he told the jury

```
 1    about how an exclusive-or operation works,

 2    correct?

 3            A.   Yes.

 4            Q.   And did his description match your

 5    understanding?

 6            A.   Yes, it did.

 7            Q.   And did his description match your

 8    understanding of how parody is used to provide

 9    reliability in a data storage system?

10            A.   Yes, it did.

11            Q.   What is the next topic that you'll

12    be covering?

13            A.   This is a brief discussion of the

14    '556 Patent before we get into the actual

15    analysis of the claims for infringement

16    purposes.

17            Q.   And do you have a binder in front

18    of you?

19            A.   Yes, I did.

20            Q.   And if you could turn to Exhibit

21    PTX- many zeros and 5.

22            A.   I'm there.

23            Q.   This is the '556 Patent.  It's

24    already in evidence.  And if you could please
```

  
```
 1      explain for the jury what your view of the key

 2      aspects of this invention are?

 3              A.   This is one of the two claims at

 4      issue, Claim 6, and we'll just take it in three

 5      parts.  Part 1 as we heard Mr. Bermingham

 6      explain, this is a patent that applies to

 7      semiconductor memory.  Semiconductor memory, as

 8      an example, that would be DRAM.  Another example

 9      of that would be Flash memory.

10              Another part, part two highlighted

11      in yellow, that's the parity calculation that

12      Mr. Bermingham was explaining and that covers or

13      is computed with logical exclusive-or.

14              The third element below is a novel

15      architecture for an organization for the memory

16      itself that allows efficient use of

17      semiconductor memory when it's combined with

18      RAID.  And we'll cover this in more detail

19      later, but I have highlighted in green some of

20      the key ideas there that it's memory segments

21      that are inside of our subdivisions of memory

22      regions which were also on memory boards.  And

23      then we also highlighted the base memory address

24      aspect which gives the flexibility to realize
```

1        some of the advantages of semiconductor memory

2        when combined with RAID.

3                Q.   So you started to touch on this.

4        Would you please explain to the jury your view

5        of the benefits that accrue from using this

6        invention in a data storage product?

7                A.   Yes.  Taken together the invention

8        provides reliability from the RAID capabilities,

9        it provides performance from the semiconductor

10       memory being used efficiently, as well as the

11       ability, the flexibility of the base memory

12       address allows for space efficiency and we'll

13       see that a bit more later.

14               Q.   Have you looked at the issue of

15       whether EMC has used this invention in any of

16       its own products?

17               A.   I analyzed the XtremIO product and

18       found it makes use of the invention.

19               Q.   What's your analysis to arrive at

20       that conclusion?

21               A.   I examined how the XtremIO array

22       functions based on documents both internal and

23       external hard XtremIO as well as the source code

24       that describes how XtremIO operates.

1          Q.   What is the next topic that you're

2     going to cover?

3          A.   This is a, just a high level

4     overview of the Pure Storage FlashArray product.

5     We have already seen a fair amount about it, but

6     I'm going to focus on one element of it.

7          Q.   You stated that it's your opinion

8     that claims 6 and 7 of the '556 patent are

9     infringed by the FlashArray; is that correct?

10         A.   Yes, this is the product at issue

11    and this is a product I compared to the claims

12    and ultimately reached the conclusion that it

13    infringes.  And I'll be explaining that

14    conclusion later.

15         Q.   This is now the Pure Storage

16    product that you're talking about?

17         A.   Yes.

18         Q.   Is there a particular product

19    feature that you focused on in your infringement

20    analysis regarding FlashArray?

21         A.   Yes.  The overall name of the

22    feature or generally referred to as the RAID-3D

23    feature by Pure Storage.

24         Q.   Have you seen evidence that Pure

```
 1        Storage regards RAID-3D as an important feature

 2        of the FlashArray?

 3                A.   Yes, I have seen many Pure Storage

 4        documents that show that and I can show you one

 5        of those up here soon.

 6                Q.   Can you just --

 7                MR. POPPE:  Your Honor, I would

 8        like to display PTX 141.  And if we could bring

 9        up the cover page, please.  And if you could

10        expand the bottom section where it says

11        reliability.

12   BY MR. POPPE:

13                Q.   Dr. Jones, do you recognize this

14        as a portion of Pure Storage's website?

15                A.   Yes, I do.

16                Q.   And do you see that in the middle

17        of this, what's been blown up which was at the

18        bottom of the first page of the exhibit, it says

19        reliability?

20                A.   I do.

21                Q.   And can you explain what Pure

22        Storage is referring to in this part of its

23        website?

24                A.   So Pure Storage is describing
```

1        their RAID-3D scheme and they're indicating that

2        it provides the benefit of reliability.  They're

3        also indicating that it's specifically designed

4        for solid state, they mean solid state memory,

5        the type of memory they use is Flash memory.

6        They also indicate that it's able to realize

7        minimal space overhead so space efficiency, and

8        that it can reduce average latency which would

9        be a performance benefit.

10               Q.   And you mentioned solid state.  Is

11       that another word for semiconductor memory?

12               A.   Well, semiconductor is an example

13       of solid state.  Solid state generally means no

14       moving parts in computer chips such as Flash

15       memory has no moving parts.

16               Q.   There is a reference here to

17       parity.  Do you see that, the fourth line down?

18               A.   Yes, I do.

19               Q.   And is that a reference to the

20       type of parity that we heard in the context of

21       RAID?

22               A.   Yes.  It makes reference to the

23       use of parity, for example, as we'll see later

24       in more detail.

```
 1                    MR. POPPE:  Your Honor, I offer

 2      PTX 141 into evidence.

 3                    MR. JOHANNINGMEIER:  No objection.

 4                    THE COURT:  Admitted without

 5      objection.

 6      BY MR. POPPE:

 7            Q.   And what is the next topic you'll

 8      be testifying about?

 9            A.   The actual analysis we'll go

10      through that shows at a high level the analysis

11      that I did to determine whether or not the

12      FlashArray infringes claim 6 and 7 of the '556

13      patent.  And I'll explain how I reached my

14      conclusions.

15            Q.   Was that generally the same

16      process as what you described with respect to

17      EMC's XtremIO product?

18            A.   Yes, comparing how the product

19      works to the claims of the patent.

20            Q.   So we have in the corner a poster

21      board with a bunch of text we have now

22      established nobody can see, but it does, in

23      fact, show each of the elements of claim 6 and 6

24      of the '556 patent.  Is that something that you
```

```
 1     confirmed yourself?

 2              A.   Yes, I had that board prepared and

 3     checked it.

 4              Q.   And you mentioned that you were

 5     here during Mr. Bermingham's testimony.  Have

 6     you been here throughout the trial proceedings?

 7              A.   Yes, I have.

 8              Q.   And so did you hear at the start

 9     of the trial the arguments, or I'm sorry, the

10     positions stated by Pure Storage about why they

11     claim the FlashArray does not infringe these

12     claims?

13              A.   I did.

14              Q.   And you heard the focus of that

15     argument was on the base memory address element

16     of the claims?

17              A.   Yes.

18              Q.   Do you agree with their arguments

19     about that particular element?

20              A.   No, I don't.  I can explain that

21     in a little more detail, but in essence I

22     analyzed it and have shown that a base memory

23     address is, in fact, assigned and I can present

24     evidence for that.
```

```
 1                     But essentially as I understand
 2         Pure Storage's argument, they're arguing that
 3         this has to be a physical address that this base
 4         memory address must be that, and also that it
 5         must be somehow assigned in the SSD itself, and
 6         I disagree with both of those positions.
 7                     Q.   So I'll ask you to address that in
 8         more detail, but let's go through the rest of
 9         the claim, and since that particular element is
10         at the bottom, we'll get to that in more detail
11         toward the end.
12                     Actually, can you please bring up
13         on the screen exactly what I was going to ask
14         you for.  And blow up the very top line of that.
15                     Dr. Jones, do you see where it
16         says at the start of claim 6 that the invention
17         being claimed is a memory system?
18                     A.   Yes, I do.
19                     Q.   And have you looked at whether
20         FlashArray is a memory system?
21                     A.   Yes, I have.  I have analyzed that
22         and found that it is a memory system and, in
23         fact, it's the particular memory system that's
24         claimed here, the claim elements, but it is a
```

```
1    system that stores and retrieves data and it's
2    built using as we have seen Flash memory.  So I
3    found that element to be present.
4              Q.   If we could please pull up PTX 12.
5    My understanding is that's in evidence.  If we
6    could look at that in your binder.  Do you
7    recognize this as the FlashArray users guide?
8              A.   Yes.
9              Q.   And if we can jump ahead to page
10   26.  And then if you could expand the section
11   that begins, Flash Memory:  Like disk, but
12   different.
13             Dr. Jones, can you explain to the
14   jury what you found in this exhibit that's
15   relevant to your opinion regarding FlashArray
16   being a memory system?
17             A.   Yes.  This is explaining that the
18   FlashArray, the Pure Storage FlashArray is built
19   to take maximum benefit from Flash storage.
20   It's built on Flash memory as opposed to, for
21   example, the spinning hard drives that we heard
22   about in the trial as well.
23             Q.   And did you see this Flash memory
24   used anywhere else in the users guide of PTX 12?
```

```
 1                    A.   I have seen it in the users guide

 2         and throughout Pure Storage documents.  That's

 3         what people call it, it's Flash memory.

 4                    Q.   And my plan had been to have us

 5         check off one by one the elements on the board

 6         over there, but since it's a bit inconveniently

 7         located, maybe we'll address that later on in

 8         your examination.  But you do agree that the top

 9         line there is met by the FlashArray system?

10                    A.   Yes, I do.

11                    Q.   Now, the claim, claim 6 uses

12         several other terms that include the word

13         memory; is that right?

14                    A.   Yes, they do, the memory regions,

15         memory segments and memory boards.

16                    Q.   And if I can have the slide show

17         back, please.  I'm going to jump ahead a few

18         slides.  And if you could please explain to the

19         jury the relationship between those elements

20         that you identified, the memory boards, memory

21         regions and memory segments?

22                    A.   Yes.  This slide illustrates it

23         fairly well.  We have got a memory board, an

24         example of that in the upper right-hand corner
```

```
1     of the screen you see is that green board and it

2     has some of those black rectangles on it are

3     Flash memory chips.  That's according to the

4     claim are divided into memory regions, and I

5     have illustrated that here with four memory

6     regions in those big rectangles in the middle.

7                   And then finally the memory

8     segment is represented by the letter S where

9     each memory region is divided into memory

10    segments.

11                  Q.   In the upper left of this slide

12    there is some language from claim 6 and then a

13    definition of the term memory region.  That's

14    the Court's claim construction of that term; is

15    that right?

16                  A.   Yes, the construction is a subset

17    of memory on a memory board that can be

18    accessed, and that's the meaning that is to be

19    used for memory region in the claim.

20                  Q.   Is that the meaning that you have

21    used in your analysis?

22                  A.   Yes, I used the Court's claim

23    constructions throughout my analysis.

24                  Q.   In this diagram you mentioned that
```

669

```
1      the memory regions and segments as depicted here

2      are in the shape of a rectangle.  Is there any

3      significance to that shape?

4              A.  No, there is not a particular

5      shape or some particular layout, this is just a

6      convenient example.

7              Q.  Do you want to take us right to

8      slide 13.  And Dr. Jones, do you recognize where

9      this picture is from?

10             A.  Yes.  It's from a Pure Storage

11     video that is demonstrating aspects of their

12     product.

13             MR. POPPE:  And I'll note it's

14     from PTX 102 and I'll move that into evidence.

15             MR. JOHANNINGMEIER:  No objection.

16             THE COURT:  Admitted without

17     objection.

18     BY MR. POPPE:

19             Q.  And how does this relate to your

20     analysis and specifically with regard to the

21     element memory board?

22             A.  This is an example of the memory

23     board that I've identified within the Pure

24     Storage system, so this is a memory board in one
```

670

```
1      of the SSD's that are in the Pure Storage
2      product.
3              Q.   Do the FlashArray memory boards
4      have memory regions?
5              A.   Yes, they do.  The Pure Storage
6      organizes the memory into what's known as write
7      units which are the memory regions of the
8      claims.
9              Q.   Can you explain your answer in
10     relationship to this slide, please?
11             A.   Yes.  In this slide I'm basing
12     this off of general documents from Pure Storage,
13     but I'm representing here that each column that
14     you see in this diagram is a solid state drive.
15     And that's a memory that has a memory board.
16     And it's the memory board of the claims.  And
17     then that memory board is further divided into
18     write units.  And I have highlighted write units
19     on each one of the solid state drives, but there
20     are many write units on each one of the memory
21     boards on the solid state drives.
22             Q.   And what evidence have you seen
23     that those pages -- I'm sorry.  Preliminary
24     question.  So you mentioned that the Court has
```

1    defined memory region to be a subset of memory
2    on a memory board that can be accessed.  What
3    evidence have you seen indicating that the
4    FlashArray memory regions are subsets of memory?
5    And you may refer to slide 16 if you would like.
6         A.   Yes.  Evidence that I have seen
7    includes, of course, my analysis of the source
8    code in the system, but also I have seen
9    deposition testimony from Pure Storage's
10   witnesses as well as Pure Storage documents.
11        Q.   And can you summarize for the jury
12   any particular deposition testimony from Pure
13   Storage witnesses that you relied on in that
14   regard?
15        A.   My recollection is testimony that
16   explains that Pure Storage has allocation, what
17   they call allocation units which is a division
18   of the memory on the boards and that those
19   allocation units are further subdivided into
20   write units and those correspond to the memory
21   on the SSD.
22        Q.   Do the FlashArray memory regions
23   contain memory segments?
24        A.   Yes, they do.  They're further

1    divided into pages, and each -- so each write

2    unit is divided into multiple pages, and I have

3    depicted here in this diagram with the red grids

4    there that shows the write units are divided

5    into pages, and I have blown up one example of

6    the page, but every one of the write units is

7    divided into multiple pages.

8         Q.   And what evidence have you seen

9    indicating that those pages are portions of

10   memory?

11        A.   Again, my analysis of the source

12   code, but also deposition testimony that

13   explains this subdivision and confirms my

14   understanding.

15        Q.   So now looking back, if we can go

16   back to the claim language, please, in PTX 5,

17   and looking at the next element below where it

18   says memory system, the claim requires a

19   plurality of semiconductor memory segments, the

20   segments being grouped into groups.  Why do you

21   believe the FlashArray meets this claim element?

22        A.   The semiconductor memory segments

23   are the pages.  And those pages are grouped into

24   groups through a parity computation that takes a

1      page from each one of the --

2             Q.   Let me just stop you.  Let's bring

3      up a slide again, slide 21, please.  Sorry, go

4      ahead with your answer.

5             A.   So, Pure Storage organizes their

6      parity computation such that they across what

7      they call a write stripe, one of their

8      terminologies, takes a page from each one of the

9      write units and groups that together by

10     competing parity over it and they store that

11     parity in another one of the write units, a page

12     of the write units.

13            Q.   Just to wrap that up, how does

14     that result in groups of memory segments?

15            A.   Well, these are groups together

16     logically in the software, but also the

17     computation of the parities over that group of

18     pages, so the parity that's grouping them

19     together.

20            Q.   Your slide highlights one group of

21     pages in that particular write stripe.  Would

22     there be other groups of pages in that same

23     write stripe, in that same write stripe?

24            A.   Yes, there would be many groups in

```
 1      each of the write stripes.  This is just one of

 2      many of the groups and they would all have the

 3      same number of pages or memory segments.

 4              Q.   And then you mentioned these are

 5      your slides; correct?

 6              A.   Yes.

 7              Q.   But you have mentioned that you

 8      based them off of Pure Storage documents?

 9              A.   Yes, I have examined as well as

10      the Pure Storage software, but it is a

11      representation of what I have seen in the

12      documents as well as their source code.

13              Q.   And if you could take a look at

14      this, which is page 11 from the FlashArray users

15      guide, PTX 12 as well as page seven of another

16      Pure Storage document, PTX 119, are these

17      examples that you based your own diagram off of?

18              A.   Yes, I think the one on the left

19      is from page 31 of the users guide.

20              Q.   I misstated that.

21              MR. POPPE:  Your Honor, I offer

22      PTX Exhibit 119 into evidence.

23              MR. JOHANNINGMEIER:  No objection.

24              THE COURT:  Admitted without
```

```
 1        objection.
 2    BY MR. POPPE:
 3             Q.   And then if we can once again pull
 4    up the language of claim 6.  The next part of
 5    that element mentioned that each of the groups
 6    includes N respective semiconductor memory
 7    segments, the number N being an integer.  What
 8    did you conclude about whether FlashArray meets
 9    that element?
10             A.   I concluded that element is met
11    actually for the reasons I just explained that
12    --
13             Q.   Let's pull up that slide again so
14    you can explain.
15             A.   As I indicated there were multiple
16    groups there and each one of those groups would
17    have the same number of pages, the number of
18    pages in that group up there, it would be five,
19    but that number is consistent throughout that,
20    throughout the groups in the write stripe.
21             Q.   And so in this instance where it
22    says there are in respective semiconductor
23    segments in a group, what would N be in this
24    example?
```

```
 1              A.   In my example N would be five,

 2     typically much larger on the Pure Storage

 3     system.

 4              Q.   Going back to again to the

 5     language of claim 6, it next states that the N

 6     respective segments in each speculative group

 7     comprises, I'm going to skip the respective's,

 8     data segments and a parity segment.  What have

 9     you concluded whether that element is met?

10              A.   I concluded that is met for the

11     reasons I just explained.  You saw that there

12     were data segments and then a parity segment

13     also in the group.

14              Q.   And just so we're clear, let's go

15     back to the slides, please.  Which of the five

16     pages indicat?

17              A.   The one labeled P, that's the one

18     where parody could be computed over the four

19     pages on the left, and then the page in the

20     right hand labeled P would be the parody.

21              Q.   And can you summarize for the jury

22     briefly what evidence you saw that Pure Storage

23     does use the exclusive-or calculation to

24     generate the parody?
```

677

1                    A.    Yes.

2                    Q.    MP?.

3                    A.    Yes, I saw that in testimony from

4     Pure Storage witnesses, but I also confirmed it

5     in the source code itself.

6                    Q.    And why in this slide have you not

7     included a page from the Q right unit on the,

8     the far right?

9                    A.    The group that's formed by

10    computing parody P is that particular group in Q

11    is not grouped with P in that computation, but

12    there's also a group that could include Q as

13    well, but for simplicity I've shown it just with

14    P.

15                   Q.    So am I correct that if we look at

16    the language of the Claim 6, you've now covered

17    the entirety of that larger claim element below

18    memory system?

19                   A.    Yes.  And I believe we've covered

20    the next one as well, because that one addressed

21    the calculation using exclusive-or.

22                   Q.    Maybe now since we've gotten

23    through part of it, can I ask you to check off

24    the portions of the corresponding claim on the

1     board behind you?

2                  The next element says that the

3     segments reside in memory regions of a memory

4     board.  How does FlashArray satisfy that

5     element?

6                  A.   That's satisfied by the

7     explanation I gave earlier, where there's a

8     memory board that's one of the -- that's the

9     board in an SSD that's divided into the regions

10    for the right units and then the right units are

11    further divided into the pages that I just

12    described which are the segments.

13                 Q.   All right.  And so the next claim

14    element below where you put the check marks is

15    met as well, leaving us with one to discuss?

16                 A.   Yes.

17                 Q.   And based on what you've heard so

18    far in the trial, are you aware of anything

19    being disputed by Pure Storage in what we've

20    talked about so far, any of those check marked

21    boxes or the additional one that you've just

22    discussed?

23                 A.   No, not based on what I've heard

24    so far at trial.

679

```
 1              Q.   And so if we now move to the last
 2     claim element of Claim 6, again you explained
 3     before your understanding that the disputed
 4     point here relates to base memory address?
 5              A.   That's correct.
 6              Q.   And do you have a view on whether
 7     the Pure Storage FlashArray includes base memory
 8     addresses?
 9              A.   Yes, I do.  My analysis shows that
10     it does include a base memory address that is
11     assigned to the segments in the way specified in
12     the claims.
13              Q.   And let's please show Slide 26.
14     So this is the definition that you've used?
15              A.   Yes, down below an address used as
16     a reference point to which a relevant address
17     may be added to determine the address of the
18     storage location to be accessed.
19              Q.   And so in reference to that
20     definition, can you explain to the jury what an
21     address is?
22              A.   It's at a high level an address is
23     essentially a number that a computer uses to
24     refer to something in memory, so it's trying to
```

```
1       find a location in memory and it uses that as a,

2       as the indication of what it wants to either

3       write to or read from.

4              Q.   And what in the Pure Storage

5       FlashArray system in your view is a base memory

6       address?  And let me show our next slide.

7              A.   The base memory address in the

8       Pure Storage system that meets this limitation

9       is the page number that's assigned to a page by

10      the Pure Storage software.

11             Q.   And you mentioned that the -- I'm

12      sorry, one moment.  So, what in the Pure Storage

13      system is the relevant address that the Court's

14      definition of base memory address requires?

15             A.   You can -- in the Pure Storage

16      software, you can add to the, to this reference

17      point or base memory address the page number,

18      and offset that would be used to locate a block

19      within that page that we've been talking about.

20             Q.   So, and with respect to this

21      particular slide, can you show here where is the

22      base memory address and what is the -- how does

23      the offset work to identify a storage location?

24             A.   So this is just an example I
```

```
 1    prepared to explain kind of a little bit of the

 2    concept of base memory address.  And for this, a

 3    base memory address is referring to the, in this

 4    case the upper left part of the memory segment

 5    or the really the beginning of the memory

 6    segment and the offset in this case, 13, is just

 7    how far to move into that memory segment, in

 8    this case, to find the data that you're looking

 9    for, and in this case just that white square

10    there.

11              Q.   And so in the Pure Storage system,

12    you mentioned a page number as the base memory

13    address; is that right?

14              A.   Yes, a page number that would be

15    the base memory address of a particular page.

16              Q.   And then what is the offset --

17    first of all, why is an offset needed in the

18    Pure Storage system?

19              A.    In the Pure Storage system they

20    are trying to, as we saw earlier, in multiple

21    ways trying to reduce the amount of data that's

22    actually -- space that's taken up actually on

23    the Flash memory, so they pack in information,

24    and these C Blocks are examples of information
```

```
 1    that's packed into each page and then ultimately

 2    you want to retrieve that information and you

 3    want to find that particular C Block, so you

 4    need to move into the middle of the page like C

 5    Block 2 there, you would need to have an offset

 6    to locate C Block 2.

 7              Q.   So C Block, that's a term that

 8    Pure Storage uses internally to describe these

 9    blocks of data?

10              A.   Yes.

11              Q.   And so if we wanted to use the

12    Pure Storage system to get at that second C

13    Block, can you explain how that would involve

14    the use of a base memory address?

15              A.   Yes, Pure Storage, when I want to

16    find one of these C Blocks, not only stores the

17    page number where it's located, but in addition

18    they also store and basically the offset within

19    that page where that C Block starts.

20              Q.   All right.  Now, you summarized

21    earlier the reasons why you understand Pure

22    Storage disagrees that they have a base memory

23    address.  And again, here we show the claim

24    language and we show the claim construction.
```

```
 1        What is your understanding of -- you also
 2     explained specifically that they disagree with
 3     whether the page number that you were referring
 4     to is an address.  And can you explain why you
 5     believe it is?
 6             A.  It's what's being used to locate
 7     the information that's being retrieved and to
 8     refer to it, so it's being used like an address
 9     and my examination of the source code of Pure
10     Storage indicates that they believe it's an
11     address as well, at least within the design of
12     the source code.
13             Q.  And in your reading of the claim
14     and in particular of the Court's claim
15     construction, do you understand there to be any
16     limitations on the type of address that it can
17     be?
18             A.  There's no limitation that it
19     would have to be for example a physical address.
20     That language doesn't appear in the claim or the
21     claim construction.  It has to meet the claim
22     limitation and the Court's construction, but as
23     I explained, it meets that.
24             Q.  And what is your view as to
```

684

```
 1        whether a person of ordinary skill in the art

 2        reading a reference to an address would

 3        understand that to exclude physical address?

 4              A.   Well, we've already heard about

 5        different types of addresses in the testimony

 6        thus far, but from the point of view of one of

 7        ordinary skill in the art, a computer address

 8        isn't restricted to either a physical or a

 9        logical address, they are both types of

10        addresses.

11              Q.   The claim -- this portion of the

12        claim also mentions that a base memory address

13        may be assigned.  Do you see that in the fourt

14        row of this part of the claim?

15              A.   Yes, I do.

16              Q.   What is it in FlashArray that

17        identifies the page number that you've

18        identified in the base memory address?

19              A.   It's the software, the Purity

20        software that's running that assigns the page

21        number to the pages.

22              Q.   And is there anything in the

23        claim, based on your analysis, that restricts

24        that act of assigning to any particular portion
```

685

1    of the product?

2             A.   No, no there's not.

3             Q.   Have you seen any evidence

4    indicating -- any evidence from Pure Storage

5    indicating that the page number indicates a

6    particular physical location on the memory?

7             A.   Yes, I've seen testimony from Pure

8    Storage witnesses that explains how the process

9    works and how it's used to locate the

10   information as it's stored on the SSD's.

11            Q.   All right.  And if we can bring

12   the full Claim 6 up again.  Just to wrap up on

13   your discussion of Claim 6, the second part of

14   that element mentions that the base memory

15   address that's assigned to a memory segment is

16   different from other respective base memory

17   addresses assigned to other segments in the same

18   memory region and is that claim element met by

19   FlashArray?

20            A.   Yes, it is.  They assign the base

21   memory addresses to the pages in a way that

22   varies across the pages that it is, it's not

23   just unique, it's -- there's no way to view them

24   as the same base memory address for each one of

1    the pages that are -- page numbers that are

2    assigned.

3         Q.   And then so in summary, having

4    gone through each of the elements, do you have

5    an opinion as to whether Claim 6 is infringed by

6    the Pure Storage FlashArray?

7         A.   Yes, it's my opinion that Pure

8    Storage's FlashArray product infringes Claim 6

9    of the '556 Patent because it meets each and

10   every element as my analysis shows.

11        Q.   Claim 7 adds just one additional

12   element; is that correct?

13        A.   Yes, Claim 7 is a dependent claim

14   and so it includes all of the limitations of

15   Claim 6 that's indicated by the language that

16   says the memory system of Claim 6, plus it has

17   an additional element that has to be met.

18        Q.   And the additional element

19   essentially is that each of the memory segments

20   in a group must be on a different memory board;

21   is that right?

22        A.   Yeah, the memory segments are

23   distributed among electrical circuit boards and

24   then there's language such that none of the

1    circuit boards includes more than one respective

2    segment from each respective group.  So every

3    memory or every electrical circuit board or

4    memory board has to have exactly or at most one

5    segment.

6              Q.   And are you aware -- and

7    FlashArray does that?

8              A.   My analysis shows that that's the

9    way the FlashArray system works and that is part

10   of the design to make the parody effective so

11   that if you lost one of the boards you would

12   still be able to recover the information on it

13   using the exclusive-or.

14             Q.   Are you aware of any dispute over

15   whether that part of Claim 7 is met by the

16   FlashArray?

17             A.   No, I didn't hear anything dispute

18   go that.

19             Q.   During your testimony you referred

20   to a couple of instances where certain claim

21   language had been interpreted by the Court and

22   you followed that interpretation in your

23   analysis.  Did you do that with all of the claim

24   interpretations that were provided by the Court

688

```
 1       for these claims of the '556 Patent?

 2               A.   Yes, I did.

 3               THE COURT:  Mr. Poppe, would this

 4       be a good time to end for the day?

 5               MR. POPPE:  Sure.  That would be

 6       fine.

 7               THE COURT:  Okay.  All right.

 8       Members of the jury, we are going to end for the

 9       day, so basically three things; one, we'll start

10       again tomorrow at 9:30, so you were good, you

11       were all here, try to be here so we can start at

12       9:30.  I'll meet with the lawyers and try to

13       make sure we're all ready so we don't waste a

14       lot of time.

15               Second thing is I want to repeat

16       my instruction about not discussing this case

17       with each other or with anybody else, family,

18       your friends.  Don't post things electronically

19       about it.  Keep your thoughts to yourself and

20       keep your mind open so that when you do discuss

21       the case a week from now, you know, you don't

22       unfairly concentrate on one piece of -- you

23       know, you don't make up your mind until you

24       actually discuss it with or colleagues here.
```

```
 1                    The third thing is, don't do any

 2       research, don't go on Google or anything to try

 3       to find out things that you'd like to know a

 4       little bit more about than you've heard so far.

 5       Everything that you're going to learn about this

 6       case, you need to learn about it in the

 7       courtroom, so don't do any independent research

 8       of any kind.

 9                    All right.  Can we take the jury

10       out and have a nice evening.

11                    So Mr. Poppe, I'm sorry, I

12       tried -- I'm trying to, you know, break at a

13       time where it seemed appropriate.  I knew you

14       weren't going to be able to finish what you had

15       to do in the next 30 seconds, so if I didn't

16       quite catch the moment right, I'm sorry about

17       that.  All right, is there anything else anybody

18       wants to discuss?

19                    MR. KREVITT:  Nothing from the

20       Plaintiff, Your Honor.  Thank you.

21                    MR. VAN NEST:  Your Honor, I'd

22       just like to get a sense of when Plaintiff's

23       case, and I use the word rest in quotes because

24       I understand I'm keeping it open for them to
```

```
 1    examine.
 2                    THE COURT:  Actually that's a very
 3    reasonable question.  So first off, after we
 4    finish with Mr. -- Doctor Jones -- no, no, I
 5    remember the last name.  I try to get the titles
 6    right here.
 7                    MR. KREVITT:  Doctor Jones.
 8                    THE COURT:  Doctor Jones,
 9    professor, what more do you have on -- you have
10    your damages person for sure.
11                    MR. KREVITT:  Here's what we have,
12    Your Honor.  We have the videotape and then we
13    have two more witnesses, Josh Goldstein whom you
14    met the first day, and our damages expert, Brian
15    Napper.  And then we're done in the way Mr. Van
16    Nest means.  We're not going to rest.
17                    THE COURT:  Right.  And you said
18    tape, is that still thirty minutes of tape?
19                    MR. KREVITT:  I don't have an
20    exact number.  I think we're in that range.
21    We're certainly sub one hour and I think we're
22    in the thirty to forty-five minutes range.
23                    THE COURT:  So it sounds to me
24    like you probably are not going to finish before
```

```
 1      lunchtime tomorrow?

 2                  MR. KREVITT:  No, I wouldn't think

 3      so, Your Honor, based on -- I don't know how

 4      long, any sense how long the cross-examination

 5      will be of Dr. Jones?

 6                  MR. JOHANNINGMEIER:  Probably not

 7      too lengthy.  Probably short.

 8                  MR. KREVITT:  Assuming it's not

 9      too lengthy, around lunchtime or shortly into

10      the mid afternoon.

11                  MR. VAN NEST:  That gives me a

12      good sense, Your Honor.  Thank you.

13                  THE COURT:  Okay.  All right.  So

14      there is nothing else, we'll be in recess and

15      we'll see you tomorrow morning at nine o'clock.

16                  (Court recessed at 5:03 p.m.)

17

18

19

20

21

22

23

24
```

692

```
1    State of Delaware )
                       )
2    New Castle County )

3

4

5              CERTIFICATE OF REPORTER

6

7         I, Dale C. Hawkins, Registered Merit

8    Reporter, Certified Shorthand Reporter, and Notary

9    Public, do hereby certify that the foregoing record,

10   Pages 348 to 692 inclusive, is a true and accurate

11   transcript of my stenographic notes taken on March 8,

12   2016, in the above-captioned matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 8th day of March 2016, at

16   Wilmington.

17

18

19            /s/ Dale C. Hawkins

20          Dale C. Hawkins, RMR

21

22

23

24
```

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

**$15,000** [1] - 440:20
**$25** [1] - 403:18
**$450** [1] - 653:12
**$475** [1] - 441:17
**'015** [48] - 356:2,
384:22, 385:8,
392:17, 404:10,
408:17, 409:6,
410:20, 419:20,
420:5, 444:12,
454:15, 455:4,
455:8, 461:8,
462:17, 470:8,
470:15, 471:23,
476:5, 480:5,
480:13, 499:13,
534:9, 534:13,
534:17, 534:21,
535:4, 535:6,
535:23, 536:14,
538:2, 538:5, 538:9,
538:21, 538:22,
542:2, 551:2, 551:9,
551:12, 551:21,
552:11, 552:13,
556:12, 570:12,
589:13, 592:3, 592:7
**'02** [1] - 456:3
**'09** [2] - 448:5, 457:11
**'464** [51] - 350:15,
356:2, 360:20,
384:15, 384:17,
392:17, 404:10,
409:7, 410:20,
419:20, 420:5,
444:11, 448:18,
449:1, 476:5, 480:5,
480:19, 480:22,
481:3, 481:5, 481:7,
482:2, 499:18,
503:14, 509:24,
530:1, 533:13,
533:15, 534:9,
534:13, 534:15,
538:2, 540:3, 540:8,
540:12, 541:1,
542:4, 542:7, 551:3,
551:9, 551:13,
551:21, 552:17,
556:12, 569:9,
570:15, 570:19,
571:2, 589:12,
592:4, 592:7
**'556** [24] - 531:23,
532:5, 609:8,
609:17, 610:17,
611:6, 613:16,
617:11, 637:5,
637:8, 637:22,
639:8, 639:19,

639:23, 644:3,
646:18, 653:9,
657:14, 657:23,
660:8, 663:12,
663:24, 686:9, 688:1
**'70s** [1] - 405:7
**'80s** [2] - 638:14,
638:18
**'93** [1] - 612:11
**/s** [1] - 692:19
**0** [6] - 404:23, 620:20,
620:22, 621:3
**0.1** [7] - 427:12, 456:5,
458:23, 459:7,
459:13, 459:24
**0.11** [1] - 458:22
**0005** [2] - 609:12,
609:20
**1** [19] - 370:12, 410:13,
428:5, 429:12,
535:5, 535:22,
536:13, 552:12,
596:24, 620:19,
620:22, 620:23,
621:3, 640:9,
649:18, 649:19,
658:5
**1,600** [4] - 558:16,
558:17, 559:4,
600:19
**1.1** [1] - 402:23
**1.4** [1] - 599:6
**1.5** [1] - 403:3
**1.6** [1] - 599:6
**1.8** [1] - 403:3
**10** [16] - 422:3, 424:13,
468:1, 483:22,
595:23, 596:15,
596:16, 596:23,
596:24, 598:4,
598:8, 598:12,
598:15, 598:19,
599:11
**102** [1] - 669:14
**11** [4] - 396:17, 423:9,
424:13, 674:14
**119** [4] - 463:18,
463:19, 674:16,
674:22
**11:14** [1] - 438:14
**11th** [1] - 386:22
**12** [7] - 506:1, 506:8,
531:5, 616:23,
666:4, 666:24,
674:15
**127** [3] - 360:12,
402:4, 402:17
**12:48** [1] - 531:8
**12th** [1] - 386:21
**13** [6] - 411:18,

421:17, 421:19,
455:14, 669:8, 681:6
**13-1985-RGA** [1] -
348:6
**13th** [2] - 466:10,
466:14
**14** [4] - 373:14,
374:10, 429:24,
459:16
**141** [2] - 661:8, 663:2
**15** [6] - 432:19, 433:6,
552:12, 626:23,
627:1, 631:15
**16** [15] - 427:5, 427:10,
427:15, 427:21,
428:16, 428:21,
429:2, 457:6, 468:1,
476:4, 552:12,
616:22, 616:23,
636:5, 671:5
**16th** [1] - 472:1
**17** [5] - 463:18,
463:20, 616:23,
627:21, 627:22
**18** [1] - 570:1
**180** [2] - 579:8, 579:15
**181** [2] - 579:6, 579:7
**193** [1] - 459:15
**1968** [1] - 482:12
**1971** [1] - 482:12
**1981** [2] - 390:17,
390:24
**1986** [3] - 383:7,
392:1, 653:22
**1990** [1] - 653:24
**1990's** [1] - 613:2
**1993** [3] - 612:8,
641:4, 641:9
**1997** [1] - 654:10
**1:53** [1] - 532:24
**2** [5] - 348:4, 370:12,
552:12, 682:5, 682:6
**20** [9] - 392:23,
401:24, 408:24,
410:8, 410:12,
422:21, 423:24,
454:22, 636:5
**200** [1] - 400:24
**2000** [1] - 397:19
**2000's** [4] - 613:2,
615:15, 616:6, 619:1
**2001** [8] - 385:22,
386:3, 386:21,
393:16, 394:2,
394:8, 399:11,
639:24
**2002** [23] - 404:21,
404:23, 411:18,
411:23, 421:11,

422:21, 423:24,
427:5, 427:6,
427:10, 427:14,
431:14, 431:15,
450:23, 451:7,
454:16, 455:14,
455:23, 466:6,
469:10, 476:4
**2003** [3] - 357:21,
551:18, 551:23
**2004** [5] - 400:13,
400:14, 439:18,
551:18, 551:24
**2005** [1] - 616:7
**2006** [3] - 400:8,
402:9, 439:20
**2007** [2] - 402:16,
432:7
**2008** [3] - 367:22,
368:2, 371:1
**2009** [3] - 402:18,
440:24, 445:1
**2010** [1] - 402:23
**2011** [1] - 616:13
**2012** [3] - 370:21,
371:14, 393:10
**2013** [9] - 370:15,
371:5, 372:1,
372:24, 376:11,
377:21, 378:9,
379:12, 381:12
**2014** [2] - 381:14
**2015** [2] - 440:22,
440:24
**2016** [3] - 348:10,
692:12, 692:15
**20th** [3] - 422:20,
454:16, 470:6
**21** [2] - 603:1, 673:3
**22** [2] - 612:9, 612:12
**23** [5] - 596:2, 596:17,
597:20, 597:21,
599:3
**23rd** [1] - 415:20
**24** [3] - 463:18,
463:20, 639:10
**25** [10] - 403:17,
411:23, 562:18,
563:7, 595:8,
600:18, 601:7,
601:10, 627:8,
627:13
**25.1** [2] - 562:15,
562:22
**250** [3] - 402:6, 402:7,
402:18
**26** [3] - 352:1, 666:10,
679:13
**27** [2] - 402:1, 421:14

467:24
**27th** [3] - 421:11,
421:23, 466:13
**28** [2] - 627:8, 627:13
**29** [4] - 372:24,
376:11, 377:21,
639:11
**2:00** [1] - 531:5
**3** [3] - 384:21, 427:6,
454:20
**3.0** [1] - 373:1
**30** [8] - 372:1, 408:24,
410:9, 484:21,
485:3, 561:14,
689:15
**30(b)(6)'s** [2] - 632:13,
634:19
**30-megabyte** [1] -
484:22
**30/30** [1] - 485:3
**30/30.** [1] - 485:5
**31** [4] - 545:20,
545:22, 636:6,
674:19
**32** [23] - 361:1, 378:13,
481:11, 509:23,
512:5, 512:13,
513:9, 513:12,
529:13, 530:1,
533:14, 540:9,
552:16, 569:9,
570:1, 570:19,
570:22, 589:1,
597:1, 606:2, 606:4,
606:14, 636:5
**33** [2] - 546:16, 636:6
**3340** [2] - 484:14,
484:16
**34** [2] - 597:14, 636:6
**348** [1] - 692:10
**38** [1] - 546:16
**3rd** [5] - 427:14,
427:22, 455:23,
456:3, 457:22
**3th** [1] - 421:12
**4** [1] - 640:12
**40** [4] - 400:23,
401:11, 483:1,
488:18
**402** [2] - 647:8, 647:10
**44** [2] - 601:24, 602:10
**46** [1] - 402:2
**47** [3] - 553:4, 553:7,
553:13
**49** [3] - 430:16,
430:19, 431:1
**5** [7] - 626:24, 639:8,
640:13, 640:14,
657:21, 672:16
**50** [2] - 430:16, 431:1

**500** [2] - 400:24, 402:13
**51** [1] - 431:1
**512** [2] - 539:5, 548:18
**523** [1] - 641:6
**528** [1] - 638:24
**55** [1] - 431:1
**57** [1] - 431:1
**570** [2] - 402:6, 402:18
**59** [1] - 431:3
**5:03** [1] - 691:16
**6** [22] - 595:15, 595:16, 626:24, 627:9, 658:4, 660:8, 663:12, 663:23, 665:16, 667:11, 668:12, 675:4, 676:5, 677:16, 679:2, 685:12, 685:13, 686:5, 686:8, 686:15, 686:16
**6.57** [1] - 595:17
**6.58** [1] - 559:17
**60** [4] - 404:2, 404:3, 404:4, 484:21
**600,000** [1] - 398:2
**62** [1] - 431:3
**63** [1] - 431:5
**65** [3] - 431:5, 553:24, 554:5
**66** [1] - 431:5
**67** [1] - 431:5
**68** [1] - 431:6
**692** [1] - 692:10
**6A** [1] - 348:11
**7** [10] - 459:15, 459:16, 471:23, 552:12, 595:16, 660:8, 663:12, 686:11, 686:13, 687:15
**70's** [1] - 448:14
**701** [1] - 380:21
**702** [2] - 544:17, 546:9
**703** [1] - 650:13
**75** [3] - 403:7, 403:18, 403:19
**797** [1] - 454:19
**8** [8] - 348:10, 400:22, 401:3, 401:20, 424:21, 455:21, 598:7, 692:11
**80** [1] - 403:8
**807** [3] - 376:5, 376:7, 377:2
**810** [2] - 371:21, 372:4
**844** [1] - 348:12
**8th** [1] - 692:15
**9** [2] - 418:12, 424:13
**905** [2] - 584:2

**95** [4] - 548:18, 548:19, 549:1, 549:10
**99** [2] - 558:20, 566:5
**9:00** [1] - 348:10
**9:30** [2] - 688:10, 688:12
**9th** [1] - 639:24
**a.m** [2] - 348:10, 438:14
**A9** [2] - 494:17, 495:1
**abbreviated** [1] - 620:18
**ability** [3] - 594:20, 656:13, 659:11
**able** [27] - 353:1, 357:2, 389:7, 395:21, 397:3, 399:2, 399:21, 400:5, 400:7, 425:20, 427:19, 443:21, 444:7, 449:6, 452:11, 457:6, 465:22, 498:16, 561:16, 561:18, 563:9, 563:10, 626:19, 652:10, 662:6, 687:12, 689:14
**above-captioned** [1] - 692:12
**absence** [1] - 556:21
**absent** [1] - 557:2
**absolute** [1] - 598:14
**absolutely** [8] - 412:24, 428:19, 476:10, 518:10, 531:2, 598:10, 598:13, 601:16
**abstract** [4] - 436:4, 453:5, 453:11, 634:11
**academics** [1] - 476:18
**Academy** [2] - 390:14, 393:10
**accent** [1] - 482:10
**accept** [2] - 488:20, 508:3
**acceptable** [24] - 534:7, 539:19, 541:1, 542:6, 543:4, 543:8, 543:14, 543:24, 544:11, 544:22, 545:9, 545:16, 545:18, 547:7, 547:23, 556:19, 559:2, 563:9, 563:23, 593:17, 595:5

595:9, 602:18, 652:7
**access** [6] - 418:20, 419:5, 456:24, 558:13, 629:24, 630:8
**accessed** [3] - 668:18, 671:2, 679:18
**accesses** [4] - 626:10, 629:1, 629:3, 645:2
**acclaimed** [1] - 476:21
**accommodate** [1] - 562:24
**accomplish** [2] - 405:24, 406:16
**according** [3] - 506:22, 593:20, 668:3
**account** [2] - 561:23, 571:8
**accounts** [2] - 374:10, 374:12
**accrue** [1] - 659:5
**accurate** [1] - 692:10
**accurately** [2] - 523:24, 524:3
**accused** [4] - 504:18, 528:14, 530:8, 587:4
**accusing** [1] - 593:6
**achieve** [8] - 405:19, 407:2, 408:22, 409:17, 419:6, 528:18, 619:8, 626:20
**achieved** [1] - 410:8
**achieving** [2] - 628:3, 628:15
**acknowledge** [1] - 501:14
**ACM** [1] - 393:12
**acquired** [13] - 368:7, 371:13, 402:19, 439:16, 440:5, 440:13, 445:1, 446:10, 616:17, 642:14, 642:17, 642:18, 642:22
**acquiring** [1] - 446:4
**acquisition** [3] - 357:22, 402:22, 440:10
**acronym** [1] - 612:19
**act** [1] - 684:24
**acting** [1] - 447:7
**active** [1] - 486:24
**activity** [1] - 626:8
**acts** [1] - 530:3
**actual** [11] - 419:18, 487:6, 514:12, 518:15, 527:15, 531:2, 591:19,

581:22, 603:18, 657:14, 663:9
**ADAM** [1] - 349:13
**add** [4] - 368:5, 559:12, 560:13, 680:16
**added** [2] - 622:13, 679:17
**adding** [5] - 512:11, 559:21, 615:9, 615:10, 615:11
**addition** [10] - 409:24, 441:3, 454:1, 487:10, 545:19, 546:22, 554:11, 605:15, 632:18, 682:17
**additional** [9] - 559:22, 615:10, 620:2, 620:18, 622:14, 678:21, 686:11, 686:17, 686:18
**address** [47] - 352:13, 527:13, 628:14, 628:24, 629:16, 630:5, 645:24, 658:23, 659:12, 664:15, 664:23, 665:3, 665:4, 665:7, 667:7, 679:4, 679:10, 679:15, 679:16, 679:17, 679:21, 679:22, 680:6, 680:7, 680:13, 680:14, 680:17, 680:22, 681:2, 681:3, 681:13, 681:15, 682:14, 682:23, 683:4, 683:8, 683:11, 683:16, 683:19, 684:2, 684:3, 684:7, 684:9, 684:12, 684:18, 685:15, 685:24
**addressed** [1] - 677:20
**addresses** [14] - 610:22, 629:15, 630:3, 630:17, 644:17, 645:6, 645:10, 645:14, 648:9, 679:8, 684:5, 684:10, 685:17, 685:21
**addressing** [2] - 502:4, 641:20
**adds** [2] - 618:20, 686:11

**admission** [1] - 546:7
**admitted** [18] - 377:4, 384:1, 385:1, 424:16, 430:10, 431:21, 432:1, 450:18, 506:11, 546:11, 546:19, 553:16, 554:8, 609:21, 650:12, 663:4, 669:16, 674:24
**Admitted** [1] - 372:6
**advantage** [3] - 373:15, 498:1, 498:2
**advantages** [8] - 374:9, 497:15, 497:19, 498:21, 543:10, 543:11, 638:10, 659:1
**advisor** [1] - 394:4
**advisory** [4] - 441:4, 444:22, 445:6, 446:20
**AFA** [2] - 377:10, 377:17
**affect** [1] - 502:8
**affectionately** [1] - 485:2
**afford** [1] - 563:10
**affordable** [1] - 492:15
**afternoon** [10] - 531:20, 565:1, 565:2, 608:6, 608:22, 608:23, 636:21, 636:23, 652:14, 691:10
**agencies** [3] - 565:15, 565:16, 566:2, 567:23
**agency** [4] - 565:12, 565:23, 567:20, 567:21
**ago** [33] - 385:15, 456:12, 457:15, 460:5, 460:7, 460:18, 461:7, 461:13, 461:21, 461:22, 461:23, 461:24, 462:4, 462:8, 463:11, 464:11, 464:13, 465:23, 466:2, 467:11, 467:18, 469:2, 469:3, 470:1, 470:7, 470:14, 471:8, 471:22, 472:9, 483:1, 525:23, 583:12, 612:9
**agree** [19] - 412:3,

480:9, 503:21,
503:24, 520:11,
528:5, 534:21,
559:24, 570:20,
577:12, 578:7,
581:9, 581:11,
582:3, 582:4,
591:12, 593:16,
664:18, 667:8
**agreed** [3] - 477:24,
510:7, 581:20
**agreeing** [1] - 635:4
**agreement** [2] -
480:15, 581:4
**agrees** [5] - 510:4,
512:9, 515:20,
521:5, 522:4
**ahead** [10] - 352:8,
445:16, 452:1,
458:11, 508:22,
533:7, 656:4, 666:9,
667:17, 673:4
**aimed** [1] - 379:16
**alert** [1] - 631:14
**algorithm** [1] - 408:19
**All-Flash** [3] - 368:10,
368:13, 444:8
**all-Flash** [4] - 377:14,
377:17, 591:1, 592:3
**All-FlashArray** [2] -
371:19, 376:8
**allocation** [3] -
671:16, 671:17,
671:19
**allow** [6] - 350:23,
437:7, 466:23,
468:12, 539:23,
630:1
**allowed** [4] - 351:16,
383:15, 451:18,
467:15
**allows** [4] - 391:17,
630:12, 658:16,
659:12
**almost** [4] - 483:1,
488:18, 532:6,
616:23
**alone** [1] - 567:10
**alternative** [13] -
534:3, 539:10,
541:1, 543:5,
543:14, 545:9,
545:16, 563:24,
564:8, 593:10,
593:14, 593:20,
601:6
**alternatives** [10] -
530:22, 533:18,
533:19, 534:8,
535:1, 537:17,

537:18, 540:2,
542:7, 563:15
**altogether** [1] - 404:20
**Amdel** [5] - 486:12,
486:17, 486:23,
486:24, 487:5
**America** [1] - 398:2
**amount** [14] - 493:14,
498:15, 557:5,
559:11, 561:5,
561:7, 561:17,
562:4, 601:3,
618:17, 633:14,
635:12, 660:5,
681:21
**amounts** [2] - 489:17,
490:24
**analogy** [1] - 390:10
**analysis** [26] - 358:12,
361:8, 423:15,
507:24, 560:14,
579:22, 581:20,
592:15, 593:21,
626:11, 653:7,
657:15, 659:19,
660:20, 663:9,
663:10, 668:21,
668:23, 669:20,
671:7, 672:11,
679:9, 684:23,
686:10, 687:8,
687:23
**analyze** [3] - 591:23,
595:13, 600:21
**analyzed** [7] - 471:8,
560:6, 591:15,
592:7, 659:17,
664:22, 665:21
**ANDREWS** [1] -
348:14
**Andy** [1] - 376:18
**Aneel** [1] - 447:7
**animation** [8] - 494:8,
495:6, 513:18,
517:13, 523:17,
523:20, 523:24,
525:1
**announced** [1] - 373:1
**annual** [1] - 449:21
**answer** [21] - 352:15,
355:22, 415:1,
415:4, 417:3,
449:23, 451:18,
451:21, 459:16,
460:2, 461:11,
463:23, 464:4,
468:3, 468:6, 468:7,
470:13, 471:2,
594:1, 670:9, 673:4
**Answer** [2] - 459:23,

464:2
**answering** [2] - 474:3,
474:4
**anticipate** [2] -
353:17, 363:23
**anticipated** [1] -
389:21
**anticipation** [4] -
434:6, 436:9,
437:19, 438:5
**anyhow** [1] - 416:1
**anyway** [1] - 574:16
**apart** [5] - 362:3,
485:18, 486:8,
505:16, 588:22
**apologize** [3] -
353:18, 353:19,
624:14
**appear** [4] - 641:7,
650:20, 683:20
**APPEARANCES** [2] -
348:17, 349:1
**appeared** [1] - 471:9
**appliances** [2] -
566:8, 566:13
**applicability** [1] -
646:1
**application** [3] -
369:5, 627:19, 646:7
**applications** [3] -
612:20, 645:14,
648:11
**applied** [9] - 390:16,
407:22, 622:20,
625:3, 631:8,
639:18, 646:4,
646:8, 646:18
**applies** [1] - 658:6
**apply** [4] - 410:2,
509:11, 509:17,
621:14
**applying** [4] - 622:24,
623:5, 647:5, 647:13
**appreciate** [3] -
366:21, 366:22,
478:9
**approach** [10] -
382:17, 410:4,
438:21, 452:16,
479:10, 479:12,
608:18, 622:24,
636:1, 636:18
**approached** [1] -
446:21
**approaches** [2] -
449:5, 502:1
**appropriate** [2] -
415:15, 689:13
**approved** [1] - 636:10
**April** [1] - 427:6

427:14, 427:22,
440:21, 444:23,
455:23, 456:3,
457:22
**architect** [1] - 554:14
**architectural** [19] -
425:2, 425:4, 425:8,
425:12, 425:17,
426:1, 426:14,
427:5, 429:3, 430:7,
431:10, 455:20,
455:22, 460:8,
462:11, 462:17,
553:21, 554:2, 590:4
**architecture** [7] -
422:9, 425:5, 487:8,
553:2, 553:8,
654:24, 658:15
**architectures** [3] -
614:8, 654:22
**archival** [2] - 442:18,
452:16
**archive** [1] - 424:9
**archiver** [1] - 442:18
**area** [3] - 376:1,
615:24, 618:7
**areas** [3] - 375:24,
614:9, 629:2
**arena** [1] - 489:16
**Argon** [1] - 654:4
**arguing** [1] - 665:2
**argument** [4] - 352:23,
354:17, 664:15,
665:2
**argumentative** [1] -
582:24
**arguments** [2] - 664:9,
664:18
**arranged** [1] - 538:2
**array** [9] - 367:24,
368:1, 368:2,
377:18, 527:14,
602:9, 656:8, 656:9,
659:21
**arrayed** [1] - 656:11
**Arrays** [2] - 641:2,
641:9
**arrays** [3] - 559:4,
597:21, 598:6
**arrive** [1] - 659:19
**arrived** [2] - 487:5,
497:7
**arrow** [4] - 573:23,
573:24, 574:8,
574:21
**arrows** [2] - 521:24,
575:5
**ARSHT** [1] - 348:19
**art** [18] - 433:22,
434:4, 435:7,

437:24, 438:2,
465:2, 640:19,
641:17, 642:2,
642:9, 646:9,
646:13, 646:18,
646:24, 647:5,
648:17, 684:1, 684:7
**article** [3] - 398:1,
437:10, 639:2
**articles** [1] - 638:22
**ASIC** [2] - 612:16,
612:18
**aside** [1] - 413:4
**aspect** [2] - 405:16,
658:24
**aspects** [4] - 560:20,
615:21, 658:2,
669:11
**asserted** [5] - 481:7,
534:8, 554:19,
555:1, 605:16
**asserting** [2] - 570:22,
627:10
**assign** [3] - 515:11,
539:2, 685:20
**assigned** [13] - 515:4,
515:23, 571:17,
619:1, 628:9,
664:23, 665:5,
679:11, 680:9,
684:13, 685:15,
685:17, 686:2
**assignee** [2] - 385:17,
500:5
**assigning** [2] -
535:24, 684:24
**assignments** [2] -
565:8, 565:17
**assigns** [4] - 514:22,
515:17, 515:20,
684:20
**assistance** [1] - 371:8
**associated** [8] -
398:8, 416:16,
498:11, 501:3,
507:6, 536:7, 539:9,
610:21
**assume** [4] - 359:12,
457:13, 531:20,
600:17
**assuming** [2] - 459:7,
691:8
**assumption** [2] -
459:9, 470:2
**assurance** [1] -
487:23
**assure** [1] - 415:8
**atmosphere** [1] -
617:5
**attempt** [1] - 453:18

attempted [1] - 448:20
attempts [2] - 501:21, 501:23
attend [2] - 449:14, 568:14
attended [6] - 434:18, 450:1, 451:9, 452:4, 482:11, 568:8
attending [1] - 451:11
attention [3] - 365:9, 627:7, 649:6
attenuated [1] - 357:6
attorneys [1] - 647:3
attributable [3] - 356:14, 357:8, 404:6
August [1] - 639:24
authentic [1] - 435:15
authenticity [3] - 435:11, 435:21, 437:23
author [1] - 641:1
authors [1] - 376:17
auto [1] - 409:15
availability [3] - 374:5, 435:12, 437:22
available [7] - 373:7, 534:7, 589:18, 589:19, 589:20, 590:14, 614:20
Avamar [2] - 642:23, 642:24
average [15] - 560:7, 561:14, 562:22, 595:12, 595:23, 596:23, 598:8, 598:23, 600:6, 601:3, 601:9, 601:12, 603:2, 603:5, 662:8
averaged [1] - 562:8
averages [1] - 560:15
avoid [7] - 388:23, 395:5, 537:22, 538:8, 540:7, 542:2, 542:14
awarded [1] - 384:10
awards [3] - 393:1, 393:3, 393:6
aware [14] - 363:1, 437:24, 444:6, 444:9, 445:5, 445:20, 445:21, 446:5, 446:19, 448:4, 460:15, 678:18, 687:6, 687:14
awfully [1] - 532:15
B-E-R-M-I-N-G-H-A-M [1] - 608:11
Babson [1] - 612:2

Bachelor [2] - 482:22, 653:20
bachelors [1] - 483:4
background [36] - 476:14, 482:7, 482:8, 489:4, 489:5, 493:19, 493:22, 493:23, 494:6, 494:19, 494:22, 495:3, 495:7, 495:9, 495:24, 497:12, 497:16, 497:24, 498:12, 498:14, 498:22, 504:4, 543:11, 543:23, 547:19, 548:21, 549:4, 592:24, 593:4, 593:7, 593:9, 611:8, 639:9, 639:14, 639:20, 653:19
backing [1] - 513:19
backup [10] - 387:5, 396:7, 398:3, 398:9, 405:21, 442:11, 442:13, 442:16, 443:1, 591:5
balance [3] - 615:6, 617:7, 626:4
ballpark [2] - 364:4, 392:22
Bank [1] - 398:1
banks [1] - 613:8
bar [5] - 397:9, 412:7, 412:8, 650:6, 650:7
base [44] - 369:3, 369:5, 369:18, 370:2, 370:11, 511:8, 628:9, 628:14, 628:23, 629:14, 629:16, 630:3, 630:5, 644:17, 645:6, 645:9, 645:14, 645:24, 648:9, 658:23, 659:11, 664:15, 664:22, 665:3, 679:4, 679:7, 679:10, 680:5, 680:7, 680:14, 680:17, 680:22, 681:2, 681:3, 681:12, 681:15, 682:14, 682:22, 684:12, 684:18, 685:14, 685:16, 685:20, 685:24
based [29] - 351:9, 397:9, 400:1, 425:19, 426:8,

427:23, 428:19, 429:7, 455:15, 455:17, 458:20, 458:21, 556:16, 561:6, 562:14, 562:21, 563:2, 563:4, 592:1, 593:21, 595:11, 601:1, 659:22, 674:8, 674:17, 678:17, 678:23, 684:23, 691:3
bases [2] - 369:21, 578:23
basic [3] - 620:8, 621:5, 622:16
basing [1] - 670:11
basis [4] - 396:10, 633:8, 634:24, 635:2
bat [1] - 480:2
battle [1] - 363:13
became [5] - 439:12, 454:15, 498:12, 615:20, 615:23
become [4] - 445:5, 445:20, 446:19, 567:17
becomes [1] - 620:24
BEFORE [1] - 348:14
began [1] - 368:2
begin [3] - 374:8, 374:18, 577:11
beginning [2] - 506:24, 681:5
begins [1] - 666:11
behind [2] - 373:14, 678:1
believes [2] - 563:17, 586:10
Bell [1] - 453:17
below [7] - 373:10, 378:1, 658:14, 672:17, 677:17, 678:14, 679:15
Ben [2] - 394:1, 410:24
benchmarking [1] - 560:22
bend [1] - 498:6
benefit [9] - 369:10, 369:19, 370:10, 370:13, 388:6, 403:12, 662:2, 662:9, 666:19
benefits [5] - 369:15, 619:21, 626:2, 642:8, 659:5
Berkley [1] - 638:14
Bermingham [12] - 608:1, 608:10,

608:22, 609:2, 627:2, 636:22, 649:5, 649:23, 655:23, 656:22, 658:5, 658:12
BERMINGHAM [1] - 608:13
Bermingham's [1] - 664:5
best [7] - 380:17, 381:1, 392:12, 392:13, 447:16, 617:8
bet [1] - 532:9
better [16] - 378:21, 391:10, 391:11, 398:24, 449:3, 449:4, 499:9, 503:7, 511:6, 619:8, 622:7, 623:20, 624:17, 624:18, 649:14, 651:14
between [17] - 427:21, 460:1, 462:16, 472:3, 490:2, 492:6, 497:10, 515:16, 520:6, 520:24, 535:16, 570:16, 575:6, 577:19, 577:23, 645:17, 667:19
beyond [3] - 453:4, 465:11, 643:3
Bhusri [1] - 447:8
big [10] - 357:7, 370:10, 377:13, 419:1, 437:3, 460:1, 484:20, 615:23, 668:6
Biles [1] - 394:12
billion [8] - 400:24, 401:2, 402:21, 402:23, 403:3, 403:4, 403:6
billions [1] - 618:20
binder [17] - 371:22, 376:5, 383:20, 424:20, 430:18, 433:12, 433:17, 433:21, 438:22, 450:4, 479:10, 506:1, 554:1, 609:11, 636:17, 657:17, 666:6
binders [2] - 382:17, 564:17
Birmingham [2] - 322:2, 656:15
bit [32] - 383:19, 385:16, 481:13,

481:16, 481:24, 482:8, 498:4, 504:4, 504:24, 513:19, 526:11, 533:5, 560:18, 580:17, 584:3, 585:19, 611:7, 614:2, 620:13, 620:19, 621:11, 622:14, 626:4, 626:11, 638:8, 644:16, 656:4, 656:6, 659:13, 667:6, 681:1, 689:4
bites [1] - 539:5
bits [4] - 423:15, 618:15, 618:20, 622:12
black [1] - 668:2
Blacksburg [2] - 653:4, 654:11
Block [6] - 682:3, 682:5, 682:6, 682:7, 682:13, 682:19
block [5] - 454:2, 496:8, 514:10, 626:10, 680:18
blocks [3] - 490:19, 539:3, 682:9
Blocks [2] - 681:24, 682:16
blog [2] - 545:5, 545:19, 545:24, 546:15, 546:24, 550:7
blow [2] - 584:2, 665:14
blown [2] - 661:17, 672:5
BLUMENFELD [1] - 348:19
board [48] - 411:7, 411:8, 411:9, 411:15, 416:10, 416:14, 418:3, 421:14, 428:12, 428:14, 428:20, 440:13, 440:16, 441:4, 444:22, 445:6, 446:20, 447:8, 468:5, 468:19, 469:24, 470:9, 470:17, 471:10, 555:17, 628:21, 641:24, 663:21, 664:2, 667:5, 667:23, 668:1, 668:17, 669:21, 669:23, 669:24, 670:15,

670:16, 670:17, 671:2, 678:1, 678:4, 678:8, 678:9, 686:20, 687:3, 687:4
**boards** [16] - 423:18, 428:17, 462:24, 471:12, 471:16, 628:12, 628:19, 658:22, 667:15, 667:20, 670:3, 670:21, 671:18, 686:23, 687:1, 687:11
**body** [1] - 358:2
**book** [5] - 491:11, 553:5, 555:18, 555:20, 555:23
**bore** [1] - 656:2
**born** [2] - 389:24, 612:11
**Boston** [1] - 612:1
**bother** [1] - 584:14
**bottom** [3] - 661:10, 661:18, 665:10
**bought** [7] - 370:20, 440:6, 445:7, 445:24, 446:9, 446:16, 457:2
**box** [4] - 407:6, 464:18, 619:16, 643:14
**boxes** [3] - 464:8, 619:13, 678:21
**branded** [1] - 613:13
**break** [7] - 386:2, 407:1, 432:19, 432:24, 531:4, 631:15, 689:12
**breaks** [1] - 383:12
**Brian** [3] - 376:18, 394:12, 690:14
**brief** [3] - 367:1, 434:16, 657:13
**briefly** [12] - 352:13, 381:10, 386:24, 393:22, 434:21, 439:8, 479:20, 492:23, 500:19, 501:19, 655:21, 676:22
**bring** [11] - 424:5, 468:19, 532:13, 561:16, 620:11, 632:15, 635:21, 661:8, 665:12, 673:2, 685:11
**bringing** [2] - 366:22, 366:23
**British** [3] - 483:7, 483:13, 483:19

**broad** [2] - 645:19, 646:1
**brought** [1] - 620:3
**build** [17] - 389:5, 389:7, 395:21, 395:23, 405:12, 405:18, 409:2, 419:9, 429:6, 429:12, 429:19, 431:17, 444:2, 449:6, 449:8, 451:15, 600:18
**building** [5] - 400:2, 406:11, 448:15, 473:18, 532:19
**built** [3] - 666:2, 666:18, 666:20
**bulky** [1] - 651:9
**bulletin** [1] - 373:11
**bunch** [3] - 415:5, 633:18, 663:21
**burden** [2] - 569:3, 630:21
**business** [5] - 500:16, 612:3, 615:16, 615:21, 616:2
**busy** [3] - 399:16, 429:13, 429:17
**buy** [3] - 497:23, 563:7, 599:24
**BY** [65] - 348:19, 348:22, 348:22, 348:23, 348:23, 349:3, 349:8, 349:9, 349:11, 349:12, 349:13, 349:13, 367:16, 372:8, 377:6, 380:5, 382:22, 384:3, 385:5, 417:7, 420:1, 424:18, 430:12, 432:2, 439:2, 445:17, 450:20, 452:3, 453:12, 454:13, 458:3, 460:20, 465:15, 474:9, 475:20, 479:16, 489:2, 506:13, 509:1, 525:13, 533:10, 545:1, 546:21, 549:12, 553:18, 554:10, 564:24, 583:5, 601:23, 604:12, 608:21, 609:23, 636:20, 642:5, 643:10, 646:16, 647:20, 649:4, 649:15, 652:13, 655:12,

661:12, 663:6, 669:18, 675:2
**byte** [1] - 548:18
**C.A** [1] - 348:6
**C4** [3] - 496:9, 496:11, 496:21
**cache** [3] - 418:17, 418:18, 511:5
**calculate** [1] - 625:5
**calculating** [1] - 625:11
**calculation** [8] - 562:7, 620:20, 623:6, 627:18, 647:24, 658:11, 676:23, 677:21
**calculations** [3] - 561:24, 623:6, 647:23
**California** [6] - 397:20, 397:22, 611:11, 611:14, 616:9, 616:16
**camera** [26] - 411:9, 411:10, 420:20, 420:22, 424:3, 424:5, 463:5, 463:6, 463:7, 463:8, 463:9, 463:10, 463:13, 463:15, 463:16, 464:1, 464:3, 464:6, 464:7, 464:9, 464:12, 464:17, 465:17, 465:20, 466:4, 468:20
**cameras** [2] - 411:12, 475:23
**Canada** [1] - 483:23
**candidly** [1] - 365:17
**cannot** [2] - 397:7, 462:20
**capabilities** [1] - 659:8
**capable** [2] - 574:16, 574:18
**capacity** [23] - 485:23, 486:1, 559:22, 560:10, 561:18, 561:20, 563:7, 592:14, 592:15, 592:17, 595:8, 596:13, 598:21, 599:18, 600:4, 600:6, 600:18, 600:22, 602:7, 602:14, 602:23, 603:6, 635:15
**capital** [1] - 477:12
**capitol** [3] - 390:3, 394:9, 447:10

**captioned** [1] - 692:12
**captured** [1] - 418:5
**career** [4] - 392:12, 393:7, 476:21, 567:2
**cartoon** [2] - 572:18, 585:19
**case** [82] - 354:11, 354:13, 355:14, 355:23, 358:11, 358:20, 368:18, 369:4, 370:7, 379:17, 384:19, 385:9, 389:3, 392:18, 403:18, 425:22, 427:10, 428:3, 428:6, 428:23, 434:9, 436:9, 436:20, 442:1, 443:11, 465:2, 478:7, 480:3, 482:4, 485:8, 486:6, 486:19, 489:6, 489:8, 495:1, 495:18, 496:8, 497:2, 499:6, 499:8, 499:12, 499:17, 500:7, 500:14, 503:15, 504:18, 508:12, 508:15, 516:9, 524:2, 533:20, 533:22, 536:6, 547:1, 565:23, 566:9, 566:19, 566:22, 578:14, 590:5, 598:1, 603:5, 619:8, 620:19, 622:12, 622:13, 627:10, 633:9, 634:22, 638:5, 647:11, 653:16, 656:20, 681:4, 681:6, 681:8, 681:9, 688:16, 688:21, 689:6, 689:23
**cases** [19] - 369:11, 369:12, 369:13, 369:18, 369:21, 369:22, 370:3, 370:4, 370:11, 377:14, 379:13, 426:20, 428:4, 565:4, 567:10, 567:13, 567:22, 567:24, 619:17
**cassette** [1] - 395:16
**Castle** [1] - 692:2
**catch** [4] - 374:8, 374:18, 374:19, 394:9

**caused** [1] - 371:15
**causes** [1] - 543:18
**CD** [1] - 504:14
**cell** [1] - 411:11
**center** [6] - 395:20, 396:7, 398:18, 407:11, 514:6, 619:12
**centers** [5] - 395:13, 395:24, 396:14, 429:8, 429:10
**central** [3] - 619:16, 643:14, 649:17
**CEO** [5] - 439:9, 447:7, 477:11, 545:4, 555:16
**certain** [19] - 416:7, 428:15, 428:19, 437:24, 459:19, 467:1, 476:3, 476:10, 487:24, 503:4, 503:7, 508:9, 518:10, 539:5, 557:17, 586:11, 635:11, 648:11, 687:20
**certainly** [13] - 359:23, 364:14, 366:12, 370:10, 446:5, 491:9, 508:9, 532:6, 588:14, 600:8, 633:6, 635:6, 690:21
**CERTIFICATE** [1] - 692:5
**certificate** [1] - 482:20
**certification** [1] - 482:17
**Certified** [1] - 692:8
**certify** [1] - 692:9
**challenge** [5] - 399:1, 406:11, 407:9, 594:5, 595:18
**challenged** [3] - 435:20, 476:23, 477:4
**challenges** [2] - 389:6, 408:6
**challenging** [1] - 448:22
**chance** [5] - 471:5, 471:7, 580:2, 649:14, 654:10
**change** [7] - 427:24, 428:9, 466:24, 467:2, 533:23, 538:7, 604:11
**changed** [7] - 387:11, 396:9, 466:21, 467:3, 539:16, 539:21, 540:6

changes [18] - 373:10, 427:20, 428:7, 428:10, 476:1, 538:11, 538:13, 538:16, 538:18, 540:15, 540:22, 541:23, 542:1, 542:6, 542:13, 563:16, 563:22
changing [4] - 475:23, 540:11, 541:17, 542:18
characteristics [1] - 626:1
characterizes [1] - 523:24
charge [1] - 375:14
charging [1] - 403:9
chart [3] - 597:4, 597:6, 597:17
cheap [1] - 492:8
check [16] - 465:22, 503:2, 503:6, 503:7, 503:9, 503:10, 512:11, 515:14, 536:21, 537:2, 579:12, 596:20, 667:5, 677:23, 678:14, 678:20
checked [4] - 465:19, 524:18, 524:19, 664:3
checking [5] - 523:18, 572:1, 572:3, 572:4, 575:13
checkmark [3] - 506:23, 510:6, 529:20
checks [4] - 502:21, 503:1, 518:9, 536:20
chest [1] - 484:20
chief [2] - 439:13, 554:13
China [11] - 389:24, 390:1, 390:5, 390:13, 390:18, 391:5, 391:6, 391:8, 391:13, 391:18, 392:8
Chinese [1] - 390:14
chip [2] - 612:21, 612:23
chips [3] - 407:19, 662:14, 668:3
choice [1] - 541:4
Chongqing [1] - 390:2
choose [1] - 492:2
chose [3] - 360:9, 593:15, 599:12
Chris [2] - 610:9,

637:3
Christopher [1] - 637:2
chunk [1] - 630:9
chunks [1] - 622:4
circle [1] - 392:4
circuit [4] - 612:20, 686:23, 687:1, 687:3
circuits [1] - 483:17
circumventing [1] - 634:6
cite [1] - 361:7
cited [4] - 579:21, 580:10, 580:13, 580:17
cites [1] - 361:8
city [1] - 390:2
City [3] - 482:11, 482:17, 482:20
claim [123] - 361:1, 438:4, 470:15, 471:23, 481:5, 481:7, 481:11, 503:14, 503:17, 503:19, 503:22, 504:1, 504:5, 506:21, 506:23, 507:3, 507:9, 507:11, 507:17, 509:14, 509:18, 509:23, 510:9, 511:1, 511:21, 511:23, 513:2, 521:7, 521:14, 522:5, 522:23, 523:1, 523:6, 525:24, 527:3, 527:5, 527:8, 528:1, 528:7, 528:15, 528:24, 529:22, 530:1, 530:4, 530:7, 530:13, 533:14, 535:4, 535:5, 535:21, 535:22, 536:2, 536:13, 537:6, 538:8, 540:8, 540:9, 568:23, 569:9, 569:13, 569:18, 569:21, 570:1, 570:5, 570:19, 570:21, 570:22, 571:15, 571:20, 571:23, 584:7, 587:11, 589:1, 589:3, 605:16, 606:1, 606:4, 606:8, 606:9, 606:14, 606:18, 626:24, 627:9, 627:13, 628:2,

663:12, 663:23, 664:11, 665:9, 665:16, 665:24, 667:11, 668:4, 668:12, 668:14, 668:19, 668:22, 672:16, 672:18, 672:21, 675:4, 676:5, 677:17, 677:24, 678:13, 679:2, 682:23, 682:24, 683:13, 683:14, 683:20, 683:21, 684:11, 684:12, 684:14, 684:23, 685:18, 686:11, 686:13, 687:20, 687:23
Claim [17] - 512:5, 512:13, 513:9, 513:12, 529:13, 552:16, 658:4, 677:16, 679:2, 685:12, 685:13, 686:5, 686:8, 686:13, 686:15, 686:16, 687:15
claimed [4] - 556:12, 606:14, 665:17, 665:24
claims [47] - 360:20, 360:21, 419:19, 420:5, 428:22, 460:11, 460:22, 461:3, 461:4, 461:8, 461:14, 461:15, 461:20, 462:2, 462:10, 462:16, 470:8, 470:11, 471:3, 471:9, 471:12, 471:17, 471:19, 472:3, 472:6, 472:11, 529:11, 534:9, 534:17, 534:21, 543:6, 552:10, 552:12, 554:19, 555:1, 627:9, 657:15, 658:3, 660:8, 660:11, 663:19, 664:12, 664:16, 670:8, 670:16, 679:12, 688:1
clarify [2] - 642:1, 649:12
classes [2] - 487:8, 654:19
cleaned [1] - 633:13
clear [1] - 355:14,

373:13, 387:6, 401:19, 428:18, 455:22, 459:18, 470:3, 475:24, 477:7, 480:1, 575:15, 631:6, 641:18, 644:2, 651:3, 676:14
cleared [1] - 497:24
Clemson [1] - 653:22
CLERK [2] - 478:24, 608:8
clock [1] - 502:13
close [1] - 465:1, 472:12, 569:20
closer [2] - 615:20, 624:16
co [12] - 393:20, 393:23, 394:1, 410:24, 411:20, 471:20, 617:16, 620:7, 622:17, 623:10, 630:24, 637:4
co-founder [1] - 410:24
co-founders [2] - 393:20, 393:23, 394:1
co-inventor [2] - 411:20, 471:20
co-inventors [6] - 617:16, 620:7, 622:17, 623:10, 630:24, 637:4
coalesced [1] - 454:2
coast [1] - 611:13
Cobb [12] - 363:16, 364:1, 367:3, 367:17, 368:17, 370:20, 375:19, 377:10, 378:16, 379:20, 380:6, 382:2
code [80] - 361:8, 397:9, 505:11, 505:12, 505:13, 505:16, 518:18, 527:23, 528:23, 540:11, 541:6, 541:17, 542:23, 572:22, 573:2, 573:4, 579:3, 579:20, 579:21, 580:6, 580:13, 580:18, 581:1, 581:5, 581:9, 581:12, 581:21, 582:8, 582:14, 582:19, 583:4, 583:7, 583:10,

583:18, 584:2, 584:4, 584:5, 584:19, 584:21, 584:24, 585:5, 585:12, 585:15, 585:24, 586:3, 586:24, 588:1, 588:2, 588:8, 588:18, 588:22, 589:6, 589:16, 589:21, 590:3, 590:7, 593:12, 593:23, 594:17, 594:24, 603:15, 603:17, 603:22, 604:2, 604:5, 604:14, 604:22, 607:3, 607:8, 607:10, 607:11, 607:14, 659:23, 671:8, 672:12, 674:12, 677:5, 683:9, 683:12
coding [1] - 541:21
cofounders [5] - 385:24, 386:19, 439:6, 477:22, 478:1
cog [1] - 514:23
coined [1] - 387:18
coinventor [1] - 461:12
cold [1] - 561:19
coldest [1] - 561:12
colleague [3] - 356:24, 478:22, 608:2
colleagues [9] - 399:20, 404:16, 409:6, 410:19, 448:10, 501:9, 502:18, 551:4, 688:24
collection [1] - 656:12
College [1] - 612:2
college [7] - 390:5, 390:12, 487:1, 568:6, 568:7, 611:15, 611:22
column [3] - 627:1, 639:10, 670:13
columns [1] - 538:3
combination [1] - 629:20
combined [3] - 410:4, 658:17, 659:2
coming [9] - 352:9, 364:1, 373:20, 409:15, 494:4, 514:4, 524:16, 560:4, 608:1

**comments** [1] - 632:3
**commercial** [19] -
350:19, 351:1,
351:8, 352:1,
352:14, 352:20,
352:21, 354:5,
354:13, 361:18,
362:10, 389:8,
449:6, 449:8,
451:15, 550:22,
554:22, 555:3,
556:13
**commercialize** [4] -
443:21, 443:23,
444:7, 446:8
**commercially** [1] -
362:16
**common** [2] - 391:12,
391:15
**commonly** [2] - 625:4,
644:20
**communicate** [1] -
557:12
**community** [1] -
403:24
**compact** [1] - 408:18
**companies** [7] -
426:22, 428:4,
446:16, 488:12,
489:13, 489:17,
617:8
**COMPANY** [1] - 348:3
**company** [55] -
375:20, 386:1,
386:20, 394:12,
394:14, 394:16,
394:20, 397:6,
397:16, 397:21,
399:6, 399:23,
400:18, 413:10,
417:16, 429:4,
429:5, 439:9,
439:17, 445:7,
445:24, 446:4,
446:9, 446:11,
446:13, 456:23,
457:1, 457:10,
457:12, 472:16,
473:10, 477:18,
483:8, 486:12,
487:13, 487:14,
487:21, 488:8,
492:1, 493:7,
560:11, 613:20,
616:8, 616:12,
616:16, 616:21,
617:2, 617:3,
642:13, 642:14,
642:18, 642:21
**company's** [1] -

637:21
**comparable** [1] -
595:14
**compare** [5] - 471:11,
471:12, 519:2,
525:4, 525:5
**compared** [5] -
369:20, 470:8,
470:15, 605:3,
660:11
**compares** [3] -
482:22, 517:7, 519:3
**comparing** [7] - 396:5,
406:23, 518:3,
518:13, 518:14,
575:23, 663:18
**comparison** [8] -
460:8, 462:10,
462:16, 471:24,
472:2, 518:19,
519:5, 605:3
**compensate** [1] -
557:5
**compensation** [1] -
653:14
**compete** [2] - 351:20,
398:20
**competing** [1] -
673:10
**competition** [3] -
376:8, 379:5, 379:14
**competitive** [3] -
373:11, 379:11,
398:24
**Competitive** [4] -
376:2, 376:23,
377:20, 378:2
**competitors** [1] -
375:21
**complete** [1] - 404:18
**completely** [6] -
542:17, 564:4,
585:3, 585:4,
585:13, 616:9
**completeness** [1] -
423:22
**complex** [1] - 518:23
**components** [2] -
443:10, 615:10
**compound** [1] - 410:6
**compress** [1] - 422:10
**compressed** [1] -
553:21
**compression** [30] -
370:3, 370:6, 370:9,
370:12, 370:16,
387:16, 388:15,
388:19, 398:22,
399:3, 405:6, 405:7,
406:20, 406:24,

407:2, 407:7,
408:22, 408:23,
409:16, 409:18,
409:20, 410:2,
410:5, 410:6, 410:7,
448:15, 473:6,
473:12
**comprised** [1] -
628:19
**comprises** [1] - 676:7
**comprising** [4] -
504:8, 507:5, 535:9,
535:10
**compromised** [1] -
398:6
**computation** [5] -
629:8, 672:24,
673:6, 673:17,
677:11
**computed** [2] -
658:13, 676:18
**computer** [44] -
388:16, 466:1,
481:20, 482:14,
485:10, 487:8,
488:11, 489:14,
491:9, 495:10,
495:11, 504:6,
504:7, 504:8,
504:10, 504:12,
504:14, 504:15,
504:19, 507:1,
519:17, 526:7,
527:19, 527:20,
560:21, 561:21,
582:5, 606:9,
612:21, 612:23,
630:15, 638:13,
644:21, 652:18,
652:24, 653:21,
653:24, 654:4,
654:8, 654:22,
662:14, 679:23,
684:7
**computers** [5] - 488:4,
490:1, 490:10,
490:13, 492:6
**Computing** [1] - 641:3
**computing** [2] - 625:9,
677:10
**concede** [1] - 577:10
**conceived** [18] -
410:21, 417:9,
417:19, 417:24,
419:18, 420:4,
420:10, 422:13,
425:11, 426:11,
426:15, 428:22,
429:1, 429:15,
435:6, 472:1, 476:4,
476:6, 472:1, 476:4,

476:7
**concentrate** [1] -
688:22
**concept** [13] - 405:3,
405:5, 405:10,
420:17, 536:20,
618:1, 626:6,
627:22, 629:14,
644:18, 645:19,
646:1, 681:2
**conception** [3] -
352:6, 360:3, 434:17
**concern** [3] - 371:18,
415:17, 437:18
**concerned** [10] -
366:14, 371:16,
375:11, 375:15,
375:18, 414:10,
414:14, 414:15,
415:9, 436:15
**concerning** [2] -
375:21, 637:8
**concerns** [6] - 366:5,
373:23, 374:2,
380:9, 380:15,
452:14
**conclude** [1] - 675:8
**concluded** [6] - 483:3,
534:11, 534:12,
675:10, 676:9,
676:10
**conclusion** [6] -
379:10, 581:6,
581:20, 659:20,
660:12, 660:14
**conclusions** [2] -
653:8, 663:14
**conclusively** [1] -
510:22
**condition** [1] - 365:23
**conduct** [2] - 436:20,
438:4
**confer** [1] - 364:22
**Conference** [1] -
641:4
**conference** [10] -
434:18, 449:14,
449:15, 449:21,
450:23, 451:9,
568:9, 568:13,
568:16, 637:13
**conferring** [1] -
364:21
**confess** [1] - 412:12
**configuration** [1] -
419:9
**confirm** [5] - 417:23,
419:17, 422:12,
437:14, 456:9
**confirmed** [1] - 664:1,

677:4
**confirms** [1] - 672:13
**conflict** [1] - 395:5
**confusion** [1] - 585:5
**conjunction** [1] -
592:21
**connection** [9] -
369:4, 440:9,
526:23, 565:23,
571:2, 572:22,
578:13, 579:22,
584:7
**consider** [8] - 392:7,
552:22, 553:1,
553:19, 554:13,
561:24, 604:6,
607:10
**consideration** [1] -
361:20
**considered** [2] -
534:6, 560:15
**considering** [2] -
560:7, 562:5
**consist** [1] - 504:15
**consistent** [4] -
547:11, 548:3,
556:10, 675:19
**consisting** [1] - 490:6
**constitutes** [1] -
525:15, 586:3,
589:5, 593:13
**constituting** [1] -
573:19
**construction** [17] -
507:10, 507:18,
507:20, 508:4,
508:14, 508:19,
509:3, 509:11,
510:15, 512:20,
571:20, 668:14,
668:16, 682:24,
683:15, 683:21,
683:22
**constructions** [4] -
508:5, 509:18,
537:5, 668:23
**construed** [4] -
507:23, 508:17,
511:1, 537:13
**consultant** [1] -
441:13
**consulting** [1] -
441:23
**consume** [3] - 396:12,
410:13, 619:16
**consumes** [1] -
625:13
**consuming** [1] -
399:15
**consumption** [1] -

454:2
**Cont'd** [1] - 349:1
**contact** [1] - 532:19
**contain** [2] - 516:8, 671:23
**container** [1] - 418:18
**contains** [4] - 514:11, 516:15, 516:17, 536:8
**contemplation** [1] - 423:16
**content** [5] - 458:21, 514:15, 515:7, 515:9, 548:17
**contention** [1] - 437:20
**contents** [3] - 517:7, 524:18, 524:19
**context** [10] - 368:19, 403:14, 409:19, 614:15, 614:16, 614:22, 629:23, 630:6, 646:6, 662:20
**continue** [4] - 364:21, 366:21, 367:12, 478:1
**continued** [3] - 403:1, 444:21, 616:3
**contract** [2] - 440:21, 488:10
**contribute** [1] - 439:21
**contributed** [1] - 474:11
**contributing** [1] - 473:2
**contributors** [1] - 376:22
**control** [5] - 514:5, 626:14, 628:24, 629:24, 645:1
**controller** [19] - 490:7, 491:5, 491:6, 491:8, 494:7, 494:24, 496:8, 496:9, 497:3, 514:22, 524:17, 535:18, 536:6, 575:17, 575:20, 576:5, 576:10, 576:12, 576:24
**convenient** [1] - 669:6
**convention** [4] - 427:24, 428:9, 435:23
**conversation** [1] - 602:22
**convince** [1] - 357:1
**convinced** [1] - 429:8
**copied** [1] - 436:17
**copies** [6] - 454:1,

479:13, 495:5, 495:18, 501:6, 618:8
**coping** [1] - 501:21
**copper** [1] - 490:5
**copy** [10] - 353:14, 493:3, 493:11, 493:13, 495:7, 497:6, 618:4, 618:9, 622:11, 641:7
**core** [1] - 482:19
**corner** [7] - 379:3, 418:17, 500:5, 609:24, 652:6, 663:20, 667:24
**corners** [1] - 436:11
**corporation** [1] - 488:5
**CORPORATION** [1] - 348:3
**Correct** [2] - 637:6, 648:14
**correct** [216] - 354:10, 358:4, 368:4, 368:8, 369:1, 369:2, 369:6, 369:7, 369:10, 369:14, 369:15, 369:19, 370:1, 370:5, 370:11, 370:17, 370:18, 371:6, 371:17, 372:13, 372:14, 372:16, 372:20, 373:8, 373:24, 374:6, 375:8, 376:3, 376:9, 376:10, 376:24, 377:12, 377:19, 378:11, 378:12, 379:7, 402:1, 439:6, 440:10, 441:1, 442:3, 442:8, 444:3, 444:16, 444:23, 445:3, 446:2, 449:11, 449:19, 450:24, 451:4, 452:15, 454:16, 455:4, 455:9, 455:16, 455:20, 455:24, 456:7, 457:4, 457:12, 457:17, 457:22, 460:9, 460:23, 462:5, 465:17, 465:20, 465:23, 465:24, 466:6, 466:19, 468:12, 470:20, 480:4, 480:7, 480:17, 482:5, 496:15, 496:16, 498:20,

519:6, 519:14, 520:3, 526:3, 534:5, 538:10, 540:20, 542:8, 544:2, 547:17, 547:24, 550:3, 550:4, 563:19, 563:20, 563:24, 564:1, 564:5, 564:6, 564:9, 565:4, 565:13, 566:4, 566:14, 567:2, 567:4, 567:11, 567:15, 567:16, 567:22, 568:18, 568:19, 569:1, 569:6, 569:7, 569:19, 570:14, 571:3, 571:6, 571:14, 571:24, 572:12, 573:7, 573:10, 573:13, 573:15, 573:21, 573:22, 576:16, 576:17, 577:1, 577:11, 577:20, 578:14, 578:24, 579:11, 579:23, 580:1, 580:3, 580:21, 580:22, 581:3, 581:7, 582:12, 582:16, 583:13, 583:16, 584:9, 584:13, 584:17, 585:8, 585:17, 585:21, 587:1, 587:10, 587:14, 587:21, 588:21, 589:8, 589:10, 589:13, 589:14, 589:23, 590:1, 590:10, 590:12, 590:16, 591:7, 591:14, 591:24, 592:4, 592:5, 592:15, 593:24, 594:7, 595:1, 596:1, 596:5, 597:18, 599:1, 599:4, 609:4, 609:5, 609:18, 612:4, 613:17, 613:18, 614:13, 615:17, 626:22, 638:6, 638:11, 638:12, 638:15, 639:21, 640:1, 640:4, 640:7, 640:23, 642:11, 643:1, 643:2, 643:19, 644:1, 644:19, 648:4,

649:20, 657:2, 660:9, 674:5, 677:15, 679:5, 686:12
**corrected** [1] - 511:24
**correction** [1] - 511:21
**correspond** [1] - 671:20
**correspondence** [1] - 414:22
**corresponding** [1] - 677:24
**corroborating** [1] - 415:22
**corroboration** [1] - 416:21
**corrupted** [2] - 614:19, 621:12
**CORY** [1] - 349:12
**COS** [1] - 422:10
**cost** [24] - 398:13, 398:18, 403:17, 403:18, 405:19, 406:16, 406:18, 406:21, 406:22, 406:23, 407:5, 407:7, 614:10, 614:12, 615:3, 615:5, 615:6, 618:14, 618:21, 619:8, 619:20, 619:23
**costly** [1] - 619:9
**costs** [3] - 408:8, 615:11, 618:21
**counsel** [2] - 523:17, 649:6
**Counsel** [2] - 349:4, 349:14
**country** [3] - 390:4, 392:11, 392:12
**County** [1] - 692:2
**couple** [6] - 402:10, 439:9, 523:12, 619:19, 641:18, 687:20
**course** [17] - 355:1, 434:11, 442:1, 537:9, 566:1, 567:1, 567:12, 568:5, 578:4, 598:16, 599:22, 610:14, 619:15, 644:17, 648:2, 648:12, 671:7
**court** [3] - 352:23, 511:24, 691:16
**COURT** [193] - 348:1, 350:1, 350:6, 350:10, 350:13, 352:11, 352:16,

353:12, 353:19, 354:6, 354:16, 355:5, 355:9, 355:16, 356:8, 356:16, 357:3, 357:9, 357:18, 358:1, 358:7, 358:16, 358:21, 359:5, 359:7, 359:15, 359:21, 360:11, 360:15, 360:18, 360:23, 361:2, 361:10, 362:12, 362:17, 362:23, 363:3, 363:7, 363:11, 363:20, 363:24, 364:3, 364:6, 364:13, 364:16, 365:6, 366:1, 366:8, 366:20, 367:2, 367:8, 372:6, 377:4, 380:3, 380:22, 382:1, 382:5, 382:10, 382:18, 382:20, 384:1, 385:1, 412:2, 412:6, 412:9, 412:22, 413:1, 413:6, 413:11, 413:17, 413:19, 414:2, 414:13, 414:18, 415:3, 415:16, 416:4, 416:13, 416:19, 416:24, 417:1, 419:23, 424:16, 430:10, 431:24, 432:18, 432:23, 433:5, 433:7, 433:13, 433:24, 434:11, 434:24, 435:13, 435:19, 436:14, 437:5, 437:15, 438:6, 438:11, 438:15, 438:23, 445:15, 450:18, 451:20, 451:24, 452:23, 453:8, 454:8, 458:2, 458:8, 460:17, 461:17, 465:10, 474:2, 475:17, 478:13, 478:18, 479:11, 479:14, 488:24, 506:11, 507:14, 508:11, 525:11, 530:23, 531:3, 531:9, 531:18, 531:24, 532:8, 532:12, 532:17,

533:1, 544:23,
546:10, 546:19,
549:8, 553:16,
554:8, 564:12,
564:15, 564:19,
564:22, 583:1,
601:19, 604:10,
604:19, 607:18,
607:22, 608:4,
608:19, 609:21,
631:12, 631:24,
633:19, 634:10,
634:14, 635:1,
635:8, 635:20,
636:2, 636:7,
636:11, 636:19,
641:14, 641:19,
642:3, 643:5,
645:22, 646:14,
647:9, 647:15,
648:24, 649:13,
649:22, 650:4,
650:8, 651:7,
651:20, 652:2,
652:8, 655:10,
663:4, 669:16,
674:24, 688:3,
688:7, 690:2, 690:8,
690:17, 690:23,
691:13
**Court** [24] - 348:15,
357:1, 357:5,
364:23, 468:11,
479:13, 488:20,
507:9, 507:12,
508:20, 509:2,
509:8, 510:14,
510:20, 510:21,
511:14, 511:21,
512:19, 537:4,
537:13, 571:4,
670:24, 687:21,
687:24
**Court's** [7] - 509:17,
571:20, 668:14,
668:22, 680:13,
683:14, 683:22
**courtroom** [8] -
438:13, 531:7,
532:18, 532:23,
544:9, 550:21,
655:22, 689:7
**Courtroom** [1] -
348:11
**cover** [8] - 437:16,
454:21, 481:15,
610:1, 640:15,
658:18, 660:2, 661:9
**covered** [5] - 476:13,
589:4, 654:16,

677:16, 677:19
**covering** [1] - 657:12
**covers** [1] - 658:12
**CPU** [1] - 407:22
**create** [4] - 392:13,
399:2, 437:23,
505:14
**created** [5] - 420:20,
420:21, 429:2,
466:17, 519:18
**creating** [2] - 438:3,
592:20
**credibility** [2] -
374:12, 651:6
**cross** [5] - 363:17,
367:13, 376:5,
564:12, 691:4
**CROSS** [2] - 439:1,
564:23
**cross-examination** [5]
- 363:17, 367:13,
376:5, 564:12, 691:4
**CROSS-**
**EXAMINATION** [2] -
439:1, 564:23
**crowded** [4] - 377:22,
379:4, 379:14,
379:22
**CRUTCHER** [1] -
348:21
**curative** [3] - 350:17,
351:3, 352:5
**cure** [1] - 351:3
**current** [2] - 419:15,
458:19
**Curve** [1] - 407:17
**customer** [17] -
368:24, 398:2,
409:16, 486:5,
506:18, 562:8,
562:20, 567:18,
595:8, 600:21,
601:7, 602:12,
602:18, 602:21,
613:7, 614:20,
615:23
**customers** [22] -
409:9, 484:3,
485:21, 485:24,
486:21, 487:7,
559:8, 560:5, 562:6,
562:22, 563:1,
563:10, 592:18,
592:19, 594:3,
595:20, 600:12,
600:19, 600:24,
601:11, 603:2, 613:7
**customers'** [3] -
397:8, 614:18,
619:12

**cut** [5] - 355:18,
489:20, 565:19,
632:19, 634:7
**Dale** [3] - 692:7,
692:19, 692:20
**damages** [5] - 351:9,
356:6, 482:3,
690:10, 690:14
**data** [241] - 368:14,
369:3, 369:4, 369:9,
369:12, 369:17,
369:21, 369:23,
369:24, 370:2,
370:3, 370:10,
370:16, 387:4,
387:5, 387:13,
388:11, 388:17,
388:22, 388:24,
395:13, 395:19,
395:24, 396:7,
396:11, 396:13,
396:17, 396:21,
396:23, 397:1,
397:2, 397:6,
397:21, 398:3,
398:17, 398:18,
399:4, 405:9,
406:19, 407:9,
407:11, 407:15,
407:16, 407:17,
407:22, 408:1,
408:3, 408:9,
408:12, 408:13,
408:14, 408:15,
408:18, 408:20,
409:1, 409:15,
410:1, 410:4,
410:13, 410:15,
418:20, 418:22,
418:23, 418:24,
419:4, 419:11,
419:13, 429:8,
429:10, 436:4,
442:18, 448:14,
452:14, 453:6,
481:20, 483:17,
489:14, 489:17,
489:22, 490:2,
490:3, 490:15,
490:18, 490:20,
490:24, 491:3,
491:7, 491:12,
491:15, 491:17,
492:18, 493:2,
494:4, 494:12,
495:16, 495:19,
496:3, 496:6, 496:7,
496:21, 496:23,
497:12, 497:14,
497:22, 497:23,

498:19, 499:15,
499:22, 500:22,
501:3, 501:7,
501:11, 501:21,
502:5, 502:9,
502:16, 502:22,
503:8, 504:6,
504:12, 507:4,
507:5, 507:6, 509:9,
510:12, 511:8,
511:23, 511:24,
512:16, 512:17,
514:3, 514:10,
514:11, 514:13,
515:7, 515:12,
515:18, 515:23,
516:14, 517:12,
518:9, 518:10,
518:15, 519:3,
520:15, 521:12,
521:18, 521:19,
524:16, 527:15,
535:9, 535:10,
535:12, 535:15,
535:16, 535:17,
535:19, 535:21,
536:1, 536:8,
536:15, 539:3,
539:14, 543:16,
548:24, 549:2,
560:3, 560:6, 561:1,
561:5, 561:7, 562:3,
562:4, 562:15,
563:3, 563:4,
571:17, 592:19,
595:11, 595:12,
595:19, 595:23,
596:7, 597:22,
597:24, 598:19,
601:3, 602:4, 603:5,
603:18, 605:4,
610:18, 610:21,
610:24, 613:9,
614:16, 614:18,
615:1, 615:9,
617:13, 617:18,
617:24, 618:3,
618:8, 618:15,
619:12, 620:19,
621:2, 621:10,
621:12, 621:21,
621:24, 622:4,
622:5, 622:11,
629:8, 629:10,
654:15, 654:21,
655:8, 656:15,
657:9, 659:6, 666:1,
676:8, 676:12,
681:8, 681:21, 682:9
**Data** [126] - 350:19,

351:10, 351:11,
351:18, 352:14,
355:15, 355:23,
356:10, 356:11,
356:18, 356:21,
357:10, 357:13,
357:15, 357:16,
358:8, 368:7,
384:11, 385:16,
385:20, 386:19,
386:23, 386:24,
387:2, 387:7,
387:19, 387:21,
388:2, 388:3,
389:14, 389:17,
393:15, 393:24,
395:10, 397:4,
399:7, 399:19,
400:3, 400:8,
400:12, 400:15,
400:18, 401:14,
401:19, 402:19,
403:1, 403:5,
403:21, 404:1,
404:6, 411:20,
426:21, 432:4,
432:8, 439:6,
439:24, 440:6,
440:12, 442:6,
442:11, 442:24,
443:5, 443:20,
444:5, 444:7, 445:2,
445:23, 448:10,
457:2, 465:7,
472:15, 472:21,
473:7, 473:16,
473:18, 473:21,
474:6, 475:8, 477:9,
477:13, 499:24,
500:2, 500:4, 500:6,
500:8, 500:12,
500:17, 550:22,
551:4, 551:7, 551:8,
551:18, 551:20,
551:22, 552:2,
552:4, 552:6,
552:10, 552:16,
552:21, 552:23,
553:1, 553:7, 553:9,
553:20, 554:12,
554:14, 554:15,
554:18, 554:23,
555:2, 555:3, 555:8,
555:16, 556:2,
556:8, 556:9,
556:13, 556:14,
589:12, 589:16,
590:3, 590:17, 592:6
**databases** [1] - 490:12
**date** [40] - 351:6,
378:8, 410:21,

413:7, 413:16, 415:13, 415:20, 416:7, 416:14, 416:15, 421:6, 421:7, 421:10, 421:13, 421:21, 421:23, 421:24, 422:18, 422:19, 422:23, 423:2, 423:5, 423:7, 423:22, 454:22, 454:23, 455:3, 455:7, 455:12, 455:13, 456:7, 465:1, 465:17, 466:3, 466:10, 466:24, 467:2, 470:4, 558:6

**dated** [3] - 376:11, 411:22, 455:23

**dates** [8] - 427:4, 427:8, 431:14, 455:2, 455:11, 465:20, 465:23, 466:6

**dating** [1] - 551:14

**David** [1] - 366:7

**DAVID** [2] - 349:9, 349:13

**days** [23] - 404:14, 439:22, 444:15, 468:17, 469:24, 477:9, 561:15, 561:19, 595:24, 596:15, 596:16, 596:23, 598:4, 598:9, 598:12, 598:15, 598:19, 599:11, 599:12, 599:19, 601:13, 604:1, 607:13

**DDR** [1] - 357:15

**DDUP** [1] - 432:11

**deal** [7] - 353:22, 355:22, 440:9, 623:5, 634:5, 634:8, 634:11

**dealing** [4] - 625:23, 629:5, 630:16, 650:9

**deals** [2] - 365:1, 610:23

**dealt** [1] - 645:16

**decades** [3] - 396:19, 448:16, 611:12

**December** [3] - 431:14, 454:16, 454:22

**decide** [4] - 408:13, 408:20, 560:21, 592:21

**decided** [4] - 355:6, 394:20, 520:21, 521:10

**decides** [1] - 491:12

**deciding** [1] - 510:22

**decision** [3] - 398:16, 447:21, 517:15

**dedup** [1] - 364:12

**dedupe** [5] - 378:3, 382:8, 432:11, 593:11, 605:3

**deduplicable** [1] - 369:14

**deduplicate** [1] - 369:21

**deduplicated** [7] - 502:22, 516:5, 516:7, 517:2, 520:20, 520:22, 548:24

**deduplication** [189] - 354:11, 354:15, 356:1, 368:3, 368:6, 368:15, 369:9, 369:16, 369:19, 377:16, 378:11, 387:3, 387:15, 387:19, 387:22, 387:24, 388:2, 388:8, 388:9, 388:10, 388:20, 389:1, 389:2, 389:5, 389:10, 389:21, 399:24, 400:4, 400:5, 400:17, 400:19, 403:24, 404:6, 404:13, 404:17, 405:3, 405:5, 405:9, 405:12, 405:23, 406:3, 406:12, 409:20, 409:22, 409:23, 410:7, 423:11, 432:12, 434:22, 436:5, 442:21, 448:12, 448:19, 449:2, 453:6, 453:11, 453:15, 454:4, 473:11, 473:19, 474:7, 474:8, 474:23, 478:22, 480:2, 481:6, 481:18, 489:11, 492:19, 492:21, 492:24, 493:1, 493:10, 493:12, 493:17, 493:20, 493:22, 493:23, 494:6, 494:20,

494:22, 495:4, 495:22, 495:23, 496:1, 496:2, 496:13, 497:11, 497:15, 497:16, 498:12, 498:15, 498:21, 498:22, 499:1, 499:10, 500:20, 500:23, 500:24, 502:19, 513:20, 513:22, 514:1, 514:19, 516:1, 517:4, 520:14, 521:16, 537:22, 538:8, 538:14, 538:19, 539:17, 540:7, 540:15, 540:23, 540:24, 541:9, 542:17, 542:19, 542:20, 543:3, 543:5, 543:10, 543:11, 543:13, 543:16, 543:22, 543:23, 544:10, 545:7, 545:10, 545:11, 545:12, 545:15, 547:5, 547:12, 547:15, 547:16, 547:19, 547:23, 548:4, 548:17, 549:1, 549:2, 549:24, 550:9, 550:15, 550:19, 551:2, 551:8, 554:24, 555:8, 556:1, 556:11, 556:20, 557:3, 557:6, 557:8, 557:16, 557:19, 557:22, 557:24, 558:3, 558:7, 558:10, 558:18, 558:24, 559:2, 559:8, 559:14, 559:19, 563:18, 564:4, 580:7, 580:11, 580:18, 581:1, 581:12, 581:22, 588:8, 592:24, 594:6, 603:3, 643:1, 643:6

**Deduplication** [2] - 357:15, 357:17

**Defendant** [1] - 348:8

**Defendants** [1] - 349:14

**deficit** [1] - 374:11

**define** [1] - 511:18

**defined** [7] - 403:24,

509:8, 510:21, 512:23, 571:4, 671:1

**defining** [1] - 510:20

**definition** [7] - 409:23, 507:9, 571:7, 668:13, 679:14, 679:20, 680:14

**degree** [8] - 390:15, 392:1, 465:4, 482:23, 483:4, 611:23, 612:6, 654:2

**degrees** [2] - 561:14, 611:21

**DELAWARE** [1] - 348:1

**Delaware** [2] - 348:13, 692:1

**delay** [5] - 371:14, 498:14, 498:17, 502:9, 511:12

**delete** [1] - 495:5

**deleting** [1] - 495:6

**deliver** [6] - 522:10, 525:20, 571:12, 586:20, 587:12, 604:15

**delivered** [2] - 524:23, 571:18

**delivering** [13] - 512:24, 521:18, 523:2, 525:7, 525:15, 526:1, 526:23, 527:9, 529:18, 571:13, 571:19, 577:7, 604:6

**delivers** [1] - 521:22

**demand** [2] - 602:8, 602:13

**demands** [1] - 563:1

**demean** [1] - 572:18

**demonstrating** [1] - 669:11

**demonstrative** [2] - 524:8, 524:13

**demonstratives** [1] - 632:6

**department** [2] - 486:15, 616:14

**Department** [3] - 483:1, 483:2, 654:5

**dependent** [10] - 460:22, 461:8, 461:14, 461:15, 461:19, 462:16, 471:16, 471:23, 472:5, 686:13

**depicted** [2] - 669:1, 672:3

**depicting** [1] - 379:21

**depicts** [1] - 518:2

**deployed** [1] - 429:9

**deponent** [4] - 382:13, 479:6, 608:14, 651:22

**depos** [1] - 634:3

**deposed** [7] - 360:8, 635:14, 637:7, 637:12, 637:24, 638:2, 638:5

**deposition** [21] - 441:16, 457:14, 457:18, 458:1, 458:14, 459:14, 463:17, 467:23, 469:8, 472:8, 472:12, 472:13, 547:1, 547:4, 547:10, 581:19, 635:3, 637:16, 671:9, 671:12, 672:12

**depositions** [4] - 364:8, 505:21, 505:22, 650:10

**deputy** [2] - 532:18, 532:19

**describe** [12] - 368:24, 406:5, 408:19, 422:4, 423:13, 470:21, 501:5, 588:14, 588:17, 614:22, 630:4, 682:8

**described** [18] - 371:9, 379:22, 397:14, 409:4, 418:18, 419:4, 428:11, 428:12, 453:19, 494:3, 499:5, 511:5, 520:10, 542:19, 569:21, 573:19, 663:16, 678:12

**describes** [4] - 421:4, 495:9, 524:4, 659:24

**describing** [4] - 425:5, 499:8, 580:6, 661:24

**description** [5] - 406:14, 420:18, 501:5, 657:4, 657:7

**design** [11] - 422:9, 425:21, 425:23, 487:23, 612:16, 612:17, 613:24, 614:2, 683:11, 687:10

**designated** [1] - 632:9

**designating** [1] - 634:3

**designed** [4] - 437:20, 504:11, 505:3, 662:3

**designers** [1] - 518:23

**designing** [1] - 429:11
**designs** [3] - 534:2, 534:3, 600:14
**desirable** [1] - 502:3
**desktop** [2] - 377:10, 388:16
**despite** [2] - 371:7, 631:13
**detail** [10] - 362:11, 364:1, 365:10, 423:10, 434:21, 658:18, 662:24, 664:21, 665:8, 665:10
**detailed** [1] - 373:10
**details** [3] - 435:8, 448:6, 596:20
**deteriorates** [1] - 469:10
**determine** [6] - 471:24, 502:22, 516:19, 518:19, 663:11, 679:17
**determined** [6] - 512:17, 516:10, 516:18, 521:20, 523:3, 525:6
**determines** [2] - 517:10, 520:15
**determining** [4] - 510:8, 510:10, 510:21, 536:14
**develop** [3] - 404:16, 425:14, 615:7
**developed** [6] - 389:14, 405:22, 444:14, 483:15, 630:24, 633:2
**developing** [7] - 371:19, 400:4, 429:19, 486:15, 487:7, 488:1, 619:5
**development** [1] - 487:4
**device** [10] - 484:21, 504:13, 571:22, 572:19, 573:1, 575:17, 578:6, 581:2, 590:18, 592:12, 595:9
**devices** [9] - 408:4, 466:1, 491:16, 557:13, 558:8, 593:1, 596:3, 596:18, 618:21
**diagram** [11] - 514:2, 514:8, 525:15, 525:18, 535:14, 626:6, 668:24, 670:14, 672:3,

674:17
**Dietzen** [4] - 545:3, 546:23, 547:14, 548:2
**Dietzen's** [2] - 546:24, 548:14
**difference** [2] - 459:8, 460:1
**differences** [1] - 459:20
**different** [46] - 354:17, 368:21, 378:10, 387:8, 445:24, 446:1, 449:1, 453:24, 461:7, 467:11, 495:2, 495:21, 495:24, 519:19, 530:3, 547:18, 562:9, 565:8, 566:3, 567:10, 567:23, 567:24, 587:20, 590:22, 590:24, 591:9, 594:16, 596:17, 603:11, 616:9, 616:14, 619:15, 628:9, 629:1, 642:17, 645:17, 646:5, 646:9, 647:16, 666:12, 684:5, 685:16, 686:20
**differently** [1] - 563:18
**difficult** [5] - 395:19, 409:3, 429:22, 594:13, 624:21
**difficulties** [3] - 498:11, 498:24, 499:2
**digit** [2] - 428:6, 428:8
**digital** [3] - 411:8, 411:10, 424:3
**Digital** [1] - 642:19
**digitally** [1] - 483:17
**digits** [1] - 618:15
**direct** [8] - 364:4, 445:11, 448:10, 524:7, 604:3, 627:7, 628:1, 647:21
**DIRECT** [3] - 382:21, 479:15, 608:20
**directed** [3] - 352:19, 524:13, 644:6
**directly** [5] - 357:7, 487:11, 581:13, 581:22, 582:9
**director** [1] - 487:23
**directors** [1] - 555:17
**disabled** [3] - 559:4, 559:5, 559:7

**disabling** [2] - 542:22, 543:2
**disadvantage** [1] - 618:13
**disadvantages** [1] - 618:12
**disagree** [4] - 510:3, 512:7, 665:6, 683:2
**disagreement** [5] - 515:15, 515:21, 520:23, 578:10, 580:24
**disagrees** [10] - 513:3, 522:6, 522:7, 528:8, 544:5, 586:14, 586:16, 586:18, 586:20, 682:22
**disaster** [1] - 396:16
**disc** [1] - 485:15
**discard** [1] - 521:11
**discarded** [1] - 497:9
**disclose** [2] - 397:23, 646:24
**disclosed** [9] - 350:16, 350:24, 351:4, 351:24, 359:24, 437:19, 438:2, 450:11, 647:2
**disclosure** [1] - 352:1
**disclosures** [1] - 360:8
**discovery** [8] - 350:17, 351:15, 352:3, 352:4, 354:18, 355:1, 355:10, 360:1
**discretion** [1] - 635:12
**discuss** [12] - 433:1, 440:17, 446:21, 477:20, 506:15, 579:10, 597:6, 631:19, 678:15, 688:20, 688:24, 689:18
**discussed** [10] - 370:19, 424:11, 437:3, 454:7, 459:6, 542:22, 543:9, 569:24, 627:16, 678:22
**discusses** [2] - 453:5, 501:2
**discussing** [2] - 579:2, 688:16
**discussion** [12] - 362:2, 411:10, 412:8, 418:3, 426:7, 426:8, 453:14, 461:1, 514:10, 650:7, 657:13,

685:13
**discussions** [4] - 353:22, 411:1, 411:7, 424:9
**disengaged** [1] - 478:2
**disk** [34] - 396:6, 398:13, 398:23, 399:4, 399:21, 400:6, 405:18, 405:24, 406:17, 442:7, 443:8, 443:12, 443:15, 444:15, 484:14, 484:16, 485:6, 485:7, 485:11, 485:12, 491:21, 492:9, 492:12, 492:14, 504:14, 622:20, 625:3, 625:15, 639:23, 640:3, 656:14, 656:21, 666:11
**Disk** [2] - 641:2, 641:9
**disks** [18] - 367:22, 398:9, 398:11, 398:12, 398:17, 399:8, 443:7, 498:3, 498:4, 590:22, 624:24, 625:3, 625:16, 639:21, 649:8, 656:9, 656:10, 656:12
**display** [2] - 437:13, 661:8
**displayed** [3] - 470:16, 598:17, 641:23
**displaying** [1] - 632:12
**dispute** [14] - 355:23, 356:3, 481:2, 481:4, 503:16, 503:18, 520:6, 570:8, 577:19, 577:23, 578:2, 589:3, 687:14, 687:17
**disputed** [4] - 504:3, 641:20, 678:19, 679:3
**disregard** [1] - 417:4
**distinct** [2] - 497:19, 526:12
**distinction** [2] - 356:24, 357:5
**distributed** [2] - 629:23, 686:23
**DISTRICT** [2] - 348:1, 348:1
**District** [1] - 348:15
**divided** [10] - 425:24,

668:4, 668:9, 670:17, 672:1, 672:2, 672:4, 672:7, 678:9, 678:11
**dividing** [1] - 648:15
**division** [3] - 642:17, 654:4, 671:17
**Doctor** [42] - 352:18, 352:20, 354:4, 430:13, 432:15, 432:21, 444:19, 445:18, 449:23, 450:21, 453:15, 466:9, 467:23, 468:13, 469:21, 470:12, 471:22, 472:16, 544:4, 548:2, 550:21, 551:4, 551:16, 554:22, 556:18, 577:19, 578:6, 579:7, 580:2, 581:11, 581:19, 582:9, 595:15, 597:2, 631:23, 633:2, 650:3, 652:14, 655:7, 655:13, 690:4, 690:8
**doctor** [6] - 432:23, 439:21, 451:16, 470:23, 548:14, 690:7
**doctorate** [3] - 391:21, 391:24, 392:8
**doctrine** [5] - 528:11, 528:14, 529:1, 586:4, 586:6
**document** [41] - 376:8, 376:18, 377:7, 377:8, 378:9, 379:11, 379:19, 384:7, 385:7, 412:20, 424:19, 424:24, 425:1, 425:5, 425:6, 426:7, 427:16, 427:17, 427:21, 427:22, 428:11, 428:16, 428:20, 436:11, 455:23, 456:10, 456:11, 457:6, 457:22, 459:6, 459:20, 459:21, 502:11, 514:16, 548:13, 548:17, 549:6, 549:10, 553:20, 627:4, 674:16
**documentation** [4] - 550:6, 551:11,

552:22, 554:12
**documents** [20] -
412:11, 416:9,
430:23, 431:7,
431:13, 431:20,
441:18, 442:3,
442:4, 506:3, 548:6,
548:9, 640:21,
659:22, 661:4,
667:2, 670:12,
671:10, 674:8,
674:12
**dollar** [2] - 486:4,
618:21
**dollars** [3] - 402:21,
403:16, 567:14
**domain** [1] - 397:23
**Domain** [112] - 350:20,
351:8, 351:9,
351:10, 351:11,
352:14, 355:15,
355:23, 356:10,
356:11, 356:18,
356:21, 357:10,
357:13, 357:15,
357:16, 358:8,
368:7, 384:11,
385:16, 385:20,
386:19, 386:24,
387:2, 387:7,
387:19, 388:2,
388:4, 389:14,
389:17, 393:15,
393:24, 395:10,
397:4, 399:7,
399:19, 400:3,
400:8, 400:12,
400:15, 400:18,
401:14, 401:19,
402:19, 403:1,
403:5, 404:1, 404:6,
411:20, 426:21,
432:4, 432:8, 439:6,
439:24, 440:6,
440:12, 442:6,
442:11, 442:24,
443:5, 443:20,
444:5, 444:7, 445:2,
445:23, 448:11,
457:2, 465:7,
472:15, 472:21,
473:7, 473:16,
473:18, 473:21,
474:6, 475:8, 477:9,
477:14, 499:24,
500:2, 500:4, 500:7,
500:9, 500:13,
500:17, 550:22,
551:4, 551:8,
551:18, 551:21,

551:22, 552:3,
552:4, 552:10,
552:16, 552:23,
553:1, 553:7,
553:20, 554:14,
554:15, 554:23,
555:2, 555:9,
555:16, 556:14,
589:12, 589:16,
590:3, 590:18, 592:6
**Domain's** [14] -
351:18, 387:21,
403:21, 551:7,
552:7, 552:21,
553:10, 554:12,
554:18, 555:3,
556:2, 556:8, 556:9,
556:13
**DOMINGUEZ** [5] -
348:23, 372:5,
377:3, 380:5, 381:23
**done** [23] - 352:6,
393:13, 416:10,
423:4, 460:7,
460:17, 462:15,
471:23, 503:2,
503:3, 503:5, 503:9,
538:7, 538:12,
540:18, 548:20,
592:2, 593:21,
593:24, 617:4,
624:13, 624:23,
690:15
**door** [1] - 365:3
**dot** [2] - 428:2, 428:7
**double** [2] - 407:20,
618:16
**doubled** [1] - 402:13
**down** [21] - 374:4,
374:7, 382:2,
385:15, 386:2,
401:3, 401:9,
426:13, 432:24,
478:14, 508:3,
508:6, 531:10,
607:19, 625:2,
632:19, 634:7,
636:9, 649:24,
662:17, 679:15
**Dr** [67] - 357:22, 359:3,
359:4, 359:23,
360:6, 364:2, 382:7,
382:23, 383:20,
385:7, 405:2, 417:2,
422:5, 424:20,
433:8, 433:10,
434:8, 434:18,
437:24, 438:19,
438:21, 439:3,
439:5, 443:16,

454:5, 454:14,
457:17, 458:4,
458:11, 458:16,
459:15, 461:17,
463:18, 464:22,
465:10, 474:2,
475:16, 475:21,
477:8, 478:13,
501:8, 502:17,
537:20, 542:13,
556:24, 557:4,
557:7, 557:14,
558:9, 558:13,
558:15, 559:10,
560:6, 561:24,
563:11, 563:16,
564:2, 568:9,
568:21, 586:14,
603:19, 661:13,
665:15, 666:13,
669:8, 691:5
**draft** [3] - 427:11,
428:3, 428:5
**drafts** [1] - 353:7
**DRAM** [2] - 408:11,
658:8
**dramatically** [3] -
388:14, 398:19,
399:3
**drawing** [4] - 420:4,
420:8, 422:14, 423:3
**drawings** [7] - 416:10,
416:15, 417:23,
419:18, 421:21,
422:1, 423:2
**drew** [2] - 357:5, 649:6
**drive** [12] - 442:8,
443:15, 484:15,
484:17, 485:6,
485:11, 485:12,
485:16, 492:9,
492:10, 504:14,
670:14
**drives** [17] - 396:6,
398:13, 443:8,
484:22, 485:7,
485:14, 491:21,
491:22, 492:7,
492:12, 492:15,
498:9, 620:10,
625:21, 666:21,
670:19, 670:21
**dropped** [1] - 599:9
**drove** [1] - 556:12
**dryers** [1] - 566:10
**DSSD** [1] - 446:11
**DTX** [6] - 454:19,
570:1, 584:2,
638:24, 639:8, 641:6
**DTX-560** [2] - 450:5,

450:15
**Duke** [1] - 653:23
**duly** [4] - 382:14,
479:7, 608:15,
651:23
**DUNN** [1] - 348:21
**dup** [1] - 519:2
**duplicate** [27] -
369:12, 388:11,
388:16, 388:22,
388:24, 405:8,
408:20, 408:21,
448:14, 454:1,
493:2, 495:1,
496:10, 496:14,
496:17, 496:24,
497:1, 501:3,
501:11, 503:4,
515:14, 516:20,
516:24, 518:20,
520:16, 521:11,
525:7
**duplicated** [1] -
622:10
**duplicates** [5] -
418:24, 481:21,
495:14, 516:11,
516:18
**duplication** [2] -
495:4, 582:8
**Durick** [1] - 376:18
**during** [25] - 351:2,
352:3, 352:5, 360:1,
383:16, 386:8,
386:13, 390:4,
390:15, 394:21,
394:23, 394:24,
398:3, 439:22,
477:16, 497:3,
582:14, 604:3,
613:1, 617:15,
654:13, 655:1,
655:23, 664:5,
687:19
**DVR** [2] - 395:18,
398:21
**e-mail** [8] - 371:24,
372:10, 372:11,
372:20, 372:23,
373:6, 373:10, 374:4
**e-mails** [1] - 516:22
**early** [8] - 397:19,
404:15, 465:5,
477:9, 503:2, 613:2,
615:15, 619:1
**earned** [1] - 567:13
**earthquake** [1] -
396:16
**easel** [2] - 651:19,
652:4

**easier** [2] - 378:19,
627:4
**easily** [1] - 359:17
**east** [1] - 611:13
**easy** [4] - 378:5,
623:1, 623:2, 625:10
**Ed** [5] - 515:10, 536:7,
536:11, 536:12,
572:15
**edits** [1] - 524:8
**education** [2] -
391:11, 392:10
**educational** [2] -
482:8, 653:19
**effect** [2] - 650:17,
651:5
**effective** [1] - 687:10
**effectively** [1] - 354:1
**efficiency** [2] - 659:12,
662:7
**efficient** [10] - 424:8,
499:9, 499:15,
499:22, 500:22,
536:17, 620:4,
623:21, 631:10,
658:16
**efficiently** [2] -
502:21, 659:10
**effort** [1] - 561:23
**eighteen** [1] - 407:20
**either** [15] - 351:20,
366:18, 401:16,
426:23, 444:11,
457:7, 510:22,
538:18, 539:17,
574:19, 584:15,
618:8, 651:7, 680:2,
684:8
**elaborate** [1] - 451:23
**elaboration** [1] - 452:1
**elect** [1] - 593:15
**elected** [3] - 393:9,
393:11, 393:12
**electrical** [4] - 611:24,
652:18, 686:23,
687:3
**electronic** [1] - 611:20
**electronically** [1] -
688:18
**electronics** [1] -
485:13
**element** [49] - 437:18,
460:7, 471:17,
481:5, 481:8, 490:7,
492:16, 504:3,
513:2, 513:11,
513:14, 514:5,
523:6, 526:1,
533:14, 543:18,
569:5, 570:5,

570:10, 570:13,
579:2, 579:22,
589:2, 630:16,
658:14, 660:6,
664:15, 664:19,
665:9, 666:3,
669:21, 672:17,
672:21, 675:5,
675:9, 675:10,
676:9, 677:17,
678:2, 678:5,
678:14, 679:2,
685:14, 685:18,
686:10, 686:12,
686:17, 686:18
**element-by-element**
[1] - 460:7
**elements** [18] -
470:16, 471:9,
481:11, 491:6,
491:14, 491:18,
492:4, 503:19,
503:22, 504:1,
529:24, 568:23,
628:13, 663:23,
665:24, 667:5,
667:19, 686:4
**elevates** [1] - 650:18
**eliminate** [1] - 541:7
**ellipses** [3] - 632:20,
633:10, 633:17
**email** [5] - 380:13,
490:12, 493:13,
502:12
**emails** [3] - 493:8,
493:9, 493:11
**embodied** [5] - 358:9,
361:18, 504:7,
554:24, 556:2
**embodies** [3] -
355:24, 359:10,
359:12
**embodying** [1] -
356:14
**EMC** [78] - 348:3,
348:3, 348:4, 353:1,
354:3, 365:21,
367:20, 368:2,
368:5, 368:9,
370:20, 370:24,
371:8, 371:13,
371:15, 372:13,
372:19, 374:17,
375:6, 375:19,
376:15, 376:23,
377:21, 379:21,
402:19, 403:9,
439:16, 440:5,
440:14, 441:5,
442:2, 444:22,

445:1, 445:7,
445:22, 446:3,
446:7, 446:9,
446:20, 457:2,
457:5, 478:19,
500:9, 500:10,
500:11, 552:4,
565:20, 567:6,
567:10, 567:19,
567:22, 569:2,
589:22, 591:23,
592:2, 607:24,
609:3, 611:4, 612:7,
612:13, 613:1,
613:3, 613:11,
613:17, 616:2,
616:4, 616:6,
616:12, 616:17,
619:2, 627:9, 637:1,
637:21, 642:13,
642:16, 642:18,
642:20, 659:15
**EMC's** [8] - 375:21,
379:11, 380:19,
381:4, 591:16,
613:6, 639:18,
663:17
**employed** [2] - 483:7,
486:23
**employee** [3] - 493:9,
609:3, 637:1
**employees** [3] - 465:6,
493:10, 505:22
**employment** [1] -
616:21
**enabled** [1] - 449:7
**encompass** [1] -
551:22
**encountering** [2] -
630:3, 634:4
**end** [11] - 397:15,
408:22, 430:1,
477:17, 526:13,
532:7, 543:15,
626:19, 665:11,
688:4, 688:8
**ended** [1] - 615:16
**Energy** [1] - 654:6
**engineer** [5] - 484:3,
505:14, 612:16,
613:22, 633:10
**Engineering** [1] -
393:10
**engineering** [5] -
611:20, 611:24,
652:19, 653:1,
653:22
**engineers** [8] -
425:19, 487:2,
487:3, 487:4, 573:5,

633:1, 633:7, 635:14
**England** [1] - 483:23
**English** [3] - 504:9,
633:11, 634:8
**enhance** [1] - 614:6
**enjoyed** [1] - 394:18
**enter** [2] - 446:1,
446:6
**entering** [3] - 381:15,
438:13, 532:23
**enterprise** [4] -
485:24, 489:10,
500:16, 602:20
**entire** [6] - 387:23,
388:21, 409:1,
417:3, 419:2, 511:8
**entirely** [1] - 438:4
**entirety** [1] - 677:17
**entitled** [3] - 376:8,
377:9, 553:21
**entries** [1] - 597:20
**entry** [1] - 423:16
**environment** [1] -
392:13
**equipment** [1] -
487:22
**equivalents** [6] -
528:11, 528:14,
529:1, 586:4, 586:6,
587:3
**erase** [1] - 468:19
**erroneously** [1] -
495:3
**error** [2] - 487:8, 487:9
**errors** [1] - 397:9
**Erta** [1] - 397:5
**especially** [1] - 387:4
**ESQ** [13] - 348:19,
348:22, 348:22,
348:23, 348:23,
349:3, 349:8, 349:9,
349:11, 349:12,
349:12, 349:13,
349:13
**essence** [1] - 664:21
**essential** [4] - 544:20,
545:11, 547:13,
548:4
**essentially** [20] -
369:13, 420:8,
426:6, 599:10,
614:24, 615:4,
618:4, 620:20,
621:20, 628:6,
628:18, 628:24,
629:13, 630:7,
631:8, 645:16,
646:23, 665:1,
679:23, 686:19

435:8, 436:3,
568:22, 569:15,
587:3
**established** [3] -
466:9, 586:23,
663:22
**establishes** [1] -
586:11
**estimated** [3] -
419:11, 559:11,
600:7
**estimation** [1] -
562:14
**evaluate** [2] - 650:14,
650:15
**evaluating** [1] - 508:2
**evaluation** [1] - 571:8
**evening** [1] - 689:10
**event** [11] - 439:23,
444:6, 486:21,
508:11, 512:16,
521:19, 523:2,
524:20, 524:22,
529:6, 566:24
**eventually** [5] -
394:19, 418:6,
444:2, 446:8, 616:11
**evidence** [41] -
359:14, 359:16,
362:18, 365:21,
372:4, 377:2,
383:23, 384:24,
424:13, 430:6,
431:21, 450:15,
454:20, 467:8,
467:15, 467:16,
468:10, 468:12,
469:13, 506:8,
546:5, 546:15,
553:13, 554:5,
582:22, 609:20,
641:12, 657:24,
660:24, 663:2,
664:24, 666:5,
669:14, 670:22,
671:3, 671:6, 672:8,
674:22, 676:22,
685:3, 685:4
**evoke** [1] - 414:17
**exact** [2] - 596:19,
690:20
**exactly** [28] - 353:13,
356:23, 360:19,
366:13, 436:8,
454:7, 455:6,
457:21, 458:5,
458:13, 458:16,
459:1, 459:23,
467:5, 467:12,
467:24, 468:7,

468:8, 468:9,
469:11, 508:14,
525:17, 536:4,
627:17, 634:2,
665:13, 687:4
**exam** [1] - 640:4
**EXAMINATION** [8] -
380:4, 382:21,
439:1, 475:19,
479:15, 564:23,
601:22, 608:20
**examination** [12] -
363:17, 367:13,
376:5, 445:11,
564:12, 604:4,
636:24, 643:11,
647:21, 667:8,
683:9, 691:4
**examine** [2] - 603:21,
690:1
**examined** [6] -
382:15, 479:8,
608:16, 651:24,
659:21, 674:9
**example** [43] - 369:4,
369:17, 370:2,
393:5, 396:20,
407:12, 484:10,
493:4, 494:17,
496:5, 496:11,
496:20, 497:2,
501:6, 502:7, 505:1,
515:5, 519:23,
535:12, 536:23,
561:10, 572:14,
583:3, 618:3,
618:16, 620:22,
621:2, 621:11,
621:24, 629:7,
658:8, 662:12,
662:23, 666:21,
667:24, 669:6,
669:22, 672:5,
675:24, 676:1,
680:24, 683:19
**examples** [5] - 477:1,
477:3, 491:24,
674:17, 681:24
**exceeded** [1] - 400:9
**except** [3] - 388:17,
505:2, 558:19
**excerpts** [1] - 635:3
**exchange** [3] - 353:9,
354:2
**exciting** [1] - 399:15
**exclude** [1] - 684:3
**excluded** [1] - 632:19
**exclusive** [8] - 620:17,
625:13, 627:15,
657:1, 658:13,

676:23, 677:21,
687:13
**exclusive-or** [6] -
627:15, 657:1,
658:13, 676:23,
677:21, 687:13
**exclusively** [1] -
624:10
**excuse** [7] - 358:5,
423:12, 468:13,
470:12, 470:23,
586:1, 612:15
**executed** [2] - 576:9,
576:11
**executive** [1] - 549:14
**executives** [3] -
371:15, 375:6,
568:14
**exhibit** [6] - 433:18,
433:22, 434:5,
546:8, 661:18,
666:14
**Exhibit** [18] - 371:21,
372:4, 376:4, 376:7,
377:2, 468:6, 506:1,
506:8, 545:20,
553:4, 553:13,
553:24, 554:5,
609:12, 609:20,
626:23, 657:20,
674:22
**Exhibits** [1] - 546:16
**exhibits** [2] - 371:22,
546:10
**exist** [2] - 462:12,
569:17
**existed** [3] - 378:9,
398:9, 649:7
**existence** [1] - 448:7
**existing** [1] - 620:9
**exists** [1] - 373:16
**exit** [1] - 526:15
**expand** [4] - 614:6,
626:24, 661:10,
666:10
**expect** [4] - 350:18,
364:3, 364:8, 414:7
**expected** [1] - 371:20
**expecting** [1] - 561:5
**expensive** [6] -
406:18, 408:8,
492:10, 492:11,
492:14, 625:19
**experience** [10] -
483:6, 486:9, 487:6,
487:11, 488:14,
630:2, 630:4, 630:6,
654:14, 655:2
**experienced** [2] -
602:13, 655:4

**experimentally** [1] -
477:14
**expert** [43] - 358:12,
358:19, 359:24,
360:12, 360:13,
360:16, 362:7,
362:8, 364:12,
434:10, 478:21,
488:21, 520:8,
520:24, 522:4,
526:5, 532:5,
537:19, 540:6,
541:24, 542:12,
544:4, 544:17,
546:8, 556:18,
565:3, 565:8,
565:13, 565:17,
566:1, 567:6,
567:14, 586:10,
591:11, 591:13,
600:9, 632:15,
632:22, 646:12,
650:13, 655:7,
690:14
**expert's** [1] - 522:14
**expertise** [1] - 394:13
**experts** [5] - 437:10,
520:11, 538:6,
565:14, 632:10
**expired** [1] - 440:21
**explain** [49] - 381:10,
386:5, 393:22,
395:8, 399:12,
401:8, 401:12,
427:8, 479:19,
489:19, 493:23,
495:23, 502:6,
504:9, 510:18,
511:3, 512:22,
513:17, 521:9,
522:24, 534:14,
534:24, 535:3,
548:13, 550:14,
560:18, 578:23,
584:11, 606:12,
621:7, 622:7,
634:24, 635:2,
653:7, 656:17,
658:1, 658:6, 659:4,
661:21, 663:13,
664:20, 666:13,
667:18, 670:9,
675:14, 679:20,
681:1, 682:13, 683:4
**explained** [8] - 398:8,
511:14, 656:15,
675:11, 676:11,
679:2, 683:2, 683:23
**explaining** [6] -
585:15, 633:3,

656:22, 658:12,
660:13, 666:17
**explains** [3] - 671:16,
672:13, 685:8
**explanation** [1] -
678:7
**explicitly** [3] - 354:2,
356:5, 414:21
**explore** [1] - 592:13
**exploring** [1] - 620:4
**exposed** [1] - 398:6
**express** [1] - 480:21
**expressed** [5] -
541:24, 585:23,
586:2, 592:14, 605:8
**expressing** [1] -
373:24
**extend** [1] - 552:2
**extensive** [1] - 353:5
**extent** [2] - 633:6,
648:20
**external** [1] - 659:23
**extra** [5] - 496:4,
497:23, 559:11,
602:7, 656:13
**extremely** [2] -
429:17, 615:8
**eyesight** [1] - 378:20
**face** [1] - 456:6
**facilitate** [2] - 629:2,
645:2
**facing** [2] - 550:7,
652:7
**fact** [35] - 351:4,
356:7, 356:23,
358:4, 358:11,
362:3, 366:7, 378:8,
409:12, 411:16,
425:16, 426:20,
435:22, 436:11,
441:12, 453:13,
469:15, 481:8,
539:15, 544:18,
558:9, 565:11,
568:12, 577:22,
591:4, 602:6, 604:3,
625:18, 632:11,
637:11, 640:2,
656:10, 663:23,
664:23, 665:23
**factor** [11] - 362:7,
398:14, 406:21,
406:23, 408:1,
408:5, 408:24,
410:16, 563:3
**factors** [3] - 361:20,
474:14, 475:14
**faculty** [5] - 383:7,
383:8, 392:3, 654:9,
654:11

**failed** [1] - 483:17
**fails** [1] - 498:7
**Failure** [2] - 641:2,
641:8
**failure** [2] - 483:16,
629:5
**fair** [6] - 439:23,
587:7, 593:19,
645:20, 652:5, 660:5
**fairly** [1] - 667:23
**fall** [1] - 586:7
**familiar** [8] - 368:18,
368:21, 420:16,
435:23, 450:10,
452:24, 568:18,
645:15
**family** [3] - 392:13,
617:10, 688:17
**far** [16] - 392:17,
457:5, 520:6,
538:14, 538:15,
577:6, 603:19,
617:2, 620:14,
677:8, 678:18,
678:20, 678:24,
681:7, 684:6, 689:4
**fast** [3] - 405:19,
498:16, 560:23
**Fast** [2] - 641:1, 641:8
**FAST** [5] - 449:15,
449:18, 450:22,
568:9
**faster** [4] - 492:9,
492:11, 502:16,
543:19
**Faulk** [1] - 566:21
**fault** [2] - 355:2, 579:9
**Fault** [1] - 641:3
**Fault-Tolerant** [1] -
641:3
**favor** [1] - 353:24
**favorite** [1] - 484:13
**feasible** [1] - 624:1
**feature** [13] - 370:17,
374:10, 542:21,
543:3, 549:3, 549:4,
557:19, 557:22,
587:4, 660:19,
660:22, 660:23,
661:1
**features** [4] - 373:14,
549:1, 550:1, 619:22
**February** [28] -
404:21, 404:22,
404:23, 411:5,
411:6, 411:16,
411:18, 411:22,
415:20, 417:10,
418:10, 421:10,
421:12, 421:14,

421:17, 421:19,
421:23, 455:14,
466:10, 466:13,
466:14, 467:8,
467:14, 467:21,
468:11, 469:14,
476:6, 476:8
**fellow** [3] - 393:11,
393:12, 455:7
**felt** [1] - 392:11
**few** [14] - 366:24,
387:16, 399:22,
407:11, 410:17,
440:16, 441:6,
460:5, 525:22,
612:5, 613:16,
635:9, 635:17,
667:17
**fiber** [1] - 490:4
**field** [6] - 373:12,
485:22, 488:21,
591:11, 610:16,
620:22
**fields** [1] - 566:4,
655:8
**fierce(r** [2] - 379:5,
379:15
**fifteen** [2] - 363:18,
565:10
**figure** [4] - 562:10,
623:14, 623:17,
629:8
**figuring** [1] - 634:4
**file** [24] - 411:17,
418:10, 421:11,
421:12, 421:16,
421:18, 449:18,
449:22, 455:17,
461:1, 466:10,
466:14, 466:18,
466:20, 466:21,
466:22, 466:23,
466:24, 467:1,
467:2, 470:10,
470:22, 471:3,
588:23
**filed** [7] - 352:17,
352:24, 454:14,
454:24, 462:8,
639:19, 639:24
**files** [3] - 396:9,
456:13, 456:15
**filing** [2] - 450:12,
455:4
**filter** [1] - 541:12
**final** [1] - 541:19
**finally** [3] - 432:3,
628:1, 668:7
**financial** [4] - 365:23,
477:2, 478:8, 613:8

**fine** [3] - 350:4, 415:5, 688:6
**finish** [7] - 451:18, 451:21, 461:17, 474:3, 689:14, 690:4, 690:24
**finishing** [1] - 531:19
**finite** [1] - 498:15
**fire** [1] - 478:5
**fired** [1] - 394:14
**firm** [5] - 447:10, 475:2, 475:3, 475:7, 477:12
**firms** [2] - 387:17, 475:10
**first** [80] - 351:1, 352:7, 355:18, 356:9, 360:1, 370:14, 382:13, 387:10, 391:1, 391:3, 391:4, 391:6, 391:17, 391:20, 392:9, 394:8, 394:9, 396:21, 398:12, 399:11, 400:12, 400:21, 401:5, 401:19, 411:17, 427:11, 428:3, 428:5, 428:8, 430:2, 430:5, 433:18, 433:22, 434:3, 434:5, 452:21, 462:11, 462:18, 462:19, 462:21, 466:8, 479:6, 485:12, 493:21, 494:11, 495:20, 496:11, 497:21, 504:1, 510:20, 520:5, 523:12, 524:17, 524:21, 535:5, 539:1, 541:4, 551:17, 567:5, 575:13, 576:20, 576:22, 577:5, 577:14, 584:10, 608:14, 611:6, 612:6, 623:16, 626:3, 627:8, 638:16, 651:22, 655:20, 661:18, 681:17, 690:3, 690:14
**fits** [1] - 588:10
**five** [17] - 360:19, 371:9, 398:15, 406:23, 407:1, 408:1, 408:5, 599:2, 599:12, 599:21, 601:14, 610:14,

634:18, 675:18, 676:1, 676:15, 690:22
**flagship** [1] - 613:6
**Flash** [55] - 351:12, 367:22, 368:10, 368:13, 372:12, 375:4, 377:14, 377:17, 377:22, 442:20, 443:12, 443:15, 443:21, 443:23, 444:2, 444:8, 444:11, 445:8, 446:1, 446:6, 446:12, 446:17, 463:15, 491:23, 492:10, 492:15, 497:18, 498:2, 498:6, 504:14, 590:19, 591:1, 591:16, 592:3, 592:8, 592:11, 592:12, 643:24, 644:2, 644:7, 644:10, 644:13, 654:23, 658:9, 662:5, 662:14, 662:2, 666:11, 666:19, 666:20, 666:23, 667:3, 668:3, 681:23
**FlashArray** [48] - 371:19, 376:8, 506:2, 506:15, 513:7, 529:14, 530:8, 549:1, 557:9, 557:11, 557:18, 558:8, 559:20, 562:17, 564:4, 570:17, 596:3, 602:12, 602:19, 660:4, 660:9, 660:20, 661:2, 663:12, 664:11, 665:20, 666:7, 666:15, 666:18, 667:9, 670:3, 671:4, 671:22, 672:21, 674:14, 675:8, 678:4, 679:7, 680:5, 684:16, 685:19, 686:6, 686:8, 687:7, 687:9, 687:16
**FlashArrays** [5] - 557:24, 558:13, 558:16, 558:17, 558:23
**flawed** [1] - 560:14
**flexibility** [2] - 658:24, 659:11

**flip** [3] - 384:21, 423:8, 424:20
**flipped** [2] - 433:16, 434:3
**flipping** [1] - 433:21
**flow** [1] - 603:18
**flowing** [1] - 490:21
**focus** [9] - 429:4, 442:10, 442:12, 574:12, 614:4, 614:7, 614:9, 660:6, 664:14
**focused** [2] - 398:10, 660:19
**focusing** [2] - 387:5, 612:16
**fold** [2] - 500:9, 642:13
**folks** [2] - 380:14, 381:6
**follow** [6] - 387:19, 400:11, 414:15, 417:13, 426:6, 561:23
**follow-up** [2] - 400:11, 417:13
**followed** [1] - 687:22
**following** [3] - 403:20, 418:21, 448:3
**follows** [4] - 382:15, 479:8, 608:16, 652:1
**footprint** [4] - 388:13, 398:22, 399:4, 406:19
**FOR** [1] - 348:1
**foregoing** [1] - 692:9
**forewent** [1] - 353:11
**form** [2] - 513:22, 527:11
**formal** [1] - 447:7
**formed** [3] - 393:24, 588:6, 677:9
**forming** [1] - 553:20, 573:9
**forms** [3] - 375:20, 444:18, 448:19
**formula** [1] - 407:8
**forth** [6] - 353:7, 429:20, 580:24, 613:8, 626:2, 638:23
**forty** [3] - 364:5, 565:8, 690:22
**forty-five** [1] - 690:22
**forward** [6] - 367:4, 533:22, 537:16, 549:21, 561:2, 612:5
**forwarding** [1] - 372:19
**forwards** [1] - 375:5

445:10
**founded** [4] - 487:13, 487:14, 487:20, 487:21
**founder** [5] - 407:18, 410:24, 439:24, 477:21, 477:22
**founders** [6] - 393:20, 393:23, 394:1, 394:7, 395:9, 404:16
**founding** [1] - 393:15
**four** [9] - 407:12, 407:13, 408:3, 436:11, 540:14, 567:9, 567:22, 568:5, 676:18
**fourt** [1] - 684:13
**fourteen** [2] - 399:17, 404:14
**fourth** [1] - 662:17
**frame** [4] - 417:10, 431:16, 472:7
**Frank** [6] - 353:1, 353:10, 353:23, 354:1, 555:12, 555:15
**frank** [1] - 556:7
**frequently** [4] - 526:14, 557:8, 565:3, 565:5
**friend** [1] - 394:5
**friends** [2] - 386:14, 688:18
**front** [4] - 378:18, 433:23, 627:5, 657:17
**FRY** [1] - 349:9
**Fujitsu** [2] - 486:13
**full** [10] - 370:14, 383:1, 392:4, 396:10, 479:1, 503:10, 598:1, 608:9, 633:6, 685:12
**function** [17] - 375:23, 423:14, 519:11, 520:1, 526:15, 528:17, 529:4, 580:7, 585:2, 587:4, 587:6, 587:8, 588:15, 604:5, 604:14, 604:22, 605:2
**functional** [3] - 425:18, 426:2, 431:11
**functionality** [2] - 587:15, 633:2
**functions** [5] - 519:1, 526:14, 575:20, 604:24, 659:22

**funding** [1] - 477:10
**future** [4] - 423:14, 486:6, 561:8, 563:4
**GA** [2] - 374:4, 374:8
**gain** [1] - 478:8
**gains** [2] - 374:11, 477:2
**game** [3] - 351:24, 566:15, 566:16
**gathering** [1] - 361:11
**gear** [2] - 515:2, 525:1
**general** [11] - 356:18, 374:5, 509:16, 592:10, 610:12, 610:13, 615:9, 615:14, 645:18, 648:13, 670:12
**generally** [15] - 368:21, 370:15, 371:4, 371:10, 371:14, 373:7, 511:6, 519:19, 561:2, 567:19, 627:12, 640:14, 660:22, 662:13, 663:15
**generate** [2] - 620:18, 676:24
**generated** [1] - 403:6
**generating** [1] - 535:15
**generation** [3] - 614:7, 619:6, 619:18
**generations** [1] - 484:7
**geometry** [1] - 548:18
**Georgia** [2] - 361:20, 362:6
**Georgia-Pacific** [2] - 361:20, 362:6
**GIBSON** [1] - 348:21
**given** [15] - 351:3, 352:8, 362:4, 415:11, 437:21, 478:7, 508:4, 508:15, 508:20, 549:21, 559:6, 569:8, 569:11, 596:9, 629:7
**glad** [1] - 616:18
**global** [6] - 387:15, 388:19, 419:3, 425:22, 473:12, 550:18
**goal** [1] - 628:15
**Goldstein** [5] - 372:20, 372:24, 373:6, 374:16, 690:13
**Goldstein's** [1] - 375:5

goldstein's [1] - 372:23
Goliath [1] - 366:7
Google [2] - 394:7, 689:2
Gordon [1] - 407:18
government [4] - 391:17, 483:8, 483:13, 483:19
graduate [4] - 394:3, 612:6, 654:17, 654:20
graduated [1] - 391:24
graduates [1] - 654:19
grandfather [2] - 485:16, 485:17
graphic [4] - 379:21, 491:4, 582:17, 582:20
graphics [1] - 572:9
great [7] - 396:1, 440:9, 485:16, 616:18, 617:5, 617:7, 619:21
greater [1] - 407:1
green [2] - 658:19, 668:1
grew [3] - 363:19, 389:24, 390:8
Greylock [8] - 447:4, 447:5, 447:10, 447:12, 447:19, 447:21, 447:22, 447:24
grids [1] - 672:3
gross [4] - 403:7, 403:14, 403:15, 403:19
Group [6] - 372:12, 375:4, 376:2, 376:23, 377:21, 378:3
group [14] - 375:19, 437:3, 616:14, 673:17, 673:20, 675:18, 675:23, 676:6, 676:13, 677:9, 677:10, 677:12, 686:20, 687:2
grouped [3] - 672:20, 672:23, 677:11
grouping [1] - 673:18
groups [12] - 672:20, 672:24, 673:9, 673:14, 673:15, 673:22, 673:24, 674:2, 675:5, 675:16, 675:20
grow [1] - 389:23

growing [1] - 407:16
grows [1] - 408:1
growth [3] - 407:15, 407:17, 407:22
guess [4] - 361:17, 435:19, 436:14, 459:24
guessed [2] - 468:22, 469:4
guide [7] - 506:2, 506:15, 666:7, 666:24, 667:1, 674:15, 674:19
guides [1] - 506:5
Guilds [3] - 482:11, 482:17, 482:20
guy [3] - 366:6, 366:16, 651:11
half [5] - 359:9, 484:19, 559:21, 562:11, 595:16
hand [12] - 359:17, 379:3, 419:8, 494:3, 500:5, 518:12, 518:14, 602:1, 634:13, 667:24, 676:20, 692:15
handed [2] - 579:13, 609:10
handle [4] - 366:18, 491:13, 498:16, 560:24
handling [2] - 495:12, 608:2
hands [2] - 353:16, 487:6
handwriting [3] - 423:17, 423:19, 462:24
happy [4] - 359:13, 364:21, 365:12, 365:15
hard [15] - 367:22, 418:13, 429:16, 429:19, 429:23, 431:17, 492:9, 492:12, 492:14, 594:5, 620:10, 625:3, 634:10, 659:23, 666:21
hardware [5] - 373:3, 485:23, 612:16, 613:22, 628:21
hash [3] - 419:3, 519:12, 519:13, 519:15, 519:17, 519:20, 519:21, 520:2, 539:2, 539:7, 539:8, 541:11, 605:1
Hawkins [3] - 692:7

692:19, 692:20
head [7] - 372:10, 372:12, 373:20, 374:16, 374:21, 375:3, 636:8
heads [2] - 374:4, 374:7
hear [9] - 361:21, 365:8, 438:7, 486:18, 551:17, 652:22, 664:8, 687:17
heard [22] - 386:4, 436:12, 481:19, 486:19, 500:12, 500:17, 528:10, 551:16, 568:9, 570:4, 620:13, 640:8, 640:13, 656:3, 658:5, 662:20, 664:14, 666:21, 678:17, 678:23, 684:4, 689:4
hearing [2] - 624:16, 653:9
hearsay [2] - 632:10, 635:11
heat [4] - 532:21, 533:3, 561:11, 631:13
heating [1] - 561:13
held [2] - 484:21, 485:3
hello [1] - 572:14
help [11] - 365:13, 386:15, 486:5, 487:3, 489:4, 513:18, 534:14, 534:24, 565:16, 650:14, 650:15
helpful [1] - 633:17
hereby [1] - 692:9
herein [4] - 382:13, 479:6, 608:14, 651:22
hereunto [1] - 692:14
HERRINGTON [1] - 349:3
hesitate [1] - 478:2
hid [1] - 626:17
high [11] - 388:7, 406:4, 407:2, 407:16, 419:6, 500:19, 541:10, 615:7, 660:3, 663:10, 679:22
higher [1] - 406:20
highest [3] - 406:9, 596:11, 599:2
highlight [3] - 384:6

453:24, 454:22
highlighted [7] - 501:7, 599:6, 639:13, 658:10, 658:19, 658:23, 670:18
highlighting [1] - 494:10
highlights [1] - 673:20
highly [3] - 356:6, 434:9, 436:12
hired [2] - 612:14, 612:15
hiring [1] - 487:3
historically [1] - 491:20
hit [2] - 562:6, 655:18
hoc [1] - 353:21
hold [3] - 408:11, 433:24, 497:23
Holland [2] - 641:1, 641:8
home [3] - 566:7, 566:12, 654:11
honesty [2] - 476:15, 476:23
Honor [138] - 350:4, 352:12, 353:4, 353:9, 353:21, 353:24, 356:13, 356:22, 357:20, 358:6, 359:3, 359:23, 360:6, 360:14, 360:22, 361:5, 361:7, 362:3, 362:20, 362:22, 363:2, 363:6, 363:10, 363:15, 364:10, 364:18, 365:4, 365:16, 365:19, 365:24, 366:11, 366:14, 367:7, 367:15, 382:4, 382:6, 382:17, 383:22, 384:23, 385:4, 412:1, 413:24, 414:24, 419:22, 424:12, 424:15, 430:5, 430:9, 431:19, 431:23, 432:16, 433:4, 433:12, 433:15, 435:10, 436:7, 437:17, 438:10, 438:21, 445:10, 445:14, 450:15, 450:17, 451:17, 453:4, 453:7, 454:6, 454:12, 454:20,

457:23, 465:8, 474:1, 478:12, 478:17, 478:19, 479:9, 488:19, 488:23, 506:7, 506:10, 508:10, 508:24, 525:10, 531:15, 531:17, 532:14, 533:9, 544:17, 544:19, 546:4, 546:7, 546:13, 546:18, 553:12, 553:15, 554:4, 554:7, 564:14, 564:16, 564:21, 582:24, 601:18, 601:21, 604:9, 604:18, 607:21, 607:23, 608:17, 609:19, 631:21, 632:5, 632:24, 635:19, 636:1, 636:18, 641:13, 641:22, 643:4, 643:9, 646:11, 647:7, 647:11, 647:19, 649:3, 649:11, 650:2, 651:17, 651:18, 652:6, 655:6, 661:7, 663:1, 674:21, 689:20, 689:21, 690:12, 691:3, 691:12
HONORABLE [1] - 348:14
honors [2] - 393:2, 393:6
hopefully [1] - 363:21
hoping [2] - 481:15, 489:4
host [4] - 366:17, 489:24, 490:9, 490:16
hosts [3] - 489:21, 494:3, 535:15
hour [8] - 359:9, 404:14, 441:18, 458:14, 531:4, 532:10, 653:13, 690:21
hours [7] - 399:17, 407:11, 407:13, 408:3, 429:24, 599:13, 599:16
house [2] - 464:19, 561:11
huge [2] - 378:4, 490:24
Hugo [2] - 411:19,

465:6
**human** [3] - 397:9, 469:9, 476:17
**hundred** [7] - 388:18, 400:23, 403:16, 465:24, 466:5, 503:3, 567:14
**hundreds** [1] - 619:13
**hurry** [1] - 367:4
**hurting** [1] - 626:21
**Hussein** [8] - 372:1, 372:9, 372:11, 372:18, 375:3, 375:10, 375:13, 375:17
**Hussein's** [1] - 372:15
**hybrid** [3] - 367:24, 368:1, 368:2
**Hyrahan** [1] - 394:4
**Ian** [5] - 360:17, 478:20, 479:2, 479:21, 487:18
**IAN** [3] - 479:3, 479:5, 487:17
**IBM** [10] - 483:20, 483:21, 483:22, 484:1, 484:6, 484:8, 485:19, 486:8, 486:11, 560:11
**idea** [13] - 399:23, 404:17, 428:16, 434:16, 448:11, 483:14, 502:14, 502:20, 620:6, 620:8, 620:16, 623:10, 623:23
**ideas** [14] - 404:19, 410:18, 410:22, 411:3, 416:7, 417:19, 420:5, 420:10, 426:7, 426:10, 426:23, 455:8, 476:5, 658:20
**identified** [15] - 360:7, 388:16, 421:7, 453:20, 581:13, 582:9, 584:5, 587:16, 587:24, 604:24, 605:11, 607:8, 667:20, 669:23, 684:18
**identifier** [81] - 507:7, 509:8, 512:16, 514:22, 515:4, 515:10, 515:12, 515:18, 515:20, 515:23, 517:7, 517:11, 518:1, 518:6, 518:7, 519:8, 519:18, 519:22,

520:19, 521:2, 521:18, 521:22, 522:2, 522:10, 522:12, 523:2, 523:7, 524:17, 525:4, 525:19, 526:1, 527:4, 527:9, 527:10, 527:18, 527:21, 527:24, 528:2, 528:4, 528:24, 529:7, 529:13, 529:18, 535:24, 536:6, 536:10, 537:1, 537:12, 537:13, 571:5, 571:16, 571:20, 572:14, 573:12, 573:20, 574:8, 576:15, 576:19, 581:14, 581:23, 582:10, 583:18, 583:21, 583:23, 584:22, 587:12, 588:1, 588:4, 603:12, 604:7, 604:16, 604:23, 605:2, 605:17, 606:3, 606:5, 606:19, 606:22, 607:1, 607:5
**identifiers** [8] - 510:11, 516:9, 516:12, 516:15, 517:19, 518:4, 526:24, 541:13
**identifies** [3] - 509:9, 537:14, 684:17
**identify** [17] - 388:11, 405:8, 408:15, 418:22, 418:23, 437:10, 437:13, 452:10, 493:12, 561:19, 562:3, 579:18, 583:6, 604:4, 604:13, 607:3, 680:23
**identifying** [4] - 410:1, 481:20, 493:1, 588:18
**IEEE** [2] - 393:11
**II** [1] - 390:4
**Illinois** [1] - 390:11
**illustrate** [2] - 542:10, 656:5
**illustrated** [1] - 668:5
**illustrates** [2] - 656:17, 667:22
**illustration** [4] - 489:22, 535:13, 536:3, 536:9

**image** [1] - 639:1
**imagine** [4] - 353:6, 355:5, 618:19, 619:11
**immediately** [2] - 411:14, 429:6
**immigrants** [1] - 392:10
**Immigration** [1] - 483:2
**impact** [1] - 378:4
**impeachment** [1] - 457:24
**implement** [6] - 406:2, 422:9, 425:20, 426:3, 551:12
**implementation** [1] - 454:3
**implementations** [2] - 378:4, 378:11
**implemented** [1] - 556:15
**implementing** [4] - 426:24, 499:1, 628:4, 628:16
**implications** [3] - 631:1, 631:4, 631:7
**imply** [1] - 574:7
**important** [17] - 356:23, 388:1, 418:3, 464:21, 464:24, 465:5, 473:2, 473:9, 473:15, 475:12, 476:16, 477:18, 555:9, 556:3, 559:9, 603:19, 661:1
**improper** [4] - 350:23, 434:9, 632:17, 632:22
**improve** [1] - 614:5
**IN** [2] - 348:1, 692:14
**inadmissible** [1] - 650:11
**INC** [1] - 348:7
**inclined** [1] - 635:10
**include** [7] - 486:17, 504:19, 507:1, 552:6, 667:12, 677:12, 679:10
**included** [3] - 508:9, 628:8, 677:7
**includes** [6] - 504:19, 671:7, 675:6, 679:7, 686:14, 687:1
**including** [7] - 354:4, 356:6, 481:8, 506:18, 627:1, 628:14, 654:21

**incoming** [12] - 514:13, 515:12, 515:18, 515:23, 516:20, 517:11, 518:4, 518:6, 518:9, 518:19, 519:9, 520:15
**inconclusively** [1] - 510:23
**inconveniently** [1] - 667:6
**incorporate** [2] - 389:17, 404:10
**incorporated** [2] - 356:5, 485:12
**increase** [5] - 398:18, 408:4, 477:23, 543:21, 557:5
**increased** [2] - 400:22, 615:19
**increasingly** [2] - 375:11, 375:14
**incremental** [1] - 396:8
**incur** [2] - 502:1, 615:6
**indeed** [1] - 578:4
**identifier** [1] - 518:3
**independent** [5] - 412:20, 414:21, 477:2, 656:8, 689:7
**independently** [1] - 629:17
**index** [14] - 527:11, 527:12, 527:13, 527:16, 527:21, 527:24, 528:6, 528:23, 529:4, 529:6, 583:19, 583:20, 588:3, 588:5
**indicat** [1] - 676:16
**indicate** [7] - 425:10, 506:24, 510:7, 512:12, 539:24, 545:13, 662:6
**indicated** [3] - 449:2, 675:15, 686:15
**indicates** [4] - 452:22, 559:7, 683:10, 685:5
**indicating** [6] - 662:1, 662:3, 671:3, 672:9, 685:4, 685:5
**indication** [3] - 540:13, 633:14, 680:2
**indirectly** [1] - 447:1
**individual** [1] - 490:10
**industry** [5] - 393:2, 407:21, 555:6, 555:10, 555:23

**inequitable** [2] - 436:20, 438:3
**inexpensive** [3] - 396:5, 396:13, 656:9
**inform** [1] - 558:24
**INFORMATION** [1] - 348:4
**information** [40] - 375:21, 397:23, 397:24, 398:2, 398:6, 408:11, 419:2, 420:19, 456:2, 456:23, 457:1, 509:9, 514:13, 516:17, 536:18, 537:14, 544:8, 546:23, 548:5, 557:13, 557:14, 558:4, 558:14, 559:6, 578:21, 599:13, 599:16, 601:2, 621:22, 625:6, 633:5, 656:14, 656:20, 656:22, 681:23, 681:24, 682:2, 683:7, 685:10, 687:12
**informed** [1] - 395:4, 505:18, 539:18
**infrastructure** [1] - 377:11
**infringe** [18] - 513:11, 529:22, 529:24, 530:4, 530:10, 530:13, 530:17, 533:24, 534:3, 534:13, 535:2, 537:11, 540:11, 541:14, 569:12, 593:23, 594:22, 664:11
**infringed** [8] - 481:9, 481:12, 529:16, 534:4, 534:22, 538:23, 660:9, 686:5
**infringement** [36] - 480:15, 480:22, 481:3, 482:2, 504:18, 506:4, 508:2, 509:19, 513:4, 530:21, 533:12, 534:16, 534:19, 542:15, 568:21, 568:22, 569:6, 569:16, 569:22, 570:19, 571:1, 573:20, 579:3, 585:10, 586:3, 586:8,

586:12, 589:1, 589:5, 593:7, 603:9, 603:23, 607:12, 653:8, 657:15, 660:19
**infringes** [15] - 479:24, 480:10, 503:17, 503:24, 524:5, 528:24, 530:7, 552:18, 576:15, 587:18, 587:20, 588:24, 660:13, 663:12, 686:8
**infringing** [11] - 537:22, 540:7, 542:2, 585:1, 593:10, 593:14, 593:16, 593:18, 593:20, 595:3, 595:4
**inherently** [1] - 625:16
**initial** [4] - 360:7, 377:15, 379:13, 379:17
**inline** [88] - 493:20, 495:22, 496:2, 496:13, 497:13, 497:14, 498:11, 498:14, 498:21, 499:1, 499:9, 500:23, 503:3, 513:22, 514:1, 514:19, 516:1, 517:4, 520:14, 521:16, 537:22, 538:7, 538:13, 538:19, 539:16, 540:7, 540:15, 540:23, 540:24, 542:16, 542:18, 542:20, 543:2, 543:5, 543:10, 543:13, 543:16, 543:22, 544:10, 545:7, 545:11, 545:15, 547:5, 547:16, 547:19, 547:23, 548:4, 548:19, 548:20, 549:3, 549:11, 549:24, 550:9, 550:15, 550:18, 555:8, 555:24, 556:19, 557:2, 557:6, 557:8, 557:15, 557:19, 557:22, 557:24, 558:2, 558:6, 558:10, 558:18, 558:23, 559:1,

559:8, 559:13, 559:19, 563:18, 564:3, 592:23, 593:3, 593:11, 593:23, 594:4, 594:6, 594:9, 594:11, 594:24, 595:7, 603:3
**innovation** [1] - 389:13
**innovations** [3] - 389:9, 389:12
**innovative** [2] - 617:6
**insanely** [4] - 377:22, 379:4, 379:14, 379:21
**inside** [5] - 407:6, 491:3, 491:15, 496:21, 658:21
**inspect** [1] - 450:23
**instance** [1] - 675:21
**instances** [2] - 602:5, 687:20
**instead** [1] - 594:19
**Institute** [3] - 482:12, 482:18, 482:20
**institution** [1] - 613:7
**institutions** [1] - 613:8
**instruct** [1] - 413:15
**instruction** [6] - 413:24, 414:11, 504:16, 526:8, 526:10, 688:16
**instructions** [5] - 504:8, 504:15, 504:20, 505:13, 652:9
**integer** [1] - 675:7
**integral** [1] - 654:23
**integrated** [1] - 612:20
**integrity** [6] - 476:16, 476:19, 476:23, 477:2, 477:4, 478:7
**Intel** [1] - 407:18
**intelligence** [1] - 379:12
**Intelligence** [4] - 376:2, 376:23, 377:20, 378:3
**intend** [1] - 632:7
**intended** [2] - 575:5, 575:9
**intending** [4] - 415:2, 436:21, 436:22, 575:11
**interest** [2] - 395:5, 615:24
**interested** [4] - 386:14, 416:3, 417:14, 616:1,

**interesting** [1] - 429:21
**interface** [2] - 490:4, 535:16
**internal** [1] - 659:22
**internally** [3] - 387:14, 442:19, 682:8
**INTERNATIONAL** [2] - 348:3, 348:4
**interphase** [2] - 490:23, 494:5
**interpretation** [3] - 578:9, 586:15, 687:22
**interpretations** [1] - 687:24
**interpreted** [1] - 687:21
**introduce** [4] - 383:2, 383:23, 609:1, 652:15
**introduced** [5] - 367:21, 368:10, 384:24, 400:19, 477:12
**introducing** [2] - 365:21, 626:1
**invalidity** [2] - 437:20, 508:3
**invent** [9] - 405:2, 406:2, 448:11, 474:16, 638:11, 640:2, 640:6, 644:18, 648:2
**invented** [7] - 405:14, 555:8, 622:18, 622:23, 629:18, 638:13, 642:2
**invention** [38] - 350:21, 351:6, 356:15, 404:19, 406:7, 420:7, 421:8, 422:9, 426:18, 426:19, 429:7, 429:16, 435:6, 436:24, 448:23, 449:10, 500:20, 556:8, 556:9, 609:9, 610:22, 613:15, 617:16, 629:21, 630:4, 630:24, 631:1, 639:10, 639:15, 647:13, 649:7, 658:2, 659:6, 659:7, 659:15, 659:18, 665:16
**inventions** [13] - 406:6, 409:5, 417:9, 417:24, 418:6, 409:7, 409:9, 482:3,

423:11, 425:10, 425:11, 426:15, 428:22, 429:2
**inventor** [9] - 350:15, 392:18, 411:20, 435:5, 461:4, 471:20, 531:23, 609:15, 610:5
**inventors** [14] - 382:8, 385:13, 435:16, 452:19, 455:7, 609:7, 610:2, 610:8, 617:16, 620:7, 622:17, 623:10, 630:24, 637:4
**invest** [1] - 447:21
**invested** [2] - 447:4, 447:18
**investing** [1] - 447:22
**investment** [1] - 447:13
**investments** [2] - 447:16, 447:24
**investor** [2] - 394:9, 447:2
**involve** [1] - 682:13
**involved** [7] - 490:14, 500:13, 584:24, 585:6, 604:6, 607:4, 654:20
**involves** [2] - 572:1, 572:3
**IO** [1] - 371:13
**IPO** [1] - 365:22
**iPod** [1] - 398:21
**ipods** [1] - 395:17
**Ireland** [2] - 611:9, 611:18
**irrelevant** [3] - 436:13, 438:4, 646:13
**irresistible** [1] - 377:9
**Irvine** [1] - 616:16
**issue** [31] - 353:17, 364:19, 365:1, 365:2, 366:13, 384:18, 385:8, 389:3, 392:18, 464:20, 480:3, 482:1, 489:6, 489:7, 499:6, 499:8, 503:15, 521:14, 524:1, 530:22, 533:17, 552:11, 570:24, 610:20, 618:23, 647:11, 656:17, 658:4, 659:14, 660:10
**issues** [8] - 366:17, 397:12, 397:15, 409:7, 409:9, 482:3,

615:2, 624:5
**IT** [2] - 488:3, 488:4
**itself** [17] - 366:6, 455:23, 490:5, 491:9, 494:5, 498:3, 549:6, 569:21, 574:13, 583:23, 606:22, 619:14, 626:13, 629:17, 658:16, 665:5, 677:5
**J-E-S-T-I-C-E** [1] - 479:3
**JACK** [1] - 348:19
**January** [5] - 434:18, 437:4, 450:23, 451:7, 452:5
**jestice** [1] - 525:22
**Jestice** [66] - 358:11, 358:20, 360:17, 364:11, 478:21, 478:23, 479:3, 479:17, 479:21, 482:6, 483:18, 487:10, 488:13, 488:20, 489:3, 493:16, 497:10, 498:10, 499:4, 499:11, 500:12, 501:1, 502:17, 503:12, 505:24, 506:14, 509:2, 509:21, 512:2, 513:1, 523:23, 525:14, 530:2, 530:20, 531:10, 531:19, 533:11, 537:4, 539:15, 541:22, 545:2, 546:22, 547:14, 549:13, 550:20, 555:5, 556:17, 558:22, 559:10, 560:17, 561:22, 563:6, 564:11, 564:17, 565:1, 568:21, 572:9, 584:23, 589:11, 597:3, 597:7, 601:24, 603:7, 604:13, 605:20, 607:19
**JESTICE** [1] - 479:5
**Jestice's** [3] - 572:7, 579:7, 597:2
**Jiaotong** [1] - 390:7
**job** [5] - 485:21, 486:4, 487:24, 488:3, 601:16
**Johanningmeier** [6] - 632:3, 633:20,

634:16, 635:21, 636:15, 649:1
**JOHANNINGMEIER** [30] - 349:12, 632:5, 634:1, 634:12, 634:17, 635:18, 635:24, 636:4, 636:16, 636:20, 641:11, 641:16, 641:22, 642:5, 643:8, 643:10, 646:16, 647:12, 647:18, 647:20, 648:22, 649:11, 649:15, 649:21, 651:2, 655:9, 663:3, 669:15, 674:23, 691:6
**John** [1] - 610:9
**JOHN** [1] - 349:8
**join** [3] - 477:10, 612:6, 642:16
**joined** [11] - 383:7, 392:2, 411:20, 413:10, 413:21, 483:20, 612:8, 613:16, 654:3, 654:8, 654:11
**joining** [2] - 417:16, 516:14
**Jones** [16] - 532:5, 631:23, 633:2, 650:3, 652:14, 652:17, 655:7, 655:13, 661:13, 665:15, 666:13, 669:8, 690:4, 690:7, 690:8, 691:5
**JONES** [1] - 651:21
**JOSH** [1] - 348:22
**Josh** [3] - 372:20, 375:10, 690:13
**Josh's** [1] - 373:22
**journal** [1] - 568:3
**judge** [2] - 507:16, 507:24
**Judge** [1] - 348:15
**judgment** [1] - 360:2
**jump** [2] - 666:9, 667:17
**jumped** [1] - 389:20
**jurors** [4] - 571:1, 572:11, 575:16, 584:15
**jury** [68] - 367:3, 367:9, 367:10, 383:2, 386:6, 393:5, 395:8, 397:13, 398:9, 399:12, 401:9, 401:12,

406:9, 413:15, 417:2, 418:13, 418:14, 422:6, 432:20, 433:14, 433:23, 438:12, 438:13, 438:16, 479:19, 485:9, 486:18, 507:15, 508:1, 510:9, 512:14, 531:3, 531:6, 531:7, 532:13, 532:23, 533:1, 535:3, 583:15, 604:14, 608:5, 609:1, 620:13, 628:2, 631:13, 631:16, 633:17, 635:21, 636:12, 636:13, 650:14, 650:15, 652:10, 652:16, 653:5, 653:18, 656:3, 656:5, 656:24, 658:1, 659:4, 666:14, 667:19, 671:11, 676:21, 679:20, 688:8, 689:9
**jury's** [2] - 388:6, 437:23
**KAI** [1] - 382:12
**Kai** [9] - 352:18, 352:20, 354:4, 382:7, 383:3, 384:12, 385:11, 477:17, 499:24
**Kamat** [1] - 554:14
**KATHERINE** [1] - 348:23
**keep** [5] - 517:1, 563:17, 626:5, 688:19, 688:20
**keeping** [5] - 493:2, 610:24, 614:17, 618:22, 689:24
**keeps** [1] - 407:16
**KEKER** [1] - 349:11
**KELLER** [1] - 349:8
**key** [14] - 378:15, 378:24, 388:3, 418:5, 473:22, 473:23, 474:6, 544:20, 545:10, 614:8, 628:10, 628:23, 658:1, 658:20
**killed** [1] - 444:2
**kilobytes** [1] - 388:18
**kind** [47] - 356:18, 358:13, 399:2,

414:15, 415:16, 416:15, 416:21, 482:16, 483:11, 483:24, 487:19, 495:21, 612:23, 613:9, 614:5, 617:5, 618:18, 618:22, 619:11, 619:16, 619:23, 620:3, 621:19, 623:19, 623:24, 624:1, 624:3, 625:20, 625:24, 626:9, 626:11, 626:12, 626:15, 626:16, 628:10, 629:6, 629:23, 630:7, 630:13, 630:15, 630:18, 630:20, 635:10, 644:7, 656:11, 681:1, 689:8
**kinds** [7] - 442:16, 486:17, 492:14, 493:18, 497:11, 547:18, 603:23
**King** [1] - 348:12
**Kingdom** [1] - 482:11
**Kixmoeller** [2] - 549:15, 549:22
**knowing** [1] - 360:19
**knowledge** [2] - 357:23, 437:18
**known** [11] - 435:3, 435:4, 435:9, 485:2, 642:9, 648:5, 648:10, 648:13, 648:16, 649:19, 670:6
**knows** [3] - 359:23, 608:5, 630:18
**Knoxville** [1] - 654:10
**Krevitt** [9] - 355:17, 358:2, 358:7, 363:3, 363:14, 382:5, 412:3, 417:5, 419:24
**KREVITT** [103] - 348:22, 352:12, 352:17, 353:15, 353:20, 355:20, 356:13, 356:22, 357:4, 357:12, 357:16, 359:2, 359:6, 359:9, 359:18, 360:6, 360:13, 360:17, 360:22, 360:24, 361:23, 362:19, 363:5, 363:9, 363:15, 363:21, 364:2, 364:5, 364:9,

364:15, 364:18, 365:15, 366:3, 366:10, 382:6, 382:16, 382:19, 382:22, 383:22, 384:3, 384:23, 385:3, 385:5, 412:4, 412:12, 412:16, 412:19, 412:23, 413:3, 413:9, 413:13, 413:23, 414:6, 414:20, 415:7, 416:2, 416:5, 416:18, 416:22, 417:7, 420:1, 424:12, 424:18, 430:5, 430:12, 431:19, 432:2, 432:14, 432:21, 433:2, 433:9, 433:15, 434:2, 435:10, 436:7, 436:19, 437:17, 445:9, 450:16, 451:17, 453:7, 454:6, 457:23, 460:16, 474:1, 475:18, 475:20, 478:11, 478:16, 478:19, 508:8, 531:14, 531:22, 532:3, 607:20, 607:23, 631:20, 689:19, 690:7, 690:11, 690:19, 691:2, 691:8
**label** [1] - 379:4
**labeled** [5] - 378:15, 378:24, 574:8, 676:17, 676:20
**Labor** [1] - 483:2
**Laboratory** [1] - 654:5
**laboratory** [1] - 655:5
**Labs** [2] - 453:17, 559:13
**lack** [2] - 557:6, 559:13
**laid** [1] - 581:5
**landmark** [2] - 556:8, 556:9
**language** [27] - 504:5, 506:21, 507:3, 507:10, 509:4, 509:18, 510:15, 510:24, 512:20, 521:7, 521:14, 522:24, 523:1, 528:1, 537:5, 606:9, 633:11, 668:12, 672:16, 675:4, 676:17, 676:16,

682:24, 683:20, 686:15, 686:24, 687:21
**laptop** [1] - 388:15
**large** [15] - 351:21, 388:20, 390:9, 485:23, 486:20, 489:10, 489:16, 489:17, 511:7, 602:20, 613:7, 618:19, 619:10, 626:7, 648:20
**larger** [4] - 562:11, 622:4, 676:2, 677:17
**largest** [1] - 397:6
**Larry** [1] - 394:6
**laser** [1] - 573:16
**last** [23] - 363:13, 368:9, 383:9, 403:8, 412:2, 417:3, 444:23, 464:10, 503:18, 512:13, 536:13, 565:10, 579:17, 579:18, 589:2, 592:13, 624:20, 628:6, 628:14, 632:6, 637:23, 679:1, 690:5
**late** [10] - 350:16, 351:24, 354:24, 360:5, 371:16, 375:11, 375:15, 437:4, 450:23, 451:7
**latency** [17] - 498:14, 499:3, 502:2, 502:3, 502:4, 502:7, 502:12, 502:15, 510:11, 511:4, 511:9, 511:10, 511:15, 541:10, 541:13, 566:23, 662:8
**launch** [3] - 380:10, 400:12, 401:6
**launched** [2] - 381:9, 381:11, 387:9
**launching** [1] - 402:11
**LAURIDSEN** [1] - 349:13
**law** [2] - 397:20, 434:9
**Law** [2] - 407:21, 407:22
**lawsuit** [3] - 443:14, 443:18, 552:11
**lawyer** [1] - 471:6
**lawyers** [6] - 441:20, 442:2, 461:2, 508:17, 508:19, 688:12
**laymen's** [1] - 606:13

layout [1] - 669:5
lead [1] - 613:23
leadership [1] - 373:12
leading [5] - 351:15, 380:21, 419:22, 525:10, 604:9
learn [5] - 386:10, 395:1, 638:16, 689:5, 689:6
learned [3] - 451:13, 453:21, 638:18
learning [1] - 616:1
least [7] - 469:3, 508:13, 571:2, 620:1, 655:17, 656:13, 683:11
leave [4] - 363:12, 391:8, 395:6, 439:21
leaving [3] - 391:6, 531:7, 678:15
LED [3] - 566:18, 566:21, 566:23
led [1] - 391:8
left [23] - 418:4, 418:17, 486:11, 489:19, 489:24, 494:3, 500:5, 514:4, 518:12, 535:15, 538:4, 539:11, 542:2, 546:1, 562:1, 609:24, 616:6, 616:7, 622:9, 668:11, 674:18, 676:19, 681:4
left-hand [3] - 494:3, 500:5, 518:12
leg [4] - 355:18, 355:19, 355:20, 355:21
legal [1] - 507:24
length [1] - 539:13
lengthy [2] - 691:7, 691:9
less [5] - 369:21, 491:1, 492:17, 532:10, 622:14
letter [22] - 353:13, 354:7, 355:7, 358:6, 361:12, 361:15, 411:22, 412:10, 413:2, 413:4, 413:7, 413:8, 413:16, 413:22, 414:7, 414:21, 415:8, 415:12, 415:21, 668:8
level [7] - 388:7, 406:4, 406:9, 500:19, 660:3,

663:10, 679:22
Level [2] - 640:9, 640:12
Li [73] - 350:12, 350:14, 352:18, 352:20, 354:4, 357:22, 359:3, 359:4, 359:23, 360:6, 364:2, 382:7, 382:23, 383:3, 383:20, 384:12, 385:7, 385:11, 405:2, 417:2, 422:5, 424:20, 430:13, 432:15, 432:22, 432:23, 433:8, 433:10, 434:8, 434:18, 436:12, 437:24, 438:19, 438:21, 439:3, 439:5, 443:16, 444:19, 445:18, 449:23, 450:21, 451:16, 453:15, 454:5, 454:14, 457:17, 458:4, 458:11, 458:16, 459:15, 461:17, 463:18, 464:22, 465:10, 466:9, 467:23, 468:13, 469:21, 470:12, 471:22, 472:16, 474:2, 475:16, 475:21, 477:8, 478:13, 499:24, 501:8, 502:17, 550:21, 551:4, 551:16, 568:9
LI [1] - 382:12
Li's [1] - 554:22
librarian [1] - 491:10
library [5] - 395:13, 395:23, 396:1, 406:24, 491:11
life [1] - 399:14
light [1] - 480:14
likely [2] - 516:24, 580:15
likewise [1] - 546:14
Limerick [1] - 611:18
liminae [1] - 365:20
limine [6] - 352:18, 352:19, 352:22, 352:24, 353:5, 354:1
limit [1] - 588:24
limitation [15] - 509:14, 509:23, 512:4, 512:13, 512:14, 512:20,

513:9, 522:5, 528:15, 569:16, 570:18, 571:23, 680:8, 683:18, 683:22
limitations [3] - 625:21, 683:16, 686:14
limited [7] - 447:3, 560:5, 562:4, 562:15, 595:12, 599:16, 603:4
Line [2] - 641:1, 641:8
line [33] - 387:23, 400:2, 400:8, 403:5, 404:1, 419:15, 429:19, 442:16, 442:19, 459:16, 542:9, 562:19, 579:3, 579:20, 579:21, 583:10, 584:5, 585:24, 586:3, 586:24, 587:24, 588:7, 588:22, 589:6, 607:8, 607:10, 627:1, 627:21, 627:22, 662:17, 665:14, 667:9
lines [8] - 459:15, 463:18, 463:20, 468:1, 620:6, 627:8, 627:13, 639:10
list [4] - 481:14, 516:6, 517:18, 537:18
listed [12] - 361:19, 500:2, 500:4, 504:20, 539:11, 542:11, 546:15, 566:20, 579:3, 610:4, 610:7, 640:24
listened [1] - 505:20
listening [2] - 365:7, 365:9
literal [4] - 569:15, 569:22, 586:8, 586:12
literally [4] - 527:24, 528:6, 528:16, 569:12
litigation [3] - 411:13, 441:13, 637:8
live [2] - 611:10, 611:11
lived [2] - 611:11, 611:12
living [1] - 483:19
LLP [5] - 348:19, 348:21, 349:3, 349:8, 349:11

load [3] - 429:9, 601:1, 601:2
lobbed [1] - 352:7
local [3] - 410:2, 410:7, 473:13
locate [5] - 456:10, 680:18, 682:6, 683:6, 685:9
located [3] - 630:10, 667:7, 682:17
location [6] - 456:20, 618:6, 679:18, 680:1, 680:23, 685:6
locations [1] - 645:18
logic [1] - 518:24
logical [4] - 627:14, 630:14, 658:13, 684:9
logically [1] - 673:16
London [2] - 482:12, 483:6
look [48] - 355:13, 372:22, 414:8, 418:7, 422:16, 423:21, 427:15, 427:18, 430:13, 430:15, 441:15, 454:17, 456:19, 486:5, 505:17, 507:13, 509:6, 526:18, 545:20, 551:14, 557:7, 560:12, 560:18, 561:4, 561:11, 573:1, 580:14, 580:16, 581:16, 589:15, 590:6, 599:8, 605:1, 606:2, 606:7, 607:4, 609:12, 623:20, 624:3, 625:7, 626:23, 627:20, 636:8, 639:7, 646:21, 666:6, 674:13, 677:15
looked [26] - 389:4, 456:13, 456:15, 456:16, 483:2, 503:13, 505:10, 505:21, 505:23, 526:22, 537:6, 537:8, 538:9, 540:8, 551:10, 558:9, 560:8, 560:16, 573:9, 581:5, 583:11, 594:9, 638:20, 659:14, 665:19
looking [33] - 358:6, 361:12, 394:15,

408:12, 418:8, 418:15, 424:22, 425:9, 429:20, 430:17, 436:3, 442:4, 459:20, 477:10, 490:11, 490:12, 494:24, 496:14, 517:24, 561:9, 561:10, 581:8, 581:19, 584:21, 596:11, 604:1, 607:13, 619:18, 631:9, 647:5, 672:15, 672:17, 681:8
looks [7] - 360:11, 447:12, 468:11, 496:2, 496:9, 605:2, 618:18
lookup [1] - 519:12, 519:13, 520:2
lookups [3] - 519:8, 519:10, 520:9
lose [2] - 397:21, 626:2
lost [10] - 356:6, 361:14, 361:23, 397:16, 398:2, 398:5, 614:19, 621:12, 621:21, 687:11
louder [2] - 474:3, 647:9
love [1] - 619:24
loved [1] - 392:11
low [5] - 405:19, 441:22, 510:11, 511:4, 511:15
lower [4] - 403:11, 441:22, 500:5, 532:20
lowered [1] - 533:5
lunch [6] - 364:7, 364:14, 530:24, 531:4, 533:4, 533:12
luncheon [1] - 532:11
lunchtime [2] - 691:1, 691:9
lure [1] - 377:9
MacLellan [1] - 610:10
magnetic [6] - 396:5, 398:13, 406:17, 443:8, 498:4, 590:22
Mahesh [1] - 554:14
mail [8] - 371:24, 372:10, 372:11, 372:20, 372:23, 373:6, 373:10, 374:4
mails [1] - 516:22
main [6] - 428:2,

428:6, 431:12,
551:12, 614:4, 614:7
**maintain** [2] - 477:1,
478:7
**maintained** [1] -
354:13
**major** [2] - 495:12,
629:4
**manage** [2] - 535:19,
565:17
**managed** [1] - 488:4
**management** [5] -
373:21, 374:16,
374:22, 394:13,
532:19
**manager** [1] - 488:3
**managers** [1] - 487:2
**Manchuria** [1] - 390:3
**mandatory** [3] -
544:20, 545:12,
550:1
**manner** [2] - 614:20,
634:2
**manuals** [2] - 505:21,
505:23
**manufacture** [2] -
590:18, 590:21
**manufacturer** [1] -
488:10
**map** [1] - 418:21
**mapping** [2] - 629:1,
645:1
**March** [20] - 348:10,
422:20, 422:21,
423:24, 427:5,
427:10, 427:15,
427:21, 428:16,
428:21, 429:2,
457:6, 469:17,
469:22, 470:5,
470:6, 472:1, 476:4,
692:11, 692:15
**margin** [3] - 403:7,
403:15, 403:19
**marginal** [1] - 369:16
**marginalized** [1] -
373:16
**margins** [1] - 403:14
**Mark** [3] - 532:5,
650:3, 652:17
**mark** [3] - 428:2,
512:11, 651:21
**marked** [4] - 383:21,
384:5, 494:11,
678:20
**market** [46] - 351:10,
351:13, 355:15,
357:22, 366:16,
371:16, 371:19,
374:11, 375:12,

375:15, 377:23,
378:5, 378:10,
379:5, 379:13,
379:14, 379:16,
379:22, 381:8,
381:15, 381:16,
381:18, 387:16,
387:18, 400:15,
403:21, 403:23,
404:2, 429:20,
442:11, 442:14,
442:24, 443:1,
443:2, 444:8, 445:8,
446:2, 446:6,
474:21, 475:2,
475:3, 475:7, 591:2,
591:5, 591:10
**marketing** [9] -
373:20, 374:2,
374:17, 374:22,
380:14, 474:24,
475:11, 591:13,
600:9
**marketplace** [3] -
366:6, 375:22,
400:20
**marks** [2] - 539:24,
678:14
**Massachusetts** [2] -
611:13, 612:2
**massive** [1] - 613:9
**master** [1] - 390:15
**masters** [2] - 611:23,
612:3
**match** [7] - 517:10,
518:1, 518:5, 529:6,
587:12, 657:4, 657:7
**matched** [1] - 518:6
**matches** [2] - 518:10,
520:17
**materials** [3] - 441:15,
505:17, 508:10
**math** [1] - 621:7
**mathematical** [1] -
620:17
**mathematics** [2] -
426:23, 654:3
**Matt** [1] - 549:15
**matter** [10] - 374:9,
435:22, 441:12,
469:15, 568:12,
577:22, 591:4,
594:5, 625:17,
692:12
**matters** [1] - 621:7
**MATTHEW** [2] - 349:3,
349:12
**Matthew** [1] - 608:7
**maximum** [4] -
560:13, 561:5,

561:6, 666:19
**MBA** [1] - 612:1
**McClellan** [2] - 637:2,
637:20
**mean** [36] - 358:17,
360:18, 366:12,
388:9, 389:12,
403:13, 409:20,
410:6, 410:11,
413:9, 413:10,
414:2, 415:17,
420:9, 423:1, 427:9,
436:14, 443:13,
444:17, 461:21,
486:1, 502:24,
510:22, 512:24,
537:13, 574:7,
598:11, 598:24,
614:4, 614:15,
614:21, 619:10,
634:18, 645:15,
648:20, 662:4
**meaning** [8] - 387:12,
473:13, 507:22,
509:3, 509:9,
628:23, 668:18,
668:20
**meaningful** [1] - 633:4
**means** [27] - 400:9,
407:24, 408:2,
410:12, 422:10,
422:22, 423:3,
444:16, 454:4,
502:15, 504:9,
504:10, 535:7,
569:16, 571:5,
571:12, 576:18,
585:9, 612:19,
614:17, 615:10,
621:9, 622:23,
630:18, 656:6,
662:13, 690:16
**meant** [8] - 401:15,
442:14, 471:13,
471:14, 472:4,
487:1, 560:19, 614:3
**meanwhile** [2] - 408:7,
429:10
**measure** [1] - 566:23
**mechanical** [4] -
443:6, 443:8,
444:15, 485:13
**media** [9] - 396:4,
396:12, 396:24,
406:17, 408:12,
443:9, 444:18,
491:19, 492:14
**medical** [1] - 439:21
**medium** [1] - 504:7
**meet** [15] - 503:22,

509:23, 513:8,
527:3, 527:17,
528:1, 528:15,
528:16, 570:18,
600:5, 600:7, 602:8,
605:12, 683:21,
688:12
**meeting** [2] - 467:19,
468:4
**meets** [14] - 440:16,
509:13, 512:4,
522:5, 525:24,
527:5, 528:7,
533:14, 605:9,
672:21, 675:8,
680:8, 683:23, 686:9
**megabytes** [6] -
410:13, 410:14,
484:21, 484:22,
485:3, 485:4
**member** [4] - 383:8,
392:3, 441:3, 446:20
**members** [9] - 367:8,
367:10, 417:1,
438:15, 507:15,
531:3, 533:1,
631:12, 688:8
**memorialized** [1] -
353:8
**memories** [6] -
491:23, 497:18,
623:1, 623:3, 624:1,
626:10
**memory** [204] -
401:24, 414:22,
442:20, 446:12,
463:15, 468:9,
469:9, 492:15,
497:19, 498:23,
510:12, 511:4,
511:5, 511:7,
511:11, 511:15,
511:16, 541:11,
541:13, 574:4,
612:17, 612:22,
613:23, 618:21,
619:9, 619:14,
619:20, 619:21,
619:24, 620:1,
620:5, 620:10,
623:7, 623:11,
623:21, 623:22,
624:22, 625:17,
625:19, 625:23,
626:3, 626:13,
626:15, 626:18,
627:20, 627:23,
628:5, 628:8, 628:9,
628:12, 628:13,
628:22, 628:17,

628:19, 628:23,
629:14, 629:16,
629:23, 630:3,
630:5, 630:9,
630:13, 630:17,
630:18, 631:9,
643:13, 643:18,
643:20, 644:7,
644:8, 644:9,
644:10, 644:17,
645:6, 645:10,
645:14, 645:17,
645:24, 647:6,
647:14, 648:9,
648:15, 648:20,
649:9, 649:17,
654:23, 658:7,
658:9, 658:15,
658:17, 658:20,
658:21, 658:22,
658:23, 659:1,
659:10, 659:11,
662:4, 662:5,
662:11, 662:15,
664:15, 664:22,
665:4, 665:17,
665:20, 665:22,
665:23, 666:2,
666:16, 666:20,
666:23, 667:3,
667:13, 667:14,
667:15, 667:20,
667:21, 667:23,
668:3, 668:4, 668:5,
668:7, 668:9,
668:13, 668:17,
668:19, 669:1,
669:21, 669:22,
669:24, 670:3,
670:4, 670:6, 670:7,
670:15, 670:16,
670:17, 670:20,
671:1, 671:2, 671:4,
671:18, 671:20,
671:22, 671:23,
672:10, 672:18,
672:19, 672:22,
673:14, 674:3,
675:6, 677:18,
678:3, 678:8, 679:4,
679:7, 679:10,
679:24, 680:1,
680:5, 680:7,
680:14, 680:17,
680:22, 681:2,
681:3, 681:4, 681:5,
681:7, 681:12,
681:15, 681:23,
682:14, 682:22,
684:12, 684:18,
685:6, 685:14,

685:15, 685:16,
685:18, 685:21,
685:24, 686:16,
686:19, 686:20,
686:22, 687:3, 687:4
**Memory** [1] - 666:11
**mention** [5] - 444:10,
448:18, 516:9,
592:8, 592:10
**mentioned** [37] -
385:19, 386:4,
406:17, 429:23,
431:11, 434:23,
444:13, 448:24,
456:5, 473:5,
474:24, 493:22,
495:21, 523:10,
525:23, 554:21,
592:23, 617:12,
619:3, 627:18,
637:1, 642:12,
643:11, 643:17,
644:3, 644:13,
645:9, 649:16,
662:10, 664:4,
668:24, 670:24,
674:4, 674:7, 675:5,
680:11, 681:12
**mentions** [2] - 684:12,
685:14
**Merit** [1] - 692:7
**mess** [1] - 625:24
**message** [4] - 373:1,
373:13, 375:5,
602:15
**met** [22] - 386:14,
394:2, 394:8,
394:10, 394:17,
523:4, 523:6,
529:13, 569:16,
637:11, 637:18,
637:23, 667:9,
675:10, 676:9,
676:10, 678:15,
685:18, 686:17,
687:15, 690:14
**metadata** [10] -
420:17, 421:2,
421:3, 422:17,
423:21, 466:10,
466:13, 467:3,
469:16, 470:4
**method** [6] - 388:10,
408:20, 535:8,
604:15, 604:22,
630:8
**Michael** [3] - 608:1,
608:10, 609:2
**MICHAEL** [2] - 608:11,
608:13

**microphone** [2] -
624:15, 652:21
**mid** [3] - 381:11,
418:10, 691:10
**mid-February** [1] -
418:10
**middle** [6] - 381:14,
419:3, 598:12,
661:16, 668:6, 682:4
**midnight** [1] - 407:12
**might** [7] - 353:5,
369:3, 485:9,
526:18, 597:4,
624:4, 624:5
**million** [13] - 400:22,
400:23, 401:3,
401:11, 401:20,
401:24, 402:1,
402:2, 402:4, 402:6,
402:8, 402:14
**mind** [4] - 437:23,
626:5, 688:20,
688:23
**mine** [2] - 394:5,
477:23
**minimal** [2] - 351:23,
662:7
**minor** [8] - 362:6,
428:1, 428:9,
428:10, 458:22,
459:8, 652:3, 653:21
**minute** [7] - 363:12,
449:14, 504:3,
575:8, 596:22,
635:17, 650:6
**minutes** [14] - 363:18,
364:5, 366:24,
432:20, 433:6,
460:5, 523:12,
525:22, 531:5,
631:15, 635:10,
635:17, 690:18,
690:22
**mirroring** [15] -
617:22, 617:23,
618:3, 618:11,
618:18, 622:7,
622:10, 625:7,
625:8, 640:6, 640:8,
641:23, 642:7,
649:18, 649:20
**misleading** [1] -
633:16
**missing** [5] - 433:9,
569:5, 621:11,
621:17, 629:8
**mission** [2] - 395:9,
395:12
**misstated** [1] - 674:20
**modern** [1] - 485:9

**modest** [1] - 393:4
**modified** [1] - 525:18
**modifying** [1] - 541:6
**module** [2] - 425:24,
431:12
**modules** [3] - 425:24,
580:10, 581:22
**moment** [9] - 361:5,
363:5, 385:15,
522:24, 564:14,
583:12, 611:6,
680:12, 689:16
**money** [7] - 365:22,
365:23, 403:9,
440:9, 475:9, 498:9,
532:20
**monitors** [2] - 566:18,
566:21
**month** [25] - 368:9,
374:10, 386:21,
435:5, 457:15,
460:6, 460:18,
461:7, 461:13,
461:21, 461:22,
461:23, 461:24,
462:4, 463:11,
464:13, 466:2,
467:11, 467:18,
469:3, 470:7,
470:14, 471:8,
471:21, 472:8
**months** [9] - 373:14,
399:11, 399:22,
404:15, 407:20,
429:15, 430:1,
439:10, 439:11
**Moore** [4] - 407:17,
407:18, 407:21,
407:22
**morning** [27] - 350:1,
350:9, 350:10,
350:12, 353:17,
354:21, 363:14,
367:8, 367:17,
367:19, 380:6,
380:7, 382:23,
382:24, 407:13,
432:19, 439:3,
439:4, 479:17,
479:18, 568:10,
572:11, 582:14,
582:21, 583:11,
584:15, 691:15
**morning's** [1] - 572:7
**MORRIS** [1] - 348:19
**most** [12] - 351:16,
374:9, 393:8, 407:8,
426:22, 429:22,
477:18, 492:5,
565:14, 580:15,

615:7, 687:4
**motion** [6] - 352:18,
352:22, 352:24,
354:1, 365:20
**motions** [1] - 353:4
**Mountain** [1] - 397:5
**mouth** [1] - 351:2
**move** [30] - 396:15,
399:21, 400:5,
405:24, 408:3,
412:1, 416:22,
416:23, 424:12,
430:6, 431:20,
444:19, 450:14,
454:10, 506:8,
510:8, 532:5, 546:5,
546:14, 549:20,
553:13, 554:5,
641:12, 643:9,
651:18, 652:6,
669:14, 679:1,
681:7, 682:4
**moved** [3] - 365:20,
464:18, 482:24
**movement** [1] - 575:6
**movie** [1] - 491:1
**moving** [11] - 407:9,
490:16, 535:20,
537:16, 574:9,
574:11, 575:13,
612:5, 641:14,
662:14, 662:15
**MP3** [1] - 395:16
**MP?** [1] - 677:2
**MR** [294] - 350:4,
350:8, 350:11,
350:14, 352:12,
352:17, 353:15,
353:20, 354:8,
354:20, 355:8,
355:12, 355:20,
356:13, 356:22,
357:4, 357:12,
357:14, 357:16,
357:20, 358:5,
358:10, 358:18,
358:24, 359:2,
359:6, 359:9,
359:18, 359:19,
359:22, 360:6,
360:10, 360:13,
360:17, 360:22,
360:24, 361:4,
361:23, 362:1,
362:14, 362:19,
362:21, 363:1,
363:5, 363:9,
363:15, 363:21,
364:2, 364:5, 364:9,
365:14, 364:18,

365:15, 366:3,
366:10, 367:14,
367:16, 372:3,
372:8, 377:1, 377:6,
379:24, 380:20,
382:6, 382:16,
382:19, 382:22,
383:22, 384:3,
384:23, 385:3,
385:5, 411:24,
412:4, 412:12,
412:15, 412:16,
412:18, 412:19,
412:23, 413:3,
413:9, 413:13,
413:14, 413:18,
413:20, 413:23,
414:6, 414:17,
414:20, 414:24,
415:7, 415:9, 416:2,
416:5, 416:17,
416:18, 416:22,
417:7, 419:21,
420:1, 424:12,
424:14, 424:18,
430:5, 430:8,
430:12, 431:19,
431:22, 432:2,
432:14, 432:21,
433:2, 433:3, 433:9,
433:11, 433:15,
434:2, 434:15,
435:2, 435:10,
435:14, 436:2,
436:7, 436:18,
436:19, 436:21,
437:12, 437:17,
438:9, 438:20,
438:24, 439:2,
445:9, 445:13,
445:17, 450:14,
450:16, 450:20,
451:17, 452:2,
452:3, 453:3, 453:7,
453:12, 454:6,
454:11, 454:13,
457:23, 458:3,
458:10, 460:16,
460:20, 465:8,
465:15, 474:1,
474:9, 475:16,
475:18, 475:20,
478:11, 478:16,
478:19, 479:9,
479:12, 479:16,
488:19, 488:22,
489:2, 506:7, 506:9,
506:13, 508:8,
508:23, 509:1,
525:9, 525:13,
531:2, 531:13,

531:14, 531:16,
531:22, 532:3,
532:14, 532:22,
533:8, 533:10,
544:16, 544:18,
545:1, 546:4, 546:6,
546:13, 546:17,
546:21, 549:5,
549:12, 553:12,
553:14, 553:18,
554:4, 554:6,
554:10, 564:10,
564:13, 564:16,
564:20, 564:24,
582:23, 583:5,
601:17, 601:21,
601:23, 604:8,
604:12, 604:17,
607:16, 607:20,
607:23, 608:6,
608:17, 608:21,
609:19, 609:23,
631:11, 631:20,
631:22, 632:2,
632:5, 632:24,
634:1, 634:12,
634:17, 634:23,
635:5, 635:18,
635:24, 636:4,
636:9, 636:16,
636:20, 641:11,
641:13, 641:16,
641:22, 642:5,
643:3, 643:8,
643:10, 645:21,
646:11, 646:16,
647:7, 647:10,
647:12, 647:18,
647:20, 648:22,
649:2, 649:4,
649:11, 649:15,
649:21, 650:2,
651:2, 651:16,
651:18, 652:5,
652:12, 652:13,
655:6, 655:9,
655:12, 661:7,
661:12, 663:1,
663:3, 663:6,
669:13, 669:15,
669:18, 674:21,
674:23, 675:2,
688:5, 689:19,
689:21, 690:7,
690:11, 690:19,
691:2, 691:6, 691:8,
691:11
**MS** [4] - 372:5, 377:3,
380:5, 381:23
**multimillion** [1] -
486:4

**multiple** [14] - 353:6,
472:22, 483:16,
539:2, 539:9, 604:1,
607:13, 625:12,
654:18, 656:10,
672:2, 672:7,
675:15, 681:20
**multistep** [1] - 571:22
**music** [1] - 395:15
**must** [5] - 506:22,
587:3, 665:4, 665:5,
686:20
**name** [47] - 357:10,
360:15, 383:1,
383:3, 387:8,
387:18, 418:10,
421:11, 455:17,
461:3, 461:12,
462:1, 467:2,
471:19, 472:11,
474:23, 477:13,
479:1, 479:2,
484:23, 485:1,
487:18, 515:5,
515:10, 516:12,
518:13, 519:15,
519:21, 519:22,
520:1, 536:7,
536:10, 549:15,
572:14, 604:5,
604:21, 608:5,
608:7, 608:9,
608:24, 609:2,
610:4, 652:15,
652:17, 656:6,
660:21, 690:5
**named** [7] - 411:17,
421:12, 421:16,
421:19, 427:11,
617:7, 637:1
**namely** [1] - 445:8
**nametags** [1] - 516:9
**Napper** [1] - 690:15
**narrow** [1] - 415:4
**National** [2] - 393:9,
654:4
**natural** [1] - 459:5
**nature** [1] - 427:20
**necessarily** [2] -
412:5, 635:2
**necessary** [1] - 413:24
**need** [46] - 353:19,
363:9, 369:23,
396:22, 402:15,
407:5, 410:13,
412:14, 423:15,
426:22, 461:4,
468:18, 475:14,
486:7, 497:4, 557:4,
559:12, 560:12.

560:17, 560:22,
561:1, 561:2, 561:4,
561:13, 561:16,
561:18, 562:22,
563:5, 568:22,
586:12, 588:17,
590:6, 592:22,
595:8, 595:12,
600:5, 600:20,
603:20, 605:11,
618:17, 622:14,
629:11, 631:19,
682:4, 682:5, 689:6
**needed** [7] - 374:18,
418:19, 522:21,
578:21, 602:10,
603:1, 681:17
**needs** [8] - 486:6,
561:8, 563:4, 601:1,
615:23, 634:23,
651:12, 652:10
**negotiations** [1] -
353:6
**NEST** [88] - 349:11,
349:11, 350:4,
350:8, 350:11,
350:14, 354:8,
354:20, 355:8,
355:12, 358:5,
358:10, 358:18,
359:22, 361:4,
362:1, 362:14,
362:21, 363:1,
411:24, 412:15,
412:18, 413:14,
413:18, 413:20,
414:17, 414:24,
415:9, 416:17,
419:21, 424:14,
430:8, 431:22,
433:3, 433:11,
434:15, 435:2,
435:14, 436:2,
436:18, 436:21,
437:12, 438:9,
438:20, 438:24,
439:2, 445:13,
445:17, 450:14,
450:20, 452:2,
452:3, 453:3,
453:12, 454:11,
454:13, 458:3,
458:10, 460:20,
465:8, 465:15,
474:9, 475:16,
488:22, 506:9,
525:9, 531:13,
531:16, 532:14,
532:22, 544:16,
546:6, 546:17,

554:6, 564:13,
564:16, 564:20,
564:24, 583:5,
601:17, 604:8,
604:17, 631:22,
632:2, 689:21,
691:11
**Nest** [23] - 354:7,
358:4, 361:3,
361:12, 366:12,
433:19, 434:14,
435:13, 437:7,
438:1, 438:18,
452:1, 454:10,
458:8, 460:18,
465:13, 475:21,
475:24, 603:8,
605:6, 605:20,
607:7, 690:16
**Nest's** [1] - 365:3
**network** [2] - 388:21,
407:19
**never** [14] - 350:24,
351:11, 359:23,
359:24, 442:21,
443:20, 444:7,
460:6, 465:19,
557:24, 568:1,
568:5, 568:8, 622:3
**new** [20] - 368:10,
368:13, 386:10,
386:11, 387:17,
394:12, 395:2,
399:2, 400:4,
405:13, 405:22,
406:2, 406:6,
418:23, 452:15,
464:19, 622:22,
654:21
**New** [1] - 692:2
**news** [1] - 360:4
**next** [40] - 375:4,
375:6, 382:7, 384:5,
402:3, 429:4,
452:13, 478:17,
506:24, 514:18,
514:21, 515:24,
520:13, 531:21,
535:22, 554:1,
579:8, 607:24,
614:7, 619:5,
619:18, 620:11,
621:6, 622:6,
623:13, 623:23,
629:10, 650:2,
656:16, 657:11,
660:1, 663:7,
672:17, 675:4,
676:5, 677:20,
678:2, 678:13,

680:6, 689:15
**nexus** [2] - 358:15,
358:16
**nice** [1] - 689:10
**NICHOLS** [1] - 348:19
**night** [2] - 616:4,
632:6
**nine** [3] - 377:8, 611:3,
691:15
**nobody** [1] - 663:22
**non** [7] - 593:10,
593:14, 593:16,
593:18, 593:20,
595:3, 595:4
**non-infringing** [7] -
593:10, 593:14,
593:16, 593:18,
593:20, 595:3, 595:4
**none** [7] - 437:19,
438:1, 531:14,
581:12, 581:21,
582:8, 686:24
**noninfringing** [11] -
530:22, 533:17,
533:19, 534:8,
538:20, 539:1,
540:1, 542:7,
563:15, 563:23,
601:6
**normally** [2] - 376:14,
586:10
**Northeastern** [1] -
611:24
**Notary** [1] - 692:8
**note** [2] - 373:10,
669:13
**notes** [3] - 467:19,
468:5, 669:17
**nothing** [8] - 381:24,
526:20, 539:3,
589:9, 601:17,
644:5, 689:19,
691:14
**notice** [1] - 352:8
**noticed** [2] - 365:7,
532:17
**novel** [2] - 623:7,
658:14
**November** [2] - 371:5,
381:12
**number** [40] - 350:18,
350:22, 350:23,
351:6, 351:14,
360:20, 378:10,
381:15, 381:19,
448:24, 450:2,
498:7, 557:18,
595:14, 601:15,
602:1, 620:21,
620:23, 621:1,

621:4, 621:16,
642:3, 674:3, 675:7,
675:17, 675:19,
679:23, 680:9,
680:17, 681:12,
681:14, 682:17,
683:3, 684:17,
684:21, 685:5,
690:20
**numbers** [11] -
351:21, 356:20,
362:2, 362:8,
401:11, 401:18,
430:16, 627:1,
636:5, 686:1
**numerous** [5] -
392:20, 393:3,
409:19
**o'clock** [2] - 407:12,
691:15
**oath** [7] - 382:14,
457:18, 464:14,
470:14, 479:7,
608:15, 651:23
**object** [6] - 350:20,
422:11, 546:8,
553:21, 634:19,
635:23
**objecting** [2] - 632:11,
632:16
**objection** [62] -
354:24, 372:5,
372:7, 377:3, 377:5,
380:20, 384:2,
385:2, 403:10,
411:24, 419:21,
424:14, 424:17,
430:8, 430:11,
431:22, 432:1,
433:18, 445:9,
445:16, 450:16,
450:19, 454:7,
454:9, 457:24,
488:22, 506:9,
506:12, 525:9,
544:16, 544:24,
546:7, 546:11,
546:12, 546:17,
546:20, 549:5,
553:14, 553:17,
554:6, 554:9,
582:23, 582:24,
583:2, 604:8,
604:17, 609:22,
632:21, 633:20,
643:3, 645:21,
646:11, 646:15,
647:7, 647:17,
655:9, 663:3, 663:5,
669:15, 669:17,

674:23, 675:1
**objections** [5] - 354:3,
354:23, 355:3,
361:13, 634:5
**observe** [1] - 557:17
**obtain** [1] - 611:21
**obtained** [1] - 472:22
**obvious** [1] - 378:4
**obviously** [13] -
351:19, 381:7,
418:13, 437:21,
445:11, 462:9,
477:23, 487:5,
488:1, 568:21,
585:22, 624:19,
654:16
**obviousness** [6] -
351:6, 354:11,
354:13, 354:21,
355:14, 362:5
**occupation** [1] -
652:23
**occur** [1] - 468:4
**occurred** [1] - 451:7
**occurring** [1] - 603:24
**occurs** [1] - 585:16
**October** [9] - 376:11,
377:21, 378:9,
379:12, 386:20,
393:16, 399:11,
404:22, 404:23
**odd** [1] - 620:23
**OF** [2] - 348:1, 692:5
**offensive** [1] - 351:17
**offer** [13] - 372:4,
377:2, 411:21,
411:22, 412:10,
413:16, 413:22,
414:7, 532:19,
534:18, 609:20,
663:1, 674:21
**offered** [3] - 350:16,
537:9, 538:1
**offering** [3] - 368:2,
530:14, 530:18
**office** [10] - 424:4,
438:3, 454:15,
454:23, 455:3,
456:16, 456:18,
456:19, 456:22,
456:24
**Office** [3] - 483:9,
483:14, 488:17
**officer** [1] - 439:13
**official** [1] - 455:3
**offset** [7] - 680:18,
680:23, 681:6,
681:16, 681:17,
682:5, 682:18
**often** [3] - 370:12,

376:21, 397:7
**old** [7] - 448:12, 463:5,
463:6, 464:3,
464:11, 465:17,
466:3
**older** [1] - 590:21
**On-Line** [1] - 641:1
**on-Line** [1] - 641:8
**once** [6] - 394:10,
394:17, 424:4,
521:10, 629:9, 675:3
**one** [199] - 350:11,
350:24, 354:10,
364:19, 368:23,
370:6, 370:10,
372:15, 375:2,
376:1, 377:13,
377:15, 378:2,
379:13, 381:15,
381:19, 382:7,
383:18, 384:18,
385:13, 386:21,
393:9, 394:1, 394:7,
394:9, 395:20,
403:3, 404:23,
406:15, 408:5,
408:16, 408:21,
412:10, 414:8,
416:7, 416:17,
418:10, 423:8,
423:13, 423:22,
423:23, 425:17,
426:6, 427:12,
429:6, 434:5, 435:6,
435:16, 437:2,
439:5, 442:17,
446:6, 447:5,
447:23, 449:7,
449:9, 456:20,
459:22, 464:8,
465:1, 466:8,
466:17, 468:17,
473:6, 477:8,
477:11, 480:8,
480:24, 481:4,
481:5, 481:8,
484:11, 484:13,
485:13, 488:1,
489:11, 490:8,
492:3, 492:17,
492:21, 493:10,
493:13, 493:21,
495:5, 498:1,
499:11, 502:6,
506:3, 506:5,
507:15, 511:20,
513:7, 514:3,
516:23, 521:8,
522:24, 523:5,
523:11, 524:4,

524:9, 526:13,
531:4, 535:24,
536:14, 538:1,
538:2, 540:22,
547:9, 547:12,
547:21, 548:9,
550:1, 550:11,
554:1, 556:5,
560:22, 569:5,
570:7, 572:8, 573:8,
577:10, 579:3,
579:20, 581:10,
583:10, 583:17,
584:18, 587:18,
589:3, 589:6, 592:2,
597:17, 598:2,
599:20, 600:19,
601:14, 604:24,
607:8, 607:10,
609:7, 617:7, 619:4,
619:14, 620:23,
620:24, 621:13,
622:14, 627:9,
628:22, 629:3,
632:18, 633:9,
634:7, 637:4,
639:10, 640:24,
642:8, 644:24,
649:2, 649:12,
655:19, 655:20,
656:13, 658:3,
660:6, 661:4, 667:5,
669:24, 670:19,
670:20, 672:5,
672:6, 673:1, 673:7,
673:8, 673:11,
673:20, 674:1,
674:18, 675:16,
676:17, 677:20,
678:8, 678:15,
678:21, 680:12,
682:16, 684:6,
685:24, 686:11,
687:1, 687:4,
687:11, 688:9,
688:22, 690:21
**one-hour** [1] - 531:4
**ones** [14] - 517:2,
542:3, 599:7,
599:17, 620:21,
620:23, 621:1,
621:3, 621:5,
621:16, 621:17,
634:20, 636:3
**online** [2] - 646:22,
646:23
**onwards** [1] - 371:1
**open** [8] - 433:16,
450:4, 458:7,
459:14, 463:17,

609:11, 688:20,
689:24
**opened** [4] - 365:3,
366:2, 464:8, 464:18
**opening** [12] - 365:3,
365:7, 366:9, 438:1,
523:13, 570:2,
578:12, 579:7,
579:10, 579:14,
579:23, 579:24
**operate** [2] - 573:5,
580:11
**operated** [1] - 575:16
**operates** [3] - 578:6,
580:6, 659:24
**operating** [5] - 373:2,
495:15, 497:12,
497:13, 505:4
**operation** [7] - 576:24,
620:17, 621:14,
621:15, 625:10,
625:13, 657:1
**operations** [2] -
561:20, 626:16
**opinion** [88] - 358:10,
358:18, 359:1,
359:2, 360:4, 361:6,
361:9, 361:10,
362:18, 374:20,
374:21, 480:22,
481:6, 481:10,
482:1, 509:12,
509:19, 509:21,
512:2, 513:6,
513:10, 513:17,
527:2, 528:21,
529:12, 529:16,
529:21, 529:23,
530:6, 530:16,
533:13, 534:16,
534:18, 537:10,
538:17, 539:18,
539:22, 540:1,
540:21, 542:5,
543:12, 545:6,
547:11, 549:18,
549:23, 551:6,
551:11, 551:20,
552:9, 552:14,
552:15, 552:19,
552:20, 553:9,
553:20, 554:18,
554:23, 555:4,
555:24, 559:1,
559:24, 563:14,
563:21, 564:7,
569:11, 577:8,
577:9, 577:17,
585:10, 585:23,
586:2, 586:11,

587:19, 588:7,
588:23, 591:19,
592:14, 600:17,
601:5, 602:24,
605:8, 605:10,
634:24, 651:1,
660:7, 666:15,
686:5, 686:7
**opinions** [15] - 506:4,
534:24, 568:21,
569:8, 573:9,
578:17, 578:24,
603:9, 603:22,
607:11, 607:15,
633:4, 633:9,
633:22, 650:16
**opportunity** [8] -
391:10, 392:12,
394:15, 395:22,
524:6, 616:2, 616:8,
616:18
**opposed** [6] - 366:4,
442:13, 498:12,
550:6, 644:7, 666:20
**optic** [1] - 490:4
**optimization** [1] -
644:12
**order** [22] - 363:13,
388:12, 398:20,
399:4, 405:23,
407:1, 407:6,
408:11, 446:6,
508:6, 508:13,
520:9, 522:9,
534:14, 541:5,
559:13, 561:19,
562:24, 568:22,
572:24, 595:9,
605:12
**ordinary** [2] - 684:1,
684:7
**organization** [3] -
502:10, 626:15,
658:15
**organized** [1] - 626:14
**organizes** [2] - 670:6,
673:5
**original** [2] - 372:23,
372:24
**originally** [2] - 611:8,
611:9
**oRRICK** [1] - 349:3
**otherwise** [4] -
366:19, 427:2,
566:2, 650:11
**ourselves** [1] - 424:10
**outcome** [1] - 653:16
**outline** [2] - 434:21,
655:14
**outside** [3] - 382:9,

445:10, 544:8
**outweighs** [1] -
650:16
**overall** [2] - 620:24,
660:21
**overcome** [1] - 625:20
**overhead** [5] - 625:5,
625:14, 626:1,
626:17, 662:7
**overnight** [1] - 363:19
**overrule** [5] - 445:16,
544:23, 583:1,
643:5, 645:22
**overruled** [4] - 380:22,
458:2, 546:12, 549:8
**overtake** [2] - 374:8,
374:18
**overview** [4] - 553:2,
553:8, 655:21, 660:4
**own** [9] - 414:22,
428:21, 439:24,
550:3, 551:7,
630:16, 639:18,
659:16, 674:17
**owned** [3] - 446:15,
483:8, 486:13
**owners** [1] - 589:21
**p)** [1] - 582:21
**p.m** [3] - 531:8,
532:24, 691:16
**P2** [16] - 494:12,
497:2, 497:3, 497:7,
514:7, 514:9,
514:11, 514:12,
515:8, 515:9,
515:24, 520:17,
521:11, 536:8
**Pacific** [2] - 361:20,
362:6
**pack** [1] - 681:23
**package** [1] - 485:14
**packed** [1] - 682:1
**page** [45] - 360:12,
377:8, 377:9,
378:13, 378:20,
378:24, 379:4,
379:18, 379:20,
384:5, 437:16,
452:13, 459:15,
463:18, 467:23,
610:1, 626:23,
661:9, 661:18,
666:9, 672:6, 673:1,
673:8, 673:11,
674:14, 674:15,
674:19, 676:19,
677:7, 680:9,
680:17, 680:19,
681:12, 681:14,
681:15, 682:1

682:4, 682:17,
682:19, 683:3,
684:17, 684:20,
685:5, 686:1
**Page** [1] - 394:6
**Pages** [1] - 692:10
**pages** [22] - 508:13,
670:23, 672:1,
672:2, 672:5, 672:7,
672:9, 672:23,
673:18, 673:21,
673:22, 674:3,
675:17, 675:18,
676:16, 676:19,
678:11, 684:21,
685:21, 685:22,
686:1
**paid** [10] - 440:19,
440:24, 441:13,
441:15, 441:17,
441:24, 565:20,
616:2, 653:11,
653:12
**paper** [24] - 434:19,
434:20, 434:22,
435:3, 435:24,
449:10, 449:13,
450:8, 450:21,
451:3, 451:12,
451:14, 452:5,
452:9, 452:10,
452:14, 452:24,
453:4, 453:8,
453:19, 453:21,
568:2, 641:8
**paperclip** [2] - 498:5
**papers** [2] - 449:9,
638:21
**paragraph** [13] -
579:6, 579:7, 579:8,
579:9, 579:15,
580:20, 597:1,
597:4, 597:14,
628:7, 628:14,
639:12
**paragraphs** [1] - 580:5
**parallel** [7] - 429:6,
625:9, 626:8,
626:16, 629:2,
629:24, 645:2
**parameters** [3] -
419:8, 419:10,
419:14
**parentheses** [1] -
379:6
**parities** [1] - 673:17
**parity** [27] - 620:20,
620:24, 621:3,
621:5, 621:14,
621:21, 622:7,

622:13, 623:6,
625:5, 625:11,
627:14, 640:3,
640:11, 641:24,
642:7, 658:11,
662:17, 662:20,
662:23, 672:24,
673:6, 673:10,
673:11, 673:18,
676:8, 676:12
**parody** [9] - 647:23,
656:20, 656:21,
657:8, 676:18,
676:20, 676:24,
677:10, 687:10
**part** [36] - 351:17,
352:23, 384:6,
406:3, 422:8, 475:5,
486:4, 486:13,
487:23, 495:3,
500:10, 500:11,
501:1, 507:11,
514:15, 521:15,
521:17, 535:5,
572:10, 607:9,
617:18, 617:20,
627:3, 654:5,
654:24, 658:5,
658:10, 661:22,
675:4, 677:23,
681:4, 684:14,
685:13, 687:9,
687:15
**partially** [1] - 486:13
**participated** [1] -
353:22
**particular** [30] -
421:18, 425:20,
427:12, 485:19,
489:11, 494:9,
500:23, 557:21,
602:9, 605:17,
607:9, 610:20,
613:2, 631:5, 639:2,
660:18, 664:19,
665:9, 665:23,
669:4, 669:5,
671:12, 673:21,
677:10, 680:21,
681:15, 682:3,
683:14, 684:24,
685:6
**particularly** [3] -
362:4, 423:14, 644:6
**parties** [9] - 353:3,
364:20, 480:9,
500:7, 503:21,
503:24, 507:21,
515:16, 534:21
**partner** [2] - 447:3,

447:9
**parts** [6] - 389:10,
491:5, 526:12,
658:5, 662:14,
662:15
**pass** [2] - 564:17,
636:17
**passed** [2] - 397:20,
485:8
**passing** [1] - 485:15
**past** [8] - 357:21,
365:17, 388:14,
393:13, 450:2,
565:9, 643:1, 646:9
**Pat** [1] - 394:4
**patent** [139] - 358:3,
358:9, 358:17,
360:20, 382:8,
383:24, 384:10,
384:15, 384:18,
384:22, 385:8,
385:15, 405:17,
406:7, 406:8,
411:13, 411:20,
417:20, 418:6,
419:20, 420:6,
423:12, 428:23,
438:2, 448:17,
449:1, 450:12,
454:15, 454:23,
454:24, 455:3,
455:4, 460:22,
461:1, 461:2, 461:8,
462:17, 470:22,
471:4, 480:5, 480:6,
480:10, 480:12,
480:16, 480:18,
480:19, 480:23,
481:3, 481:5, 481:7,
482:2, 499:13,
499:14, 499:16,
499:18, 499:20,
500:3, 500:13,
501:2, 501:5,
503:14, 506:21,
507:11, 507:17,
509:14, 509:24,
530:1, 530:4,
530:13, 530:17,
531:23, 532:6,
533:13, 533:15,
533:19, 534:17,
534:19, 534:22,
535:3, 535:4, 535:6,
535:23, 536:14,
538:9, 538:21,
538:22, 539:4,
539:12, 540:3,
540:8, 541:1, 542:2,
542:4, 552:13,

552:17, 570:11,
570:12, 570:22,
571:2, 571:12,
592:4, 606:2, 609:8,
609:14, 609:17,
610:1, 610:12,
610:17, 611:6,
613:16, 617:12,
639:1, 639:7, 639:8,
639:14, 639:17,
639:19, 639:20,
639:23, 640:16,
640:18, 640:22,
641:17, 644:3,
644:6, 646:10,
646:19, 648:7,
648:10, 649:7,
653:9, 658:6, 660:8,
663:13, 663:19,
663:24
**Patent** [16] - 408:17,
409:7, 448:18,
470:8, 470:16,
551:22, 552:11,
552:17, 617:12,
637:5, 637:8,
637:22, 657:14,
657:23, 686:9, 688:1
**patented** [6] - 356:15,
357:24, 380:19,
381:4, 530:14,
610:22
**Patents** [3] - 551:3,
551:13, 556:12
**patents** [71] - 354:15,
355:24, 356:1,
358:3, 358:13,
358:15, 359:13,
361:19, 364:12,
384:18, 389:3,
389:4, 389:18,
392:15, 392:16,
392:17, 392:19,
392:21, 392:24,
404:10, 405:15,
405:17, 408:17,
410:19, 410:20,
410:23, 423:12,
426:11, 426:16,
444:12, 444:14,
445:2, 460:9,
460:11, 460:12,
470:11, 472:22,
473:1, 476:5,
478:22, 479:23,
479:24, 480:3,
480:8, 482:1, 499:6,
499:7, 499:12,
500:18, 500:20,
502:19, 503:13,
533:24, 534:9,

534:13, 537:23,
551:2, 551:9,
552:21, 553:10,
555:1, 556:15,
556:16, 589:13,
591:17, 592:6,
611:2, 611:3
**path** [1] - 620:3
**Patterson** [8] - 411:19,
413:10, 413:21,
415:11, 415:18,
415:23, 416:11,
465:7
**PAUL** [1] - 348:22
**pay** [2] - 394:24, 395:6
**paying** [1] - 395:4
**PC** [1] - 505:2
**PC's** [1] - 490:2
**peak** [8] - 562:3,
562:9, 562:24,
596:12, 600:5,
600:7, 602:8, 602:13
**peaks** [7] - 560:12,
560:18, 561:9,
561:23, 561:24,
562:6, 562:8
**peer** [1] - 568:3
**penalty** [1] - 629:12
**people** [25] - 391:12,
394:15, 395:19,
396:6, 397:5,
399:24, 400:16,
411:2, 417:15,
429:22, 449:22,
474:15, 474:16,
474:18, 474:20,
474:21, 477:19,
490:9, 490:11,
493:7, 501:12,
617:6, 634:19,
650:24, 667:3
**per** [1] - 423:15
**percent** [33] - 397:10,
397:17, 403:7,
403:8, 403:17,
403:19, 404:2,
404:3, 404:4,
465:24, 466:5,
503:3, 548:18,
548:19, 549:2,
549:10, 558:20,
559:17, 559:21,
562:11, 562:15,
562:18, 562:22,
563:7, 566:6, 595:8,
595:15, 599:6,
601:7, 602:1,
602:10, 603:1
**percentage** [1] -
560:13

**percentages** [1] -
562:16
**perform** [12] - 407:6,
506:22, 513:14,
513:15, 518:18,
519:5, 541:9, 546:9,
606:4, 606:19,
606:21, 607:1
**performance** [22] -
373:15, 407:23,
419:6, 419:11,
492:7, 614:10,
614:11, 614:21,
615:3, 615:5, 619:7,
619:22, 623:4,
624:5, 625:20,
625:24, 626:21,
628:3, 628:16,
629:12, 659:9, 662:9
**performed** [4] -
375:24, 541:5,
583:8, 588:15
**performing** [9] -
449:2, 453:14,
498:11, 520:8,
529:3, 571:8, 587:4,
595:9, 615:8
**performs** [8] - 505:9,
519:8, 519:10,
528:17, 575:19,
584:7, 587:17,
603:12
**perhaps** [2] - 386:10,
386:17
**period** [6] - 357:19,
383:17, 386:13,
418:1, 617:15, 619:2
**periods** [1] - 616:20
**permitted** [1] - 352:21
**person** [13] - 394:12,
411:23, 459:4,
477:11, 477:13,
477:17, 477:19,
477:23, 478:3,
478:4, 624:20,
684:1, 690:10
**personal** [3] - 357:23,
611:7, 635:14
**perspective** [1] -
365:2
**phase** [2] - 351:3,
352:5
**PhD** [5] - 390:16,
390:17, 390:19,
392:1, 653:23
**phones** [1] - 411:11
**photo** [4] - 421:15,
423:4, 466:8, 470:1
**photograph** [10] -
419:16, 420:2,

420:23, 421:4,
421:7, 421:17,
422:1, 422:17,
422:22, 455:18
**photographs** [5] -
418:8, 420:14,
424:2, 428:14,
455:16
**photos** [25] - 417:11,
417:17, 417:22,
417:23, 418:2,
420:20, 424:5,
424:7, 424:22,
428:20, 462:23,
464:1, 464:21,
465:18, 467:5,
467:12, 468:14,
468:23, 469:4,
469:16, 469:19,
470:4, 470:20,
471:1, 475:22
**physical** [8] - 630:13,
630:19, 645:17,
665:3, 683:19,
684:3, 684:8, 685:6
**physically** [3] -
484:20, 619:10,
628:20
**pick** [4] - 447:15,
495:4, 567:19,
567:23
**picked** [8] - 567:20,
567:21, 599:2,
599:7, 599:17,
599:20, 599:21,
637:21
**picking** [1] - 601:13
**picture** [6] - 422:18,
422:19, 621:1,
622:10, 639:1, 669:9
**pictures** [1] - 622:9
**piece** [7] - 408:13,
582:19, 622:5,
628:10, 629:3,
629:4, 688:22
**pieces** [7] - 386:3,
429:11, 465:2,
519:1, 621:24,
628:20, 628:23
**place** [2] - 426:19,
626:3
**placed** [4] - 576:19,
576:23, 577:3, 577:4
**placement** [1] - 397:8
**places** [1] - 495:2
**plainer** [1] - 504:9
**plaintiff** [2] - 531:15,
569:2
**Plaintiff** [1] - 689:20
**Plaintiff's** [1] - 689:22

**Plaintiffs** [2] - 348:5,
349:4
**plan** [4] - 374:9,
374:18, 483:15,
667:4
**planner** [2] - 600:23,
602:23
**planning** [8] - 485:23,
486:2, 560:10,
561:18, 596:13,
598:22, 599:18,
603:6
**plant** [2] - 436:16,
436:22
**plausible** [1] - 413:7
**players** [2] - 395:16,
398:21
**pleasure** [1] - 478:20
**plurality** [7] - 507:5,
535:10, 535:17,
536:1, 536:15,
627:22, 672:19
**plus** [2] - 374:10,
686:16
**point** [28] - 354:22,
358:21, 378:2,
403:3, 416:20,
432:3, 434:24,
435:2, 440:3, 440:8,
446:14, 452:4,
459:22, 475:11,
521:3, 525:14,
558:10, 558:11,
616:5, 623:9, 624:8,
641:20, 652:3,
652:5, 679:4,
679:16, 680:17,
684:6
**pointed** [2] - 359:7,
571:21
**pointer** [2] - 527:14,
573:16
**points** [2] - 383:11,
655:17
**POPPE** [36] - 349:3,
608:6, 608:17,
608:21, 609:19,
609:23, 631:11,
632:24, 634:23,
635:5, 636:9,
641:13, 643:3,
645:21, 646:11,
647:7, 647:10,
649:2, 649:4, 650:2,
651:16, 651:18,
652:5, 652:12,
652:13, 655:6,
655:12, 661:7,
661:12, 663:1,
663:6, 669:13,

669:18, 674:21, 675:2, 688:5
**poppe** [1] - 688:3
**Poppe** [6] - 608:2, 608:7, 608:19, 636:11, 652:2, 689:11
**portion** [6] - 378:14, 627:12, 628:2, 661:14, 684:11, 684:24
**portions** [2] - 672:9, 677:24
**portray** [1] - 366:5
**portrayed** [1] - 366:14
**position** [8] - 381:17, 381:21, 439:15, 440:23, 445:6, 612:13, 613:19, 615:14
**positions** [2] - 664:10, 665:6
**possession** [1] - 445:23
**possible** [4] - 381:8, 469:21, 530:12, 594:2
**possibly** [2] - 412:22, 645:8
**Post** [3] - 483:9, 483:14, 488:17
**post** [3] - 545:24, 548:21, 688:18
**post-process** [1] - 548:21
**poster** [1] - 663:20
**posts** [4] - 545:6, 545:19, 546:15, 550:7
**potential** [2] - 394:8, 395:5
**potentially** [3] - 518:20, 547:22, 619:13
**practice** [12] - 358:17, 425:13, 426:21, 461:5, 551:9, 551:21, 552:10, 552:16, 552:21, 553:10, 554:19, 589:12
**practiced** [1] - 555:1
**practices** [1] - 591:16
**pre** [1] - 649:7
**pre-existed** [1] - 649:7
**precisely** [1] - 357:5
**precision** [1] - 410:21
**predict** [1] - 486:6
**predicted** [1] - 407:18
**prefer** [2] - 364:24,

396:14
**preferable** [1] - 651:14
**prejudicial** [3] - 351:22, 436:13, 650:17
**preliminary** [11] - 502:21, 502:24, 503:1, 503:2, 503:6, 503:9, 515:13, 536:20, 536:21, 537:2, 670:23
**preparation** [2] - 524:8, 524:13
**prepared** [10] - 379:21, 417:22, 419:17, 420:3, 420:11, 578:12, 655:14, 655:16, 664:2, 681:1
**prepares** [1] - 375:20
**present** [6] - 435:17, 523:17, 552:7, 568:24, 664:23, 666:3
**presentation** [8] - 434:20, 435:4, 451:12, 452:5, 523:14, 550:17, 572:8, 634:2
**presentations** [2] - 550:8, 550:12
**presented** [10] - 360:1, 379:11, 434:19, 435:17, 450:22, 452:6, 523:21, 572:10, 641:3
**preserve** [1] - 621:4
**president** [1] - 493:8
**prestigious** [1] - 393:9
**presumably** [1] - 434:7
**pretty** [12] - 428:10, 448:12, 612:10, 617:4, 618:2, 619:9, 623:4, 626:6, 631:3, 631:7, 634:10, 651:8
**prevent** [2] - 365:21, 501:21
**previous** [2] - 449:5
**previously** [7] - 468:22, 510:12, 512:18, 516:7, 521:20, 523:4, 536:16
**price** [5] - 357:7, 398:24, 486:21, 492:6, 543:21
**primary** [11] - 351:12, 370:3, 442:14,

442:24, 443:2, 443:9, 444:15, 591:5, 613:9, 618:13
**prime** [1] - 619:4
**Princeton** [8] - 383:4, 383:6, 383:13, 392:2, 394:22, 456:22, 476:15, 476:22
**principle** [1] - 621:5
**printed** [1] - 378:20
**probabilistic** [1] - 536:17
**probative** [1] - 650:15
**problem** [20] - 389:7, 395:20, 396:19, 399:20, 415:3, 434:11, 437:1, 437:15, 452:18, 498:13, 501:9, 501:10, 501:13, 502:4, 502:18, 623:2, 623:18, 624:21, 625:2, 631:5
**problematic** [1] - 625:16
**problems** [13] - 396:20, 398:7, 448:22, 452:11, 453:20, 453:21, 501:3, 501:6, 501:17, 623:4, 624:5, 625:21, 634:8
**procedures** [1] - 418:19
**proceed** [7] - 382:19, 438:18, 489:1, 564:20, 607:21, 636:8, 655:11
**proceedings** [2] - 451:4, 664:6
**process** [38] - 409:3, 495:10, 495:15, 497:3, 497:24, 513:20, 514:1, 514:20, 516:1, 517:5, 520:14, 521:3, 521:16, 523:17, 537:22, 538:8, 539:17, 540:7, 540:15, 540:23, 540:24, 548:21, 571:22, 572:1, 573:12, 573:18, 576:14, 579:11, 588:8, 593:7, 607:14, 622:16, 623:15, 623:17, 630:21, 634:3, 663:16, 685:8

**processed** [1] - 596:5
**processing** [3] - 593:4, 593:9, 630:16
**processor** [1] - 494:23
**produce** [2] - 396:6, 397:9
**produced** [2] - 487:21, 505:23
**product** [115] - 351:12, 351:19, 355:24, 356:4, 356:8, 356:20, 357:8, 357:10, 357:24, 359:12, 361:18, 362:4, 367:21, 368:6, 368:11, 369:1, 369:8, 371:4, 371:10, 373:7, 373:21, 374:1, 374:16, 374:22, 381:11, 387:8, 387:10, 387:23, 388:4, 389:8, 394:13, 395:21, 395:23, 400:2, 400:8, 400:12, 400:18, 400:20, 402:11, 403:1, 403:5, 403:17, 404:1, 405:20, 409:3, 409:24, 411:5, 419:15, 422:10, 425:5, 425:7, 425:15, 425:23, 426:9, 429:12, 429:19, 431:12, 431:17, 442:16, 442:17, 442:20, 443:19, 443:21, 443:24, 444:8, 446:8, 449:6, 449:8, 451:15, 452:12, 486:15, 487:4, 487:24, 504:6, 504:19, 507:2, 528:15, 530:14, 538:20, 543:21, 544:1, 544:22, 545:15, 563:9, 569:17, 591:9, 591:16, 592:3, 605:9, 606:10, 606:13, 613:3, 613:5, 613:6, 616:15, 617:18, 617:19, 617:21, 619:6, 631:5, 643:12, 659:6, 659:17, 660:4, 660:10, 660:11,

660:16, 660:18, 663:17, 663:18, 669:12, 670:2, 685:1, 686:8
**Products** [2] - 372:12, 375:4
**products** [108] - 351:10, 351:18, 351:20, 356:14, 358:9, 358:13, 362:15, 387:1, 387:4, 387:22, 388:2, 389:16, 401:14, 404:7, 404:9, 409:9, 409:10, 409:13, 442:16, 443:5, 473:3, 473:21, 474:12, 474:18, 474:20, 474:21, 481:12, 503:21, 504:17, 505:5, 505:8, 505:19, 509:13, 509:22, 512:3, 512:4, 513:8, 513:11, 521:17, 529:15, 529:22, 529:24, 530:8, 530:11, 530:18, 533:24, 534:2, 537:11, 538:14, 538:19, 542:14, 543:4, 544:10, 545:8, 547:6, 550:3, 550:16, 551:7, 551:8, 551:12, 551:14, 551:17, 551:21, 551:23, 552:3, 552:7, 552:10, 552:16, 552:21, 552:23, 553:10, 554:12, 554:15, 554:19, 555:2, 555:3, 556:2, 556:13, 556:20, 557:10, 557:12, 557:15, 557:18, 559:12, 559:20, 559:22, 560:5, 560:16, 563:8, 566:4, 567:1, 567:4, 569:12, 585:7, 589:12, 589:16, 590:3, 590:8, 600:15, 610:19, 610:21, 613:12, 613:24, 614:6, 633:5, 639:18, 643:1, 659:16
**products'** [1] - 556:16
**professionals** [2] -

437:3, 454:4
**Professor** [1] - 350:12
**professor** [12] -
350:13, 383:3,
383:5, 394:22,
476:14, 476:22,
652:18, 652:24,
653:2, 654:14,
655:2, 690:9
**proffer** [1] - 655:7
**proffered** [1] - 352:2
**profits** [2] - 356:7,
361:24
**program** [11] - 386:12,
487:1, 504:6,
504:10, 504:12,
504:19, 507:1,
514:24, 526:12,
566:16, 606:10
**programing** [1] -
566:15
**programming** [2] -
518:24, 527:20
**programs** [2] - 390:16,
573:5
**progressed** [1] -
381:13
**progressively** [1] -
373:16
**project** [6] - 442:20,
444:1, 444:3,
453:17, 561:2, 561:8
**projected** [1] - 601:2
**promising** [1] - 355:17
**promoted** [1] - 613:21
**proof** [1] - 569:3
**proper** [1] - 352:10
**proposed** [6] - 535:1,
537:17, 537:20,
542:13, 542:16,
563:16
**proposing** [1] -
374:17
**protect** [4] - 387:4,
617:18, 617:23,
621:10
**protected** [1] - 618:9
**protecting** [2] -
610:23, 617:13
**protection** [1] -
622:15
**protects** [1] - 621:20
**prototype** [3] - 426:24,
429:7, 429:9
**proud** [1] - 472:20
**proved** [1] - 409:8
**provide** [5] - 397:22,
561:19, 595:19,
603:1, 657:8
**provided** [16] - 371:8,

383:20, 507:9,
509:3, 510:14,
512:19, 537:5,
558:5, 559:5, 560:4,
562:4, 565:7,
585:11, 585:14,
602:4, 687:24
**provides** [4] - 369:9,
659:8, 659:9, 662:2
**province** [1] - 390:7
**proving** [1] - 619:6
**PTO** [1] - 647:1
**PTX** [21] - 384:21,
418:12, 422:3,
423:9, 424:13,
424:21, 454:20,
455:21, 609:12,
609:20, 626:24,
657:21, 661:8,
663:2, 666:4,
666:24, 669:14,
672:16, 674:15,
674:16, 674:22
**PTX-1** [1] - 383:21
**PTX-31** [2] - 545:21,
546:5
**PTX-8** [1] - 430:6
**PTX-9** [1] - 466:8
**Public** [1] - 692:9
**public** [8] - 390:8,
390:9, 397:23,
402:17, 432:4,
432:8, 440:2, 550:7
**publications** [2] -
640:17, 640:19
**published** [1] - 568:2
**pull** [13] - 418:9,
418:12, 421:2,
572:6, 593:22,
594:17, 594:24,
617:24, 624:15,
636:10, 666:4,
675:3, 675:13
**pulled** [2] - 594:19,
632:8
**purchase** [1] - 446:7
**purchased** [1] - 552:4
**Pure** [212] - 348:7,
351:11, 351:21,
352:17, 352:24,
354:2, 360:7,
365:20, 365:21,
366:5, 366:15,
373:1, 373:14,
374:11, 374:19,
380:18, 381:3,
434:5, 436:9,
446:21, 447:2,
447:4, 447:8,
447:24, 448:4,

448:7, 479:23,
480:10, 481:9,
481:12, 485:14,
503:17, 503:21,
503:24, 504:17,
505:5, 505:7,
505:19, 505:22,
505:23, 507:1,
509:13, 509:22,
510:2, 510:4, 512:7,
512:9, 513:2, 513:8,
513:10, 513:13,
513:20, 513:21,
513:24, 514:19,
515:19, 516:1,
518:18, 520:7,
520:14, 520:24,
521:1, 521:16,
522:3, 522:13,
523:4, 523:13,
523:16, 525:18,
526:5, 527:23,
528:5, 528:8,
528:22, 529:14,
529:21, 529:23,
530:7, 533:23,
534:6, 535:1,
537:17, 537:19,
537:20, 538:6,
538:11, 538:12,
538:17, 539:16,
540:5, 540:6,
540:14, 540:17,
540:18, 540:21,
541:22, 541:24,
542:12, 542:13,
543:3, 544:3, 544:8,
545:4, 545:8,
545:14, 546:23,
547:5, 548:3, 548:5,
548:16, 548:23,
549:14, 550:2,
550:5, 550:8,
550:16, 552:18,
555:18, 556:17,
556:19, 556:24,
557:9, 557:11,
557:12, 558:15,
559:11, 559:18,
559:20, 563:6,
563:8, 563:11,
563:15, 563:17,
563:21, 564:3,
569:12, 572:19,
575:12, 581:1,
587:16, 588:9,
591:6, 593:14,
594:3, 594:12,
594:14, 594:19,
595:19, 600:11,

602:4, 602:18,
602:24, 603:21,
604:15, 605:8,
605:12, 607:10,
627:10, 633:1,
633:7, 660:4,
660:15, 660:23,
660:24, 661:3,
661:14, 661:21,
661:24, 664:10,
665:2, 666:18,
667:2, 669:10,
669:23, 670:1,
670:5, 670:12,
671:9, 671:10,
671:12, 671:16,
673:5, 674:8,
674:10, 674:16,
676:2, 676:22,
677:4, 678:19,
679:7, 680:4, 680:8,
680:10, 680:12,
680:15, 681:11,
681:18, 681:19,
682:8, 682:12,
682:15, 682:21,
683:9, 685:4, 685:7,
686:6, 686:7
**Pure's** [4] - 571:22,
580:7, 585:6, 593:1
**purer** [1] - 429:12
**Purity** [47] - 373:2,
504:21, 504:23,
505:8, 505:18,
506:15, 506:19,
508:6, 509:12,
513:7, 515:1, 515:3,
515:17, 515:22,
516:2, 517:3, 517:6,
517:9, 517:14,
517:19, 517:21,
517:23, 518:2,
518:8, 520:18,
520:21, 521:21,
523:8, 524:1, 525:2,
525:3, 525:24,
526:22, 533:13,
542:24, 574:11,
575:2, 575:12,
575:16, 575:17,
576:5, 576:7, 577:2,
603:11, 606:17,
606:20, 684:19
**purpose** [2] - 395:10,
504:12
**purposes** [2] - 359:11,
657:16
**pursue** [1] - 395:11
**push** [1] - 631:14
**pushing** [1] - 381:7

**put** [42] - 357:2,
359:19, 362:17,
405:15, 408:4,
409:6, 410:19,
410:22, 411:3,
421:17, 426:4,
426:15, 454:21,
461:12, 466:7,
471:19, 491:13,
506:23, 510:6,
522:2, 525:19,
529:20, 533:22,
537:10, 539:23,
542:9, 557:14,
578:17, 582:20,
584:1, 585:24,
594:8, 597:16,
606:1, 620:2, 623:3,
632:20, 633:23,
638:9, 642:7,
647:22, 678:14
**putting** [4] - 353:15,
521:2, 634:6, 650:17
**qualifications** [1] -
483:3
**quality** [1] - 397:14
**quarter** [2] - 381:12,
619:17
**quarters** [1] - 381:22
**questioning** [1] -
646:13
**questions** [18] - 380:1,
380:9, 410:17,
417:14, 430:23,
432:15, 434:12,
437:9, 475:22,
478:12, 534:1,
539:20, 603:8,
605:7, 605:21,
607:17, 641:18,
648:23
**quick** [1] - 475:21
**quicker** [1] - 389:21
**quickly** [13] - 371:20,
387:13, 393:23,
400:22, 401:2,
404:15, 475:18,
498:9, 503:5,
503:10, 511:6,
511:16, 614:24
**quite** [4] - 418:5,
580:17, 626:11,
689:16
**quotes** [2] - 650:9,
689:23
**quoting** [1] - 457:24
**RAID** [51] - 620:8,
620:14, 620:15,
622:12, 622:16,
622:19, 623:3,

623:5, 623:11,
623:23, 625:3,
625:4, 625:11,
626:16, 626:20,
627:15, 627:17,
627:19, 628:5,
628:16, 638:9,
638:10, 638:11,
638:13, 638:17,
638:21, 639:18,
639:22, 640:3,
640:9, 640:11,
640:12, 640:14,
647:5, 647:13,
648:12, 649:8,
649:17, 649:18,
649:19, 655:3,
655:5, 655:8,
655:21, 656:6,
658:18, 659:2,
659:8, 662:21
**RAID-3D** [3] - 660:22,
661:1, 662:1
**raise** [1] - 363:10
**raised** [4] - 353:17,
355:21, 365:2,
633:15
**raising** [2] - 355:2,
364:23
**ram** [3] - 643:20,
644:11
**ran** [2] - 557:15,
602:21
**random** [1] - 635:13
**range** [4] - 567:1,
567:4, 690:20,
690:22
**ranging** [1] - 431:14
**rate** [8] - 407:15,
407:17, 407:22,
440:20, 441:17,
441:21, 441:22,
441:24
**rather** [5] - 478:6,
508:1, 534:3, 591:5,
599:5
**ratio** [7] - 406:20,
406:24, 407:3,
408:23, 409:16,
410:5
**reached** [3] - 603:22,
660:12, 663:13
**reaching** [8] - 506:4,
509:12, 509:19,
552:20, 553:9,
555:24, 607:11,
607:14
**read** [38] - 397:2,
397:3, 406:8,
418:14, 434:20,

435:17, 452:8,
452:10, 460:3,
460:22, 461:4,
461:8, 461:11,
461:15, 461:19,
462:1, 462:3, 462:6,
471:16, 471:18,
472:6, 472:10,
472:13, 472:14,
507:3, 510:8, 511:6,
511:16, 512:13,
549:9, 555:20,
568:16, 633:6,
638:22, 651:13,
680:3
**readable** [2] - 504:7,
504:13
**reading** [4] - 462:2,
651:3, 683:13, 684:2
**reads** [1] - 625:12
**ready** [4] - 433:8,
532:13, 607:20,
688:13
**real** [5] - 475:21,
493:5, 502:8,
570:24, 615:22
**realize** [2] - 658:24,
662:6
**really** [25] - 351:7,
351:15, 354:17,
356:19, 361:15,
394:18, 434:12,
435:24, 464:3,
465:19, 475:9,
476:24, 524:10,
559:9, 577:23,
614:5, 614:17,
620:1, 623:7,
623:24, 624:9,
625:2, 626:12,
626:13, 681:5
**reason** [10] - 395:13,
396:15, 407:10,
411:5, 428:1,
437:21, 507:24,
539:7, 583:17,
625:18
**reasonable** [6] -
356:7, 532:9,
561:17, 633:8,
635:6, 690:3
**reasons** [7] - 350:22,
351:14, 529:12,
588:24, 675:11,
676:11, 682:21
**rebuild** [2] - 629:6,
629:9
**recalling** [1] - 360:19
**receive** [2] - 483:11,
516:23

received [14] - 372:1,
375:13, 376:14,
392:1, 392:20,
393:1, 393:6,
411:21, 535:21,
561:7, 605:5, 632:6,
653:20
**receives** [2] - 491:11,
516:23
**receiving** [3] - 392:10,
507:4, 535:9
**recent** [23] - 517:16,
517:17, 517:18,
517:22, 517:24,
518:5, 518:7,
519:10, 523:18,
524:20, 524:22,
525:5, 541:7, 572:4,
573:18, 573:24,
574:12, 574:17,
574:22, 574:24,
575:3, 575:14
**recently** [1] - 517:1
**recess** [4] - 366:23,
367:1, 532:11,
691:14
**recessed** [1] - 691:16
**recited** [1] - 535:22
**recognition** [2] -
483:12, 483:15
**recognitions** [1] -
393:13
**recognize** [9] - 384:4,
384:7, 385:7,
424:24, 431:7,
431:8, 661:13,
666:7, 669:8
**recognized** [2] -
394:10, 482:10
**recognizing** [1] -
483:16
**recollection** [6] -
412:21, 414:23,
428:21, 431:15,
468:4, 671:15
**recommendations** [1]
- 600:24
**record** [14] - 362:5,
383:2, 401:18,
411:9, 424:6,
454:23, 459:19,
460:4, 477:11,
479:1, 608:9,
632:23, 651:4, 692:9
**recorded** [1] - 468:5
**recording** [1] - 487:9
**records** [1] - 457:11
**recover** [4] - 621:10,
621:21, 656:15,
687:12

**Recovery** [2] - 641:2,
641:9
**recovery** [1] - 396:16
**recruit** [1] - 397:4
**recruited** [1] - 616:15
**recruiting** [2] - 411:2,
487:1
**rectangle** [1] - 669:2
**rectangles** [2] - 668:2,
668:6
**red** [1] - 672:3
**redesign** [1] - 538:7
**redesigned** [1] -
537:21
**REDIRECT** [3] - 380:4,
475:19, 601:22
**redirect** [6] - 352:7,
363:22, 380:3,
475:17, 601:19,
649:1
**reduce** [6] - 388:13,
406:16, 408:7,
499:3, 502:3,
619:19, 662:8,
681:21
**reduced** [2] - 407:7,
410:15
**reduces** [1] - 502:15
**reducing** [2] - 454:2,
477:21
**reduction** [4] - 369:23,
369:24, 370:4,
370:17
**redundancy** [2] -
615:11, 656:18
**redundant** [7] - 408:9,
408:15, 409:1,
410:1, 501:21,
656:8, 656:12
**Redundant** [2] -
641:2, 641:9
**refer** [8] - 389:1,
414:7, 415:7, 467:7,
612:22, 671:5,
679:24, 683:8
**reference** [11] -
413:15, 434:7,
526:16, 627:21,
662:16, 662:19,
662:22, 679:16,
679:19, 680:16,
684:2
**references** [3] - 434:6,
435:7, 581:17
**referred** [7] - 412:9,
414:3, 421:3, 640:8,
650:12, 660:22,
687:19
**referring** [6] - 409:11,
506:18, 655:18,

661:22, 681:3, 683:3
**refers** [4] - 519:21,
630:7, 656:9, 656:12
**refine** [1] - 624:8
**reflect** [5] - 425:10,
537:18, 575:6,
575:9, 575:11
**reflecting** [1] - 532:15
**refresh** [1] - 431:15
**refrigerator** [1] -
619:11
**regard** [2] - 669:20,
671:14
**regarding** [2] -
660:20, 666:15
**regardless** [1] -
600:19
**regards** [1] - 661:1
**region** [7] - 628:8,
628:22, 668:9,
668:13, 668:19,
671:1, 685:18
**regions** [15] - 628:12,
628:21, 648:16,
658:22, 667:14,
667:21, 668:4,
668:6, 669:1, 670:4,
670:7, 671:4,
671:22, 678:3, 678:9
**Registered** [1] - 692:7
**reinforces** [1] - 544:9
**rejoined** [2] - 616:11,
616:13
**rejoining** [1] - 642:20
**relate** [13] - 389:2,
423:11, 482:3,
484:23, 485:7,
488:15, 499:5,
511:11, 536:2,
543:12, 544:13,
653:8, 669:19
**related** [9] - 350:19,
417:15, 603:15,
603:17, 605:11,
610:17, 615:22,
627:13, 628:15
**relates** [9] - 486:10,
500:7, 535:11,
536:19, 544:19,
610:18, 617:13,
628:3, 679:4
**relating** [3] - 356:20,
487:12, 627:15
**relation** [1] - 618:23
**relationship** [3] -
420:3, 667:19,
670:10
**relatively** [4] - 378:5,
492:8, 541:10,
625:10

release [2] - 371:4, 371:10
released [4] - 370:15, 371:15, 427:13, 551:18
relevance [10] - 351:22, 352:13, 355:3, 355:6, 356:3, 359:11, 437:6, 438:5, 641:13
relevant [11] - 354:14, 354:19, 356:6, 361:16, 366:17, 417:18, 436:10, 545:6, 666:15, 679:16, 680:13
reliability [14] - 614:10, 614:11, 614:14, 615:3, 615:5, 615:9, 619:7, 626:20, 631:10, 657:9, 659:8, 661:11, 661:19, 662:2
reliable [3] - 397:1, 610:24, 615:8
reliably [1] - 397:3
relied [2] - 633:4, 671:13
relies [1] - 633:21
rely [3] - 362:7, 541:7, 632:10
relying [2] - 362:9, 543:23
remain [1] - 394:22
remainder [1] - 548:20
remaining [1] - 481:23
remap [1] - 630:20
remapping [1] - 645:17
remember [27] - 353:12, 353:13, 395:15, 402:7, 410:20, 411:5, 411:18, 411:19, 415:18, 424:1, 432:6, 451:6, 451:11, 458:13, 462:7, 465:6, 467:20, 468:7, 469:1, 469:7, 469:10, 469:23, 580:17, 596:19, 603:13, 612:10, 690:5
remembered [1] - 411:14
remembers [2] - 413:7, 413:21
remind [5] - 424:10,

459:12, 511:10, 524:24, 545:2
reminded [1] - 354:8
remote [1] - 397:6
remove [5] - 481:21, 541:18, 542:23, 593:11, 650:23
removed [2] - 354:10, 564:3
removing [11] - 493:2, 541:16, 542:16, 542:20, 543:2, 544:21, 547:5, 547:22, 550:9, 550:15, 559:1
repeat [2] - 567:17, 688:15
repeating [1] - 633:13
rephrase [6] - 419:24, 462:13, 556:23, 578:5, 606:6, 645:23
replace [9] - 395:12, 395:21, 395:23, 396:2, 399:4, 399:8, 405:20, 406:12, 442:7
replaced [2] - 395:16, 395:17
replacing [1] - 400:10
report [28] - 360:12, 361:6, 362:9, 376:14, 378:14, 379:22, 578:13, 579:7, 579:10, 579:13, 579:14, 579:23, 579:24, 580:3, 580:15, 581:11, 583:7, 584:10, 588:15, 588:18, 596:20, 597:2, 597:3, 597:9, 597:10, 597:12, 597:18, 607:9
REPORTER [1] - 692:5
Reporter [2] - 692:8
reporting [1] - 487:9
reports [2] - 378:3, 584:6
reposition [1] - 477:21
represent [4] - 353:20, 565:15, 597:13, 598:18
representation [3] - 412:17, 494:12, 674:11
represented [4] - 468:6, 515:2, 565:22, 668:8
representing [2] -

374:1, 670:13
represents [3] - 389:10, 565:12, 656:19
request [1] - 353:10
require [2] - 541:11, 601:11
required [2] - 578:17, 626:11
requirement [2] - 526:6, 587:11
requires [7] - 527:8, 571:16, 605:18, 606:4, 625:6, 672:18, 680:14
reread [2] - 415:12, 461:14
research [12] - 386:11, 387:17, 403:23, 439:19, 453:16, 475:2, 475:3, 475:7, 475:10, 654:21, 689:2, 689:7
researcher [1] - 476:18
resent [1] - 606:24
reserved [2] - 353:4, 355:3
reset [1] - 605:22
reside [1] - 678:3
residents [1] - 397:22
resolution [1] - 353:7
resolve [2] - 365:12, 571:1
resolved [1] - 355:11
resort [1] - 586:12
resources [2] - 408:10, 495:13
respect [14] - 352:21, 354:4, 459:21, 467:18, 471:15, 471:22, 472:5, 498:22, 538:20, 538:22, 585:9, 585:10, 663:16, 680:20
respective [9] - 628:8, 628:9, 628:12, 675:6, 675:22, 676:6, 685:16, 687:1, 687:2
respective's [1] - 676:7
responsibilities [6] - 372:16, 507:16, 614:9, 615:14, 619:4, 624:11
responsibility [1] - 615:20
responsible [2] -

613:23, 614:1, 617:19
responsive [1] - 465:9
rest [7] - 403:4, 429:11, 532:1, 546:11, 665:8, 689:23, 690:16
restate [1] - 380:23
restore [1] - 387:13
restored [1] - 408:12
restorer [1] - 387:12
restricted [1] - 684:8
restricts [1] - 684:23
result [9] - 528:19, 529:7, 529:9, 542:6, 543:15, 544:21, 587:5, 587:9, 673:14
resulted [3] - 538:20, 563:23, 564:8
resulting [1] - 633:16
resume [4] - 433:8, 531:5, 565:7, 566:21
retrieve [2] - 615:1, 682:2
retrieved [1] - 683:7
retrieves [1] - 666:1
return [43] - 386:10, 526:6, 526:9, 526:14, 526:17, 526:19, 526:20, 526:21, 527:3, 527:10, 527:20, 527:22, 528:22, 529:19, 541:6, 541:8, 541:14, 541:17, 541:18, 571:11, 578:3, 581:13, 581:24, 582:5, 582:10, 582:11, 582:18, 582:21, 583:4, 583:8, 583:18, 583:22, 584:7, 584:11, 584:22, 586:18, 586:22, 588:19, 603:20, 605:10, 605:18
returned [4] - 439:18, 522:17, 571:18, 577:14
returning [22] - 512:15, 512:23, 526:24, 527:4, 527:16, 527:17, 528:1, 528:6, 529:13, 529:17, 571:5, 571:11, 603:12, 605:9, 605:13, 605:17, 606:3, 606:9,

606:19, 606:22, 607:1, 607:5
returns [13] - 527:10, 527:23, 528:3, 528:23, 529:4, 529:5, 581:22, 583:19, 583:20, 588:1, 588:2, 588:4, 604:23
revenue [13] - 400:9, 400:22, 400:24, 401:13, 401:19, 401:22, 402:21, 402:24, 403:6, 403:16, 409:11, 409:14
revenues [7] - 351:18, 351:19, 356:11, 356:14, 357:7, 357:23, 404:5
reverse [1] - 541:5
review [7] - 470:11, 471:3, 481:23, 546:24, 549:14, 550:5
reviewed [11] - 415:11, 499:12, 499:17, 506:3, 518:17, 548:10, 550:12, 553:9, 554:2, 568:3, 637:15
revision [1] - 458:23
revisiting [1] - 365:4
revolution [1] - 391:16
reward [1] - 483:12
rewind [1] - 396:22
RICHARD [1] - 348:14
rifle [1] - 485:5
right-hand [5] - 379:3, 419:8, 518:14, 602:1, 667:24
rights [1] - 625:9
RIZK [1] - 349:13
RMR [1] - 692:20
road [1] - 508:3
ROBERT [1] - 349:11
role [2] - 373:22, 376:15
room [1] - 359:4
roommate [1] - 394:6
ROSENBERG [30] - 348:23, 479:9, 479:12, 479:16, 488:19, 489:2, 506:7, 506:13, 508:23, 509:1, 525:13, 531:2, 533:8, 533:10, 544:18, 545:1, 546:4, 546:13,

546:21, 549:12,
553:12, 553:18,
554:4, 554:10,
564:10, 582:23,
601:21, 601:23,
604:12, 607:16
**Rosenberg** [9] -
358:24, 359:3,
478:23, 507:15,
508:22, 530:23,
533:7, 570:12,
601:20
**rotating** [5] - 485:14,
491:21, 498:3,
514:23, 515:2
**roughly** [2] - 548:18,
548:19
**routine** [3] - 581:14,
581:23, 582:10
**routines** [2] - 581:12,
582:9
**row** [1] - 684:14
**royalty** [1] - 356:7
**rule** [1] - 353:24
**Rule** [2] - 352:1,
650:13
**rules** [1] - 578:16
**ruling** [1] - 353:4
**rulings** [1] - 365:4
**run** [5] - 405:7,
405:19, 429:8,
566:12, 593:4
**running** [9] - 426:24,
491:10, 494:23,
495:10, 505:2,
514:24, 558:6,
574:22, 684:20
**runs** [1] - 566:16
**sabbatical** [8] -
383:15, 383:16,
385:21, 385:23,
386:7, 386:8,
394:23, 394:24
**safe** [1] - 614:18
**salary** [3] - 395:1,
395:4, 440:24
**sale** [1] - 371:4
**sales** [3] - 358:8,
409:12, 475:12
**satisfied** [1] - 678:6
**satisfies** [1] - 571:23
**satisfy** [1] - 678:4
**sauce** [1] - 550:18
**save** [9] - 369:23,
451:24, 481:22,
492:17, 493:11,
493:13, 498:19,
502:16, 517:2
**saved** [1] - 518:10
**saves** [2] - 497:22,

498:9
**saving** [6] - 369:19,
493:13, 496:4,
498:17, 502:11
**saw** [14] - 381:7,
398:1, 413:2, 413:8,
434:19, 435:5,
435:17, 523:21,
582:21, 585:19,
676:11, 676:22,
677:3, 681:20
**scenario** [1] - 594:16
**scheme** [1] - 662:1
**scholarly** [1] - 638:21
**school** [6] - 390:8,
390:9, 483:5,
615:16, 616:2, 616:4
**science** [7] - 482:14,
519:17, 527:19,
653:21, 653:24,
654:4, 654:8
**Science** [3] - 390:15,
482:22, 653:20
**scientist** [1] - 476:21
**scientists** [1] - 638:14
**scope** [3] - 445:10,
589:4, 643:4
**scores** [1] - 589:15
**Scott** [1] - 545:3
**scratch** [1] - 551:15
**screen** [24] - 359:20,
378:18, 411:16,
428:12, 451:2,
454:21, 458:21,
459:11, 484:11,
489:21, 518:13,
526:17, 535:6,
539:11, 541:23,
542:12, 585:19,
597:5, 632:12,
633:24, 634:7,
639:9, 665:13, 668:1
**screenshot** [1] -
411:17
**SD** [67] - 516:3, 516:4,
516:8, 516:13,
517:4, 517:8,
517:11, 517:14,
519:9, 520:19,
521:2, 521:22,
522:2, 522:13,
522:16, 523:8,
523:9, 523:18,
524:18, 524:21,
524:23, 525:4,
525:8, 525:16,
525:20, 525:21,
529:19, 541:7,
572:2, 572:3, 572:5,
573:13, 573:14,

573:17, 573:21,
573:24, 574:3,
574:12, 574:13,
574:15, 574:23,
575:3, 575:4, 575:9,
575:13, 575:14,
576:16, 576:20,
576:22, 577:11,
584:19, 584:24,
585:6, 585:11,
585:15, 586:24,
587:17, 588:23,
589:6, 603:18,
604:7, 604:16,
604:23, 605:11,
605:22, 606:21,
643:20
**seal** [1] - 692:15
**search** [3] - 441:18,
646:23, 647:4
**searched** [1] - 456:21
**searches** [1] - 517:23
**searching** [4] - 442:2,
517:14, 646:17,
646:20
**season** [1] - 561:12
**seat** [1] - 367:4
**seated** [9] - 350:2,
367:9, 438:17,
438:19, 531:11,
532:13, 533:2,
631:18, 636:14
**second** [24] - 355:19,
363:8, 363:13,
378:2, 385:8,
401:22, 401:23,
428:8, 478:2, 491:1,
497:5, 539:10,
560:24, 605:7,
610:5, 618:4, 618:9,
629:4, 629:7,
633:11, 682:12,
685:13, 688:15
**secondary** [1] - 488:3
**secondly** [1] - 543:19
**seconds** [1] - 689:15
**secret** [1] - 550:18
**section** [6] - 610:2,
639:13, 640:16,
640:18, 661:10,
666:10
**sector** [1] - 539:3
**sectors** [3] - 495:1,
539:9, 539:13
**see** [53] - 359:15,
364:24, 373:3,
373:17, 374:12,
377:23, 378:6,
419:7, 450:7,
460:14, 468:6,

471:17, 484:18,
496:9, 500:2,
502:13, 511:9,
515:14, 517:24,
523:16, 532:9,
532:20, 536:3,
537:2, 561:6, 574:1,
590:2, 597:8,
597:15, 601:24,
602:5, 606:9, 610:1,
618:14, 627:2,
633:18, 639:12,
641:4, 650:4, 652:4,
652:10, 656:7,
659:13, 661:16,
662:17, 662:23,
663:22, 665:15,
666:23, 668:1,
670:14, 684:13,
691:15
**seed** [1] - 436:16
**seeing** [1] - 353:12
**seeking** [1] - 351:9
**seem** [3] - 414:11,
631:13, 635:4
**segment** [50] - 387:18,
400:18, 403:24,
494:6, 494:9,
494:11, 496:14,
496:18, 496:19,
496:21, 496:23,
507:6, 509:10,
511:8, 512:1,
512:16, 512:17,
514:9, 515:12,
515:18, 515:24,
516:20, 517:12,
517:19, 518:4,
518:6, 518:9,
518:20, 518:21,
519:9, 520:16,
520:22, 521:19,
525:6, 536:5, 536:8,
536:18, 571:17,
627:14, 668:8,
676:8, 676:12,
681:4, 681:6, 681:7,
685:15, 687:2, 687:5
**segment's** [1] - 523:3
**segments** [49] -
388:11, 388:12,
410:1, 410:3,
418:24, 490:19,
494:13, 494:15,
494:20, 507:5,
510:12, 511:23,
516:6, 516:10,
516:17, 535:10,
535:17, 535:18,
536:1, 536:15,

627:23, 628:7,
628:10, 628:13,
628:22, 629:14,
648:16, 658:20,
667:15, 667:21,
668:10, 669:1,
671:23, 672:19,
672:20, 672:22,
673:14, 674:3,
675:7, 675:23,
676:6, 676:8,
676:12, 678:3,
678:12, 679:11,
685:17, 686:19,
686:22
**selecting** [1] - 601:13
**selection** [1] - 596:24
**sell** [12] - 389:17,
442:19, 474:18,
474:20, 488:2,
530:14, 530:18,
563:9, 601:7,
601:10, 613:11
**selling** [4] - 381:13,
484:8, 530:13,
530:17
**sells** [1] - 513:8
**semiconductor** [29] -
619:20, 620:10,
623:1, 623:11,
623:22, 624:1,
624:22, 625:17,
625:19, 627:20,
627:23, 628:5,
628:17, 631:9,
643:18, 644:9,
644:10, 649:9,
658:7, 658:17,
659:1, 659:9,
662:11, 662:12,
672:19, 672:22,
675:6, 675:22
**send** [6] - 373:11,
373:13, 574:3,
575:1, 576:2, 605:23
**sending** [5] - 491:1,
574:5, 574:14,
574:16, 574:18
**sends** [1] - 575:10
**senior** [2] - 371:15,
613:22
**sense** [9] - 389:22,
392:22, 401:9,
403:21, 433:20,
522:20, 689:22,
691:4, 691:12
**sent** [6] - 372:10,
372:11, 372:23,
373:6, 493:8, 574:23
**sentence** [7] - 362:10,

362:12, 412:3, 452:21, 454:1, 509:4, 579:18
**separate** [11] - 413:22, 533:17, 567:22, 585:3, 585:4, 585:13, 587:20, 597:21, 618:6, 628:20
**September** [2] - 386:21, 396:17
**series** [2] - 380:9, 473:14
**serious** [2] - 433:18, 602:22
**serve** [1] - 565:3
**served** [6] - 439:9, 439:15, 440:13, 440:23, 567:6, 588:8
**server** [2] - 396:12, 407:6
**service** [1] - 565:20
**serving** [1] - 444:21
**session** [1] - 624:2
**set** [8] - 371:23, 395:11, 399:5, 399:7, 404:18, 580:24, 630:16, 692:14
**sets** [3] - 406:7, 537:24, 539:4
**setting** [2] - 465:17, 466:3
**seven** [3] - 379:18, 458:14, 674:15
**seven-hour** [1] - 458:14
**several** [22] - 368:20, 375:24, 383:16, 394:2, 398:14, 401:17, 406:18, 429:5, 442:15, 449:17, 464:11, 481:19, 501:6, 565:9, 565:15, 567:13, 580:5, 611:12, 613:21, 616:17, 617:8, 667:12
**shape** [3] - 669:2, 669:3, 669:5
**share** [4] - 400:15, 403:22, 404:2, 477:8
**shares** [3] - 441:7, 477:21, 477:22
**SHAW** [2] - 349:8, 349:8
**Shaw** [1] - 359:8
**shipped** [1] - 442:22
**shipping** [1] - 409:9

**short** [3] - 355:17, 355:22, 691:7
**shorter** [2] - 352:15, 624:19
**Shorthand** [1] - 692:8
**shortly** [2] - 637:11, 691:9
**shots** [5] - 411:9, 411:15, 428:13, 458:21, 459:11
**show** [30] - 359:1, 359:13, 424:19, 467:15, 468:10, 469:13, 469:16, 477:1, 494:2, 514:23, 524:9, 535:11, 568:23, 572:13, 572:18, 572:21, 582:13, 583:14, 587:3, 633:8, 638:24, 661:4, 663:23, 667:16, 679:13, 680:6, 680:21, 682:23, 682:24
**showed** [7] - 380:13, 496:20, 497:11, 517:13, 521:15, 552:17, 582:17
**showing** [8] - 409:16, 418:22, 437:16, 573:23, 574:22, 621:11, 628:7, 647:22
**shown** [7] - 456:6, 491:24, 545:24, 585:18, 632:4, 662:24, 677:13
**shows** [8] - 466:11, 466:13, 565:8, 663:10, 672:4, 679:9, 686:10, 687:8
**shrink** [3] - 398:22, 399:3, 406:19
**shrunk** [2] - 363:20, 363:21
**sick** [1] - 439:20
**Side** [2] - 412:8, 650:7
**side** [17] - 396:15, 412:7, 419:8, 489:20, 489:24, 490:6, 491:4, 494:3, 518:12, 518:14, 538:4, 539:11, 540:4, 541:23, 546:1, 650:6
**sign** [2] - 461:3, 472:11
**signed** [1] - 462:1
**significance** [1] -

669:3
**significant** [7] - 398:7, 427:20, 435:16, 493:14, 498:1, 502:12, 570:5
**significantly** [1] - 502:2
**similar** [6] - 390:9, 390:10, 395:20, 398:20, 514:2, 631:8
**simple** [3] - 618:2, 626:6, 647:23
**simplicity** [1] - 677:13
**simplify** [1] - 406:13
**simplifying** [1] - 454:3
**simply** [7] - 471:7, 475:11, 542:20, 632:14, 633:3, 633:10, 633:13
**single** [5] - 493:3, 541:10, 600:19, 622:5, 656:21
**sit** [1] - 426:13
**sitting** [1] - 359:4
**situate** [1] - 416:11
**situation** [1] - 629:5
**six** [15] - 360:20, 381:13, 383:15, 557:20, 557:23, 558:8, 558:12, 559:21, 562:11, 610:15, 622:12, 627:3, 634:18, 634:20, 635:22
**six-and-a-half** [2] - 559:21, 562:11
**size** [4] - 418:19, 484:18, 539:5
**sized** [1] - 619:12
**skill** [2] - 684:1, 684:7
**skip** [3] - 416:1, 656:4, 676:7
**slide** [31] - 481:14, 489:18, 546:1, 549:20, 572:7, 602:2, 606:1, 617:24, 620:11, 620:15, 621:6, 622:6, 634:9, 636:10, 650:18, 650:23, 656:16, 667:16, 667:22, 668:11, 669:8, 670:10, 670:11, 671:5, 673:3, 673:20, 675:13, 677:6, 680:6, 680:21
**Slide** [1] - 679:13
**slides** [13] - 632:3, 632:19, 634:15,

634:20, 635:3, 635:22, 638:9, 647:22, 655:16, 656:23, 667:18, 674:5, 676:15
**sliding** [1] - 539:13
**slogan** [1] - 474:24
**Slootman** [8] - 353:2, 353:10, 353:23, 354:1, 555:13, 555:15, 555:23, 556:7
**slow** [3] - 401:2, 401:9, 492:8
**slower** [1] - 625:17
**small** [7] - 388:17, 447:3, 577:21, 601:3, 616:8, 618:3, 618:16
**smaller** [1] - 386:3
**smart** [1] - 651:11
**snap** [1] - 498:6
**snippets** [1] - 634:6
**so-called** [1] - 410:2
**society** [1] - 490:14
**software** [86] - 448:15, 485:22, 491:10, 504:11, 504:16, 504:22, 504:23, 504:24, 505:1, 505:2, 505:8, 505:10, 505:11, 505:15, 505:18, 506:16, 506:19, 506:22, 509:13, 509:22, 512:4, 513:7, 514:24, 515:1, 515:3, 515:11, 515:17, 515:22, 516:2, 517:3, 517:6, 517:10, 517:14, 517:19, 517:21, 517:23, 518:3, 518:8, 518:22, 518:23, 519:2, 519:4, 519:7, 520:8, 520:15, 520:18, 520:21, 521:1, 521:21, 523:8, 524:1, 524:5, 524:9, 525:2, 525:3, 525:24, 526:22, 529:14, 533:14, 542:24, 566:5, 566:11, 566:16, 566:22, 567:3, 574:11, 575:2, 575:12, 575:16, 575:7, 576:24,

577:2, 577:24, 578:5, 580:7, 603:12, 605:12, 606:17, 606:20, 673:16, 674:10, 680:10, 680:16, 684:19, 684:20
**softwares** [1] - 566:12
**sold** [11] - 356:11, 356:21, 357:11, 357:18, 357:21, 457:12, 488:7, 551:8, 551:23, 552:3, 613:6
**solid** [12] - 491:22, 497:18, 647:5, 647:13, 662:4, 662:10, 662:13, 670:14, 670:19, 670:21
**solution** [3] - 355:18, 399:20, 626:13
**solutions** [2] - 538:1, 539:19
**solve** [9] - 389:7, 409:7, 409:8, 448:21, 501:9, 501:10, 502:18, 624:22, 631:4
**someone** [2] - 475:1, 477:10
**sometime** [2] - 469:14, 531:20
**sometimes** [3] - 397:1, 398:4, 507:17
**somewhere** [2] - 619:16, 629:10
**son** [2] - 381:8, 612:11
**soon** [1] - 661:5
**sorry** [25] - 364:19, 380:23, 390:22, 402:15, 430:20, 433:16, 434:2, 458:10, 462:14, 521:7, 536:3, 548:2, 579:9, 608:4, 640:23, 643:8, 646:3, 647:9, 647:10, 664:9, 670:23, 673:3, 680:12, 689:11, 689:16
**sort** [12] - 390:9, 392:4, 394:18, 415:4, 435:21, 442:3, 490:13, 527:14, 568:3, 572:17, 572:18, 634:6
**sounding** [1] - 355:10

**sounds** [3] - 371:12, 436:16, 690:23
**source** [43] - 361:8, 505:11, 505:12, 505:13, 505:16, 518:17, 527:23, 528:23, 572:22, 573:2, 573:4, 580:6, 581:1, 581:5, 581:8, 581:12, 581:21, 582:8, 582:14, 582:19, 583:7, 584:1, 584:4, 585:12, 585:15, 590:3, 590:7, 603:15, 603:17, 603:22, 604:2, 604:5, 604:14, 604:21, 607:11, 607:14, 659:23, 671:7, 672:11, 674:12, 677:5, 683:9, 683:12
**sources** [1] - 646:22
**space** [16] - 369:18, 369:24, 398:23, 481:22, 493:14, 536:17, 602:16, 602:21, 618:14, 618:22, 619:17, 620:2, 659:12, 662:7, 681:22
**spare** [1] - 495:11
**speaking** [3] - 365:18, 458:9, 478:23
**speaks** [1] - 549:6
**spec** [2] - 462:11, 462:17
**special** [1] - 398:22
**specialist** [2] - 484:4, 484:6
**specific** [9] - 405:22, 430:22, 455:7, 455:12, 504:11, 526:7, 583:7, 601:1, 612:20
**specifically** [10] - 352:19, 366:7, 512:3, 537:19, 552:12, 592:9, 605:22, 662:3, 669:20, 683:2
**specification** [33] - 425:3, 425:4, 425:9, 425:12, 425:16, 425:18, 425:19, 426:2, 426:14, 426:18, 426:20, 427:2, 427:5, 429:3, 430:7, 431:11,

455:20, 455:22, 456:3, 459:5, 460:8, 472:3, 501:2, 501:4, 501:14, 501:16, 501:18, 501:22, 503:13, 553:22, 554:2, 590:4
**specifications** [1] - 425:17
**specified** [1] - 679:11
**specify** [1] - 630:18
**speculation** [1] - 549:7
**speculative** [1] - 676:6
**speed** [4] - 407:9, 430:14, 546:14, 614:24
**spell** [3] - 478:24, 487:16, 608:8
**spend** [1] - 394:19
**spent** [2] - 604:1, 607:13
**spin** [1] - 566:10
**spinning** [4] - 443:7, 525:1, 590:22, 666:21
**split** [3] - 490:19, 518:24, 526:12
**spokesperson** [1] - 637:21
**spot** [1] - 652:21
**square** [1] - 681:9
**SSD** [5] - 446:9, 446:12, 665:5, 671:21, 678:9
**SSD's** [2] - 670:1, 685:10
**stable** [1] - 541:7
**stamps** [1] - 475:23
**standard** [3] - 425:13, 426:21, 461:5
**standards** [1] - 541:21
**Standford** [1] - 394:3
**standpoint** [1] - 596:4
**stands** [3] - 377:17, 449:18, 656:7
**Stanford** [5] - 385:23, 386:4, 386:5, 386:6, 386:8
**start** [34] - 356:2, 385:24, 386:11, 386:19, 386:20, 387:17, 394:11, 394:16, 394:20, 395:3, 399:10, 399:23, 400:1, 405:6, 411:2, 416:8, 417:20, 418:7, 427:1, 448:14, 459:16, 504:3,

507:2, 561:9, 573:12, 573:18, 576:14, 606:8, 621:23, 630:19, 664:8, 665:16, 688:9, 688:11
**started** [10] - 364:11, 415:11, 415:19, 415:24, 416:11, 442:6, 448:4, 599:19, 632:1, 659:3
**starting** [2] - 489:19, 551:23
**starts** [2] - 504:5, 682:19
**startup** [8] - 384:11, 386:18, 399:5, 399:13, 399:14, 404:15, 439:22, 560:11
**startups** [3] - 386:16, 447:12, 447:16
**State** [1] - 692:1
**state** [18] - 362:5, 383:1, 478:24, 491:22, 497:18, 608:8, 608:24, 647:6, 647:14, 652:15, 662:4, 662:10, 662:13, 670:14, 670:19, 670:21
**statement** [29] - 365:3, 438:1, 470:24, 526:7, 526:9, 526:15, 526:17, 526:19, 526:21, 527:3, 527:10, 527:22, 528:22, 529:19, 541:6, 541:8, 541:15, 541:17, 541:19, 548:2, 548:11, 570:2, 582:1, 582:6, 582:11, 586:19, 603:20, 605:10, 605:18
**statements** [9] - 365:8, 544:13, 547:9, 555:6, 555:12, 556:6, 633:21, 633:23, 635:13
**STATES** [1] - 348:1
**states** [1] - 676:5
**States** [12] - 348:15, 391:2, 391:4, 391:13, 391:20, 482:23, 482:24, 483:23, 530:9,

530:11, 530:15, 530:19
**stating** [1] - 377:21
**statistics** [3] - 397:10, 557:13, 558:22
**stay** [2] - 432:22, 586:1
**stayed** [2] - 392:14, 617:1
**stenographic** [1] - 692:11
**step** [38] - 382:2, 382:9, 389:20, 393:14, 405:2, 432:24, 478:14, 510:8, 510:9, 521:8, 521:23, 522:1, 522:4, 525:19, 525:21, 527:3, 527:6, 527:17, 528:7, 528:24, 529:13, 531:10, 533:14, 535:22, 536:13, 536:19, 603:12, 605:9, 605:13, 605:18, 606:3, 606:4, 606:19, 606:22, 607:1, 607:19, 623:23, 649:23
**steps** [3] - 504:20, 505:9, 506:22
**stick** [1] - 515:5
**still** [27] - 354:12, 357:22, 363:16, 364:20, 371:9, 373:15, 374:4, 381:19, 419:14, 463:8, 463:9, 463:10, 463:24, 534:12, 535:2, 538:23, 541:5, 541:8, 541:11, 541:14, 593:4, 594:22, 613:11, 631:14, 650:23, 687:12, 690:18
**stipulated** [2] - 435:11, 437:22
**stipulations** [1] - 366:19
**stock** [5] - 432:9, 439:24, 440:2, 440:5, 441:5
**stood** [2] - 364:20, 484:19
**stop** [5] - 395:4, 465:12, 545:20, 561:20, 673:2
**STORAGE** [1] - 348:7

**storage** [154] - 351:13, 368:18, 369:1, 369:8, 377:14, 377:16, 377:22, 378:10, 387:3, 388:13, 388:21, 388:22, 389:6, 398:10, 398:23, 400:1, 400:17, 400:19, 404:1, 405:12, 405:18, 406:3, 406:12, 407:6, 408:8, 409:1, 410:14, 434:22, 436:5, 442:13, 442:21, 443:9, 444:16, 446:12, 449:19, 449:22, 450:22, 452:15, 452:16, 453:6, 454:3, 463:15, 473:19, 474:7, 474:8, 484:4, 484:5, 484:6, 484:8, 485:19, 486:7, 486:10, 486:14, 486:15, 486:16, 486:18, 486:20, 487:11, 487:12, 487:22, 488:11, 488:15, 488:16, 488:21, 489:9, 489:10, 489:12, 489:14, 489:15, 489:22, 490:5, 490:6, 490:7, 490:16, 490:21, 491:3, 491:6, 491:7, 491:14, 491:15, 491:16, 491:18, 492:2, 492:3, 492:16, 493:14, 494:5, 494:7, 494:23, 495:16, 495:19, 496:7, 496:9, 497:2, 497:3, 497:23, 498:7, 499:15, 499:22, 500:16, 500:22, 501:11, 505:3, 514:4, 514:5, 514:22, 516:23, 535:12, 535:18, 536:5, 536:23, 543:17, 543:18, 543:19, 555:6, 557:5, 559:11, 559:22, 560:22, 560:24, 562:18, 563:7, 568:2, 568:6, 568:13, 590:18,

591:6, 592:12,
592:22, 601:8,
601:10, 602:9,
603:2, 610:18,
610:21, 613:6,
613:9, 614:17,
615:10, 618:5,
618:7, 618:17,
622:14, 654:15,
654:21, 655:8,
657:9, 659:6,
666:19, 679:18,
680:23

**Storage** [160] - 352:17,
352:24, 354:3,
365:20, 366:5,
366:15, 373:1,
380:19, 381:3,
446:21, 447:2,
447:4, 447:8, 448:1,
448:4, 448:7, 448:8,
479:23, 480:10,
481:9, 481:12,
485:15, 503:17,
503:21, 503:24,
504:17, 505:5,
505:8, 505:19,
505:22, 505:23,
507:1, 510:2, 510:4,
512:7, 512:9, 513:2,
513:8, 513:11,
513:14, 513:21,
515:19, 518:18,
520:7, 520:14,
521:1, 525:18,
526:5, 528:5, 528:8,
529:22, 529:24,
530:7, 533:23,
534:7, 535:2,
537:17, 537:19,
537:21, 538:6,
538:12, 538:17,
539:16, 540:6,
540:14, 540:17,
540:18, 540:21,
541:22, 542:14,
543:3, 544:8, 545:4,
546:24, 548:3,
548:16, 548:23,
549:14, 550:2,
550:6, 550:8,
552:18, 555:18,
556:19, 556:24,
557:12, 558:15,
559:12, 559:19,
559:20, 563:6,
563:8, 563:11,
563:15, 563:17,
563:22, 564:3,
569:12, 572:19,
575:12, 587:16,

594:12, 594:14,
594:19, 595:19,
601:4, 602:5,
602:18, 603:1,
603:21, 604:15,
605:9, 605:12,
627:10, 633:1,
633:7, 660:4,
660:15, 660:23,
661:1, 661:3,
661:22, 661:24,
664:10, 666:18,
667:2, 669:10,
669:24, 670:1,
670:5, 670:12,
671:10, 671:13,
671:16, 673:5,
674:8, 674:10,
674:16, 676:2,
676:22, 677:4,
678:19, 679:7,
680:4, 680:8,
680:10, 680:12,
680:15, 681:11,
681:18, 681:19,
682:8, 682:12,
682:15, 682:22,
683:10, 685:4,
685:8, 686:6

**Storage's** [39] - 360:7,
365:22, 434:6,
509:13, 509:22,
512:3, 513:20,
514:1, 514:19,
516:1, 520:7,
520:24, 521:16,
522:4, 522:13,
523:4, 523:13,
523:16, 527:23,
528:23, 529:14,
538:6, 540:5,
541:24, 542:12,
544:4, 545:8,
545:14, 547:6,
548:6, 556:17,
557:9, 557:11,
581:2, 607:10,
661:14, 665:2,
671:9, 686:8

**store** [15] - 388:12,
398:17, 410:3,
422:11, 489:13,
491:17, 496:4,
496:18, 496:19,
535:19, 553:21,
615:1, 629:10,
673:10, 682:18

**stored** [35] - 481:21,
489:17, 494:14,
494:16, 494:21,
495:2, 495

495:19, 496:3,
496:6, 496:15,
497:8, 497:13,
497:14, 503:8,
510:11, 510:13,
512:18, 518:21,
520:17, 521:20,
522:13, 522:16,
522:21, 523:3,
536:15, 537:2,
541:10, 573:14,
573:20, 576:15,
576:22, 605:4,
656:20, 685:10

**stores** [7] - 397:17,
489:14, 496:11,
511:7, 520:19,
666:1, 682:16

**storing** [7] - 388:23,
442:18, 504:6,
504:12, 523:7, 535:8

**story** [1] - 350:21

**straightforward** [1] -
398:17

**stream** [10] - 490:3,
490:15, 494:4,
507:4, 514:4,
521:12, 535:9,
535:17, 535:21

**streaming** [1] - 490:21

**streams** [2] - 491:2,
491:11

**Street** [1] - 348:12

**stricken** [2] - 412:18,
413:16

**strike** [6] - 379:8,
412:1, 417:3, 443:3,
539:24, 585:22

**stripe** [5] - 673:7,
673:21, 673:23,
675:20

**stripes** [1] - 674:1

**struck** [5] - 412:11,
412:19, 414:3,
414:14, 415:1

**structure** [8] - 408:18,
418:20, 418:23,
419:4, 419:12,
419:13, 516:3

**structures** [1] - 626:14

**STUART** [1] - 348:23

**Stuart** [1] - 478:22

**student** [2] - 394:3,
654:18

**students** [3] - 391:17,
654:20, 655:5

**studied** [2] - 482:14,
611:20

**studies** [3] - 390:13,
390:18, 390:19

**study** [6] - 390:17,
391:11, 391:13,
391:18, 482:13,
611:19

**studying** [1] - 483:10

**stuff** [6] - 437:11,
487:7, 641:23,
642:6, 642:9, 651:9

**stuttering** [2] -
633:12, 633:18

**sub** [1] - 690:21

**subbullet** [1] - 378:2

**subdivide** [1] - 648:21

**subdivided** [1] -
671:19

**subdivision** [1] -
672:13

**subdivisions** [1] -
658:21

**subject** [3] - 434:22,
611:5, 651:10

**subjects** [1] - 350:19

**submillisecond** [1] -
545:12

**submitted** [2] -
352:22, 353:8

**subroutine** [1] - 519:2

**subroutines** [3] -
519:1, 526:11,
526:13

**subset** [4] - 510:10,
541:12, 668:16,
671:1

**subsets** [1] - 671:4

**substantially** [11] -
528:17, 528:18,
528:19, 529:3,
529:5, 529:9, 587:6,
587:7, 587:8, 587:9,
650:16

**substitute** [2] -
556:21, 557:2

**subsystem** [5] -
613:23, 617:20,
626:18, 643:12,
643:22

**subtext** [1] - 438:3

**succeed** [1] - 400:3

**success** [29] - 350:19,
351:1, 351:8, 352:2,
352:14, 352:20,
352:22, 354:5,
354:14, 356:4,
356:9, 356:19,
361:17, 361:18,
362:10, 443:1,
443:6, 473:2,
473:15, 474:11,
474:15, 475:5,
475:13, 475:15,

550:22, 554:23,
555:3, 556:13,
556:16

**successful** [6] -
362:4, 362:16,
472:16, 472:19,
501:24, 611:1

**successfully** [4] -
516:5, 517:1,
520:20, 520:22

**Sucks** [1] - 555:19

**suffer** [1] - 629:11

**suggest** [2] - 436:22

**suggested** [3] - 542:4,
564:2, 592:2

**suggestion** [3] -
365:11, 539:2,
541:19

**suggestions** [4] -
533:22, 540:10,
541:16, 541:20

**suit** [2] - 355:24, 356:1

**sum** [1] - 563:14

**summarize** [7] -
498:20, 529:11,
529:21, 651:12,
655:17, 671:11,
676:21

**summarized** [1] -
682:20

**summarizing** [1] -
651:8

**summary** [8] - 360:2,
418:22, 536:16,
536:17, 622:8,
651:10, 686:3

**supplemental** [4] -
597:2, 597:3,
597:10, 597:11

**support** [9] - 362:18,
409:15, 485:22,
549:18, 550:8,
555:7, 578:20,
633:3, 633:22

**supported** [1] - 486:3

**supporting** [2] -
484:3, 485:21

**supports** [8] - 547:4,
548:6, 548:10,
548:14, 549:22,
550:14, 554:18,
651:1

**supposed** [1] - 386:9

**supposedly** [1] -
537:21

**sustain** [4] - 454:9,
525:12, 643:7,
646:14

**sustian** [1] - 647:16

**SUTCLIFFE** [1] -

349:3
**switching** [1] - 472:16
**sworn** [4] - 382:14,
479:7, 608:15,
651:23
**symbol** [2] - 432:9,
432:10
**Symmetix** [1] - 649:5
**Symmetrix** [8] - 613:5,
613:12, 613:24,
614:6, 617:18,
639:18, 639:22,
649:16
**synthesize** [1] -
651:14
**system** [104] - 373:2,
387:3, 388:21,
389:6, 405:12,
405:18, 406:12,
436:5, 436:6, 437:2,
442:7, 443:10,
450:8, 453:6,
453:18, 466:22,
466:23, 473:19,
474:7, 474:8,
481:20, 483:15,
484:3, 488:2,
489:12, 489:14,
489:15, 490:5,
490:6, 490:17,
490:22, 491:4,
491:7, 491:15,
492:2, 492:16,
493:12, 494:5,
495:17, 495:19,
499:15, 499:22,
500:22, 501:11,
502:11, 505:3,
505:4, 506:18,
516:23, 523:4,
535:12, 536:23,
560:23, 562:19,
573:6, 577:20,
578:1, 588:11,
613:10, 614:10,
615:8, 618:5,
618:19, 619:9,
619:14, 623:22,
625:15, 625:19,
626:5, 628:19,
629:24, 630:15,
630:19, 631:9,
634:5, 643:14,
643:17, 645:4,
648:20, 649:17,
649:18, 657:9,
665:17, 665:20,
665:22, 665:23,
666:1, 666:16,
667:9, 669:24,

671:8, 672:18,
676:3, 677:18,
680:5, 680:8,
680:13, 681:11,
681:18, 681:19,
682:12, 686:16,
687:9
**systems** [38] - 388:22,
467:1, 484:6, 484:8,
484:14, 485:19,
486:3, 486:4,
486:10, 486:15,
486:16, 486:18,
486:21, 487:12,
487:13, 487:22,
488:11, 488:15,
488:17, 488:21,
489:10, 491:8,
493:15, 560:8,
568:2, 594:9,
619:11, 622:20,
625:3, 626:7,
630:13, 644:21,
645:6, 645:11, 649:6
**SYSTEMS** [1] - 348:4
**table** [103] - 418:18,
419:1, 419:2, 419:3,
516:3, 516:4, 516:6,
516:8, 516:13,
516:17, 517:4,
517:8, 517:11,
517:14, 517:16,
517:17, 517:18,
517:22, 517:24,
518:5, 518:7, 519:9,
519:10, 520:19,
520:20, 521:2,
521:22, 522:2,
522:13, 522:16,
523:8, 523:9,
523:18, 524:18,
524:20, 524:21,
524:22, 524:23,
525:5, 525:6, 525:8,
525:16, 525:20,
525:21, 529:19,
541:8, 541:10,
572:2, 572:3, 572:4,
572:5, 573:13,
573:14, 573:17,
573:18, 573:21,
573:24, 574:3,
574:9, 574:12,
574:13, 574:15,
574:17, 574:18,
574:22, 574:23,
574:24, 575:3,
575:4, 575:10,
575:13, 575:14,
576:16, 576:20,
576:22, 57

584:19, 585:1,
585:6, 585:11,
585:15, 586:24,
587:17, 589:6,
603:18, 604:7,
604:16, 604:23,
605:11, 605:21,
605:22, 606:21,
606:24
**tables** [5] - 575:6,
575:22, 575:24,
576:3, 605:2
**tag** [7] - 515:5, 515:10,
519:22, 536:7,
536:10, 572:14,
605:1
**tags** [2] - 516:13,
518:13
**tainted** [1] - 415:13
**takeaways** [2] -
378:15, 379:1
**talks** [7] - 418:17,
501:16, 539:12,
627:14, 639:14,
639:19, 640:18
**tape** [32] - 395:12,
395:23, 396:1,
396:4, 396:15,
396:21, 396:22,
396:24, 397:8,
397:12, 397:15,
397:18, 398:4,
398:8, 398:14,
399:5, 399:8,
399:21, 400:6,
400:9, 400:10,
405:21, 405:24,
406:12, 406:24,
442:7, 491:21,
492:7, 492:10,
690:18
**Tape** [1] - 555:18
**tapes** [6] - 395:16,
395:18, 396:13,
396:14, 397:11,
406:19
**targets** [1] - 377:16
**task** [3] - 495:12,
546:9, 560:9
**tasks** [1] - 618:24
**taught** [2] - 568:5,
654:18
**teaching** [5] - 383:12,
439:19, 486:22,
487:12, 655:4
**team** [7] - 373:12,
379:12, 385:24,
386:18, 477:11,
613:22, 619:5
**Tech** [2] - 652:19,

654:12
**tech** [1] - 653:3
**technical** [7] -
358:12, 358:19,
364:11, 407:9,
437:9, 437:11,
439:13, 440:13,
440:16, 441:4,
444:22, 445:6,
446:20, 478:21,
482:3, 577:23,
593:21, 594:4, 594:5
**technique** [3] - 449:7,
453:14, 548:5
**techniques** [5] -
405:23, 406:6,
451:14, 452:15,
547:13
**technological** [2] -
482:19, 652:9
**Technologies** [1] -
487:15
**technologies** [16] -
369:23, 370:7,
449:1, 449:19,
473:7, 473:15,
473:17, 473:20,
474:10, 474:13,
474:17, 488:15,
492:22, 566:4,
654:15, 655:3
**technologists** [1] -
568:13
**technology** [54] -
356:5, 370:4,
380:19, 381:4,
388:3, 389:11,
389:17, 400:1,
400:4, 400:5,
404:19, 425:6,
425:14, 425:15,
440:17, 443:15,
445:3, 445:23,
446:1, 446:15,
446:22, 448:19,
473:22, 473:23,
474:6, 474:7,
481:17, 481:18,
487:5, 489:5, 489:6,
489:9, 489:23,
492:13, 497:17,
498:3, 499:5,
544:20, 553:2,
553:8, 554:24,
555:8, 555:9, 556:1,
556:3, 556:11,
610:16, 615:22,
617:17, 617:21,
620:9, 638:17,
639:22, 655:21

**telecommunication**
[1] - 482:15
**telephone** [1] - 483:8
**temperature** [1] -
561:17
**ten** [7] - 397:10,
397:17, 403:6,
408:1, 408:5,
508:16, 601:13
**tend** [1] - 369:21
**Tennessee** [1] - 654:9
**term** [11] - 368:18,
387:20, 409:18,
507:18, 507:22,
507:23, 510:16,
571:11, 668:13,
668:14, 682:7
**terminologies** [1] -
673:8
**terminology** [1] -
387:20
**terms** [17] - 356:18,
415:21, 417:18,
446:4, 508:16,
519:17, 527:19,
527:20, 531:19,
578:5, 582:11,
602:7, 606:13,
619:24, 623:15,
625:9, 667:12
**test** [4] - 408:9,
408:11, 426:4,
487:22
**testified** [24] - 367:20,
370:23, 382:15,
448:9, 455:10,
455:19, 467:4,
468:14, 471:15,
479:8, 499:24,
556:1, 566:3, 566:5,
566:7, 566:24,
567:3, 567:9, 582:7,
589:11, 608:16,
633:7, 647:12,
651:24
**testify** [11] - 352:21,
359:10, 463:11,
467:18, 468:22,
551:16, 551:17,
568:9, 581:18,
609:6, 634:21
**testifying** [2] - 646:12,
663:8
**testimony** [37] - 351:7,
351:17, 361:9,
415:22, 462:4,
476:2, 544:17,
548:15, 549:14,
549:17, 549:21,
550:7, 554:13,

554:17, 554:22,
572:22, 582:15,
632:7, 632:12,
632:16, 632:22,
637:16, 650:19,
651:3, 653:15,
655:14, 655:17,
655:23, 664:5,
671:9, 671:12,
671:15, 672:12,
677:3, 684:5, 685:7,
687:19
**text** [1] - 663:21
**THE** [212] - 348:1,
348:1, 348:14,
350:1, 350:6,
350:10, 350:13,
352:11, 352:16,
353:12, 353:19,
354:6, 354:16,
355:5, 355:9,
355:16, 356:8,
356:16, 357:3,
357:9, 357:18,
358:1, 358:7,
358:16, 358:21,
359:5, 359:7,
359:15, 359:21,
360:11, 360:15,
360:18, 360:23,
361:2, 361:10,
362:12, 362:17,
362:23, 363:3,
363:7, 363:11,
363:20, 363:24,
364:3, 364:6,
364:13, 364:16,
365:6, 366:1, 366:8,
366:20, 367:2,
367:6, 367:8, 372:6,
377:4, 380:2, 380:3,
380:22, 382:1,
382:3, 382:5,
382:10, 382:18,
382:20, 384:1,
385:1, 412:2, 412:6,
412:9, 412:22,
413:1, 413:6,
413:11, 413:17,
413:19, 414:2,
414:13, 414:18,
415:3, 415:16,
416:4, 416:13,
416:19, 416:24,
417:1, 419:23,
424:16, 430:10,
431:24, 432:17,
432:18, 432:23,
433:5, 433:7,
433:13, 433:24,
434:11, 434:24,

435:13, 435:19,
436:14, 437:5,
437:15, 438:6,
438:11, 438:15,
438:23, 445:15,
450:18, 451:20,
451:22, 451:24,
452:23, 453:8,
453:10, 454:8,
458:2, 458:8,
458:12, 460:17,
461:17, 465:10,
465:14, 474:2,
474:5, 475:17,
478:13, 478:15,
478:18, 478:24,
479:2, 479:11,
479:14, 488:24,
506:11, 507:14,
508:11, 525:11,
530:23, 531:3,
531:9, 531:18,
531:24, 532:8,
532:12, 532:17,
533:1, 544:23,
546:10, 546:19,
549:8, 549:9,
553:16, 554:8,
564:12, 564:15,
564:19, 564:22,
583:1, 583:3,
601:19, 604:10,
604:19, 607:18,
607:22, 608:4,
608:8, 608:10,
608:19, 609:21,
631:12, 631:24,
633:19, 634:10,
634:14, 635:1,
635:8, 635:20,
636:2, 636:7,
636:11, 636:19,
641:14, 641:19,
642:3, 643:5,
645:22, 646:14,
647:9, 647:15,
648:24, 649:13,
649:22, 650:1,
650:4, 650:8, 651:7,
651:20, 652:2,
652:8, 655:10,
663:4, 669:16,
674:24, 688:3,
688:7, 690:2, 690:8,
690:17, 690:23,
691:13
**themselves** [1] - 362:3
**theory** [2] - 605:7,
605:13
**therefore** [10] - 378:5,
396:13, 39

408:8, 453:20,
496:3, 497:4,
588:20, 590:9,
621:17
**they've** [3] - 617:3,
632:19, 656:3
**thinking** [5] - 395:3,
395:14, 419:10,
530:24, 532:4
**third** [3] - 453:24,
658:14, 689:1
**thirty** [5] - 383:9,
476:15, 476:21,
690:18, 690:22
**thirty-year** [1] - 476:21
**THOMAS** [1] - 651:21
**thoughts** [1] - 688:19
**thousand** [6] - 387:11,
493:7, 493:8, 493:9,
516:22, 567:14
**thousands** [2] -
599:13, 599:15
**three** [28] - 381:22,
394:17, 429:8,
429:10, 430:3,
462:22, 462:24,
468:23, 469:5,
469:16, 470:20,
471:1, 492:1, 492:3,
508:13, 521:23,
522:1, 525:19,
558:5, 558:9,
558:19, 559:3,
618:15, 621:23,
622:3, 654:6, 658:4,
688:9
**threw** [1] - 360:3
**throughout** [6] -
655:19, 664:6,
667:2, 668:23,
675:19, 675:20
**throughput** [1] - 511:7
**ticker** [2] - 432:9,
432:10
**tie** [1] - 358:13
**timeline** [1] - 624:12
**timely** [1] - 614:20
**timing** [2] - 380:10,
401:10
**title** [12] - 436:4,
451:3, 452:14,
452:15, 466:9,
466:14, 466:18,
466:20, 499:14,
499:19, 499:21,
500:21
**titles** [1] - 690:5
**TiVo's** [1] - 395:18
**today** [33] - 373:2,
381:18, 381:19,

387:14, 388:19,
389:1, 399:24,
465:21, 473:11,
476:20, 479:20,
479:22, 480:16,
480:22, 481:1,
481:15, 481:16,
490:14, 491:9,
493:19, 499:23,
550:21, 569:9,
590:19, 603:10,
604:4, 604:14,
609:6, 609:8,
611:10, 631:23,
653:6, 655:15
**today's** [2] - 563:2,
563:4
**together** [18] - 393:24,
394:18, 395:9,
410:7, 411:4, 426:5,
477:15, 557:14,
597:16, 610:10,
610:11, 615:3,
616:21, 656:11,
659:7, 673:9,
673:15, 673:19
**Tolerant** [1] - 641:3
**tomorrow** [3] -
688:10, 691:1,
691:15
**took** [19] - 371:9,
383:16, 385:20,
420:13, 420:24,
421:1, 421:15,
439:20, 465:18,
469:24, 487:7,
557:3, 559:14,
559:19, 596:22,
598:14, 599:10,
616:10, 624:7
**tools** [2] - 388:15,
405:8
**top** [6] - 425:23,
519:5, 562:19,
602:1, 665:14, 667:8
**topic** [4] - 359:24,
657:11, 660:1, 663:7
**topics** [4] - 353:6,
472:17, 481:14,
481:24
**TORCHIA** [6] - 348:22,
357:14, 357:20,
358:24, 359:19,
360:10
**Torchia** [3] - 357:1,
358:23, 363:6
**total** [7] - 403:5,
410:5, 483:22,
488:14, 581:9,
622:12, 624:7

**totally** [1] - 587:19
**touch** [2] - 445:11,
659:3
**touched** [1] - 385:14
**tough** [2] - 623:4,
625:22
**toward** [1] - 665:11
**towards** [1] - 477:16
**TPV** [1] - 566:21
**track** [2] - 477:11,
517:1
**trade** [2] - 492:6,
615:12
**tradition** [2] - 411:8,
460:24
**trajectory** [1] - 401:13
**transcript** [1] - 692:11
**transfer** [3] - 397:6,
398:3, 398:4
**transistors** [1] -
407:19
**transition** [3] - 443:12,
443:15, 443:18
**translation** [1] -
630:14
**transmits** [1] - 535:16
**Trial** [1] - 348:4
**trial** [7] - 355:13,
507:20, 664:6,
664:9, 666:22,
678:18, 678:24
**trick** [1] - 621:19
**tried** [4] - 357:1,
501:9, 501:10,
689:12
**trivial** [2] - 618:18,
623:2
**trouble** [1] - 624:16
**true** [16] - 352:6,
355:1, 455:10,
469:19, 470:19,
471:1, 557:23,
558:1, 563:12,
563:13, 573:11,
576:1, 576:4, 586:9,
594:15, 692:10
**try** [11] - 417:5, 434:7,
444:1, 526:11,
533:4, 562:3,
623:13, 688:11,
688:12, 689:2, 690:5
**trying** [26] - 405:8,
406:13, 416:20,
436:16, 442:7,
445:14, 447:15,
461:10, 467:7,
471:2, 477:20,
495:13, 498:18,
499:3, 516:19,
560:21, 602:18,

619:7, 622:21,
623:10, 623:20,
631:4, 679:24,
681:20, 681:21,
689:12
**Tuesday** [1] - 348:10
**TUNNELL** [1] - 348:19
**turn** [27] - 371:21,
376:4, 378:13,
379:18, 383:19,
422:3, 462:22,
467:22, 503:14,
506:1, 506:20,
513:18, 521:6,
521:13, 529:10,
530:22, 533:16,
540:3, 553:4,
553:24, 593:3,
594:3, 594:6,
594:14, 603:7,
617:11, 657:20
**turnaround** [1] -
502:16
**turned** [5] - 533:3,
594:10, 594:11,
594:18, 594:21
**turning** [4] - 392:15,
493:21, 500:18,
522:23
**twenty** [2] - 363:18,
498:6
**twice** [2] - 497:22,
602:6
**two** [64] - 351:6,
354:9, 355:24,
358:3, 385:24,
386:19, 392:16,
393:5, 403:4, 403:8,
405:17, 425:16,
427:4, 430:2,
439:11, 460:1,
468:16, 468:17,
468:24, 469:5,
469:8, 469:16,
469:20, 470:3,
477:15, 477:22,
479:22, 480:2,
480:8, 484:22,
491:5, 493:18,
495:2, 497:10,
497:19, 499:12,
504:1, 513:15,
529:12, 537:24,
538:1, 538:3,
538:13, 538:18,
539:17, 541:20,
546:15, 547:18,
560:20, 570:16,
574:1, 574:8,
577:13, 577:24,

603:10, 604:24,
610:7, 616:20,
621:3, 622:8, 625:9,
658:3, 658:10,
690:13
**type** [9] - 376:13,
613:7, 622:15,
623:6, 644:10,
656:21, 662:5,
662:20, 683:16
**types** [3] - 566:3,
684:5, 684:9
**typical** [3] - 388:15,
396:7, 441:22
**typically** [17] - 383:14,
386:9, 396:10,
399:16, 406:18,
408:23, 428:1,
428:5, 429:24,
490:1, 490:18,
492:8, 495:9,
518:23, 622:2,
622:3, 676:2
**uhs** [1] - 633:18
**ultimately** [5] -
542:23, 573:2,
592:17, 660:12,
682:1
**unable** [1] - 456:9
**unacceptable** [2] -
550:16, 564:8
**under** [10] - 457:17,
464:14, 470:14,
528:14, 528:24,
543:5, 586:3,
605:13, 640:17,
650:13
**undergraduate** [1] -
654:17
**undergraduates** [1] -
654:19
**understandably** [2] -
375:18, 633:12
**understood** [9] -
373:19, 374:15,
375:12, 406:5,
406:10, 411:4,
578:16, 637:20,
652:12
**undisputed** [1] - 358:2
**unfairly** [1] - 688:22
**unique** [6] - 388:12,
410:3, 562:7,
562:21, 570:15,
685:23
**unit** [2] - 672:2, 677:7
**UNITED** [1] - 348:1
**United** [13] - 348:15,
391:2, 391:4,
391:13, 391:20,

482:10, 482:23,
482:24, 483:23,
530:9, 530:11,
530:15, 530:18
**units** [14] - 670:7,
670:18, 670:20,
671:17, 671:19,
671:20, 672:4,
672:6, 673:9,
673:11, 673:12,
678:10
**University** [17] -
383:4, 383:6,
383:13, 385:23,
386:8, 390:7,
390:10, 390:11,
390:17, 392:2,
394:4, 476:22,
611:18, 612:1,
653:22, 653:23,
654:9
**university** [13] -
383:14, 386:11,
390:6, 390:8,
394:24, 395:4,
395:7, 439:19,
487:3, 568:6, 568:7,
654:13, 655:2
**unless** [1] - 361:21
**unnecessarily** [1] -
635:15
**unnecessary** [1] -
650:22
**unpack** [1] - 442:23
**unpacking** [1] -
464:19
**up** [129] - 357:21,
359:20, 364:20,
366:2, 366:22,
366:23, 367:5,
374:8, 374:18,
374:19, 375:2,
385:24, 386:18,
389:23, 389:24,
390:8, 394:16,
395:3, 396:8, 396:9,
396:10, 396:11,
399:23, 400:11,
406:10, 407:10,
408:3, 408:24,
409:6, 410:18,
414:15, 416:7,
417:13, 418:9,
418:12, 421:2,
434:1, 436:23,
439:16, 441:9,
444:22, 449:14,
455:8, 461:2,
463:17, 466:7,
475:1, 477:13,

481:13, 484:11,
484:19, 490:19,
491:19, 495:4,
495:13, 502:20,
508:18, 513:19,
516:14, 520:5,
526:12, 529:20,
535:6, 552:3, 552:7,
559:13, 559:20,
561:17, 562:8,
562:10, 562:13,
563:14, 570:1,
572:6, 572:9, 575:8,
582:20, 584:1,
584:3, 586:1,
595:15, 597:5,
602:7, 605:1, 605:2,
606:1, 609:11,
615:16, 616:10,
617:24, 618:20,
619:23, 620:11,
626:12, 627:20,
631:16, 633:13,
633:23, 634:13,
635:3, 636:10,
636:17, 638:9,
639:9, 641:6, 642:7,
647:22, 648:7,
648:10, 648:15,
650:18, 655:20,
661:5, 661:9,
661:17, 665:12,
665:14, 666:4,
672:5, 673:3,
673:13, 675:4,
675:13, 675:18,
681:22, 685:12,
688:23
**update** [6] - 419:6,
576:18, 584:24,
585:16, 586:24,
589:6
**updated** [2] - 373:3,
577:13
**updates** [1] - 584:19
**updating** [6] - 572:2,
572:4, 585:6,
585:11, 587:17,
588:23
**upper** [6] - 379:3,
418:17, 609:24,
667:24, 668:11,
681:4
**ups** [1] - 607:4
**upset** [1] - 438:8
**US** [5] - 390:3, 390:16,
392:10, 611:12,
617:8
**usable** [1] - 620:1
**usage** [2] - 560:7,

560:13
**useful** [3] - 555:23,
621:8, 630:11
**usefulness** [1] -
516:16
**user** [2] - 498:18,
506:5
**users** [10] - 407:14,
409:10, 498:18,
506:2, 506:15,
666:7, 666:24,
667:1, 674:14,
674:19
**uses** [13] - 369:8,
380:19, 381:3,
513:22, 518:18,
592:3, 604:15,
620:4, 654:21,
667:11, 679:23,
680:1, 682:8
**utilize** [1] - 626:15
**vague** [2] - 409:23,
645:21
**validate** [1] - 426:22
**value** [4] - 441:9,
526:20, 581:14,
650:15
**values** [3] - 539:2,
539:8
**van** [1] - 354:6
**VAN** [88] - 349:11,
349:11, 350:4,
350:8, 350:11,
350:14, 354:8,
354:20, 355:8,
355:12, 358:5,
358:10, 358:18,
359:22, 361:4,
362:1, 362:14,
362:21, 363:1,
411:24, 412:15,
412:18, 413:14,
413:18, 413:20,
414:17, 414:24,
415:9, 416:17,
419:21, 424:14,
430:8, 431:22,
433:3, 433:11,
434:15, 435:2,
435:14, 436:2,
436:18, 436:21,
437:12, 438:9,
438:20, 438:24,
439:2, 445:13,
445:17, 450:14,
450:20, 452:2,
452:3, 453:3,
453:12, 454:11,
454:13, 458:3,
458:10, 460:20,

465:8, 465:15, 474:9, 475:16, 488:22, 506:9, 525:9, 531:13, 531:16, 532:14, 532:22, 544:16, 546:6, 546:17, 549:5, 553:14, 554:6, 564:13, 564:16, 564:20, 564:24, 583:5, 601:17, 604:8, 604:17, 631:22, 632:2, 689:21, 691:11

**Van** [23] - 358:4, 361:3, 361:11, 365:2, 366:12, 433:19, 434:14, 435:13, 437:7, 438:1, 438:18, 452:1, 454:10, 458:8, 460:18, 465:13, 475:21, 475:24, 603:8, 605:6, 605:20, 607:7, 690:15

**variable** [2] - 539:6, 539:13

**varies** [1] - 685:22

**variety** [2] - 590:22, 590:23

**various** [4] - 375:20, 407:19, 584:6, 628:19

**VDI** [5] - 377:9, 377:10, 377:22, 379:13, 379:17

**vendor** [1] - 592:21

**Venti** [7] - 434:6, 437:2, 449:10, 449:13, 450:8, 450:21, 451:12

**venture** [3] - 394:9, 447:9, 477:12

**Ventures** [1] - 446:21

**verba** [1] - 353:21

**verbal** [1] - 449:23

**verbatim** [1] - 651:4

**verified** [1] - 622:4

**verifying** [1] - 415:22

**version** [27] - 367:21, 368:10, 368:14, 373:1, 427:12, 427:13, 428:2, 428:6, 428:8, 428:16, 429:12, 456:5, 457:21, 458:17, 458:20, 458:22, 458:23,

459:1, 459:3, 459:7, 459:13, 459:21, 462:11, 462:18, 462:19, 462:21

**versioning** [1] - 427:24

**versions** [1] - 619:15

**versus** [3] - 566:21, 622:5, 642:8

**VHS** [1] - 395:17

**video** [1] - 669:11

**videotape** [1] - 690:12

**videotapes** [1] - 395:17

**view** [31] - 453:18, 522:14, 522:15, 525:7, 525:15, 527:17, 527:24, 542:1, 543:24, 544:9, 545:14, 547:4, 548:3, 550:9, 550:15, 555:7, 556:11, 559:14, 559:18, 593:10, 594:23, 602:17, 604:22, 605:16, 658:1, 659:4, 679:6, 680:5, 683:24, 684:6, 685:23

**viewed** [1] - 442:15

**viewing** [1] - 524:7

**views** [2] - 544:14, 548:4

**violation** [3] - 354:18, 355:10, 541:21

**Virginia** [4] - 652:19, 653:3, 653:4, 654:12

**virtual** [3] - 377:10, 630:13, 645:10

**vision** [1] - 427:13

**VMAX** [5] - 367:21, 368:6, 368:10, 368:14, 613:14

**voice** [1] - 483:16

**Volume** [1] - 348:4

**volume** [1] - 596:5

**volunteered** [1] - 414:9

**wait** [2] - 458:8, 643:6

**waiting** [1] - 502:14

**walked** [1] - 532:18

**Walton** [1] - 610:9

**wants** [6] - 531:12, 620:21, 621:15, 630:17, 680:2, 689:18

**war** [1] - 400:10

**War** [1] - 390:4

**warm** [1] - 532:15

**waste** [2] - 427:2,

688:13

**Watson** [1] - 376:18

**ways** [19] - 366:18, 368:21, 406:2, 513:13, 513:15, 519:19, 523:5, 523:11, 523:12, 524:5, 529:17, 533:23, 537:20, 539:18, 540:5, 542:19, 603:11, 620:4, 681:21

**wear** [3] - 498:8, 498:24, 543:19

**wears** [1] - 498:4

**website** [2] - 661:14, 661:23

**week** [3] - 411:21, 415:20, 688:21

**weekend** [1] - 616:4

**weekends** [1] - 399:17

**weekly** [1] - 396:10

**weeks** [2] - 381:13, 477:15

**welcome** [6] - 367:18, 380:2, 438:16, 533:2, 533:11, 636:14

**well-known** [4] - 435:3, 435:4, 435:9, 642:9

**WERDEGAR** [7] - 349:12, 367:14, 372:3, 377:1, 377:6, 379:24, 380:20

**Werdegar** [3] - 367:12, 380:8, 381:2

**WERDERGAR** [2] - 367:16, 372:8

**Wesley** [1] - 612:2

**Western** [1] - 642:19

**wherein** [2] - 507:5, 536:16

**WHEREOF** [1] - 692:14

**white** [21] - 411:7, 411:8, 411:9, 411:15, 416:10, 416:14, 418:3, 423:18, 428:12, 428:14, 428:16, 428:20, 468:5, 470:9, 470:16, 471:10, 471:12, 471:16, 609:10, 681:9

**whiteboard** [19] - 417:11, 417:17, 417:22, 417:23, 418:2, 418:4, 418:8,

419:16, 420:4, 420:14, 420:24, 421:8, 422:5, 423:10, 423:17, 424:22, 426:7, 462:23, 475:22

**whiteboarding** [1] - 624:2

**whole** [6] - 366:17, 396:11, 434:16, 473:14, 506:18, 606:8

**wide** [4] - 567:1, 567:3, 631:4, 631:7

**widely** [1] - 396:2

**Wilmington** [2] - 348:13, 692:16

**Winchester** [8] - 484:14, 484:16, 484:24, 485:1, 485:2, 485:4, 485:11, 485:15

**window** [2] - 388:17, 388:20

**Windows** [1] - 505:1

**windows** [1] - 539:14

**wins** [1] - 374:12

**Wisconsin** [1] - 390:11

**wish** [1] - 403:11

**withdraw** [3] - 353:23, 354:23, 597:1

**withdrawing** [1] - 353:9

**withdrawn** [2] - 354:14, 354:24

**withdrew** [1] - 354:3

**witness** [3] - 358:19, 363:16, 364:7, 367:4, 382:7, 414:7, 433:12, 433:16, 433:21, 436:9, 438:21, 441:16, 451:18, 458:1, 460:16, 478:17, 479:10, 521:1, 544:4, 565:4, 567:14, 607:24, 608:3, 636:17, 638:24, 641:7, 641:23, 646:12, 650:3, 651:3, 651:5, 652:3

**WITNESS** [16] - 367:6, 380:2, 382:3, 432:17, 451:22, 453:10, 458:12, 465:14, 474:5, 478:15, 479:2, 549:9, 583:3,

608:10, 650:1, 692:14

**witnesses** [10] - 350:12, 632:8, 632:14, 633:1, 634:21, 671:10, 671:13, 677:4, 685:8, 690:13

**won** [1] - 400:10

**wondering** [2] - 435:20, 641:19

**word** [11] - 453:11, 489:21, 495:7, 511:9, 537:12, 547:15, 656:9, 656:12, 662:11, 667:12, 689:23

**words** [7] - 354:12, 366:15, 413:5, 594:4, 594:18, 622:4, 633:13

**work/life** [1] - 617:7

**workable** [1] - 624:9

**workload** [2] - 427:1, 562:21

**works** [20] - 389:8, 446:3, 493:24, 494:2, 495:23, 505:19, 513:21, 520:12, 524:10, 573:1, 577:20, 578:1, 581:1, 581:7, 620:15, 627:5, 657:1, 663:19, 685:9, 687:9

**workstation** [1] - 490:1

**World** [1] - 390:4

**world** [3] - 493:5, 502:8, 620:19

**worry** [1] - 471:6

**worst** [21] - 595:24, 596:4, 596:10, 598:14, 598:15, 598:18, 598:19, 599:11, 599:12, 599:17, 599:19, 599:20, 599:21, 600:1, 600:2, 601:13, 601:14, 603:5

**wrap** [3] - 631:16, 673:13, 685:12

**write** [35] - 397:1, 425:15, 425:16, 426:1, 426:13, 426:17, 426:19, 459:4, 459:12, 497:4, 497:22, 498:8, 502:5,

505:14, 573:5,
618:5, 618:6, 670:6,
670:18, 670:20,
671:20, 672:1,
672:4, 672:6, 673:7,
673:9, 673:11,
673:12, 673:21,
673:23, 674:1,
675:20, 680:3

**writes** [5] - 373:9,
374:3, 375:4, 498:7,
625:12

**writing** [7] - 353:9,
418:4, 421:13,
427:1, 490:12,
502:9, 578:18

**written** [3] - 508:5,
543:17, 555:22

**wrote** [11] - 372:24,
375:10, 411:6,
425:1, 425:12,
459:3, 463:2,
546:23, 555:18,
566:22, 580:5

**XOR** [2] - 647:22,
647:23

**XR** [2] - 620:18,
621:15

**Xtreme** [1] - 371:13

**XtremeIO** [19] -
351:11, 351:21,
370:16, 370:20,
370:24, 371:3,
371:8, 371:10,
371:14, 371:16,
372:16, 373:6,
373:21, 374:17,
374:22, 375:11,
375:14, 445:8, 446:7

**XtremIO** [9] - 381:7,
381:21, 591:6,
591:16, 659:17,
659:21, 659:23,
659:24, 663:17

**XtremIO's** [2] -
380:10, 381:17

**Xyratex** [3] - 488:8,
488:9, 488:10

**Yale** [5] - 390:17,
390:19, 391:19,
391:21, 392:8

**year** [35] - 370:14,
386:3, 390:23,
397:24, 400:14,
400:21, 401:5,
401:19, 401:22,
402:3, 402:5, 402:7,
402:16, 402:17,
402:18, 402:19,
402:22, 403:2,

432:6, 440:17,
440:20, 441:1,
444:23, 449:15,
449:16, 476:21,
561:12, 568:14,
595:24, 596:4,
598:15, 612:11,
624:8, 624:10,
624:12

**years** [34] - 371:9,
383:9, 383:16,
387:16, 394:2,
402:10, 403:4,
403:8, 403:22,
408:1, 408:5, 430:3,
456:12, 462:3,
462:8, 464:11,
465:23, 469:2,
470:1, 476:15,
483:1, 483:22,
488:13, 488:18,
565:9, 565:10,
610:15, 612:5,
612:9, 613:16,
616:17, 616:22,
616:23, 654:6

**yellow** [2] - 521:24,
658:11

**yesterday** [6] -
363:16, 367:20,
370:20, 370:23,
371:9, 524:7

**yourself** [10] - 383:2,
447:1, 454:5, 463:2,
520:7, 520:24,
609:1, 652:16,
664:1, 688:19

**Z-A-D-I-A-N** [1] -
487:17

**Zadian** [3] - 487:15,
487:20, 488:6

**Zadok** [24] - 537:20,
542:13, 544:4,
556:18, 556:24,
557:4, 557:7,
557:14, 558:9,
558:13, 558:15,
559:10, 560:6,
563:11, 563:16,
564:2, 577:19,
578:6, 580:2, 582:9,
586:14, 595:15,
603:19

**Zadok's** [3] - 561:24,
581:11, 581:20

**Zahid** [1] - 372:1

**zero** [6] - 428:3, 438:5,
561:16, 621:4,
621:14, 621:18

**zeros** [1] - 657:21

**Zhu** [2] - 394:2,
410:24